**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF KANSAS**

**Justin Spiehs**

                       Plaintiff

v.

**Jay Armbrister,** in his individual capacity as Sheriff for Douglas County Kansas
\*

**Tyler Kruzel,** in his individual capacity as Deputy for Douglas County Kansas
\*

**Jimmy Wold**, in his individual capacity as Deputy for Douglas County Kansas
\*

**Jameson D. Shew,** in his official capacity as the County Clerk/County Election Official for Douglas County, Kansas pursuant to K.S.A. § 19-301
\*

**Sarah Plinsky**, in her individual capacity as Administrator for Douglas County, Kansas
\*

**Douglas County, Kansas Board of County Commissioners**
\*

**Shannon Portillo,** in her individual capacity as Commissioner of the County Commission of County Commissioners of Douglas County, Kansas
\*

**Shannon Reid,** in her individual capacity as Commissioner of the County Commission of County Commissioners of Douglas County, Kansas
\*

**Patrick Kelly,** in his individual capacity as Commissioner of the County Commission of County Commissioners of Douglas County, Kansas
\*

Case No. 5:24-CV-4005-JAR-BGS

1

**Karen Wiley**, in her individual capacity as Commissioner of the County Commission of County Commissioners of Douglas County, Kansas

*

**Kristen Channels,** in her individual capacity as Lieutenant for the Douglas County Sheriff, Douglas County Kansas

*

**Chase Coleman**, in his individual capacity as Deputy for the Douglas County Sheriff, Douglas County Kansas

Defendants

~~SECOND~~ **THIRD VERIFIED AMENDED COMPLAINT**

JURISDICTION AND VENUE

1. This civil rights action raises federal questions under the United States Constitution, particularly the First, Fourth, and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

3. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

THE PARTIES

4. Plaintiff Justin Spiehs is a natural person, citizen of Kansas, and legal resident of Johnson County, Kansas. Dr. Spiehs has a doctorate degree in Lifespan Human Development and a Masters in Marriage and Family Therapy.

2

5. Defendant Jay Armbrister is a natural person who was elected as Sheriff of Douglas County, Kansas. He is sued in his individual capacity.

6. Tyler Kruzel is a deputy employed by the Douglas County Sheriff. Defendant Kruzel is sued in his individual capacity.

7. Jimmy Wold is a deputy employed by the Douglas County Sheriff. Defendant Wold is sued in his individual capacity.

8. Jameson D. Shew is the County Clerk/County Election Official for Douglas County, Kansas pursuant to K.S.A. § 19-301. Defendant Shew (Douglas County) is sued in his official capacity for Douglas County.

9. Sarah Plinsky is an employee of Douglas County and is employed as the Administrator for Douglas County, Kansas.  Defendant Plinsky is sued in her individual capacity.

10. Douglas County, Kansas Board of County Commissioners. The Douglas County Commissioners (Commissioners) is a policymaking entity for Douglas County, Kansas pursuant to K.S.A. § 19-101 *et seq*. The Commissioners are a separate legal entity from Douglas County, Kansas.

11. Shannon Portillo was a Commissioner of the County Commission of County Commissioners of Douglas County, Kansas.  Defendant Portillo is sued in her individual capacity.

12. Shannon Reid is a Commissioner of the County Commission of County Commissioners of Douglas County, Kansas.  Defendant Reid is sued in her individual capacity.

3

13. Patrick Kelly is a Commissioner of the County Commission of County Commissioners of Douglas County, Kansas. Defendant Kelly is sued in his individual capacity.

14. Karen Wiley is a Commissioner of the County Commission of County Commissioners of Douglas County, Kansas. Defendant Wiley is sued in her individual capacity.

15. Kristen Channels, is a Lieutenant employed by the Douglas County Sheriff. Defendant Channels is sued in her individual capacity.

~~14.~~16. Chase Coleman is a deputy employed by the Douglas County Sheriff. Defendant Coleman is sued in his individual capacity.

Facts

~~15.~~17. Dr. Spiehs is well known in the Lawrence, Kansas community, particularly by the Douglas County Sheriff's department, as a community activist boldly speaking about matters that municipal, county, and school board governments do not like to hear in ways that might be considered shocking, rudely truthful, earthy, or even crass. Dr. Spiehs protested the mask mandate daily outside the USD 497 administrative building, as well as at the County Administrative office, in Lawrence, Kansas. All of the defendants were aware of Dr. Spiehs, his appearances at open meetings, and his protests.

~~16.~~18. The Douglas County Commissioners have purportedly created a hodgepodge of vague public comment restrictions at its open meetings – some of which are published in writing while others are created on the fly and read orally at the open

4

meeting.   None of those restrictions have been passed by a majority vote of the Commission and none are a result of a proper resolution as required under the Kansas Home Rule statutes.   The Commissioners have not promulgated any rules that apply to citizens appearing prior to the start of an open meeting. The Commission has no rules that apply to content of a speaker's speech prior to the beginning of the Commission's open meeting.

~~17.~~19. The Commission purports to restrict vague topics of "inappropriate," "rude," "vulgar" and "campaigning for public office."   None of those words or phrases are defined.   Position statements on topics of public concern made at public meetings, either the public speaker's own or on behalf of someone else running for public office, are being banned by the Commission under this utterly vague "campaigning" prohibition.

~~18.~~20. The County Home Rule Act (Act), K.S.A. 19-101 *et seq.,* empowers Douglas County to perform certain actions, including exercising "the powers of home rule to determine their local affairs and government authorized under the provisions of K.S.A. 19-101a."

~~19.~~21. Pursuant to K.S.A. 19-101a(b), "local legislation" is only authorized "by resolution of the County Commission of county commissioners."   Pursuant to K.S.A. 19-103, the "powers of a county as a body politic and corporate shall be exercised by a board of county commissioner."

~~20.~~22. Each of the Douglas County Commissioners have not complied with procedural requirements of the Kansas Home Rule statutes and the Kansas Open Meetings Act

because they have not enacted any public comment restriction by proper motion or resolution and have not provided notice to the public of contemplated creation or changes to any public comment policy regarding its open meetings.

21. 23. Whatever public comment requirements or restrictions the County Commissioners purport to create or enforce, they exceed home rule power, are unconstitutional as depriving citizens of due process, and are unconstitutionally vague, overbroad, and viewpoint based.

22. 24. The Douglas County Commission enforces speech restrictions upon individuals speaking at its open meetings which were never lawfully enacted by resolution.

23. 25. Home rule power of counties must be exercised by the County Commission of county commissioners by resolution and not by some kind of informal consensus.

24. 26. The Douglas County Commission enforces speech restrictions upon individuals speaking at its open meetings which were never lawfully enacted by a majority vote of the three member Commission.

25. 27. There is no written record of any agenda item provided to the public in which the Douglas County Commission proposed to consider, or did consider, enacting a public speaking policy or restrictions at Commission open meetings.

26. 28. There was never an agenda of the Douglas County Commission published or created in which the Commission would consider enacting or modifying any public comments restrictions at a Commission open meeting.

27.29. There is no record of any agenda item provided to the public in which the Douglas County Commission voted on enacting public speaking restrictions at an open meeting.

28.30. The Douglas County Commission has never voted or passed by majority vote any public comment restrictions that the Commission orally reads at each open meeting including prohibitions regarding comments being vulgar, inappropriate, rude, personal attacks, or campaigning for office.

29.31. On August 18, 2021, the Commission Board conducted an open meeting subject to the provisions of the Kansas Open Meetings Act.

30.32. The commission Board adopted a mask mandate for the county which required individuals to wear masks to attend open meetings.

31.33. In the Douglas County Kansas website for the August 18, 2021, open meeting, it published a webpage titled "Meeting Information" in which it states "The public is encouraged to join our County Commission meetings in person or live using Zoom."

32.34. The webpage further states that for "public comment on agenda items or general public comment: General public comment for items of County business not on the agenda will be taken under that section of the agenda."

33.35. It further states that if "a participant on the zoom call would like to speak, they need to utilize the "Raise your hand" function on zoom. The meeting host will indicate they can speak. We ask that speakers give their name and address for the minutes. The County reserves the right to shut off the microphone and remove any speaker from the meeting if they are vulgar, rude or inappropriate."

~~34.~~36. The policy then refers to "in person:"  "In Person: The County Commission meeting room will be available for in-person viewing of the meeting or in-person public comment on certain agenda items, as mentioned above."

~~35.~~37. This public comment language then was changed beginning October 27, 2021, to put a time limit on the speaker: "General Public comment will be limited to three-minutes per person."

~~36.~~38. Beginning in January, 2022, the three-minute limitation was removed from the meeting webpage.

~~37.~~39. There is no recordation of the Commission voting on any of the language "the County reserves the right to shut off the microphone and remove any speaker from the meeting if they are vulgar, rude or inappropriate."

~~38.~~40. The Commission's published agenda for September 22, 2021, contains a September 16, 2021, email from Dr. Spiehs.  Dr. Spiehs' email had a subject line of "child abuse" and was sent to numerous public officials and news media including:

| | | |
|---|---|---|
| ehill@usd497.org | skimball@usd497.org | ccaduebl@usd497.org |
| Gr.gordon-ross@usd497.org | mjohnson@usd497.org | Kelly.Jones@usd497.org |
| psmith@usd497.org | Anthony.Lewis@usd497.org | Nathan.Vickers@kctv5.com |
| HHollingsworth@ap.org | news@ljworld.com | hello@lawrencekstimes.com |
| tmarcellino@hotmail.com | BFinkeldei@stevensbrand.com | AD – Crabtree, Robin, County Commissioner – Kelly, Patrick, County Commissioner – Portillo, Shannon |

~~39.~~41. The email stated in part "Do you feel the walls closing in on you?  I wasn't joking when I said you're abusing our children.  This is a very serious thing you're doing to kids.  And we won't forget.  You will be held accountable eventually."

40.42. The Commission's published October 13, 2021, agenda states that during the August 18, 2021, General Comments "Justin Spiehs, 3904 Kimos Circle, said he is a professor that teaches lifespan human development classes and feels wearing masks is stupid and dangerous. He said masks will cause behavioral issues in children and create psychopaths."

41.43. The Commission's November 17, 2021, agenda stated that Dr. Spiehs stated at a 09/22/2021, Commission open meeting that "asking a child to wear a mask is child abuse. The Commissioners are evil and don't have children. It is sick to put a child in a mask." The agenda also states that Dr. Spiehs stated "he opposes a mask mandate. He has concerns that Brad Finkeldei-represents both the School Board and the Health Department."

42.44. The Commission's December 1, 2021, agenda stated that at the Commission's open meeting on 10/13/,2021, Dr. Spiehs stated "Douglas County is in the green per the local paper and he feels a mask mandate is not necessary. He said there is talk about health officials recommending masks be worn for flu season."

43.45. The Commission published an agenda for its January 12th, 2022, open meeting which included an email from Dr. Spiehs to various public officials including the following:

From: spiehsjustin@gmail.com <spiehsjustin@gmail.com>
Sent: Sunday, January 9, 2022 6:43 PM
To: Bradley R. Finkeldei <BFinkeldei@stevensbrand.com>
Cc: ehill@usd497.org; skimball@usd497.org; ccaduebl@usd497.org; Gr.gordon-ross@usd497.org;
mjohnson@usd497.org; Kelly.Jones@usd497.org; psmith@usd497.org; Anthony.Lewis@usd497.org;
Nathan.Vickers@kctv5.com; HHollingsworth@ap.org; news@ljworld.com; hello@lawrencekstimes.com;
tmarcellino@hotmail.com; AD - Crabtree, Robin <rcrabtree@douglascountyks.org>; County Commissioner - Kelly,
Patrick <pkelly@douglascountyks.org>; County Commissioner - Portillo, Shannon <sportillo@douglascountyks.org>;
kbethell-smith@usd348.com; tbrown@usd348.com; pharvey@usd348.com; aparks@usd348.com; cperry@usd348.com;
sschiffelbein@usd348.com; carriestevens@usd348.com; DCF.CustomerService@ks.gov;
Stumoeckel@eudoraschools.org; markchrislip@eudoraschools.org; mikekelso@eudoraschools.org;
joehurla@eudoraschools.org; samanthaarredondo@eudoraschools.org; beckyplate@eudoraschools.org;
lynnreazin@eudoraschools.org; ericvotaw@eudoraschools.org; JBElliott@kaws343.org; Travis.Daniels@kaws343.org;
Nick.Fergus@kaws343.org; Ramon.Gonzalez@kaws343.org; Ryan.Blosser@kaws343.org; Emily.Riner@kaws343.org;
Jacki.Aldrich@kaws343.org; Jarae.Essman@kaws343.org; Marci.Francisco@senate.ks.gov; Mike.Amyx@house.ks.gov;
Senator Roger Marshall <senator_marshall@marshall.senate.gov>; tomholland23@hotmail.com; bbailard1969@att.net;
eileenhorn@gmail.com; dennis.boog.highberger@house.ks.gov; Rick.Kloos@senate.ks.gov; rvalverde@ljworld.com;
prosecutorinfo@lawrenceks.org; twheeler@lawrenceks.org; sriedemann@lawrenceks.org; parneill@lawrenceks.org;
humanrelations@lawreneks.org; lcarnahan@lawrenceks.org; Larry.Alley@senate.ks.gov;
Molly.Baumgardner@senate.ks.gov; Elaine.Bowers@senate.ks.gov; JRClaeys@senate.ks.gov;
Ethan.Corson@senate.ks.gov; john.alcala@house.ks.gov; Mike.Amyx@house.ks.gov; avery.anderson@house.ks.gov;
ToryMarie.Arnberger@house.ks.gov; francis.awerkamp@house.ks.gov; dave.baker@house.ks.gov;
info@kansasreflector.com; jshorman@kcstar.com; tcarpenter@kansasreflector.com; cwirestone@kansasreflector.com;
mclark@lawrencekstimes.com; clawhorn@ljworld.com; dlysen@ljworld.com; votekemerson@outlook.com;
anussbaum1982@gmail.com
Subject: Re: Schwegler elementary Child abuse

~~44.~~ 46. The email from Dr. Spiehs contained forwarded emails he has sent to various Douglas County officials and news media.

~~45.~~ 47. On January 12th, 2022, the Douglas County Commission conducted an open meeting to discuss extending the Douglas County mask mandate.

~~46.~~ 48. Anticipating public push back from Douglas County citizenry on this issue, the County placed an estimated fifteen sheriff deputies in front of the courthouse from the sidewalk leading up to the courthouse entrance and up into the entrance steps to prevent people from entering the meeting without masks.

~~47.~~ 49. A group of about thirty people, including Dr. Spiehs, were prevented from entering the courthouse due to the deputies physically preventing people from entering the courthouse and under threat of trespass arrest.

~~48.~~ 50. Douglas County lieutenant Qualls recorded Dr. Spiehs on his iPhone outside the Courthouse on January 12, 2022.

10

49.51. Dr. Spiehs informed the County deputies that he possessed a doctor's note indicating that Dr. Spiehs should not wear a mask for medical reasons.

50.52. Those County deputies refused Dr. Spiehs entry into the open meeting without viewing Dr. Spiehs' written doctor's note.

51.53. Dr. Spiehs asked them why they wouldn't let him into the open meeting despite having a medical exemption to which they responded stating that the County mask mandate required individuals wear masks in the courthouse.

52.54. Photos of the Deputies confrontation with Dr. Spiehs were taken by a freelance photographer:

 

53.55. The Commission's February 2, 2022, agenda stated that at the Commission's open meeting on 12/15/2021, Dr. Spiehs stated "he has been protesting child mask mandates since July. He feels masks will have disastrous effects on children and mask mandates are child abuse."

54.56. The Douglas County Sheriff's department, including this defendant Sheriff, has had a custom or standard operating procedure of approving or allowing himself or his deputies be instrumentalities of the County or Commission or to take or receive instructions or guidance from the Commission and County employees regarding the

11

treatment of public speakers at Commission open meetings, including taking instructions from County employees to silence or hinder protected speech and removal of a speaker from the building or the Commission's open meeting.

~~55.~~57. The Commission's February 9, 2022, agenda included a February 4, 2022, email from Dr. Spiehs to Dr. Shannon Portillo stating "Dr. Portillo, The current covid public health order states there are exemptions for those who cannot wear a mask. How's come then when I went to the county commissioners meeting this past Wednesday and also on January 12th I wasn't allowed in even though I have an exemption? Wasn't even allowed the opportunity to present my documentation. I was told by multiple county deputies that I could access the meeting online instead. That, Shannon, is not an exemption. That is an option. Do you know the difference between an exemption and an option? I wasn't asking for a different option or accommodation to access the meeting.  I was asking the deputies to follow the health order they so confidently cited in order to justify not letting me in the courthouse.  I'm not a second class citizen. And I expect an answer."

~~56.~~58. On February 9th, 2022, the County Commission conducted an open meeting with an agenda item as to whether to extend the County's mask mandate.  The Commission videotapes its meetings.

~~57.~~59. Similar to the January 12, 2022, meeting, Douglas County deputies blocked the entrance not permitting individuals without masks to attend the meeting which included Dr. Spiehs.

12

58.60. Dr. Spiehs again informed the Deputies he had a medical exemption evidenced by a written doctor's note.  The Deputies refused to view or acknowledge Dr. Spiehs' medical exemption and prevented him from entering the Courthouse to attend the Commission's open meeting.

59.61.  On or about March 2, 2022, the County's mandatory mask policy was modified to not require masking.

60.62. On April 13, 2022, Dr. Spiehs filed as a candidate for the Douglas County Commission in District 1 which was and is held by the defendant Kelly.

61.63. The Douglas County Commission meets at 1100 Massachusetts Street, Lawrence, KS 66044, where the Commission Board, Douglas County Administrator, the Appraiser, County Clerk, Treasurer, and Douglas County Register of Deeds office.

62.64. Prior to a Commissioner's open meeting, the room is legally a "designated public forum." There is no County or Commissioner limitation on protected speech of individuals in that room prior to a Commissioner's meeting.  Other than opening the building to the public, there are no speech manner restrictions placed upon individuals in that room waiting for a meeting to begin.

63.65. Prior to the beginning of the April 20, 2022, 5:30 p.m. open meeting, the defendant Sheriff and the defendant deputies considered Dr. Spiehs' speech and demonstrations as "bizarre," abnormal, and out of the ordinary. The department had discussions amongst themselves and at meetings regarding Dr. Spiehs, his speech, and his demonstrations.

13

~~64.~~66. These defendants engaged in deliberative, intentional, and premediated agreements and conspiracies to restrict, retaliate, and punish Dr. Spiehs for his protected First Amendment activity.

~~65.~~67. Prior to the beginning of the April 20, 2022 meeting, the Sheriff Jay Armbrister communicated with one or more Commissioners Shannon Reid, Patrick Kelly, and Shannon Portillo, regarding how and when to remove Dr. Spiehs from the open meeting related, in part, to the display of his sign which stated, "Dr. Spiehs For DGCO Commissioner Fuck These Liberal Motherfuckers." Dr. Spiehs' sign is below:



~~66.~~68. Defendant Armbrister talked to the Commissioners that he wanted Dr. Spiehs removed from meeting place. In response, the Commission members agreed and told defendant Armbrister to do it before the start of the open meeting so that it wouldn't be videotaped or on the record.

~~67.~~69. On April 20th 2022, Dr. Spiehs appeared at the meeting location for the Commissioner's open meeting carrying a sign that stated "Dr. Spiehs For DGCO Commissioner Fuck These Liberal Motherfuckers."

14

68. 70. This was the same sign Dr. Spiehs had displayed, after filing for a Douglas County Commission seat, on busy streets nearby which the defendant Sheriff and County Commissioners were aware of.

69. 71. On April 20, 2022, Dr. Spiehs again appeared for several hours, prior to the open meeting, at the corner where the Douglas County courthouse was located with his sign "Dr. Spiehs For DGCO Commissioner Fuck These Liberal Motherfuckers."

70. 72. The defendant Commissioners and defendant Sheriff were aware of this and anticipated that Dr. Spiehs would appear with his sign at the April 20, 2022, open meeting of the Commissioners.   Dr. Spiehs engendered an overreacted disgust, discomfort, and uncertainty in the minds of each defendant regarding Dr. Spiehs' presence, particularly at an in person Commission open meeting.

71. 73. The defendant Commissioners at this meeting and the defendant Armbrister had a plan: suppress and retaliate against Dr. Spiehs for exercising his right to petition with the goal of removing him and his vulgar signs from the Commissioners' YOUTUBE broadcasted meetings.

72. 74. This constituted an official retaliatory custom and policy of the defendant Sheriff and the Commissioners directed at Dr. Spiehs.

73. 75. The Sheriff was aware that purported speech code violations occurring at a Commission's open meetings involving protected speech (e.g. no fighting words or threats of harm) do not constitute any crime or disturbance of the peace as defined under Kansas law.   Each defendant shared in that conspiratorial objective. Each defendant took overt acts of discussing this action and then agreeing to an action to

15

have Dr. Spiehs removed. Another overt act was confronting Dr. Spiehs. Another was restraining and arresting Dr. Spiehs. Another overt act was Deputy Kruzel's written report.

74.76. Other overt acts were that Dr. Spiehs was: a. handcuffed; b. forced and caged in the back of a police car; c. booked; d. fingerprinted; e. incarcerated; f. charged with a crime which required bond payment for release.

75.77. The fact that Deputy Kruzel's inclusion of seemingly irrelevant facts underlying a disorderly conduct charge (prior "bizarre" behavior in street protest displays and vulgar language at location and on Dr. Spiehs' sign) underscores that Deputy Kruzel shared in the conspiratorial objective to retaliate against Dr. Spiehs regarding his viewpoints and prior protest actions.

76.78. Shortly before the open meeting began, Dr. Spiehs entered the courthouse location and the meeting room carrying that sign. There were approximately thirty individuals seated in the meeting room including the defendant Armbrister and other Douglas County deputies.

77.79. Defendant Armbrister was aware of Dr. Spiehs entry with his sign. Dr. Spiehs entered the meeting room and walked quietly to the podium to sign up to speak. As Dr. Spiehs was writing his name, he was confronted by defendant Armbrister telling Dr. Spiehs that defendant Armbrister was ordering Dr. Spiehs to remove his sign from the meeting room.

78.80. Dr. Spiehs responded: "Oh yeah why's that?"

79.81. Defendant Armbrister responded saying: "Because it has foul language on it."

16

80.82. Dr. Spiehs responded saying "horseshit it does." Defendant Armbrister responded stating "OK, fine then" and walked up to where the three Commissioners were sitting and engaged in discussion with them.

81.83. Defendant Armbrister talked to the Commissioners that they all wanted Dr. Spiehs removed from meeting place. In response, the Commission members agreed and told defendant Armbrister to do this before the start of the open meeting and so that it wouldn't be videotaped or on the open meeting record.

82.84. Dr. Spiehs completed his sign up and as he was walking to his seat tells the defendant Armbrister that his conversation telling Dr. Spiehs to remove the sign was out of line. Dr. Spiehs also addressed the crowd asking how would the audience members feel if Dr. Spiehs were elected Commission and they came to the meeting telling him "vote blue no matter who" – a position Dr. Spiehs disagreed with – and were told to get out.

83.85. Several members of the audience then began making specific remarks directed back towards Dr. Spiehs while Dr. Spiehs was sitting on the front row. They expressed disapproval of Dr. Spiehs, his sign, and his speech. The statements from the audience sitting members were loud enough for the Commissioners, the defendant Sheriff, and Dr. Spiehs to hear. None of those attendees speaking were asked or told to leave by any of the defendants and were not threatened with an arrest for disorderly conduct.

17

~~84.~~86. While sitting in his chair on the front row, Dr. Spiehs continued to engage in the dialogue with other sitting audience members with no one in particular.  It was prior to the time the open meeting was to begin.

~~85.~~87. As Dr. Spiehs was seated in the front row, audience attendee Michael Almon seated behind him continued to speak to Dr. Spiehs using derisory names about Dr. Spiehs and the sign Dr. Spiehs was displaying at his side.  While seated, Dr. Spiehs turned around to see who was making the comments.  Dr. Spiehs was not waving his arms, did not move closer to Mr. Almon, and made no gestures at all during the dialogue with Mr. Almon.

~~86.~~88. An incomplete video taken by a free-lance journalist exists regarding Dr. Spiehs' arrest.  The video starts with Dr. Spiehs sitting quietly in the front row holding his sign.  The video, however, did not capture the entire incident.

~~87.~~89. Michael Almon spoke and gestured towards Dr. Spiehs as Dr. Spiehs remained seated but turned around to see who was talking to him:



~~88.~~90. During this dialogue, Mr. Almon did not appear angry or upset, and did not stand up, get closer to Dr. Spiehs, move to another seat, did not request assistance

from law enforcement, and did not react with violence or view Dr. Spiehs' dialogue with him as an invitation to fight. Dr. Spiehs did not direct towards Almon any intimidating or disrespectful gestures nor did Dr. Spiehs act in any manner challenging Michael Almon or anyone in the room to physically fight.

~~89.~~91. Nor was Mr. Almon insulted under physically imposing circumstances by Dr. Spiehs.  The fact that Mr. Almon remained sitting and exhibited restraint and did not respond to Dr. Spiehs in some aggressive manner controverts the assertion that Dr. Spiehs' remark about Dr. Spiehs' feelings about Mr. Almon's opinions about him was likely to induce immediate violence.  The law does not proscribe mere incivility. The use of earthy and perhaps repugnant words at that time did not constitute fighting words or any basis for a disorderly conduct arrest and charge.

~~90.~~92. Still while seated, Dr. Spiehs began to disengage from Almon and turned his head back towards the front towards the Commissioners:







~~91.~~93. Like all other members of the audience, the three other attendees depicted remain seated, expressionless, and one continues with his arms folded looking at the Commissioners and not Dr. Spiehs.

~~92.~~94. While seated quietly looking to the side the defendant Armbrister in civilian clothes approached Dr. Spiehs from behind and stated "get up":





~~93.~~ 95. At this point both attendees still face forward without any movement with the same expressions. No one in the crowd of attendees responded to Dr. Spiehs' words in any way that met the legal definition of threatening a breach of peace.

~~94.~~ 96. Defendant Armbrister confronts Dr. Spiehs telling him to "get out" using his thumb gesture.  By that time Dr. Spiehs had kicked back putting his foot up with the sign still on the floor by his side:

22



~~95.~~97. Dr. Spiehs remains facing the front, his head turned, with his legs crossed and the sign next to him on the floor while defendant Armbrister continues to get closer from behind:



~~96.~~98.  While Dr. Spiehs remained quietly sitting, defendant Armbrister motions up

front to his deputy:

24



97.99. While Dr. Spiehs remained sitting in the same position with his sign on the

floor, the defendant Armbrister then turns back towards Mr. Almon talking to both

Mr. Almon and Dr. Spiehs:





98. 100. Defendant Armbrister then begins to push Dr. Spiehs with his left hand telling him he has to leave while motioning with his right thumb:



~~99.~~ 101. Dr. Spiehs continues to ask defendant Armbrister "why" while a deputy approached:



~~100.~~102. Defendant Armbrister picked up Dr. Spiehs under Dr. Spiehs' right arm while Dr. Spiehs continued to hold his sign:



~~101.~~103. The deputy defendant Kruzel then grabbed Dr. Spiehs' sign:

29





102.104. The Deputy then released the sign yet defendant Armbrister then grabs it

and throws it rather than putting it on the floor or handing it to a nearby deputy:







103.105. Not being told that he was being arrested, Dr. Spiehs holds his hand out asking the Commissioners why he is being removed:



104.106. Dr. Spiehs is forcibly removed from the open meeting:



~~105.~~107. Dr. Spiehs was forced into the hallway where he was handcuffed and taken out of the building:



~~106.~~108. The defendant Sheriff's and Deputy's actions in restraining and arresting Dr. Spiehs was not the product of a "split-second judgment." Rather, it was a deliberate, premeditated, days-long conspiracy to discriminate and retaliate against Dr. Spiehs.

~~107.~~109. Dr. Spiehs engaged in speech and petitioning conduct "high in the hierarchy of First Amendment values." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1955 (2018). It was plainly impossible that Dr. Spiehs' speech and petitioning activity was

34

an actual legal and legitimate consideration in these defendants' efforts to silence, arrest, and jail Dr. Spiehs.

108.110. All individual Defendants acted together.  The individual Defendants are capable of collectively entering into a civil conspiracy.  Defendant Sheriff directed his defendant deputies to follow the instructions of County employees and Commission in silencing or removing public speakers.  The defendant Sheriff acted through his deputies, setting in motion a series of acts by his subordinates that the Sheriff knew, or reasonably should have known, would cause the deputies to violate the plaintiff's rights.

109.111. The Sheriff had actual knowledge of his deputies violating Dr. Spiehs' rights and acquiesced in those violations as described in this Amended Complaint – the Sheriff  gave assent to the violations.  The Sheriff did not discipline any deputy for their respective participation in the violation of Dr. Spiehs' rights as described in this Amended Complaint.

110.112. The Sheriff had authority over his deputies, gave instructions for his deputies to take instructions from the Commissioners and County employees.  The Sheriff knew that the deputies had violated Dr. Spiehs' rights as described in this Complaint but failed to stop them from doing so.

111.113. Defendants formed a premeditated plan to retaliate against Dr. Spiehs for engaging in protected activity. The protected speech of Dr. Spiehs' motivated the defendants' actions but Dr. Spiehs' protected activity wasn't a legitimate consideration for his arrest – rather it bore "little [relevant] relation to the criminal

35

offense for which the arrest is made." *Id. See Nieves v. Bartlett*, 139 S. Ct. 1715, 1723-24 (2019) ("The causal inquiry is complex because protected speech is often a *wholly legitimate consideration* for officers when deciding whether to make an arrest." (emphasis added).

~~112.~~114. Dr. Spiehs' spearheading his protests directed at the Commission was irrelevant to the elements of a disorderly conduct allegation and the reasons provided in the charge and incident report.  The right violated here is also the right to petition. *See Lozman* at 1954–55.

~~113.~~115. The defendants intended to humiliate, and did in fact humiliate, Dr. Spiehs and violated his First Amendment rights by stopping his free speech, retaliating against him and in preventing him from associating, having his grievances addressed, and in speaking to the Commission. Defendants also violated Dr. Spiehs' Fourth Amendment rights by seizure of his person and property.

~~114.~~116. The defendant Sheriff acted with deliberate indifference to the consequences, and established and maintained a policy, practice or custom which directly caused his and the respective deputy's conduct. The defendant Sheriff should have adopted a practice of not instructing or allowing his deputies to be instructed by County employees to remove public speakers when no crime has been committed and when the Commissioners or County employee is offended by the speaker.

~~115.~~117. These customs and practices created an unreasonable risk of suppressing protected speech; the Sheriff was aware that this unreasonable risk existed and was deliberately indifferent to that risk. The Sheriff failed to adopt customs and practices

that so that the suppression of protected speech or retaliation because of offensive speech, would not occur.

~~116.~~118. Dr. Spiehs was arrested and removed from the room because of Dr. Spiehs' protected speech occurring prior to the start of the open meeting. "Protected speech cannot serve as the basis for a violation of any" State law. *Mink v. Knox*, 613 F.3d 995, 1004 (10th Cir.2010). More specifically, protected speech "cannot serve as the basis for probable cause." *Id.* (quoting *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir.2006). "Where plaintiff's speech did not constitute fighting words and was thereby protected speech, it could not serve as basis for violation of city ordinances at issue." *Id.* (quoting *Sandul v. Larion*, 119 F.3d 1250, 1255-56 (6th Cir.1997)).

~~117.~~119. No reasonable officer could believe Dr. Spiehs could be arrested for his protected speech occurring prior to the start of the meeting. *Jordan v. Jenkins,* 73 F.4th 1162, 1171 (10th Cir 2023); *Frenchko* at *19 (no qualified immunity: "Commissioner Fuda, who chaired the meeting, did not rule Commissioner Frenchko out of order and admitted that he did not make that determination"). In fact, the Commission had not even started the meeting according to the Agenda Minutes. Dr. Spiehs did nothing to disturb any meeting of the Commission. Dr. Spiehs did nothing that prevented the meeting from starting on time.

~~118.~~120. Nothing that Dr. Spiehs did prior to the start of the meeting involved his actions: "Indeed, the only conduct involved in this case is [Dr. Spiehs'] speech." *Frenchko* at *21. And even if a meeting had begun – which it had not – beyond Dr.

Spiehs' protected speech, "no other act provides any basis, let alone a reasonable basis, for determining that [Dr. Spiehs] disrupted a lawful public meeting." *Id.*

~~110.~~121. Dr. Spiehs was confronted and arrested when "otherwise similarly situated individuals in that room engaged in the same sort of protected speech [or conduct] had not been." *Nieves* at 1727. Dr. Spiehs had a right to be free from an arrest without probable cause and a retaliatory arrest that is otherwise purportedly supported by probable cause. Either way this was anything but a split-second decision to arrest Dr. Spiehs.

~~120.~~122. Defendant Armbrister and his deputies had sufficient time to make calculated choices about removing Dr. Spiehs or in enacting or enforcing this unconstitutional policy which Dr. Spiehs' speech and actions prior to the confrontation presented no danger to anyone at that meeting.

~~121.~~123. No one must guess at the defendants' motives – the face of the defendant Deputy's incident report written by Douglas County sheriff's deputy Tyler Kruzel lists Dr. Spiehs' viewpoints as "relevant facts" warranting arrest. Defendant Kruzel stated that Dr. Spiehs was "known to appear weekly to meetings and has engaged in noisy conduct by using loud, explicit language towards members of the public and the County Commissioners."

~~122.~~124. What relevance does that have with whether disorderly conduct happened in that room or later at that meeting?

~~123.~~125. Deputy Kruzel further stated that "Justin was holding a sign that read, 'DR SPIEHS FOR DGCO COMMISSIONER FUCK THESE LIBERAL

38

MOTHERFUCKERS.' Justin was informed he would not be allowed to present that sign during the meeting due to the explicit language. Justin became visibly upset and began yelling. Justin started yelling comments about his freedom of speech and how he can say whatever he wants."

~~124.~~126. The defendants had all previously decided that the speech on Dr. Spiehs' sign could not be and they planned action prior to the meeting to accomplish that animus towards Dr. Spiehs and his speech.

~~125.~~127. No one has to guess why Dr. Spiehs was arrested – according to Deputy Kruzel's sworn report, it was not for some "disorderly conduct" occurring prior to the meeting but because Dr. Spiehs refused to leave when Deputy Kruzel claims it was only suggested ("asked") that Dr. Spiehs leave. For not going along with this suggestion it appears Dr. Spiehs was arrested according to defendant Kruzel's report.

~~126.~~128. Deputy Kruzel stated that "County Commissioners had to wait for Justin to lower the volume of his voice to begin the meeting. As Justin sat back down, I observed Justin turn towards a member of the public, who was seated behind Justin, and started yelling at the individual, later identified as [Michael Almon]. Justin was yelling, 'I don't give a fuck what you think of me' Justin started making comments toward about wearing a mask. I stood up from my seat, southwest corner of the room, and started walking towards Justin, who was sitting in the front row of the gallery on the south side of the building. Justin was asked to leave based on his conduct towards [Michael Almon]. Justin refused to leave and was told he was being placed under arrest for disorderly conduct."

39

127.129. But according to the official Commission Agenda Minutes, the Commission was not waiting on Dr. Spiehs and started the meeting timely at 5:30 p.m.:



**MINUTES**
**Commission Board Meeting**
4:00 p.m. Work Session and 5:30 p.m. Regular Session
Wednesday, April 20, 2022
Douglas County Courthouse

Reid called the Business Meeting to order at 5:30 p.m. on Wednesday, April 20, 2022.

**PRESENT:**   Commissioners Patrick Kelly, Shannon Reid, and Shannon Portillo

128.130. Nothing Dr. Spiehs did or said prior to the meeting interrupted or delayed the scheduled start of the open meeting on April 20, 2022, at 5:30 p.m.

129.131. As the incident report states, Dr. Spiehs' only crime was his refusal to follow a suggestion to leave.  And irrespective it is not a crime and certainly not disorderly conduct to disobey a police order to leave when Dr. Spiehs was entitled to remain in the forum and when no crime in the first place had been committed.

130.132. The plan was to have Dr. Spiehs removed – either under his own voluntary choice or by force.  If Dr. Spiehs had engaged in disorderly conduct prior to defendant Armbrister's confrontation, defendant Armbrister was certainly not following any arrest protocol by asking Dr. Spiehs to leave the meeting or in engaging in conversation with Mr. Almon.  Dr. Spiehs' sign was an irritant and this is demonstrated in defendant Armbrister angrily throwing the sign into the banister.

131.133. Dr. Spiehs engaged in protective activity which never constituted disorderly conduct.  The Sheriff defendants and the three defendant Commissioners present in

40

the room took a material and premeditated adverse action, and that retaliatory animus caused the confrontation and arrest of Dr. Spiehs.

~~132.~~134. According to Deputy Kruzel, either the charge of disorderly conduct was based upon Dr. Spiehs' statement that "I don't give a fuck what you think of me" or was based upon not leaving the room when leaving was communicated by the defendant Sheriff.  And if only "asked" to leave that means Dr. Spiehs had a choice in remaining in the room.  Yet he was arrested for purportedly not choosing to follow the alleged suggestion of the defendant Armbrister.

~~133.~~135. The incident report was intended and designed to further deprive Dr. Spiehs of his rights under the First Amendment. The report was untruthful in parts and incomplete painting a pretextual picture of the event.  It also left out exculpatory facts and any report from a key law enforcement witness – Sheriff Armbrister –  who is a significant actor and arresting officer.

~~134.~~136. The "mere fact that other people come outside or stop to watch what is going on is insufficient to support a conviction for disorderly conduct." *Barry v. State*, 934 So. 2d 656, 659 (Fla. Dist. Ct. App. 2006).  Speech characterized as profane as used by Dr. Spiehs in his sign or to Michael Almon did not constitute fighting words. *See Wood v. Eubanks*, 25 F. 4th 414, 423-25 (6th Cir. 2022) (defendant calling police "fucking thugs," "motherfuckers," "bitch ass fucking pigs," "dirty rat bastards," and "pussies with badges" were not fighting words)

~~135.~~137. In a sworn report from Douglas County sheriff's deputy Tyler Kruzel he states that on April 20, 2022, at approximately 5: 20 p.m., that Dr. Spiehs "entered

41

into the Douglas County Court House Commission Meeting Room, located at 1100 Massachusetts Street, in Lawrence, Douglas County, Kansas.  Justin was holding a sign that read 'DR SPIEHS FOR DGCO COMMISSIONER FUCK THESE LIBERAL MOTHERFUCKERS.' Justin sat down on the south end of the first row of the gallery. Affiant observed Justin turn toward [Michael Almon], who was seated directly behind Justin, and started yelling at Almon. Affiant heard Justin yell 'I don't give a fuck what you think of me.' Affiant and Sheriff Armbrister approached Justin and asked him to leave.  Justin did not leave right away and asked Sheriff Armbrister why he needed to leave.  Affiant heard Sheriff Armbrister to tell Justin he was under arrest for Disorderly Conduct."

136.138. Nothing in that report substantiates factually that Dr. Spiehs engaged in any disorderly conduct meeting the statutory definition in that room at that time.

137.139. Defendant Armbrister never told Dr. Spiehs he was under arrest and Dr. Spiehs "wanted his shit back" (i.e., his sign that defendant Armbrister had angrily thrown over the banister) because he expected all that was happening was Dr. Spiehs being removed from the meeting.

138.140. Defendants' actions were designed to advance their viewpoint over Dr. Spiehs' viewpoints.

139.141. Deputy Kruzel stated "Affiant believes Justin violated 21-6203(a)(3)."

140.142. Despite Dr. Spiehs sitting peacefully at the meeting with his sign, the individual Defendant police officers, at the direction and approval of the defendant Armbrister, and with the approval and ratification of the three Commissioners,

42

planned, intended, and colluded to have Dr. Spiehs ejected from the meeting because of what he presented, his sign, and his use of the word "fuck," and further omitted this information and other exculpatory information from their presentation of evidence to the prosecutor and magistrate in order to justify Dr. Spiehs' arrest and disorderly conduct charge.

~~141.~~143. To constitute disorderly conduct under K.S.A. 21-6203 based upon speech, the statute requires the speech to constitute "fighting words."

~~142.~~144. "The freedom of individuals verbally to oppose or challenge [official] action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston v. Hill*, 482 U.S. 451, 462–63, (1987). The First Amendment protects "the freedom to express disagreement with state action, without fear of reprisal based on the expression ...." *McCurdy v. Montgomery Cnty.,* 240 F.3d 512, 520 (6th Cir. 2001).

~~143.~~145. The statement "I don't give a fuck what you think of me" was not "fighting words" within the legal meaning of K.S.A. 21-6203(a)(3). *See State v. Dotson*, 133 Ohio App.3d 299, 301, 303 (7th Dist.1999) (not "fighting words" to call various police officers "motherfuckers"); *Chillicothe v. Lowery*, 4th Dist. Ross No. 97 CA 2331, 1998 WL 396316, *1,8 (July 13, 1998) (saying "fuck you" to police officers and repeatedly calling them "motherfuckers" did not constitute "fighting words"); *see also State v. Baccala,* 326 Conn. 232, 251-256 (Conn.2017) (calling a store manager a "fat ugly bitch," and worse, and saying, "fuck you, you're not a manager," were not "fighting words" under facts of the case); *People in the Interest of R.C.,* 411 P.3d 1105, 2016

43

COA 166, ¶ 26-34 (Colo.App.2016) (rejecting an argument that the term "cocksucker," "by its mere utterance qualifies as fighting words").

144.146. Dr. Spiehs was charged by the Douglas County prosecutor with a Class C Misdemeanor under K.S.A. 21-6203(a)(2). Dr. Spiehs' carrying his sign "DR SPIEHS FOR DGCO COMMISSIONER FUCK THESE LIBERAL MOTHERFUCKERS" is protected speech and protected speech on a sign disturbed the sensibilities and viewpoints of the defendant Sheriff and the three sitting Commissioners, it did not disturb anything or anyone meeting the definition of disorderly conduct under Kansas statute.

145.147. The prosecutor later dismissed that charge against Dr. Spiehs.

146.148. Dr. Spiehs' statement "I don't give a fuck what you think of me" to Michael Almon is protected speech and could not have "disturbed" the open meeting which had not begun. The statement never disturbed the meeting as evidenced by the proxemics of the other meeting attendees and body language of the individuals at the meeting.

147.149. The actions of the defendant Sheriff, his deputies, and the Commission were concerted and the reasons cited by Sheriff or in the Complaint were retaliatory and pretextual as the true reason Dr. Spiehs was silenced and removed from the open meeting was because of retaliation regarding his message and intentional viewpoint discrimination regarding Dr. Spiehs' protected speech.

148.150. The individual Commissioners and Sheriff and Deputy defendants were aware of and responsible for the processes that resulted in the deprivation of Dr.

Spiehs' protected interests without providing any opportunity to be heard, and thus that they implicitly authorized, approved, or knowingly acquiesced in the policies and procedures at issue.  They were each aware of the alleged misconduct at issue and, more importantly, participated in that misconduct.

~~149.~~151. Each of these defendants were given every conceivable form of fair notice – in a string of authority from 1689 to 2018 – that their conduct was flagrantly violative of the First Amendment.  *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (Qualified immunity's "focus is on whether the officer had fair notice that her conduct was unlawful").  *See Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., respecting the denial of certiorari and criticizing a "one-size-fits-all doctrine" for law enforcement – "why should [speech-suppressing] officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?") *Id.* at 2422.

~~150.~~152. The Commission conducted a May 11, 2022, open meeting. Dr. Spiehs attended the meeting and had signed up to speak.  Dr. Spiehs waited his turn with a sign stating "Dr. Spiehs for DGCO Commissioner Fuck These Child Abusing Motherfuckers":

45



~~151.~~153. Despite Dr. Spiehs displaying his message on his sign throughout that part of the meeting, he was not removed.

~~152.~~154. When it was his turn to speak, he began by saying "Evening, they's; evening, beta male. I'd like to start off with a quote by Einstein: the thing about smart motherfuckers is that they sound like crazy motherfuckers to stupid motherfuckers."

~~153.~~155. Defendant Shannon Reid chaired the open meeting.   Defendant Reid instructed to have Dr. Spiehs' microphone turned off (which was done by Sarah Plinsky).  Dr. Spiehs asked that his microphone be turned back on.  Defendant Reid responded that the microphone would not be turned back on for Dr. Spiehs.

~~154.~~156. When asked by Dr. Spiehs as to why, the defendant Reid stated it was because she claimed Dr. Spiehs "directed derogatory language at us" and because of Dr. Spiehs' "vulgar language."

~~155.~~157. Dr. Spiehs objected and defendant Reid then instructed the deputies (which included defendant Kruzel) to have Dr. Spiehs removed.  Three deputies made Dr.

Spiehs leave while Dr. Spiehs continued to object while being forcibly removed again under threat of arrest:





156.158. The Commission broadcasts its meetings using YOUTUBE.   YOUTUBE notified the Commission that the Commission's public comments had violated its terms but did not explain to the Commission how.

157.159. The Commission publicized on its website that comments will "not be recorded or shared on the County's YOUTUBE site to ensure compliance with

47

YOUTUBE's public comment policies."  "A recording of this meeting will be available on our YOUTUBE webpage and website."

158.160. Because of YOUTUBE, the Commission stated it had modified its public comment speaking requirements without prior notice to the public, a majority vote, or by resolution.

159.161. On July 20, 2022, the Commission conducted an open meeting. Dr. Spiehs carried a sign into the meeting stating "Vote Dr. Spiehs Tired of the Bullshit." Dr. Spiehs sat on the front row and stood the sign up against the rail where the video camera recording the meeting would capture the sign.

160.162. Under K.S.A 19-813. the actions of the Sheriff and his deputies described before and during these Commission meetings were not performed to "keep and preserve the peace" or to "quiet and suppress" "affrays, riots and unlawful assemblies and insurrections."  Douglas County staff member Jill Jolecuer, the Assistant County administrator, showed deputy Mike Steel her laptop screen showing Dr. Spiehs' sign on the live feed and then directs him to have Dr. Spiehs' sign removed or otherwise taken out of view of the camera while the meeting is ongoing.  Deputy Steel stands in front of Dr. Spiehs, which has nothing to do with keeping the peace and repeatedly attempted to have Dr. Spiehs remove his sign while Dr. Spiehs says "no" – that he was not doing anything wrong – and asks what rule had been broken to justify his sign being removed:



161.163. The deputy remained there for several minutes telling Dr. Spiehs why he

should remove the sign and telling Dr. Spiehs "why do you got to be a jerk about it"?



162.164. Assistant County administrator Jill Jolecuer is then instructed by Commissioner Reid raising her arm to get involved:



163.165. The Sheriff's department routinely takes instructions from County employees and the Commission to silence or remove speakers such as Dr. Spiehs. Defendants together operate and work in agreement as one entity using methods and actions with the County and the Commission taken during the Commission's open meetings (although the Sheriff is not obligated to even attend open meetings). The Douglas County Assistant Administrator Jill Jolicuer walks past the commissioners then tells the deputy "don't worry about it" where deputy Steel then walks away from Dr. Spiehs. The Sheriff's department routinely takes instructions from Douglas County employees during the Commission's open meetings.

164.166. On August 10, 2022, speaker Michael Eravi addressed the Commission with Dr. Spiehs present (where Dr. Spiehs display of his sign was visible online):



165.167. Speaker Eravi stated that "George Carlin, many years ago, one of the most honored comedians in this country, had a list of seven words that were just strictly banned.  I believe they were shit, piss, cunt, fuck, motherfucker, cocksucker, and tits. Now my point with this is those words, even though you may not like them and I see your about ready to speak – even though you may not like them they are acceptable free speech.  Just the same as in the article that came out talking about.. said they didn't like Justin's sign but what I told my wife who donated to that fund with my blessing… What we don't do is go out and arrest somebody or throw them out of business, spit on them, pull guns on them, just because we don't like what they said."

166.168. He went on to say "they are just words – they are just words.  I know you are upset with me right now but they're just words."   Speaker Eravi told the Commission it was wrong to allow YOUTUBE to dictate First Amendment freedoms at the open meetings. The Commission and Sheriff's department deputies permitted

speaker Eravi to complete his speech uninterrupted and did not call for his arrest or removal.

~~167.~~169. At the August 24, 2022, Douglas county commission meeting, Michael Eravi appeared prior to the meeting and began addressing the crowd about taxes increasing, general public comment not being up on YouTube anymore, and asked the audience in general how anyone could still support this commission.

~~168.~~170. When the meeting began and while the chair of the meeting (Shannon Reid) was reading the meeting rules, Eravi interrupted her: "You have once again stated a falsehood" to which Reid replies "please do not disrupt the meeting." Evari disrupted and delayed the meeting but was not arrested.

~~169.~~171. During that general public comment period Evari spoke and after his 3 minutes expired he continued to speak. Evari told the Commission that he would continue speaking since the meetings are not being recorded any longer. Evari continued to speak in an audibly louder voice while walking from the podium to his seat. Commissioner Reid confronted Evari telling him to stop yelling but Evari ignored her and continued his speech. Evari again yelled loudly. Reid told him "Michael I'm going to ask you one more time to please stop disrupting the meeting" to which he challenged her saying "go ahead and ask me one more time."

~~170.~~172. The actions of Evari delayed the meeting thus far and the next speaker who was waiting her turn to speak. Evari continued to yell delaying the speaker from having her turn to speak. When the next speaker spoke Evari yelled out "Yeah" then later during her speech he yells out "No" while she was speaking. At the end of her

52

comments, as she walked away from the podium, Evari yelled out "There's a reason the state passed a law to mandate these meetings and this is the reason. The state passed a law to mandate these meetings." After a different speaker finished her general public comment Evari again yelled out saying "They're forced to have this open public meeting but they're not going to let your words be heard." After a different speaker spoke Evari yelled out "They have a $12.6 million slush fund and they are going to take another six from us."  Then, while Reid was checking for online speakers, Evari yelled out "Remember their savings account grows while yours goes dry." There was no warning to Evari during these events and he was not arrested and not threatened with arrest.

171.173. After general public comment period was completed, county administrator Sarah Plinsky gave a presentation which Evari interrupted her by yelling out "Pay attention to those numbers up there guys that's a double digit increase this year." Reid then warned Evari saying "please do not disrupt the meeting any further. If you do it one more time I will ask the deputies to escort you out of the building."  Reid subsequently directed Plinsky to continue her presentation.  While Plinsky continued her presentation, Evari yelled from the audience "you know what I'm going to go ahead and disrupt the meeting and you can throw me out because I'm tired of hearing them talk about confusion. The citizens are not as confused as you think we are. We understand double digit tax increases and we understand double digit mill levy increases and this taxation that you're doing is wrong. I'll leave."

172.174. Reid responds saying "thank you" while Evari continued to yell.  Evari was not arrested.  Reid instructed the deputies, one of which is deputy Kruzel, "Deputy can you please make sure he leaves the building? Sorry for the interruption, Sarah." Evari left the meeting room on his own but was never threatened with arrest and was not arrested.

173.175. In the Commission's March 29, 2023, agenda, it does not mention any agenda item as to voting on enacting or changing the Commission's public comment restrictions.

174.176. At the March 29, 2023, meeting, the Commission orally read a restriction that comments must be "related to general county business."

175.177. At the March 29, 2023, meeting, the Commission then discussed revising the public comment policy regarding public comments at the 5:16:30 mark.   The Commission members also commented on a restriction to limit comments to "county business" or the "business of the county."   The Commission member asked Sarah Plinsky, the County Administrator, to talk to "legal" to have a statement made in the opening statement to open meetings.  Sarah Plinsky asked the County Commission as to where "personal attacks fall under the business of the county."  The presiding commissioner Kelly then stated he would "manage" that if it was a "personal attack on staff."  The presiding commissioner directed Administrator Plinsky to create a new opening statement next week "based upon this conversation."

176.178. The Commission never voted on this non-agenda public speaking restrictions.

177.179. The Commission's March 29, 2023, open meeting minutes under "Miscellaneous" state that the "Commission revisited the current policy of not filming public comment during the County Commission meetings. The reasoning was meetings had been bounced off YouTube due to public comment not meeting YouTube standards.  It was determined that the Commission was willing to try recording again with direction given to the public prior to comments. Campaigning for office and personal attacks on staff will not be tolerated." The Commission decided to no longer record the general public comment section of the meeting so that the video of the meeting could once again be posted on YouTube. This was decided without notice or by commission vote.

178.180. The Commission then orally read different restrictions at the April 5, 2023, open meeting, that comments must now be "related to general business of the Douglas County Commission" and that "campaigning for public office is not allowed."  There was no mention of "personal attacks on staff" in that oral statement.

179.181. At the April 12, 2023, open meeting the Commission orally gave a restriction that "campaigning for office is not allowed."

182. At the December 20, 2023, open meeting the presiding Commissioner stated that "campaigning for public office is not allowed."

183. Dr. Spiehs attended the Douglas County Commissioner's meeting on April 3, 2024.  *See attached* Sworn Statement of Dr. Spiehs. Defendant Karen Wiley read a statement regarding general public comment which included this: "all comments must address topics within the jurisdiction of the county commission and be directed

55

**Formatted:** Font: Italic, Complex Script Font: Italic

to us and we reserve the right to mute any speaker whose comments are threatening, aggressively hostile, or belligerent."

184. Dr. Spiehs carried a handmade sign that read: "Patrick Kelly is a giant pussy." At the general public comment section the plaintiff spoke while holding this sign. The sign was visible to the commissioners and was also visible on the county camera that records the meeting which is posted to the county's YouTube channel.

185. Dr. Spiehs made many statements at this meeting that could be unreasonably considered by the Commission as a topic not within the jurisdiction of the county commission, threatening, aggressively hostile, or belligerent yet the Commission took no adverse actions against Dr. Spiehs at that meeting.   See attached Sworn Statement, p.1 under "April 3, 2024" heading.

186. On April 17, 2024 Dr. Spiehs attended a Commission meeting carrying the same sign as the one on April 3, 2024.  At this meeting the Commission stated new speaking requirements. Defendant Reid read a statement regarding general public comment which included new requirements for public speaking regarding prohibiting "campaigning" and a purported right "remove any speaker" whose comments "are threatening, aggressively hostile, or belligerent."

187. Dr. Spiehs was engaged in protected speech, and was speaking about a topics within the jurisdiction of the county commission. Defendant Reid stopped Dr. Spiehs' speech stating it was not "specific to the county commission," was not "specific to the business of the county commission," and was "attacking" the "character" of defendant Kelly.

56

188. When Dr. Spiehs subsequently spoke claiming a Commissioner's character was relevant to the Commission and its business, defendant Reid instructed defendant Plinsky to mute Dr. Spiehs' microphone and that Dr. Spiehs would not be allowed to finish his allotted time. See attached Sworn Statement, under "April 17, 2024" heading.

189.  On April 24, 2024, Dr. Spiehs attended a Douglas County Commission meeting. Dr. Spiehs carried and displayed to the Commission, audience, and the camera live-streaming to YOUTUBE the same sign he carried to the two prior meetings on April 3rd and April 17th.

190. At this meeting the public comment rules were again changed removing the "campaigning" prohibition and including the prior "topics within the jurisdiction" and "threatening, aggressively hostile, or belligerent" prohibitions.

191. The first speaker during general public comment began by giving Commissioner Wiley compliments saying "Karen I want to begin by telling you that I appreciate your stoic demeanor and that you give the impression that you're really listening to us and we, I appreciate that to no end."

192. The next speaker, Michael Eravi, calmly approached the podium to speak carrying two signs that he did not initially display, instead keeping them by his side. He calmly said, "Right about now I'm going to start talking about the character of our commissioners and I freaking dare you to shut me down. I dare you to turn off this mike. Patrick Kelly, I am sorry but I have to agree with the man, you sir are a pussy. I sent you an email…"

57

193. Defendant Wiley stopped Mr. Eravi's speech claiming it was "aggressive" ("manage your aggressive language").  Defendant Wiley asserted her stopping of Mr. Eravi's speech was not his speech ("It's not the words").

194. Mr. Eravi continued "I guarantee you, in your limited public forum right now my free speech rules do apply, my free speech rights, I'm sorry, rules, do apply. But Patrick Kelly is a pussy and I'm going to be allowed to say that up here and…"

195. Defendant Wiley again interrupted Mr. Eravi stating "You've been warned. Thank you.   Sarah." At that point defendant Plinsky muted Mr. Eravi's microphone.

196. Mr. Eravi continued speaking and defendant Plinsky still tracked his allotted time while Plinsky later erased and censored from the Commission's public record Mr. Eravi's speech.

197. Mr. Eravi displayed signs that said "Screw the bad cops and the good ones who won't turn them in" and "Courtney Shipley is a liar."  He also said  he was going to create another sign "that says Patrick Kelly is a pussy and I'm going to be standing out around town with it and we'll see what people think."

198. Mr. Eravi pointed out the discrepancy of how the defendant Commissioners were or were not enforcing rules: "Now I talked about character. You didn't throw me out like you did that man, you muted the Mic. Then let us keep speaking. You didn't throw him out, did you? You just muted his Mic. That's still a violation of our first amendment rights to speak. Patrick Kelly you are still a pussy."

199. Mr. Eravi finished within his 3 minutes and returned to where he was previously standing.

200. When Dr. Spiehs spoke he stated "So my comments that I'm about to read here are quotes from last week's meeting so therefore this is germane because it was said in last week's meeting. And so here's what was said: "Yes Patrick you are less of a person. Exactly. You are far, far below being a real man…"   Defendant Wiley interrupted Dr. Spiehs stating "I'm afraid we're not going to allow personal insults."

201. Dr. Spiehs then recited comments quotes from a YOUTUBE video about the Commission: "Another coward scared of accountability." "This guy sounds like an absolute wimp. Grow up and be a man." "Our government has become cowards and it makes me ashamed of mankind." "What a cowardly man that man is." "I have more balls than Patrick, too."…

202. Defined Wiley stated "we're done" to which the defendant Plinsky muted Dr. Spiehs' Mic while still holding up the time cards indicating how much time Dr. Spiehs had remaining to speak.

203. Dr. Spiehs then continued to speak in his remaining allotted time yet while his Mic was muted (See attached sworn statement, pp. 6-7):

I got my microphone muted last week, I got my microphone muted this week for saying that Patrick Kelly is a giant pussy, so why didn't my sign get removed as well? My sign says, "Patrick Kelly is a giant pussy." Why is it allowed? It's the same words. Why don't you mute that? Second question: in your general public comment guidelines you read at the beginning say that quote "we will do our best to enforce these speaking policies and without regard to point of view expressed by the speaker." During my general public comment last week Shannon Reid you said I couldn't talk about the character of a county commissioner, and you're saying it again this week, because I was, according to you, "attacking his character." Is you stopping me from saying negative things about Patrick Kelly an admission of guilt that you don't enforce the speaking rules without regard to point of view expressed? So praise is allowed but attacking his character isn't? Earlier someone praised Karen Wiley's stoicism and good listening skills and that was perfectly fine. It's allowed because it makes you look favorable, but any unfavorable speech is deemed

not germane to your business and a personal attack. So here's a tough one for you: what if I said "Patrick, you're the best at being a giant pussy"? That's praise, right? What about this one: what if I said "Shannon, you're the best commissioner ever, and the reason you're the best is because you're a giant bitch, that makes you a good commissioner"? You going to allow that? You guys are controlling the narrative of what the public sees so they tune in and they only see nice things, good things, respectful things said about you but the truth you don't allow. And the truth is that you're a giant fucking pussy, you're a fucking bitch, and you're a fucking commie. And all you guys that sit here and allow this to happen, you ain't fucking Americans. And you [Douglas county sheriff's Sergeant Dale Flory] fucking wanted to have me illegally arrested. Fuck you, Flory.

**Formatted:** Line spacing: single, No bullets or numbering

204. Dr. Spiehs comments were censored and removed from Commission's official YOUTUBE channel broadcast of this meeting.

205. On May 1, 2024, Dr. Spiehs attended the Douglas County Commission's open meeting in which he signed up to speak. One of the topics concerned wind turbines which the public turned out in droves.

206. Dr. Spiehs openly carried a sign saying "Women have more balls than Patrick too." Mr. Eravi attended the meeting with a sign that read "Patrick Kelly is a pussy." The room was packed with people standing because the seats were all filled. Dr. Spiehs stood in a spacious area at the front of the audience section.

207. The area where Dr. Spiehs was standing was not an aisle. Dr. Spiehs was not blocking the view of anyone in attendance, nor did he physically block the passage of other people attending the meeting.

208. Dr. Spiehs' sign was in view of the live-stream camera which displayed it on the County's video feed and recording of the meeting which was being continuously monitored by defendant Plinsky in real time. County staff – including Plinsky herself - and sheriff's deputies are seen on multiple videos freely passing by unencumbered

60

both in front of and behind Dr. Spiehs without any hinderance or issue whatsoever. There were multiple aisles in the meeting room for people to access and use in order to gain access to the front of the meeting to speak.

209. Karen Wiley read a public comment statement different from the prior statements she read at prior public meetings.  This time the statement included the following: a "recent Kansas federal court decision has provided additional clarity regarding standards for public comment, we've updated our policy accordingly. We will do our best to enforce these rules consistently without regard to the point of view expressed by the speaker and those are…. all comments must address topics within the jurisdiction of the county commission. We also get to maintain the decorum of our meeting therefore we prohibit public comments that are threatening, aggressively hostile, or belligerent, fighting words, slander, or speech that invades the privacy of individuals, unreasonably loud, disruptive, or repetitive, or that interrupt or substantially interfere with the board's ability to conduct county business. We do reserve the right to mute or remove any speaker who violates these public comment rules…."

210. The defendants misinterpreted this Court's prior rulings. Nothing this Court stated was intended to authorize the defendants to charge Dr. Spiehs with a criminal offense if Dr. Spiehs purportedly violated something the Court referred to.  Nothing this Court stated was intended to authorize the defendants to arrest Dr. Spiehs.

211. Defendant Wiley then confronted Dr. Spiehs about his sign when Dr. Spiehs began his allotted time to speak:

61

[JS]: My name is Dr. Justin Spiehs. At last week's meeting during general public comment someone said of commissioner Karen Wiley quote "Karen I want to begin by saying I appreciate your stoic demeanor,..."

[KW interrupting]: I believe Justin we are not going to allow the sign this time. So if you could please put it down that would be wonderful.

[JS]: What's wrong with the sign? What's wrong with the sign, Karen?

[KW]: You've been warned.

[JS]: What's wrong with the sign?

[KW]: Do you have any other public comment that is unrelated?

[JS]: I sure do. They said "Karen I want to begin by saying I appreciate your stoic demeanor and that you give the impression that you are really listening to us and I appreciate that to no end. She was allowed by this commission to say that without interruption or muting her microphone. After her I spoke and said the words out loud that are on my sign and was muted…

[KW interrupting]: Justin I need to have you put the sign down and I think we're done with your public comment. Thank you very much you're welcome to stay [Defendant Plinsky mutes the podium microphone]. Thank you.

[JS]: You all allow praise but not criticism. I'm not allowed to say what's on my sign? In previous meetings people have heaped praise on the commission without being silenced…

[KW interrupting]: Is there anyone else who would like…

(At this point, Plinsky makes a hand gesture motion to staff member "Chad" who is off camera)

[JS] …without fear of being silenced. They were free to say things like…

[KW]: I think we could…

[JS]: We're here to thank you for your part in addressing homelessness

[KW interrupting]: Thank you, Chad.

[JS]: "I appreciate the effort you all have…

[KW interrupting] Is there anyone else who would like to give public comment?

[JS]: …put it over the past few years.

[KW]: Is there anyone else who would like to give public comment since we're done with this one?

[Shannon Reid [SR] interrupts]: Justin you're welcome to, Justin

[JS]: What?

[SR]: You can stay for the meeting with us, but your public comment has ended.

[JS]: Why has it ended?

[SR]: So the chair is going to call on the next person for public comment.

[JS]: Why has my…? This is protected speech. Why has my…? This is protected speech.

[KW directing Plinsky]: Sarah, we need to get the…yeah

[Sarah Plinsky, SP]: I had Chad get the sheriff.

*See attached* Sworn Statement under Heading "May 1, 2024" pp.7-17.

212.  The dialogue between Dr. Spiehs and the defendants continued:

[JS]: …speech. I haven't done anything wrong. I'm exercising my first amendment right to speak to you guys and it just happens to be criticizing you but if I was saying "Hey, you guys are the best" it would be perfectly fine.

(County audio recording turns back on for YouTube video of meeting)

[Defendant Patrick Kelly interrupts]: Justin you're welcome to stay but you need to take a seat.

(Defendant Plinsky then directs a staff member out of the room to perform some task related to removing plaintiff Spiehs from the meeting. Dr. Spiehs turns to the audience as he is being interrupted by Kelly)

[JS]: Are you guys alright with this? Are you guys alright with this?

(multiple audience members call out "No!")

[JS] Sit there on your hands then.

[JS] What is with this?

(Audience members: "No, we are not alright with this!")

[JS] Yeah. It's me right now, but come up here and say something unpopular and it will be you. Yeah you guys will really like it then won't you?

(audience member shouts "Agreed!")

[KW]: Who else would like to give general public comment?

213. Dr. Spiehs returned to where he had been been standing before speaking and stood silently holding his sign so that the live-stream camera would capture the sign. The next speaker, Michael Eravi, walked past Dr. Spiehs on his way up to the podium. After Mr. Eravi spoke, he was able to again walk past Dr. Spiehs.

214. For the next thirty minutes of meeting time, while the next agenda item was discussed, Dr. Spiehs stood silently at the front of the room with his sign. During this time, multiple audience members, staff, and deputies freely moved both in front of and behind him as they walked around the room. None of them were prevented in any way from moving about the room as they walked by Dr. Spiehs. No one was hindered or obstructed or prevented from freely moving about in that meeting.

215. While standing holding his sign, a Douglas County deputy arrived two and a half minutes after the general public comment ended.  She positioned herself behind Dr. Spiehs. See attached Sworn Statement, pp.11-12.

63

216. At about eight minutes after arriving, this deputy is called over by the Plinsky where Plinsky crouched down and whispered into the deputy's ear.  After that this deputy walked up behind Dr. Spiehs in a physically intimidating way which was an effort to force or coerce Dr. Spiehs to move from where Dr. Spiehs was standing displaying his sign to the meeting live streaming camera.

217. After a period of 30 minutes of Dr. Spiehs merely standing quietly with his sign displayed, the defendant Reid stopped the meeting saying: "I do want to make a point of order before we start public comment and ask: deputy can you please have Justin just step back and stand near the wall…we've been very patient, you've made your point, you can still stand there, you've been very close to staff, and I would just like you to step back because that's a traffic way for folks that may be leaving the room after their public comment, so you can just stand right next to Michael."

218. The following dialogue occurred:

[Dr. Spiehs (JS)]: I'll let you know when I've made my point. Thank you. I don't care if you think I've made my point. I'll let you know.
[Reid (SR)]: So I was speaking to you out of courtesy.
[JS]: No, no thank you. No thank you.
[SR]: And I'm asking the deputy to please have him step back against the wall.
[JS]: I'm not doing nothing wrong. I'm not doing…Don't
    (Douglas County deputy attempts to grab Dr. Spiehs' sign and he moves sign away from the deputy's reach)
[Deputy Gonzalez]: I'm not touching anything just step back.
[JS]: For what?
[SR]: You can stay Justin
[Gonzalez]: You're more than welcome to stay it's just to clear a path for people for public comment. That's all it is so there's a good flow of travel for people to speak.
[JS]: According to you? According to you?
[Gonzalez]: Step back sir please.
[JS]: No I'm fine right here. I'm fine right here.
    (Mr. Eravi asks another deputy "is there a law being broken, deputy?" And the deputy responds "No")

64

[SR]: Patrick, sorry that was me reading signs, look at how effective your signs are [laughs]. Justin the alternative is to leave the meeting. So either please take a step back and just allow traffic flow and follow the deputies orders or please leave the meeting.
[JS]: No, I'm good. I'll stay. I'll stay. I'm not doing anything wrong. I'll stay. I'm not breaking any laws. I'll stay. If somebody approaches me I'll move out of the way but I'm not going to just be moved over to the side."
[KW]: Thank you deputies I think it's time. I'm sorry. Deputies please."
[Deputy 2]: Mr. Spiehs, they're asking you to leave."
[JS]: No, nope, I'm not doing anything unlawful.

219. Defendant Plinsky knows from defendant Armbrister and his department that additional County deputies have been sent to the building and said to a County Deputy "the guys are in the parking lot so if you need to bring them in they're in the parking lot." Plinsky instructs a County deputy "you need to escort him out of here – the commissioners have said so."

220. The following dialogue occurred:

[Deputy]: "Okay, the commissioners have said he needs to go."
[JS]: "It don't matter, I'm not doing nothing wrong."
[Deputy 2]: "Okay sir, you're being removed."
[JS]:  you are violating my rights and no law had been broken. "No, I'm not being removed. I'm not being removed. I'm not being removed."
[Deputy]: "You're being asked to be removed."
[JS] "And I'm declining. I'm not leaving. I have a right to be here like everybody else, so thank you."
[Defendant Wiley]: "Justin we've asked very nicely"
[JS]: "and that's fine and I'm declining."
[Wiley]: "Alright we are going to move on. We are moving on"

221. Defendant Wiley then directs Plinsky to perform a task which Plinsky responds "I'd like a quick break." Wiley says "so we'll take a 5 minute break," The meeting was then recessed by Karen Wiley.

222.  During the recess Sarah Plinsky huddles talks with the two deputies. Mr. Eravi says to her that charges can't be pressed because no law has been broken.

65

Plinsky tells one of the County Deputies "No, I don't want them charged but they need to leave." One Deputy responds "It's not to be charged." Plinsky then told Dr. Spiehs and Mr. Eravi that "we can ask you to leave." Both Mr. Eravi and Dr. Spiehs decline the ask and defendant Plinsky then says to the deputies, "I want you to make them leave." The commission then called for another recess.

223. Mr. Eravi stated to the live streaming camera "We're going to decline to leave. Please continue the meeting. We have their sergeant (Dale Flory) on camera last week saying if no law is broken he won't act. So let's move on, let's get the meeting going."

224. One audience woman shouts "Start the meeting!" Dr. Spiehs calmly and peacefully asked one deputy: "You waiting on the sheriff to get here? You waiting on the sheriff to get here? You waiting on the sheriff?" At that moment defendants Douglas County Sheriff Lieutenant Channels and Douglas County Sheriff Deputy Coleman entered the room. A chorus of boos from the audience followed.

225. Deputy Channels approached both Dr. Spiehs and Mr. Eravi saying "Ok, so, Mr. Spiehs and Mr. Eravi, I'm going to ask, listen, what I'm going to ask is that you just move down aways."

226. Both Dr. Spiehs and Mr. Eravi politely decline the Deputy's ask. Deputy Channels then says "Ok, well here's part of the problem when I come in and you are actively yelling and disrupting the meeting" but this was a false statement.

227. The meeting was in recess and nothing that Dr. Spiehs or Mr. Eravi was doing prevented the meeting from continuing in an orderly fashion. The audience continued

66

to voice its displeasure at Lieutenant Channels by loudly booing her presence.  Mr. Eravi said to her that the meeting is in recess right then and there is no disruption and that she needs to "catch up on things before she starts accusing us of a crime."

228.  Defendant Channels said, "So here's the thing: per the county commission and per the Sheriff if you are not going to have a seat or move down, I'm not asking you to remove your sign at all, I'm just asking you to move away a little ways from staff, that's all I'm asking." Dr. Spiehs responded: "under what grounds? What am I doing wrong?"

229.  Mr. Eravi stated "now remember this is an ask, we are not being told under threat of arrest so we're going to decline. Thank you." Dr. Spiehs said "this is a public building and a public meeting, I can stand here if I want to, there Channels." Channels says, "Okay, here's the thing: I'm going to ask you to move down." Mr. Eravi responded: "She's asking. We're going to decline. Thank you." Defendant Channels said: "Here's the thing: if you don't want to, then I do not have a choice but to ask you to leave and it's actually not an ask. But it's actually not an ask. I'm going to have to tell you to leave on behalf of the county commission…. "Okay, then you're going to have to walk out."

230. Defendant Channels then made the following statements: See Sworn Statement, p.15:

[JS] I am not leaving.
                    (audience erupts into a chorus of "Stay! Stay!")
[Channels]: "Okay, then per the sheriff I'm going to have to arrest you."
Dr. Spiehs and Mr. Eravi: "for what?"
[Channels]: "For disrupting a meeting."
[Mr. Eravi]: "the meeting is in recess."

67

[Channels] "We cannot continue the meeting at this point."
[Mr. Eravi] "No, they can continue the meeting, that's not on us, we're just holding signs and you have the whole room here saying it's not a problem."
[JS] how am I disrupting any meeting?
[Channels] the Commission cannot continue the meeting.
[JS] "why can't they continue the meeting?"
[Channels] "Here's the thing: you have options."
[JS] I am staying
[Channels] "No, you're not and that's the problem."

231. Defendant Channels directed defendant Coleman to arrest Dr. Spiehs but not Mr. Eravi. Dr. Spiehs was handcuffed.

232. Mr. Eravi was not arrested and he was allowed to stay in the meeting with his sign. Mr. Eravi asked the one remaining deputy in the meeting room "So really it's only him? Really? Really? Is there a reason I'm not out?"

233. The commissioners reappeared and resumed the meeting. Defendant Wiley gaslighted the audience saying "We're going to resume our meeting. I'm really sorry for anything that's disruptive because this is your meeting." But the audience said "You're disrupting it!" "You disrupted it!" "You did it! You disrupted the meeting!" "You did it! You did it!" "You disrupted your own meeting!" "You're the problem!"

234. After bonding out of jail, Dr. Spiehs returned to the meeting later that same evening and again held his sign. When it's his turn to speak, he went to the podium carrying his sign. The agenda item concerned windmills and windmill energy. The following interaction happens:

[JS]: My name is Dr. Justin Spiehs. Earlier somebody said that he trusted you guys did your research on this and I got to tell you, I disagree with that. I don't trust that you guys did your research on this and the reason I don't trust you guys did your research on this is because well aside from the fact that you're incompetent,

68

there's no trust because earlier tonight I was standing in here with my sign and I just got unlawfully arrested and taken to jail for doing nothing wrong and now I've come back to the meeting here to speak about how your incompetence leads you to make bad decisions and it leads me to make signs that say...

[interrupted by defendant Wiley]: Justin, can you pull it back to the wind conversation?

[JS]: Yeah, I'm doing an analogy right now. I'm doing an analogy so just bear with me, would you Karen? Can you give me the same courtesy you gave the other guy there that was doing an analogy? [referring to a speaker before him who went off topic by talking about abortion, and was told by KW to stay on topic and then was allowed to continue talking after he said he was simply making an analogy]. So anyways like I was saying so my lack of trust in your decision, judgment leads me to make a sign here that says, or hold a sign here that says "Patrick Kelly is a pussy" and so I just want to know: Patrick, as a giant pussy, how much research have you done?...

[KW interrupting] Sorry Justin you'll need to pull it back to the wind conversation.

[JS]: Oh ok, so let me ask that again: Patrick, so as a giant pussy, how much research have you done on the wind turbine stuff we're talking about right now? Shannon, Shannon...

[KW interrupting]: I'm afraid insults and fighting words have not been allowed. You're welcome to stay, but you have to sit down.

[JS]: Oh that's fighting words? That's fi...[talked over by KW]...so then that is that disorderly conduct then? That's fighting words?

[KW]: Thank you.

[JS]: That's fighting....

(Defendant Plinsky muted the microphone and entire audio is deleted from the County's YOUTUBE recording of the meeting)

[JS]: Hold on a second, hold on a second: why did I just get shut down? What was the reason? What was the reason? How much time do I got left? 50 seconds, alright here we go. So..

[KW]: Who do we have next, Sarah?

[JS]: No, what, hold on a sec. What is going on here? Why did you just shut off my mic? I'm asking a direct question of how much research was done on this? That's, that doesn't, how much more do you have to be on topic for that? How much research have you done on this topic that we're talking about? What is going on here?

[KW]: Can you please sit down your public comment is over?

[JS]: It looks like I got about 22 more seconds so because I haven't done anything wrong I'm going to talk for another, ah you stopped it. Alright we I guess I got about 10 more seconds then so, (Plinsky begins talking over Dr. Spiehs on her microphone calling out the names of the next speakers) the other question I have is Shannon, as a giant bitch, how much research have you done? Huh?

69

235. Sheriff Armbrister and his defendant officers alleged that Dr. Spiehs had violated K.S.A.21-5922 as a basis for the arrest. There was no probable cause to arrest Dr. Spiehs under that statute or any statute.

236. The Douglas County prosecutor refused to prosecute this charge:



237. Dr. Spiehs attended the May 15, 2024, Commission meeting.  He again displayed his "Women have more balls than Patrick too" while wearing a shirt that had the same message displayed on the front and back of his shirt. At the public comment section he asked the Commission a question and said "I'll wait."

238. With around 38 seconds remaining of the allotted 3 minutes, Dr. Spiehs waited quietly for about 20 seconds.  Defendant Wiley interrupted and said "Do we have

anyone else who would like to give public comment?" Dr. Spiehs responded that he still had time left and asked her why she interrupted his time. Dr. Spiehs left the podium and stood with his sign in the same place he stood at the May 1, 2024 meeting where he was arrested.  No one asked or required Dr. Spiehs to move.

239. Mr. Eravi then came to the podium to speak and with a little over a minute of time remaining to speak he said "We'll see if Karen Wiley can stay quiet for a minute ten" and stood at the podium in silence.

180.240. Mr. Eravi was not interrupted during that silence and said "So once again it's just him [plaintiff Spiehs] that you interrupt? Your bias shows through, Karen" and he returned to his seat.

**FIRST CAUSE OF ACTION**
**Right to Petition**
**(42 U.S.C. § 1983)**

181.241. Plaintiff Dr. Spiehs repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

182.242. The "most heinous act in which a democratic government can engage is to use its law enforcement machinery for political ends." *Gonzalez v. Trevino*, 60 F. 4th 906, 907 (5th Cir 2023).  "Here in America, we do not arrest our political opponents." *Frenchko v. Monroe*, No. 4:23-CV-781, 2023 WL 9249834 at *1 (N.D. Ohio Jan. 16, 2023).

183.243. The room in which Dr. Spiehs appeared to speak (prior to his arrest and before the meeting started) was a traditional public forum.  The First Amendment right to petition the government for redress "extends to all departments of the

Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Generally speaking, claims under the Petition Clause are "analyzed no different than" a claim under the Free Speech Clause. *Glover v. Mabrey*, 384 F. App'x 763, 776 (10th Cir. 2010).

~~184.~~244. Appearing before an elected County Commission board to engage in a public discussion constitutes "petition[ing] the Government for a redress of grievances." U.S. Const. amend. I.

~~185.~~245. Being arrested prior to the meeting suppresses the right to petition. Shutting off the microphone suppresses the right to petition. *See Mnyofu v. Bd. of Educ . of Rich High Sch. Dist. 227*, No. 15 C 8884, 2016 U.S. Dist. LEXIS 45773, at *2 (N.D. Ill. Apr. 5, 2016) (school board shut off the microphone in the midst of a citizen activist's speech criticizing school personnel: holding it was a constitutionally protected right to use the public-comment period to criticize school employees and held the right is "clearly established" by decades of federal precedent).

~~186.~~246. Defendants' respective actions in silencing and removing Dr. Spiehs from assembling denied Dr. Spiehs the right to associate and petition government.

**Defendant Douglas County Commission's Restrictions Are Unauthorized and Ultra Vires**

~~187.~~247. The three board commission can only enact policy by a vote of the majority of the Commission arising from a quorum meeting. There is no record of any agenda item provided to the public in which the Commission would consider enacting a public speaking policy or restrictions. There is no record that the Commission voted, by majority of the Commission, any resolution imposing any public speaking

72

requirement. And then when the Commission purports to have installed some new or modified speaking requirement, the published notice to the public of the Commission's meeting agenda did not contain any notice of the subject and further did not contain any vulgar, rude, or inappropriate restrictions regarding public comments.

188.248. The Commission has not passed by a majority vote any motion or resolution in any convened quorum meeting a policy requiring speakers at a Commission's open meetings a requirement that speakers cannot speak "rudely," "inappropriately," or in using "vulgar" verbiage. It has not voted on any anti-campaigning speech restriction.

**Personal Attacks, Campaigning, Vulgar, Rude, and Inappropriate Speech Are Each Protected Speech**

189.249. The defendant Commissioner's restrictions on personal attacks, threatening, aggressively hostile, belligerent, vulgar, rude, inappropriate, and campaigning remarks are content-based. personal attacks, threatening, aggressively hostile, belligerent, Ccampaigning, vulgar, rude, and inappropriate remarks constitute protected speech. *See* http://tinyurl.com/mjk67d9d ("Massachusetts high court affirms the right to be rude in a public assembly").

190.250. Because vulgar, rude, and inappropriate remarks are protected speech, outright prohibitions on vulgar, rude, and inappropriate language is not allowed. *See Acosta v. City of Costa Mesa*, 718 F.3d 800, 813 (9th Cir. 2013); *Mama Bears of Forsyth County v. McCall,* 642 F.Supp.3d 1338, 1361 (2022).

**Personal Attacks, Campaigning, Vulgar, Rude, and Inappropriate Are Viewpoint Based**

73

~~191.~~251. The Court should follow the reasoning regarding "personal attacks" contained in *MacQuigg v. Albuquerque Pub. Sch. Bd. of Educ.,* No. 12-1137 2015 WL 13659218 (D.N.M. Apr. 6, 2015). Judge Armijo held personal attacks were viewpoint discrimination citing *Griffin v. Bryant*, 30 F.Supp. 3d 1139, 1181 (D.N.M. 2014); accord *Moore v. Asbury Park Bd. of Educ.,* 2005WL 2033687 *11-13 (D.N.J. 2005) (collecting cases). The more recent Supreme Court cases support this reasoning. *See also Mama Bears* and *Marshall v. Amuso* (citing Supreme Court cases). Judge Armijo stated "Judge Browning's reasoning has considerable intuitive appeal." Judge Armijo reasoned:

> The Board's express designation of its members for protection from personal attacks gives the members of the Board a personal interest in suppressing critical speech. The Court is inclined to confine the *Boos* plurality's conclusion about viewpoint neutrality to the context of the statute at issue in that case and to follow Judge Browning's compelling reasoning: the Board's policy is viewpoint-based because it "permits praise and neutral feedback, but not criticism of both government employees and worse, [the Board] itself." *Griffin*, 30 F. Supp. 2d at 1173.... The Board's "personal attacks" policy is declared on its face to violate of the First Amendment.

~~192.~~252. The three rude-inappropriate-vulgar words taken together most logically mandates a heightened "civility" rule – that speakers not be "disrespectful." Instead, the speaker must show high or special regard or esteem towards the Commission and other meeting attendees and refrain from insulting them or being offensive, rude, insulting, or abusive towards them. This converts the meeting into 3rd grade class managed by a presiding "teacher" watching to ensure his "students" talk nice.

~~193.~~253. "Civility" cannot be required during the public comment section of a government meeting.  Such requirements are viewpoint-based and thus facially unconstitutional. Members of the public must be able to provide their feedback and

74

critiques, even if some people, County Commissioner members included, find that distasteful, irritating, or unfair. "Giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 137 S. Ct. 1744, 1763 (2017).

~~194.~~254. The ordinary meaning of "vulgar" includes "lacking in cultivation, perception, or taste," "morally crude," "and offensive in language." Vulgar, Merriam-Webster, available at https://perma.cc/Y5YP-FJZU. Prohibiting vulgar speech thus discriminates based on viewpoint because it restricts speech in reference to "conventional moral standards." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2300 (2019).

**"Reserves the Right" is Vague, Not a Mandatory Requirement, and Institutionalizes Inconsistent and Arbitrary Treatment of Speakers**

~~195.~~255. "Reserving a right" is not a speech prohibition at all. Rather, it is a moving target. It means a presiding Commissioner can decide whether he wants to exercise a discretionary and arbitrary license to censor or stop speech. The purported comment restrictions do not necessarily prohibit vulgar, rude, or inappropriate remarks at all. Rather, it vests arbitrary and unguided discretion in the presiding commissioner to two options: removal of the speaker or muting of a microphone.

~~196.~~256. As presiding Commissioner, even if Dr. Spiehs' speech constituted a speech code violation, it did not merit removal each time: "there were ample tools available, such as adjourning, taking a break…." *Frenchko* at *18.

~~197.~~257. The policy is not narrowly tailored and is unreasonably retaliatory as it provides only two options and does not contemplate a third option of allowing the speaker to simply remain in the open meeting assembly as an observer.

75

198.258. The policy provides no guidance or notice to the public as to why or when campaigning, or a vulgar, rude, or inappropriate statement occurs or why not all statements are treated equally with equal consequences.

**Restrictions "Threatening," "Aggressively Hostile," "Belligerent," "Vulgar, Rude, Inappropriate" Personal Attacks, and "Campaigning," Fighting Words," "Slander," "Speech that Invades the Privacy of Individuals," "Unreasonably Loud," "Disruptive," "Repetitive" Are Vague**

199. The County's webpage provides no definition of the words "threatening," "aggressively hostile," "belligerent, "vulgar, rude, inappropriate," "personal attacks," "campaigning," "fighting words," "slander," "speech that invades the privacy of individuals," "unreasonably loud," "disruptive," or "repetitive."vulgar, rude, inappropriate, or campaigning.

200.259. A law or regulation is void-for-vagueness when "people of ordinary intelligence" do not have "a reasonable opportunity to understand what conduct it prohibits." *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1201 (10th Cir. 2005).

201.260. "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone … than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972).

**SECOND CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Content & Viewpoint Discrimination**
**(42 U.S.C. § 1983)**

202.261. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

203.262. Each of the defendants are also motivated to appease YOUTUBE by allowing YOUTUBE, by ratification and approval by the defendants, to impose

Formatted: Font: Bold, Complex Script Font: Bold

Formatted: Font: Bold, Complex Script Font: Bold

Formatted: Font: Bold, Complex Script Font: Bold

through these defendants viewpoint discriminatory censorship upon Dr. Spiehs in violation of the First Amendment of the U.S. Constitution. YOUTUBE and government such as Douglas County have a symbiotic relationship. This is similar to federal officials "persuading" social-media platforms into censoring certain social media content, in violation of the First Amendment, except in reversal. *See Missouri v. Biden*, ___F. 4th ___,___, 2023 WL 6425697, *27 (CA5, Oct. 3, 2023); *Missouri v. Biden*, ____F. Supp. 3d ___, 2023 WL 4335270 (WD La., July 4, 2023) (suppressing the expression of disfavored views on important public issues).

204.263. The Commission so much covets the ability to publish, record, and livestream its open meetings on YOUTUBE that it would ratify YOUTUBE'S manipulation of public debate. Each defendant has engaged in retaliation, discrimination, and outright punishment as applied to Dr. Spiehs because of his speech.

205.264. The Free Speech Clause prevents the government from wielding its power to "manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). This "constitutional safeguard, [the Supreme Court] has said, was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). It is "the theory of our Constitution" that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). And if the First Amendment does anything, it prevents the

77

government from interfering in public debate to "effectively drive certain ideas or viewpoints from the marketplace" of ideas. *Turner* at 641.

~~206.~~265. Defendants are manipulating public debate in its treatment of Dr. Spiehs, as well as other public speakers. While other speakers can use the vulgar word "fuck" at an open meeting, Dr. Spiehs is censured and punished for the same behavior. "The Supreme Court has long…warned about the pernicious effects of an artificially controlled public debate and [has] held that the First Amendment serves to prevent such manipulation." *Bach v. Sch. Bd. of Va. Beach*, 139 F. Supp. 2d 738, 742 (E.D. Va. 2001).

~~207.~~266. That danger exists because the defendants regulate the content of Dr. Spiehs' speech, and it is no less worrisome that the government manipulates debate on its own property. *See Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 831-32 (1995) (adopting a broad interpretation of viewpoint discrimination to prevent a university from "skewing" public debate in a limited public forum).

~~208.~~267. The defendant Commission, of course, can choose not to open a public comment forum at all in its open meetings. But it cannot open a forum that skews "the marketplace of ideas." *See id.* at 831. That's because "the first amendment is concerned, not only with the extent to which a law reduces the total quantity of communication, but also -- and perhaps even more fundamentally -- with the extent to which the law distorts public debate." GEOFFREY R. STONE, CONTENT REGULATION AND THE FIRST AMENDMENT, 25 WM. & MARY L. REV. 189, 198 (1983).

209.268. The Commission addresses by proclamation numerous issues the Commission has no control over: "Human Trafficking Awareness"; "Juneteenth, June 19 celebrating the end of slavery"; "National Law Enforcement Month"; "League of Women Voters"; "AmericCorps Week"; "Lawrence Public Library's 2022 Read Across Lawrence."

210.269. This Court should prevent the defendants from manipulating debate where defendants purport to set up an ostensibly free and fair discussion that turns out to be neither.  The First Amendment cabins the government's power over speech even in a limited public forum – and why defendants speech rules directed at Dr. Spiehs is unconstitutional. Defendants cannot be permitted to prevent Dr. Spiehs from sharing his own unique message about topics. And content-based restrictions must be reasonable – because the Commission opens a forum for discussion about literally anything, it cannot undermine that discussion by excluding otherwise relevant speech.

211.270. The defendants have suppressed Dr. Spiehs's speech because of what he represents message-wise which include his prior and present viewpoints.   The manner in which defendants apply whatever speaking policies defendants think apply does ban certain ideas using whatever purported "inappropriate" or "vulgar" language to convey those ideas.

212.271. It makes no difference that the defendants allow the same or other forms of criticism not utilizing purported "vulgar" language. *See Rosenberger*, 515 U.S. at 831.

79

~~213.~~272. The defendants have suppressed Dr. Spiehs's speech because of the viewpoints he has expressed or wants to express at open meetings conducted by the Commission.

~~214.~~273. The defendants have not drawn "a reasonable line" when regulating the content of speech at its open meetings. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018).

~~215.~~274. Government bears the burden of "articulat[ing] some sensible basis for distinguishing what may come in from what must stay out." *Id.* And its rules must further – rather than undermine – the purpose of the forum. *Id.* at 1891. Thus, the defendants inconsistent categorical bans on certain kinds of speech of Dr. Spiehs violate the First Amendment because defendants cannot explain "why such a restriction 'preserves the property' for the … uses to which it has been put.*" Int'l Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 692 (1992) (O'Connor, J., concurring).

~~216.~~275. The defendants' respective actions targeted certain viewpoints and have targeted Dr. Spiehs' and his particular views for disparate and adverse treatment. Defendants restricted and punished Dr. Spiehs' views because they didn't like him and because of their respective specific motivating ideology, opinion, and perspective.

~~217.~~276. Defendants inconsistent and ostensible bans on Dr. Spiehs' speech because it is perceived as violating YOUTUBE standards, is negative, embarrassing, or not "woke" (while allowing others to speak on the same topics if positive) fail the *Mansky* "forgiving test." *Mansky* at 1888.

~~218.~~278. Defendants purported application of its speech policies to Dr. Spiehs reaches far broader than whatever legitimate interest Defendants may have for enacting or applying its policies. And it imposes an "expansive" ban on an entire class of political speech that undermines the purpose of the open meetings forum conducted by the Commission.

~~219.~~278. A ban on "threatening," "aggressively hostile," "belligerent, "vulgar, rude, inappropriate," "personal attacks," "campaigning," "fighting words," "slander," "speech that invades the privacy of individuals," "unreasonably loud," "disruptive," or "repetitive." ~~"campaigning for public office" or mentioning any topic utilizing purported "inappropriate"~~ language is not reasonable in that forum which is dedicated to discussing all topics. The County is run by people. Those people, including defendants and their respective employees, implement policy daily. Criticizing or complimenting these government officials by name who run the County and execute policy fits within the scope of public comments at an open meeting.

~~220.~~279. As one court has explained, an "opinion that a school employee is incompetent in performing school duties or violating the law governing the performance of the employee's duties is in fact relevant to the purpose of the limited public forum." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 426 (E.D. Pa. 2021). Thus, the manner in which defendants interpret its speaking policy "undermines" defendants' "interest in maintaining" a forum to hear opinions about the County and its employees, *Mansky* at 1891, because it prevents speakers from discussing issues that otherwise fit within the "subject matter" that the Commission Board seeks input

81

on. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 393 (1993).

~~221.~~280. Making matters worse, the interpretation and application of the amorphous purported speech rules governing public comments at the County Commission's open meetings directed at Dr. Spiehs prohibits core First Amendment speech. "The right to criticize public officials is at the heart of the First Amendment's right of free speech." *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir. 1993). That is why the Constitution protects "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.* at 270. So it "is a serious matter when the whole point of [defendants' application of its speaking policy] is to prohibit the expression of political views" about the officials responsible for enacting government policy. *See Mansky* at 1891.

~~222.~~281. Defendants restricted and punished Dr. Spiehs' views because of his specific motivating ideology, opinion, and perspective. The defendants view Dr. Spiehs as an unwelcome antagonist due to his protest status and outspokenness about social issues such as mask and vaccine mandates, as well as his status as an opposing political candidate.

~~223.~~282. Each defendant acted with a viewpoint-discriminatory purpose when Dr. Spiehs' speech was suppressed.

~~224.~~283. And there are ample ways to prevent the narrow problems that the Commission Board might worry about. *See id.* ("For example, the prohibitions on 'physically threatening remarks' and disruptive conduct could be invoked to limit

82

certain speech directed towards County Commissioner members that may have, for lack of a better phrase, crossed the line, and terminate speech or conduct that inhibits the meeting's progress").

225.284. Each defendant acted with a viewpoint-discriminatory purpose when Dr. Spiehs was silenced, removed, and otherwise banned from County property where the open meetings occur.

### THIRD CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech Retaliation**
**(42 U.S.C. § 1983)**

226.285. Plaintiff Dr. Spiehs repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

227.286. Each defendant has targeted Dr. Spiehs because of his status and viewpoints and have been motivated from their respective animosity and predispositions against Dr. Spiehs and his political viewpoints as a basis to retaliate and chill Dr. Spiehs' speech.

228.287. Each defendant was "motivated by improper considerations" such as "the desire to prevent the exercise of a constitutional right." *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000).

229.288. Defendants have retaliated against Dr. Spiehs, in part, because each has ratified YOUTUBE's discriminatory viewpoint policies which has determined that Dr. Spiehs' speech violates its policy. Defendants each, in order to cajole or otherwise appease YOUTUBE, has censored and retaliated against Dr. Spiehs so that Dr.

Spiehs' protected speech at the Commission's open meetings is silenced and prohibited.

230.289. "Singling out one individual, banning his (perhaps disfavored) speech, and essentially preventing him from engaging in a form of civil discourse that is available to everyone else ... is unreasonable." *Mama Bears* at 1362 (quoting *McBreairty v. Sch. Bd. of RSU 22*, 616 F.Supp.3d 79, 96 (D. Me. July 20, 2022)).

231.290. The Douglas County Commission, Douglas County, and Douglas County Sheriff each ratified each confrontation, removal(s), and arrest of Dr. Spiehs.  Each made an affirmative approval of those decisions of the defendants described in this Complaint regarding the removal of Dr. Spiehs from a building or meeting. They each further ratified those decisions by failing to meaningfully investigate and punish the unconstitutional conduct.

232.291. An inference of policy or custom may be drawn from a failure to take remedial action after a constitutional violation.  *See Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.1991).

233.292. Defendants had a policy or custom of viewpoint discrimination from the failure of Board to take any remedial steps after the violation. *See Larez; Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir. 1985).

234.293. The Douglas County Commission and Douglas County Sheriff had, and continue to maintain, an illegal policy or custom, as described in this Complaint regarding Dr. Spiehs' protests, campaign, and speech.

235.294. There was an illegal official policy or legislative enactment of both the Commission and the Sheriff.

236.295. The Sheriff and presiding Commissioner were each officials with final decision making authority who ratified the illegal actions.

237.296. There was a custom by each of the defendants of tolerance or acquiescence of federal rights violations.

238.297. There is no written resolution of the County Commission that suggests arrest decisions of the County Sheriff are reviewable by the County Commission.

239.298. Defendant Armbrister directly participated in unconstitutional conduct and further promulgated an unconstitutional policy carried out by subordinate defendant deputies.

240.299. There is no authority provided in any of the defendant County Commission policies in 2022 through 2024 to limit the scope of a public speaker's topic or speech.

241.300. There is no authority provided in any of the defendant County Commission policies in 2022 through 2024 to give authority to any defendant to silence, remove, or ban individuals from attending open meetings conducted by the defendant County Commission.

242.301. There is no authority provided in any of the defendant County Commission policies in 2022 through 2024 that provides for removal of a speaker at an open meeting conducted by the County Commission.

243.302. There is no authority provided in any of the defendant County Commission policies in 2022 through 2024 that provides for removal of a speaker at an open

meeting conducted by the County Commission because of the President's perceived speech-code violation by that speaker.

**FOURTH CAUSE OF ACTION**
**Violation of Plaintiff's Fourteenth Amendment Right to**
**Equal Protection of the Law**
**(42 U.S.C. § 1983)**

244.303. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

304. To prevail, Dr. Spiehs "must show that [he was] prevented from speaking while someone espousing another viewpoint was permitted to do so." *Harmon v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023). Each defendant "prevented [Dr. Spiehs] from speaking while someone espousing another viewpoint was permitted to do so." *Id.*

245.305. Defendants stop Dr. Spiehs from speaking when they mute his microphone which then means neither the audience, the Commission, or the viewing online public can hear him. Other speakers are not muted because the defendants approve the speaker's viewpoints.

246.306. ""Threatening," "aggressively hostile," "belligerent, "vulgar, rude, inappropriate," "personal attacks," "campaigning," "fighting words," "slander," "speech that invades the privacy of individuals," "unreasonably loud," "disruptive," or "repetitive." is Campaigning" (whatever that means) is purportedly prohibited which is unconstitutionally vague as applied to Dr. Spiehs as well as discriminatory. Other speakers are permitted to state their own individual positions regarding any number of topics yet Dr. Spiehs cannot because those same or different positions are

86

connected to his Commission candidacy.  Thus, any speaker could say "I am against raising taxes" at the public comment section but could not say "as an elected Commissioner I am against taxes" or that "I support Dr. Spiehs' position on taxes." The distinction is unreasonable, serves no governmental interest, and treats similarly situated public speakers differently.

~~247.~~307. If saying "vulgar" or "inappropriate" things before or during an open meeting merits arrest or removal, why not for Michael Eravi for who did the same thing?

~~248.~~308. If having a dialogue or disagreements prior to the open meeting merits arrest or removal, why didn't Mr. Almon or others get arrested or removed from the building?

~~249.~~309. The First Amendment limits the government's authority to regulate private speech on public property. *Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997).

~~250.~~310. Plaintiff is a "class of one" and alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215-16 (10th Cir. 2011).

~~251.~~311. "A violation of equal protection occurs when the government treats someone differently than another who is similarly situated." *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kan.*, 927 F.2d 1111, 1118 (10th Cir. 1991).

~~252.~~312. Dr. Spiehs has named specific speakers in this Complaint who are comparators – similarly situated – to Dr. Spiehs.

253.313. The policy created, interpreted, or enforced by the Sheriff and County Commissioner defendants treats speakers and viewpoints unequally and arbitrarily.

254.314. This treatment violates the First Amendment because "no conceivable governmental interest" justifies prohibiting individuals from having dialogues prior to an open meeting with other attendees neither is there any interest in punishing individuals for using the word "fuck" in those dialogues. *See Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575 (1987).

255.315. After taking the many adverse actions against Dr. Spiehs for purported speech code violations, the defendants have knowingly refrained from taking the same adverse actions against other speakers who have purportedly violated the speech code in the same manner or in discussing the same topics and viewpoints as the plaintiff Dr. Spiehs.

256.316. Defendants' customs, practices, and their enforcement have also been applied to discriminate intentionally against Dr. Spiehs' rights to freedom of speech, right to be free from compelled speech (if speaking, only making positive statements), right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

257.317. Defendants' Policy and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to Commission's asserted interests unprohibited.

258.318. Defendants applied their Policy and related practices to Dr. Spiehs in a discriminatory and unequal manner, granting other speakers the right to express

88

their views on the same topics and subjects as Dr. Spiehs attempted to speak on while denying that right to Dr. Spiehs, in violation of Dr. Spiehs' right to equal protection of the law under the Fourteenth Amendment.

**FIFTH CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Declaratory and Injunctive Relief**
**As Applied Challenge**

~~259.~~319. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

~~260.~~320. The Commission has and operates a *laissez-faire* standardless public speaking policy.  It is a designated public forum.  *See Mesa v. White,* 197 F.3d 1041, 1045 (10th Cir. 1999).  The erratic and standardless application undermines any claim it is a limited public forum.

~~261.~~321. As identified in Count 1, the restrictions are vague, unauthorized, and void. The Kansas legislature has delegated autonomy to Counties with definite standards. The Kansas legislature not only delegated this power in its Home Rule framework with its expressed standards as well as dictating to the County a procedure for the exercise of that power.  Together the statute provides for adequate notice and safeguards to those who are affected by the County's actions. Thus, the County's citizenry is entitled to an agenda notice of Commission actions that require a voted "resolution."  Because the Commissioners have failed to vote upon or otherwise legally adopt their speaking policy as a regulation, it is already presumed suspect. Having jettisoned the legislature's restrictions on the County's existence as an

autonomous governing unit, they now arbitrarily and capriciously perform the functions of governance far beyond those assigned by the legislature.

262.322. Here, the County's purported "legislation" on public comments is so lacking in guidelines that neither the County nor the courts can determine whether the County is carrying out the intent of the legislature's "resolution" requirement, then, in fact, the County Commissioners become the lawgiver rather than subject to the confines of the statute.  In essence, the Commissioners have created new law which usurps the authority of the legislature.

263.323. The Commission's treatment of the Home Rule statutory framework in circumventing the resolution requirement renders all of its purported public comment restrictions null and void.

264.324. The defendant Sheriff defendants and the individual Commissioner's written or unwritten rules on speaking in public has been applied to the plaintiff Dr. Spiehs in a discriminatory and disparate fashion.  As pointed out previously in this Complaint, whatever the restrictions are that YOUTUBE imposes – which defendants have and now impose – are viewpoint discriminatory and vague. Even the Commissioners and the County Administrator state they are unclear and have targeted Dr. Spiehs as the purported culprit of YOUTUBE's denial of services.

265.325. Even if this Court finds that whatever public comment restrictions that exist are constitutional, the uncontroverted evidence establishes that the defendants enforced, and continue to enforce, these restrictions against Dr. Spiehs unequally.  If

the restrictions regarding "vulgar" and "inappropriate" are constitutional, they do not include a speaker using the word "fuck" or "motherfucker" as applied to Dr. Spiehs.

~~266.~~326. Other speakers are permitted to dialogue with other members of the audience without reprisal while defendants apply "vulgar" and "inappropriate" speech restrictions to Dr. Spiehs' speech – including his signs.

~~267.~~327. The online notice does not restrict topics or subject matter for discussion. Yet the oral instructions given at the current meetings add or suggest different restrictions such as "campaigning for public office is not allowed" and suggesting a time that the comments be "related to the general business of the Douglas County Commission." "Threatening," "aggressively hostile," "belligerent, "vulgar, rude, inappropriate," "personal attacks," "campaigning," "fighting words," "slander," "speech that invades the privacy of individuals," "unreasonably loud," "disruptive," or "repetitive." ~~"Campaigning"~~ is unconstitutionally vague as applied to Dr. Spiehs. The Commission does not define what constitutes "the general business of the Douglas County Commission" and do not state this business subject as a topic requirement but rather only as a suggestion.  This requirement, as applied to Dr. Spiehs, is unconstitutionally vague.

328. The defendants apply these restrictions against Dr. Spiehs when the restriction language does not apply.

~~268.~~

**Formatted:** No bullets or numbering

### SIXTH CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Declaratory and Injunctive Relief**
**Facial Challenge**

~~269.~~329. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

~~270.~~330. "In a typical case, the party moving for a preliminary injunction bears the burden of establishing its likelihood of success on the merits." *Mama Bears* at 1362 (citing *Matal v. Tam*, 582 U.S. 218, 137 S. Ct. 1744, 1763 (2017)). "However, in First Amendment cases the initial burden is flipped." *Id.* "Instead, the government bears the burden of proving that the law is constitutional and, as a result, the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality of the law." *Id. See New York State Rifle & Pistol Association, Inc. v. Bruen,* 142 S. Ct. 2111, 2130 (2022) (government "bears the burden of proving the constitutionality of its actions" when it restricts speech). The defendants each bear the burden to show each and every reason for the suppression of Dr. Spiehs' speech and his subsequent removal was Constitutional. *See Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2426 (2022) ("Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the District").

~~271.~~331. Under 42 U.S.C. §§ 1983 and 1988, Dr. Spiehs is entitled to appropriate relief invalidating Defendants' respective challenged policies (Sheriff defendants and the County Commissioners) and related conduct.

~~272.~~332. The Commission's open meetings are publicized online on its County website. The meeting scheduled for January 10, 2024, states the following:

92

**Meeting Information**

The public is encouraged to join our County Commission meetings in person or live using Zoom. Agendas for public meetings, along with the materials associated with those meeting agendas, will continue to be available ahead of the meeting on the County's website, and recordings of the County Commission meetings will be posted on the County's website after the meeting. Individuals may sign up to receive notification of the agenda for County Commission meetings on the County's website as well.

**There are three methods to provide Public Comment**

**Written Public Comment**: Written public comments for items on the agenda must be provided in writing no later than 24 hours ahead of the scheduled meeting start time. Comments received in that timeframe will be posted with the agenda materials. Comments received after that timeframe will not be posted with the agenda materials. Please email written public comment to [publiccomment@douglascountyks.org](mailto:publiccomment@douglascountyks.org). If email is not available, written comments may be placed in the County's information drop box in the south parking lot adjacent to the Courthouse.

**Via Zoom**: For applicants and meeting participants: If an applicant or member of the public wishes to make live public comments, they may do so remotely or in person at the meeting. Those wishing to participate remotely with public comment, will be accommodated via web conference (requires internet connection) or telephone. Instructions are listed below on how to raise your hand on Zoom. Commenters will be called upon by name to provide comments during the live meeting and all regular time limits will apply.

For public comment on agenda items or general public comment: General public comment for items of County business not on the agenda will be taken under that section of the agenda. If a participant on the zoom call would like to speak, they need to utilize the "Raise your hand" function on zoom. The meeting host will indicate they can speak. We ask that speakers give their names and address for the minutes. The County reserves the right to shut off the microphone and remove any speaker from the meeting if they are vulgar, rude, or inappropriate.

**In Person**: The County Commission meeting room will be available for an in-person viewing of the meeting or in-person public comment on certain agenda items, as mentioned above.

**Join the Zoom meeting for Wednesday, January 10, 2024, for the Business Meeting at 5:30 p.m.**

1. Follow this link: [https://douglascountyks-org.zoom.us/j/91338492736](https://douglascountyks-org.zoom.us/j/91338492736)
2. Use the meeting ID (if necessary): Meeting ID: 913 3849 2736
-or-

3. Dial this number +1 253 215 8782 and put in the Meeting ID: 913 3949 2736

**Note**: There is no participant code.
If you are new to Zoom, please see the detailed Zoom instructions. Zoom allows you to listen and/or watch the County Commission meeting live on a tablet, smartphone or computer. The County Commission chamber is open for public comment and for anyone that does not have access to a computer device such as smart phone, computer or tablet.

273.333. The online notice does not restrict topics or subject matter for discussion. Yet the oral instructions given at the current meetings add or suggest different restrictions such as "campaigning for public office is not allowed" and suggesting a time that the comments be "related to the general business of the Douglas County Commission." The Commission does not define what constitutes "the general business of the Douglas County Commission" and do not state this business subject as a topic requirement but rather only as a suggestion.

274.334. Considering that the activities of the Commission include speaking on topics that the Commission has no control over, it is reasonable to interpret the general business of the Commission to include speech encompassing matters the Commission has no control over as to an unlimited topic base as demonstrated in its proclamations.

275.335. A law or regulation is void-for-vagueness when "people of ordinary intelligence" do not have "a reasonable opportunity to understand what conduct it prohibits." *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1201 (10th Cir. 2005).

276.336. "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone … than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972).

94

277.337. The defendant Commissioners have apparently delegated to each Commissioner presiding at its open meetings the ability to determine the scope of public speaking authority at these open meetings conducted by the Commission. This formal authority continues under current policy and constitutes an ongoing standard operating procedure of the County Commission.

278.338. Their respective acts itself constituted an act of official government policy of the County Commission.

279.339. Each County Commissioner member who had final policy-making authority ratified each Commissioner president's unconstitutional actions.

280.340. A First Amendment violation centers on three questions: (1) whether speech is protected, (2) the type of forum, and (3) the justification for restricting speech. *See Summum* at 913. Dr. Spiehs' speech on each occasion cited in this Complaint was protected speech. The assembling of individuals prior to the start of any Commission open meeting is a designated public forum. The open meeting itself, because of the unlimited subject matter as to proclamations and what would then be "business" of the Commission, it also is a designated public forum.

281.341. The cited words and phrases are unconstitutionally vague because they lack "objective, workable standards" that a person of ordinary intelligence can understand. *Marshall* at 424 (quoting *Mansky* at 1891). The terms are "irreparably clothed in subjectivity." *Id.* This subjectivity renders the policy facially unconstitutionally vague. *Id.*

282.342. "Allowing a viewpoint to be offered on some occasions without interruption does not prove the policy viewpoint neutral." *McBrearity* at 96 (quoting *Marshall*). "Here, it is hard to shake the sense that the [Sheriff and Commission] is restricting the speech because the [defendants] disagrees with both [Dr. Spiehs'] opinions and the unpleasantness that accompanies them." *Id*. No harm will come to the defendants regarding an injunction.  The Court is requested to provide the injunctive and declaratory relief set forth in the Complaint.  Defendants cannot sustain their burden that each of their actions was Constitutional.

343. There is a credible or objectively justified fear of future enforcement of these policies because there has been a past enforcement of the same Commissioner requirements for the same conduct of Dr. Spiehs. The application of these requirements are purposely designed to permit the unguided and arbitrary enforcement according to the particular interpretations of any given Commissioner president.

**SEVENTH CAUSE OF ACTION**
**Violation of U.S. Const. Amend. I: Free Exercise Clause Categorical**
**Exclusion from Otherwise Available Government Benefits**
283.   **(42 U.S.C. § 1983)**

344.  Plaintiff repeats and reallege each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

345. Defendant County conveys a benefit to all public speakers to have their comments heard in their entirety by the audience attending meetings as well as the online viewers in the general public. This benefit includes having those comments archived on YOUTUBE so that they may listened to by the public.

96

346. Many speakers at these meetings, including Dr. Spiehs, desire that their viewpoints not only be heard by the defendant Commissioners but to be heard by the public at large via YOUTUBE.  And another purpose would be for candidates for public office, such as Dr. Spiehs, could have his viewpoints broadcast and accessed by the public on the Commission's YOUTUBE channel.

347. The "unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595, 604 (2013).

348. "The 'unconstitutional conditions' doctrine limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *United States v. Scott,* 450 F.3d 863, 866 (9th Cir. 2006); see also Koontz, at 608 ("We have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights").

349. The defendant Commissioners, together with the aid and assistance of the Sheriff department defendants, retaliate against Dr. Spiehs by denying Dr. Spiehs' this benefit because of their bias and animus towards him.  This violates the unconstitional conditions doctrine.

350. By muting Dr. Spiehs' microphone while speaking distorts Dr. Spiehs' speech, it is also retaliatory and designed to coerce Dr. Spiehs' in improperly changing his viewpoints to those approved by the defendants.  The actions denies Dr. Spiehss the

97

equal benefit of having his speech heard by the Commission and the audience in its

entirety and uncensored.

351. The plaintiff has been damaged by these actions.

## EIGHTH CAUSE OF ACTION
### RETALIATION AND RETALIATORY ARREST FOR EXERCISE OF PROTECTED SPEECH
### (42 U.S.C. § 1983)
### (AGAINST ALL DEFENDANTS)

352. Plaintiff repeats and realleges each of the allegations contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

353. At the time of both arrests, Plaintiff Dr. Spiehs was engaged in constitutionally

protected activity.

354. Defendants knew that Plaintiff's conduct did not violate Kansas state law.

355. Defendants knew that Plaintiff's conduct was affirmatively protected by federal

law.

356. The defendants decision(s) to arrest and initiate prosecution against the plaintiff

came directly in response to and because of Plaintiff's reasonable exercise of his

constitutionally protected rights under the First Amendment.

357. Defendants sought to punish the plaintiff for his many prior actions, including

his signs, his negative comments, his past protests, this lawsuit, and his mere

presence at meetings.   As a result, the plaintiff suffered monetary damages in

attorney fees defending against the prosecution, emotional, other economic, and

dignitary injuries.

358. Plaintiff has lost confidence in his ability to assert the rights guaranteed to him the Constitution of the United States of America. Plaintiff fears that defendants will continue to retaliate/punish him for asserting his rights in the future.

359. Such actions by Defendants, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America. These deprivations proximately caused Plaintiff's loss of liberty, emotional distress, and other harms associated with his retaliatory arrests.

### NINTH CAUSE OF ACTION
#### 42 U.S.C. §1983 FOURTH AMENDMENT VIOLATION – UNLAWFUL ARREST/FAILURE-TO-INTERVENE
#### (AGAINST ALL DEFENDANTS)

360. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

361. The defendants claimed Dr. Spiehs' post-arrest conduct justified the arrest.  But Dr. Spiehs' post-arrest conduct cannot supply the probable cause necessary to initiate the arrest.  *See Davis v. City of Apopka*, 78 F.4th 1326, 1333 n.3 (11th Cir. 2023) ("Probable cause is measured at the time of the arrest, not at some time before or after").

362. The arresting officers' post-arrest statements are *post hoc* decision-making which together indicate pretext.

363. Defendants knew that the plaintiff's specific conduct did not violate any Kansas or Federal law.

364. Based on their training regarding First Amendment protections, including the right to be present and speak at open meetings, the defendants each knew that the plaintiff's acts of being present, quietly displaying his signs was Constitutionally protected activity.

365. Despite knowing this, the defendants arrested, aided and abetted those arrests, and conspired to arrest Dr. Spiehs in retaliation.

366. Prior to each arrest, there was no crime committed by Dr. Spiehs, no emergency, nor did Dr. Spiehs threaten, or pose a threat, to anyone.

367. At any time during the interaction with Plaintiff, his arrest, or the subsequent booking processes, the defendants each had the opportunity to intervene in each of the unlawful arrests of the plaintiff but failed to do so.

368. Instead of intervening to prevent the unlawful arrests of Plaintiff, all the defendant Officers either chose to arrest the plaintiff or participate in that arrest without possessing any information that Dr. Spiehs committed a crime.

369. The actions as described herein of Defendants, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from unreasonable search and seizure.

**TENTH CAUSE OF ACTION**
**MALICIOUS PROSECUTION UNDER 42 U.S.C. SECTION 1983 AGAINST DEFENDANTS**

370. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

371. Plaintiff was charged with crimes as previously described.

100

372. After arresting the plaintiff both times, each of the defendant Officers caused a judicial proceeding to be commenced against Dr. Spiehs by the filing of reports and information in Douglas County Kansas.

373. Each of the judicial proceedings were instituted by each of the defendants without probable cause as Dr. Spiehs did not commit a crime in the defendants' presence or otherwise.

374. A reasonable inference from the lack of probable cause from the events and statements made immediately preceding the arrests, during the arrests, and after the arrests, that each of the defendants acted with malice each time Dr. Spiehs was unlawfully arrested, and initiated the criminal prosecution by booking each time Dr. Spiehs with monetary bonds that Dr. Spiehs paid.

375. As a result of each of the defendant's respective conduct described in this Complaint, the plaintiff had to endure detention, along with the stress and humiliation of dealing with unfounded criminal prosecutions, multiple unfavorable press coverage.

376. The actions as described herein of these defendants while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from wrongful prosecution as guaranteed by the Fourth Amendment to the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. § 1983. These deprivations proximately caused Plaintiff's loss of liberty, emotional distress, and other injuries associated with malicious prosecution.

**PRAYERS FOR RELIEF**

284.377. As to all counts, Defendants, under color of law, have deprived and continue to deprive the plaintiff of the right to petition, associated, and free speech in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution. Accordingly, this plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

285.378. That as a direct and proximate result of the aforementioned unlawful conduct and omissions of each of the defendants, Plaintiff suffered fear, pain, anguish, and the following damages: a. shock, fright, anxiety, mental distress, annoyance, vexation, and humiliation suffered by plaintiff; b. loss of freedom; c. pain and suffering during the arrest and confinement; d. isolation from friends and family; e. loss of dignity; f. loss of reputation; g. Loss of enjoyment of life; h. Compensatory and punitive damages; and any and all other damages otherwise recoverable under USC Section 1983 and Section 1988; and punitive damages in the individual capacity of each Defendant.

286.379. Dr. Spiehs' First Amendment rights were callously violated by each defendant sued in their individual capacity.

287.380. Dr. Spiehs' First Amendment rights were maliciously violated by each defendant sued in their individual capacity.

288.381. Dr. Spiehs' First Amendment rights were wantonly violated by each defendant sued in their individual capacity.

289.382. Dr. Spiehs' First Amendment rights were oppressively violated by each defendant sued in their individual capacity.

290.383. The acts by the defendants in this Complaint were prompted or accompanied by ill will, or spite, or grudge, either toward Dr. Spiehs individually, or toward persons in one of more groups or categories of which Dr. Spiehs is a member.

291.384. The acts by the defendants in this Complaint were done in reckless or callous disregard, or indifference to, the rights of one of more persons, including Dr. Spiehs.

292.385. The acts by the defendants in this Complaint were done in a way or manner which injures, or damages, or otherwise violates the rights of Dr. Spiehs with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of Dr. Spiehs.

WHEREFORE, the plaintiff requests that judgment be entered in his favor and against each defendant as follows:

A.   An order declaring that the statements "Dr. Spiehs For DGCO Commissioner Fuck These Liberal Motherfuckers" and "I don't give a fuck what you think of me" made by Dr. Spiehs do not legally constitute "fighting words" under the Kansas disorderly conduct statute Dr. Spiehs was charged with;

B.   An order declaring that Dr. Spiehs' charge of disorderly conduct based upon speech must be based upon the legal definition of "fighting words";

C.   That refusing a suggestion or an order to leave an open meeting by a police officer cannot constitute the crime of disorderly conduct under Kansas statute.

D.   An order enjoining the defendant Sheriff and his deputies, officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from arresting Dr. Spiehs at a Commission open meeting for disorderly conduct based solely upon speech that does not constitute the legal definition of fighting words;

E.   An order enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from cutting off the microphone, silencing, ejecting, or otherwise removing plaintiff Dr. Spiehs or any public speaker at a Commission open meeting solely because a claim by a Commissioner president that the speech violated a public comment restriction, was off-topic, vulgar, inappropriate, rude, or constituted campaigning;

F.   An order enjoining defendants from enforcing a policy regarding public comment topics because they are advisory and not mandatory and is subject to unbridled discretion by a presiding Commissioner president in its interpretation and unconstitutionally vague;

G.   Declaratory relief consistent with the injunction, to the effect that the oral statements which contains additional speaker restrictions are void, unauthorized,

104

and unconstitutionally void and unenforceable as they violate the First Amendment rights of free speech, religion, and to petition, and the Fourteenth Amendment's guarantee of due process against vague laws;

H.   An award of actual damages to the plaintiff;

I.   An award of nominal damages to the plaintiff;

J.   Against each individual defendant in their individual capacity an award of punitive and exemplary damages to the plaintiff;

K.   Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988 and any other relief as the Court deems just and appropriate.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all causes of action.

<u>/s/Linus L. Baker</u>
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:           913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

Verification of Complaint

I, Dr. Justin Spiehs, am the plaintiff in the above-captioned matter.  I have reviewed the foregoing allegations in this ~~Second~~ Third Amended Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

105

Date: _____          By: _____
                                 Dr. Justin Spiehs