**IN THE DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JUSTIN SPIEHS,<br><br>Plaintiff,<br><br>v.<br><br>JAY ARMBRISTER, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 5:24-cv-4005-JAR-BGS |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants, Sheriff Jay Armbrister, Lieutenant Kristen Channel, Deputy Tyler Kruzel, and Deputy Chase Coleman, in their individual capacities, submit this memorandum in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56(a).

**INTRODUCTION**

This civil rights case stems from Plaintiff Justin Spiehs's arrests at two separate meetings of the Douglas County Board of County Commissioners ("BOCC"). On April 20, 2022, Spiehs attended a BOCC meeting at which he angrily directed profane language at another attendee in close proximity to him, while holding a sign affixed to a large wooden stick, prompting Sheriff Armbrister to arrest him for disorderly conduct in violation of K.S.A. 21-6203(a)(3). Nearly two years later, on May 1, 2024, Spiehs attended another BOCC meeting, at which he stood in close proximity to county staff throughout the meeting, refused repeated requests to move further away or leave the room, and caused the BOCC to recess its meeting until deputies could restore order, prompting his arrest under K.S.A. 21-5922 for interference with the conduct of public business in a public building.

Spiehs now brings this action pursuant to 42 U.S.C. § 1983, asserting that multiple law enforcement officers violated his Fourth Amendment rights by arresting him without probable

cause, and that one officer further violated his rights by submitting a purportedly false probable cause affidavit. For the following reasons, Defendants are entitled to summary judgment:

1. Sheriff Armbrister, Lieutenant Channel, Deputy Kruzel, and Deputy Coleman are each entitled to qualified immunity from Plaintiff's wrongful arrest claims because none of these individual defendants violated Spiehs's rights under the Fourth Amendment;
2. Each of these defendants is also entitled to qualified immunity from Plaintiff's wrongful arrest claims because it was not clearly established that any of their alleged conduct violated Plaintiff's Fourt Amendment rights; and
3. Deputy Kruzel is entitled to qualified immunity from Plaintiff's malicious prosecution claim because Plaintiff cannot show a *Franks* Violation, the absence of probable cause, or a violation of his clearly established rights.

## DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSOF")

Defendants submit the following statement of uncontroverted facts. Consistent with summary judgment standards, these facts are based on the evidence viewed in a light most favorable to Plaintiff. Defendant reserves the right to later present evidence contradicting this evidence and these facts.

### I. Facts regarding Spiehs's April 20, 2022 arrest.

1. At all relevant times, Sheriff Jay Armbrister was the Sheriff of Douglas County, Kansas. (ECF 142, Pretrial Order (hereafter "PTO"), p. 2, Stip. Fact 3).
2. At all relevant times, Lieutenant Kristen Channel and Deputies Tyler Kruzel and Chase Coleman were sworn law enforcement officers employed by the Douglas County Sheriff's Office ("DGSO"). (PTO, p. 3, Stip. Fact 4).

3. On the afternoon of April 20, 2022, plaintiff Justin Spiehs stood outside the Douglas County Courthouse, with a cardboard sign stapled to a piece of wood that read, "DR. SPIEHS FOR DGCO COMMISSIONER FUCK THESE LIBERAL MOTHER FUCKERS." (**Ex. A,** Spiehs Depo. 19:7-20:24; 113:18-19).

4. Spiehs estimated the wood was under three feet in length. (**Ex. A,** Spiehs Depo. 114:1-7).

5. On April 20, 2022, the Douglas County Board of County Commissioners (the "BOCC") held their business meeting in the Douglas County courthouse. (**Ex. A,** Spiehs Depo. 18:1-8; **Ex. B,** Armbrister Depo. 41:17-21).

6. Spiehs entered the meeting room before the meeting began and brought his sign with him. (ECF 142, PTO, Stip. Fact. 1; **Ex. A,** Spiehs Depo. 19:7-10).

7. At the time Spiehs entered, he estimated there were 15 to 20 people in the room already. (**Ex. A**, Spiehs Depo. 116:4-7).

8. A true and accurate photograph of Spiehs's sign is depicted below:




(**Ex. A,** Spiehs Depo. 113:21-25; **Ex. C,** Spiehs Depo. Ex. 3).

9. Upon entering, Spiehs walked over to the sign-up sheet to sign up to make a public comment. (**Ex. A,** Spiehs Depo. 117:25-118:5).

10. When Spiehs arrived, Sheriff Armbrister was standing near the Commissioners' table and Deputy Kruzel was stationed in the corner, to the right of the table. (**Ex. A,** Spiehs Depo. 116:8-117:3).

11. As Spiehs was walking to the sign-in sheet, Sheriff Armbrister approached him and told him he could not be there with his sign. (**Ex. A,** Spiehs Depo. 118:11-119:6).

12. Spiehs said, "Oh yeah, why's that?" Sheriff Armbrister responded, "It's got cuss words on it." Spiehs replied, "Horse shit, it does." (**Ex. A,** Spiehs Depo. 22:20-23:14).

13. Spiehs told Sheriff Armbrister he was wrong, that he could be there with his sign, and that he was crossing the line, and Sheriff Armbrister responded, "Okay then." (**Ex. A,** Spiehs Depo. 23:13-21; 119:3-120:12).

14. Sheriff Armbrister began talking to the commissioners and Spiehs finished signing up to speak and sat down in the front row of the room. (**Ex. A**, Spiehs Depo. 23:17-21; 120:24-121:3).

15. Sheriff Armbrister told Commissioner Reid and possibly Commissioner Portillo that if there was a problem and the Commission wanted someone removed, they needed to let him know because he was not going to do it on his own. (**Ex. B,** Armbrister Depo. 46:17-48:2).

16. Neither Spiehs nor Deputy Kruzel could hear the conversation between Sheriff Armbrister and the Commissioners. (**Ex. A**, Spiehs Depo. 25:2-22; **Ex. D**, Kruzel Depo. 8:16-22).

17. After Sheriff Armbrister finished speaking with the Commissioners, he stood in the back of the seating area for the meeting. (**Ex. A,** Spiehs Depo. 27:3-7).

18. While seated in the front row, Spiehs asked Sheriff Armbrister why someone would still be wearing a mask (as a COVID-19 precaution). (**Ex. A,** Spiehs Depo. 28:20-29:2).

19. Spiehs then called Sheriff Armbrister, who was standing in the back of the room, a "pussy" for wearing a mask. (**Ex. A,** Spiehs Depo. 31:3-10; 37:5-13; 123:1-9).
20. Sheriff Armbrister responded with something along the lines of, "My face, my choice." (**Ex. A,** Spiehs Depo. 123:10-15).
21. Although not directed at Sheriff Armbrister, Spiehs then said something to the effect of, "You didn't give a fuck about my face when it was my choice." (Spiehs Depo. 123:16-124:14).
22. A man seated next to Sheriff Armbrister said, "Hey watch your mouth. There are ladies present." (**Ex. B**, Armbrister Depo. 64:21-24).
23. Sheriff Armbrister interpreted this comment to indicate someone not involved in the conversation felt upset, alarmed, angered, by Spiehs's actions. (**Ex. B**, Armbrister Depo. 64:24-65:6).
24. Citizen Michael Almon was seated in the row directly behind Spiehs at the meeting and was also wearing a mask. (**Ex. A**, Spiehs Depo. 125:14-19).
25. Almon told Spiehs that this would not help his chances for election to the county commission. (**Ex. E**, Almon Affidavit, ¶ 4; **Ex. A**, Spiehs Depo. 125:14-19).
26. Spiehs turned to see who had made the comment and said out loud, "I don't give a fuck what you think about me." (**Ex. A**, Spiehs Depo. 36:13-22; 126:4-9).
27. Spiehs was speaking in his "normal conversational voice," which was loud enough that he believed others in the crowd could hear it. (**Ex. A**, Spiehs Depo. 126:13-23).
28. Members of the audience told Spiehs to watch his language. (**Ex. A,** Spiehs Depo. 31:21-23).
29. Spiehs replied to the crowd in general, "How would you guys like it if you all came in here and said, 'Back The Blue no matter who,' and I'm up on the Commission and I tell you guys to get out of here? How would you like that?" (**Ex. A,** Spiehs Depo. 32:1-10).

30. When Spiehs turned back around, Sheriff Armbrister approached him. (**Ex. A,** Spiehs Depo. 33:11-15, 127:14-19).

31. When Sheriff Armbrister approached Spiehs, he said, "Get out." Spiehs responded, "For what?" and Sheriff Armbrister threw his hands up and said, "Disorderly conduct." (**Ex. A,** Spiehs Depo. 37:5-24).

32. While still seated, Spiehs said, "Disorderly conduct?" and repeated, "For what?" (**Ex. A,** Spiehs Depo. 37:5-24).

33. Spiehs told Sheriff Armbrister "No," three times, then said "For what?" seven times. (**Ex. A,** Spiehs Depo. 39:17-40:4).

34. Spiehs did not stand up on his own and was forced up by Sheriff Armbrister and Deputy Kruzel. (**Ex. A**, Spiehs Depo. 39:17 -20; 40:5-11).

35. Spiehs denies he was ever told he was under arrest while seated in the meeting room. (**Ex. A**, Spiehs Depo. 38:6-20).

36. Sheriff Armbrister and Deputy Kruzel grabbed Spiehs, took his sign, grabbed him by the wrists, and led him into the hallway, where he was arrested. (**Ex. A**, Spiehs Depo. 40:5-11).

37. Sheriff Armbrister was the officer who witnessed the crime, initiated the contact, and initiated the arrest. **(Ex. B,** Armbrister Depo. 191:9-18).

38. Sheriff Armbrister arrested Spiehs for disorderly conduct based on the totality of the circumstances, which included (1) the close proximity between Mr. Almon and Spiehs; (2) the volume and tone of Spiehs's voice; (3) the fact that Spiehs was using profane language directed at Mr. Almon; and (4) the fact that Spiehs was holding a sign attached to a large, wooden stick at the time. **(Ex. F**, Def. Armbrister's Resp. to Interrogatory 8).

39. From the courthouse, Deputy Kruzel took Spiehs to the Judicial and Law Enforcement Center and placed Spiehs in his patrol car. (**Ex. A**, Spiehs Depo. 132:8-13).

40. At approximately 5:41 p.m., Deputy Coleman spoke to Michael Almon. Deputy Coleman asked Mr. Almon if he felt that Spiehs had been trying to goad him into a fight, and Mr. Almon responded that he couldn't know Spiehs's intentions for sure, but that he was worried things would have escalated if law enforcement hadn't stepped in. Mr. Almon also described Spiehs's demeanor as "hostile," adding that this was a more severe situation than he had ever seen from Spiehs before. (**Ex. G**, Coleman Affidavit, ¶ 7; **Ex. E**, Almon Affidavit, ¶ 4).

41. Deputy Kruzel prepared and submitted a probable-cause affidavit relating to Spiehs's April 20, 2022 arrest. (**Ex. D,** Kruzel Depo. 57:17-58:7; **Ex. H,** Kruzel Depo. Ex. 2).

42. In the affidavit, Kruzel stated, relevant part:

    a. "Affiant observed Justin turn toward Michael Almon . . . who was seated directly behind [Spiehs,] and started yelling at Almon. Affiant heard [Spiehs] yell, 'I don't give a fuck what you think of me!";

    b. "Affiant and Sheriff Armbrister approached [Spiehs] and asked him to leave. [Spiehs] did not leave right away and asked Sheriff Armbrister why he needed to leave. Affiant heard Sheriff Armbrister tell [Spiehs] he was under arrest for Disorderly Conduct."; and

    c. "The meeting, which was scheduled to start at 1730 hours, was delayed [sic] Justin's actions."

(**Ex. H,** Kruzel Depo. Ex. 2).

43. Deputy Kruzel stated in the affidavit that the meeting had been delayed because he observed that the commissioners were already out, which to him meant they had been ready to start the meeting, although he agreed the minutes from the meeting stated that it started at 5:30, approximately five (5) minutes after the time he noted in his report that Spiehs was arrested. (**Ex. D,** Kruzel Depo. 77:12-78:24)

## II. <u>Facts regarding Spiehs's May 1, 2024 arrest.</u>

44. On May 1, 2024, the BOCC held its commission meeting in the Public Works Training Room, located at 3755 E. 25th Street, Lawrence, Kansas. (ECF 142, PTO, Stip. Fact 7).

45. At the outset of the meeting, Commissioner Karen Wiley read aloud a statement regarding public comment, stating in relevant part:

> "We also get to maintain the decorum of our meeting therefore we prohibit public comments that are threatening, aggressively hostile, or belligerent, fighting words, slander, or speech that invades the privacy of individuals, unreasonably loud, disruptive, or repetitive, or that interrupt or substantially interfere with the board's ability to conduct county business. We do reserve the right to mute or remove any speaker who violates these public comment rules . . . ."

(**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 3:43-4:07).

46. Spiehs entered the meeting room shortly after the meeting was called to order. (ECF 142, PTO, Stip. Fact 9).

47. At the meeting, Spiehs held a sign that on one side read "WOMEN HAVE MORE BALLS THAN PATRICK TOO," in reference to County Commissioner Patrick Kelly, and on the other side read something to the effect of, "KEEP FIGHTING THE LIBERAL AGENDA." (**Ex. A**, Spiehs Depo. 147:2-16).

48. The room for the May 1 meeting had a podium at which citizens could stand to make public comment, and rows of tables on either side of a podium. (**Ex. A,** Spiehs Depo. 76:23-77:3).

49. As depicted in Spiehs Depo. Ex. 6, the commissioners were seated in the row of tables depicted to the left of the podium, and county staff were seated in the front row depicted to the right of the podium. (**Ex. A,** Spiehs Depo. 144:1-145:1; **Ex. J**, Spiehs Depo. Ex. 6).

50. Spiehs Depo. Exhibit 6 shows the general area where Spiehs stood throughout the meeting, until his arrest, other than when he addressed the Commissioners for public comment. (**Ex. A,** Spiehs Depo. 144:1-145:1; **Ex. J**, Spiehs Depo. Ex. 6) (emphasis of Spiehs's location added).

51. While Spiehs was delivering his public comment, his microphone was cut off at the direction of Commissioner Reid. (**Ex. A,** Spiehs Depo. 47:15-48:4-6).

52. Spiehs continued to speak after his microphone was cut off, and Commissioner Kelly told him, "Justin, you're welcome to stay but you need to take a seat." (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 9:10-9:20).

53. After leaving the podium, Spiehs returned to the same general area where he'd previously been standing. (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 9:55-10:00).

54. As the meeting continued, approximately thirty (30) minutes later, Commissioner Reid stated, in relevant part:

> "Beyond that, I do want to make a point of public order before we start public comment. And, um, ask, "Deputy, can you please have Justin just step back and stand near the wall? Um, we've been very patient. You've made your point. You can still stand there. You've been very close to staff and I would just like you to step back because that's a traffic way for folks that may be leaving the room after their public comment. So you can just stand right next to Michael."

(**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 40:42-41:10).

55. Shortly after this comment, Commissioner Reid asked Deputy Melissa Favre to have Spiehs step back against the wall. (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 41:15-41:22).

56. During the meeting, a female County staff member told County Administrator Sarah Plinksky she was distracted from her job duties and feared for her safety because Spiehs was standing so close to her. (**Ex. K,** Plinsky Affidavit, ¶ 31).

57. After Commissioner Reid's comment, the County staff member who had been seated closest to Spiehs stood up and switched seats with Plinksky, who had previously occupied a seat further away from Spiehs. (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 40:25-41:35; (**Ex. K,** Plinsky Affidavit, ¶¶ 31, 35).

58. Commissioner Reid told Spiehs that he could stay, then added "Justin, the alterative is to leave the meeting. So either please take a step back and allow traffic flow and follow the deputy's orders, or please leave the meeting." (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 41:25-42:01).

59. Spiehs continued to stand in the same general location until Commissioner Wiley said, "Thank you deputies. I think it's time, I'm sorry. Deputies, please." (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 42:00-42:06).

60. After another minute passed with Spiehs continuing to stand in the same general area, Commissioner Wiley said, "Justin, we've asked very nicely. If we could have you either step back or leave the room. And deputies, I think we'll have to make that happen." (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 43:00-43:18).

61. Spiehs continued to stand in the same general area and the Commissioners announced the meeting would be taking a five-minute recess, at the request of County Administrator Plinsky. (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 43:30-44:00).

62. When the meeting resumed following the break, Spiehs remained the same general area he'd previously been standing in. (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 44:13-44:15).

63. Commissioner Reid announced that the meeting was resuming, then said, "On the advice of counsel, we would like to ask deputies to remove our two sign holders from the room. I'm very sorry, we'd like to have you back next time but we have an orderly meeting to conduct

here, so deputies if you don't mind, thank you." (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 44:09-44:32).

64. The Commissioners announced a second recess to "handle this issue." (**Ex. I,** ECF 142, PTO, Stip. Ex. ii at 45:10-45:17).

65. Around 6:15 p.m., Deputy Coleman and Lieutenant Channel responded to a request for assistance from Deputy Favre, who reported to dispatch that there was a subject refusing to leave the BOCC meeting that was taking place. (**Ex. L**, Channel Affidavit, ¶ 3; **Ex. G**, Coleman Affidavit, ¶ 9).

66. As of the time Lieutenant Channel and Deputy Coleman arrived, neither had been present for, nor had any personal knowledge regarding what had already taken place at the May 1, 2024 BOCC meeting thus far. (**Ex. L**, Channel Affidavit, ¶ 5; **Ex. G**, Coleman Affidavit, ¶ 5).

67. Lieutenant Channel and Deputy Coleman spoke with Deputy Favre outside the building. Deputy Favre told them the BOCC was conducting its meeting inside, that the Commissioners and Plinksky had asked Spiehs to leave because he was standing in the aisle near the staff area, and that the BOCC had called a recess and were waiting for Spiehs to be removed before they felt they could continue the meeting. (**Ex. L**, Channel Affidavit, ¶ 3; **Ex. G**, Coleman Affidavit, ¶ 10).

68. While the meeting was still in recess, Plinksky and County Counselor John Bullock met with Lieutenant Channel, Deputy Coleman, and Deputy Favre outside. (**Ex. K,** Plinsky Affidavit, ¶ 38; **Ex. L,** Channel Affidavit, ¶ 6).

69. Plinsky told the deputies that Spiehs was causing a disturbance and needed to be removed. Plinsky explained that Spiehs was blocking the access path and standing next to the staff table,

which made staff feel threatened, and that she had already moved one staff member who felt uncomfortable with Spiehs standing so close to the table. She also told the deputies that Spiehs had been asked multiple times to move away from the table and have a seat with the rest of the public audience, but he would not. (**Ex. K,** Plinsky Affidavit, ¶ 38; **Ex. L,** Channel Affidavit, ¶ 6).

70. While the meeting was still in recess, Lieutenant Channel and Deputy Coleman entered the building and observed that the room appeared to be set-up to intentionally create separation between the rows of chairs for the audience and the tables the commissioner and county staff were seated, so people could approach the podium when needed and for the BOCC to conduct the meeting. (**Ex. L,** Channel Affidavit, ¶ 6).

71. Lieutenant Channel and Deputy Coleman observed Spiehs standing beyond the front row of chairs for the audience, close to the end of one of the tables. (**Ex. L,** Channel Affidavit, ¶ 9; **Ex. G**, Coleman Affidavit, ¶ 12).

72. Lieutenant Channel told Spiehs that she was not asking him to remove his sign but was asking him to move away a little ways from staff. Spiehs asked the grounds for Lieutenant Channel's request and what he was doing wrong, then stated that it was a public building and a public meeting and he could stand where he was if he wanted. (**Ex. L,** Channel Affidavit, ¶ 10; Channel Affidavit Attachment 1 at 0:05:00-0:05:50).

73. Lieutenant Channel asked Spiehs again to move down, and Spiehs responded that he would not. (**Ex. L,** Channel Affidavit, ¶ 11; Channel Affidavit Attachment 1 at 0:05:45-0:05:55).

74. Lieutenant Channel told Spiehs she was telling him to leave on behalf of the County Commission, and he again responded that he was declining. (**Ex. L,** Channel Affidavit, ¶ 12; Channel Affidavit Attachment 1 at 0:05:55-0:06:10).

75. Spiehs told Lieutenant Channel he was not leaving and Lieutenant Channel responded that per the Sheriff, she was going to have to arrest him for disrupting the meeting. (**Ex. L,** Channel Affidavit, ¶ 13; Channel Affidavit Attachment 1 [at 0:06:00-06:25).

76. Deputy Coleman placed Spiehs in handcuffs, then took him to the detention center. (**Ex. A,** Spiehs Depo. 155:25-156:1-5).

## ARGUMENTS AND AUTHORITIES

### I. Standards of Review.

Summary judgment is appropriate if the moving party demonstrates there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant initially bears the burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003). The nonmovant must then bring forth specific facts showing a genuine issue for trial through affidavits, deposition transcripts, or exhibits; conclusory allegations are insufficient . *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000). Failure to controvert a fact renders it admitted. D. Kan. Local Rule 56.1(b)(2). The Court views all evidence and reasonable inferences in the light most favorable to the non-moving party. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). Finally, since 1986, federal courts have not viewed summary judgment as a "disfavored procedural shortcut[.]" *Celotex* Corp. v. Catrett, 477 U.S. 317, 327 (1986). Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' " *Id.* (quoting Fed. R. Civ. P. 1).

## II. **Sheriff Armbrister and Deputy Kruzel are entitled to qualified immunity from the wrongful arrest claim asserted in Count IX.**

The § 1983 wrongful arrest claims against Sheriff Armbrister and Deputy Kruzel, in their individual capacities, should be dismissed on qualified immunity grounds. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "the norm," and officials enjoy a presumption of immunity. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (quoting *Harlow*, 457 U.S. at 807). A plaintiff overcomes this presumption "by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity such that 'every reasonable official would have understood that what he [was] doing' violated the law." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, (2011)). The Court may address the two prongs in any order. *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009).

### A. **Prong One: The April 20, 2022 arrest was supported by probable cause.**

In Count IX, Spiehs claims that Sheriff Armbrister and Deputy Kruzel violated his Fourth Amendment rights by arresting him on April 20, 2022 without probable cause. The Fourth Amendment protects an individual's right "against unreasonable searches and seizures[.]" U.S. Const. amend. IV. A seizure is authorized when a warrant is issued, justified by probable cause, and describes the person to seize. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). However, under Kansas law, a law enforcement officer may arrest an individual without a warrant when the officer has probable cause to believe the individual is committing or has committed a felony or, in some instances, a misdemeanor. *See* K.S.A. 22-2401(c). The Supreme Court has recognized that a

"warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).

Probable cause is not a precise quantum of evidence. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). It "does not require metaphysical certitude or proof beyond a reasonable doubt." *U.S. v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010). It does not even require a suspect's guild to be more likely true than false. *Stonecipher*, 759 F.3d at 1141. "[T]he relevant question is whether a 'substantial probability' existed that the suspect committed the crime, requiring something 'more than a bare suspicion.'" *Id.* (internal citations omitted); *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) ("Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."). This is "not a high bar." *Kaley v. U.S.*, 571 U.S. 320, 338 (2014).

Probable cause is reviewed under an objective standard of reasonableness. *Quinn v. Young*, 780 F.3d 998, 1006 (10th Cir. 2015). Therefore, "an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime." *Id.* (citations and internal quotation marks omitted). Probable cause is an absolute defense to a wrongful arrest claim. *See Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985) (lack of probable cause is an essential element of a § 1983 claim for unlawful arrest); *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) ("Probable cause is an absolute defense to claims of wrongful or false arrest under the Fourth Amendment in section 1983 suits.").

Here, Spiehs was arrested on April 20, 2022 for disorderly conduct under K.S.A. 21-6203(a)(3), DSOF ¶ 38, which defines "disorderly conduct" to include "engaging in noisy conduct

tending reasonably to arouse alarm, anger or resentment in others." Almost two years after Spiehs's arrest, the Kansas Supreme Court interpreted a materially identical city ordinance in *City of Wichita v. Griffie*, 318 Kan. 510, 511, 544 P.3d 776 (2024). To evaluate the ordinance's scope, the Court first interpreted its plain language. *See id.* at 523. Applying dictionary definitions of "noisy" and "conduct," the Court determined the ordinance "criminally punishes a person who makes disagreeable, unpleasant, or loud sounds that the person knows or should know would tend to reasonably arouse alarm, anger, or resentment in others." *Id.* at 524.

Using these definitions, the Court provided examples of conduct that would be criminal "in a considerable number of cases," including "[u]sing profane language in front of, or directed to, another person," if "expressed in a disagreeable, unpleasant, or loud way that would tend to reasonably arouse alarm, anger, or resentment in others . . . ." *Id.* at 525-526. Because the ordinance necessarily criminalized some conduct the Supreme Court had previously deemed protected under the First Amendment, the Court severed the "engaging in noisy conduct tending to reasonably arouse alarm, anger or resentment in others" language from the ordinance and limited its application only to "fighting words." *Id.* at 533-34.

While *Griffie* suggests it is possible, if not probable, the "noisy conduct" portion of K.S.A. 21-6203(a)(3) is overbroad, "[p]olice are charged to enforce laws until and unless they are declared unconstitutional." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). Correspondingly "[a] prudent officer, in the course of determining whether [a criminal defendant] ha[s] committed an offense . . . should not [be] required to anticipate that a court would later hold the [charging statute] unconstitutional." *Id.* at 37-38. Sheriff Armbrister and Deputy Kruzel were therefore entitled to rely on the plain meaning of the words used in K.S.A. 21-6203(a)(3), without attempting to forecast whether a court might later conclude the statute was overbroad.

This is not a case in which K.S.A. 21-6203(a)(3) was "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *DeFillippo*, 443 U.S. at 38. To the contrary, prior to *Griffie*, Kansas appellate courts had repeatedly applied and enforced K.S.A. 21-6203(a)(3) in circumstances consistent with the Kansas Supreme Court's interpretation of the statute's plain language. *See State v. Heyder*, No. 82,810, 2000 WL 36745844, at *1-2 (Kan. Ct. App. Feb. 11, 2000) (unpublished opinion) (affirming conviction where defendant exited vehicle at a toll booth, angrily advanced toward collector while flailing his arms, and uttered profanity in a raised voice); *City of Paola v. Ammel*, No. 96,301, 2007 WL 2767953, at *3 (Kan. Ct. App. Sept. 21, 2007) (unpublished opinion) (affirming conviction where defendant loudly screamed insults at officers in public library, heard throughout the building, and physically resisted arrest); *State v. Mead*, No. 115,989, 2017 WL 4082240, at *4-5, 12 (Kan. Ct. App. Sept. 15, 2017 2017) (unpublished opinion) (affirming conviction were defendant advanced toward others while flailing his arm, and yelled and screamed in an out-of-control, belligerent, threatening, and aggressive manner); *State v. Hughs*, 2018 WL 2374766, at *1, 4 (Kan. Ct App. May 25, 2018) (unpublished) (affirming conviction based on evidence of screaming and cursing that resulted in fighting and brawling).

*Griffie* confirms that the plain language of K.S.A. 21-6203(a)(3) operates to "criminally punish[] a person who makes disagreeable, unpleasant, or loud sounds that the person knows or should know would tend to reasonably arouse alarm, anger, or resentment in others," and that such language may encompass loud, profane, or confrontational speech directed at others in a public setting. *See* 318 Kan. 525-26. Even resolving all factual disputes in Plaintiff's favor, the uncontroverted evidence shows Spiehs was seated in close physical proximity to Mr. Almon in public meeting room, DSOF ¶ 24, holding a sign affixed to a wooden stick, DSOF ¶ 6, 8, and that

he turned toward Almon and directed profanity at him, stating, "I don't give a fuck what you think about me," DSOF ¶ 26, in a voice loud enough that others could hear, DSOF ¶ 27, prompting other members of the public to reach by telling Spiehs to "watch his language," DSOF ¶ 28. These uncontroverted facts align squarely with the Court's interpretation of the plain meaning of criminal "noisy conduct" described in *Griffie*: disagreeable and unpleasant speech, directed at another person in close quarters, tending reasonably to arouse anger or resentment. *See* 318 Kan. 510, 524–26 (interpreting "noisy conduct" to include "disagreeable" or "unpleasant" sounds, including profane language directed at another person, that tend reasonably to arouse anger or resentment).

A reasonable officer observing these facts was not required to speculate about constitutional overbreadth or future judicial narrowing of the statute; he was permitted to rely on the plain meaning of the statute's text and the observable reaction of those present in the meeting room. The accuracy and reasonableness of this assessment is further reinforced by the fact that Almon who later expressed his own concern that the situation could have escalated into a physical confrontation absent law enforcement intervention. DSOF ¶ 40.

The probable cause inquiry asks only whether there was a substantial probability, i.e. "more than a bare suspicion" that the suspect committed the crime. *See Stonecipher*, 759 F.3d at 1141. Here, that standard was readily met. Accordingly, the totality of the circumstances—profane speech directed at another attendee in a crowded public setting, audible to others, and provoking immediate public reaction—was sufficient to warrant a reasonable belief that Spiehs was engaging in noisy conduct under K.S.A. 21-6203(a)(3). Plaintiff cannot establish a Fourth Amendment violation as a matter of law, and Sheriff Armbrister and Deputy Kruzel are entitled to qualified immunity from the wrongful arrest claim asserted in Count IX.

### B. Prong Two: The April 20 arrest was supported by arguable probable cause.

Plaintiff also cannot show that his arrest violated his clearly established rights. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S 658, 664 (2012)). "For the law to be 'clearly established,' there ordinarily must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must point in one direction." *Pompeo v. Bd. of Regents of Univ. of New Mexico*, 852 F.3d 973, 981 (10th Cir. 2017). Courts are not to define a clearly established right "at a high level of generality." *White v. Pauly*, 137 S.Ct. 548, 552 (2017). Rather, "the clearly established law must be particularized to the facts of the case." *Id.* "Although plaintiffs need not cite a case with identical facts to demonstrate a clearly established right, existing precedent "must [ ] place[ ] the statutory or constitutional question beyond debate." *Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020) (quoting *Ashcroft*, 563 U.S. at 741).

In the context of a qualified immunity defense to a wrongful arrest claim, the Tenth Circuit has instructed courts to

> "ascertain whether a defendant violated clearly established law 'by asking whether there was 'arguable probable cause' for the challenged conduct. *Kaufman,* 697 F.3d at 1300. Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists. *Cortez v. McCauley,* 478 F.3d 1108, 1120 (10th Cir. 2007). A defendant 'is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest . . . the plaintiff.'"

*Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). In other words, Sheriff Armbrister and Deputy Kruzel are entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to stop plaintiff. *See id.*

Even if the Court were to conclude that actual probable cause did not exist (it did), Plaintiff cannot show that every reasonable officer would have known that arresting him for disorderly

conduct violated clearly established law. The relevant question is not whether Spiehs's conduct was ultimately criminal, but whether reasonable officers in Sheriff Armbrister and Deputy Kruzel's position could have believed that Spiehs's conduct constituted "noisy conduct tending reasonably to arouse alarm, anger or resentment in others" under K.S.A. 21-6203(a)(3). *See Stonecipher*, 759 F.3d at 1141.

At the time of the arrest, Spiehs was seated close to Almon in a public meeting room, holding a sign affixed to a wooden stick. He had already directed profanity at Sheriff Armbrister and then turned toward Almon and stated, "I don't give a fuck what you think about me," in a voice he admitted was loud enough for others in the room to hear. Members of the public reacted by telling Spiehs to watch his language, and Almon later reporting concern that the situation would have escalated into a physical confrontation absent law enforcement intervention. Under these circumstances, a reasonable officer could believe that Spiehs was engaging in disagreeable and unpleasant speech, directed at another person in close quarters, that tended reasonably to arouse anger or resentment among others present.

Nothing in clearly established Supreme Court or Tenth Circuit precedent placed it "beyond debate" that arresting Spiehs under these circumstances violated the Fourth Amendment. *Kapinski*, 964 F.3d at 910. To the contrary, officers were entitled to rely on the plain language of K.S.A. 21-6203(a)(3) as it existed on April 20, 2022, and to enforce it unless it was "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). As later explained in *Griffie*, the statute's plain language encompassed profane, loud, and confrontational speech directed at others—the exact conduct Sheriff Armbrister observed. *See* 318 Kan. at 524–26. Because reasonable officers could, at a bare minimum, disagree as to whether Spiehs's conduct constituted noisy conduct under the

statute, Sheriff Armbrister and Deputy Kruzel necessarily had at least arguable probable cause to arrest Plaintiff. Accordingly, Plaintiff cannot demonstrate that his arrest violated clearly established law, and Sheriff Armbrister and Deputy Kruzel are entitled to qualified immunity.

## III. Deputy Kruzel is entitled to qualified immunity from the malicious prosecution claim asserted in Count X.

In Count X, Plaintiff asserts a separate claim against Deputy Kruzel for malicious prosecution in connection with the April 20, 2022 arrest. It is uncontroverted that Deputy Kruzel prepared an affidavit in conjunction with the arrest. DSOF ¶ 41. Plaintiff contends this affidavit contained false statements and omitted exculpatory facts that were material to the magistrate's probable cause determination and the prosecutor's decision to file charges. *See* ECF 142, p. 5. As a threshold issue, the claim that this affidavit included false statements and omitted exculpatory information does not, by itself, amount to a constitutional violation. *See Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011); *Gangja v. Jojola*, 402 F.Supp.3d 1021, 1084 (D.N.M. 2019).

Claims of this sort are often referred to as "*Franks*" claims, after the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978). "In *Franks*, the Supreme Court held that affiants seeking arrest warrants violate the constitution when they knowingly, or with reckless disregard for the truth, include false statements in a supporting affidavit or omit information which, if included, would prevent the warrant from lawfully issuing." *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (citing *Franks*, 437 U.S. at 171). Under these circumstances, the Court reviews the affidavit as if the false information were set aside and the omitted information were included. *Kerns*, 663 F.3d at 1188 (citations omitted). From there, the Court determines whether the modified affidavit establishes probable cause. *Id.* The standard for establishing probable cause is set forth in Section II.A and therefore is not repeated here.

"Where a § 1983 claim premises liability on an alleged *Franks* violation, courts may decide the probable cause question at the summary judgment stage." *Kapinski*, 964 F.3d at 906. In doing so, the Court is not required to characterize ambiguous omitted material in plaintiff's favor. *Id.* (citing *Puller v. Baca*, 781 F.3d 1190, 1198 (10th Cir. 2015)). For example, if there is an ambiguity as to what a video show, the Court "assume[s] that [the officer] included the video footage with all of its uncertainties and ambiguities as an attachment to the warrant affidavit," rather than accepting the plaintiff's characterization of the video. *See id*. A challenged fact's inclusion or omission is material only insofar as its consideration / modification vitiates probable cause. *See Kapinski,* 964 F.3d 905.

### A. <u>Prong One: Plaintiff cannot show a *Franks* Violation or the absence of probable cause.</u>

The same qualified immunity standards set forth in Section II, *supra*, applies to this claim against Deputy Kruzel and therefore is not restated here. In the Pretrial Order, Plaintiff identifies the following as either falsities or omissions from the affidavit: that he (1) engaged in noisy conduct, (2) began yelling, and (3) refused to leave, (4) directing profanity toward attendees, and (4) that the BOCC had to wait for Spiehs to lower his voice before beginning the meeting. ECF 142, p. 5. Defendants address each of these claims in turn.

1. <u>Whether Spiehs engaged in noisy conduct / began yelling.</u>

Because Plaintiff's challenges to the affidavit's references to "noisy conduct" and "yelling" both rest on the same dispute regarding the volume and tone of Spiehs's voice, they are addressed together. As a threshold issue, the Kansas Supreme Court articulated in *Griffie* that the plain meaning of the phrase "noisy" does not require yelling. *See* 318 Kan. 524 (2024) (interpreting "noisy conduct" by its plain meaning and explaining that noise includes sound that "lacks an agreeable quality or is noticeably unpleasant **<u>or</u>** loud," and that the ordinance "criminally punishes

a person who makes disagreeable, unpleasant, **or** loud sounds[.]) (emphasis added). Correspondingly, whether Plaintiff was "yelling" is not dispositive of whether his conduct violated K.S.A. 21-6203(a)(3). Even under Spiehs's version of events, he turned towards Almon and stated, "I don't give a fuck what you think about me," DSOF ¶ 26, in a voice loud enough that he believed others in the crowd could hear him, DSOF ¶ 27, which he acknowledges prompted members of the crowd to tell him to watch him language, DSOF ¶ 28. This conduct which fits squarely within the plain meaning of "noisy," *i.e.* "lacks an agreeable quality or is noticeably unpleasant," whether it was also "yelling" or not. *See Griffie*, 318 Kan. at 524. And even if Spiehs could show some imprecision in the affidavit's description of his volume as "yelling," a *Franks* claim requires proof that any alleged misstatement was made knowingly or with reckless disregard for the truth, rather than through negligence or inadvertence. *Taylor v. Meacham*, 82 F.3d 1556 (10th Cir. 1996). Spiehs offers no evidence that Deputy Kruzel intentionally or recklessly mischaracterized Spiehs's volume, and a disagreement over whether the conduct constituted "yelling" does not meet that demanding standard. Plaintiff's semantic disagreement with the affidavit's use of the terms "noisy" or "yelling" does not establish a material falsity or omission, nor does it undermine probable cause when the affidavit is viewed in light of the statute's plain meaning and the totality of the circumstances.

2. <u>Whether Spiehs refused to leave.</u>

Plaintiff challenges the affidavit's reference to the fact that he was "asked . . . to leave" and "did not leave right away. . . ." DSOF ¶ 42. As a preliminary issue, whether Spiehs was asked to leave the meeting room, and whether he did so promptly, is irrelevant to whether probable cause existed to believe he engaged in disorderly conduct under K.S.A. 21-6203(a)(3). The offense at issue turns on whether Spiehs engaged in "noisy conduct tending reasonably to arouse alarm, anger

or resentment in others," not on whether he complied with or was given a directive to leave. Accordingly, even assuming for purposes of argument that Plaintiff was not expressly asked to leave, the inclusion of these facts would not negate probable cause and therefore cannot support a Franks violation. *See Kapinski*, 964 F.3d at 905 (holding that a *Franks* claim turns on whether the challenged fact was "material," that is, whether its inclusion/omission would have vitiated probable cause). And as explained above, a *Franks* claim also requires proof that any alleged misstatement or omission be made knowingly or with reckless disregard for the truth, rather than through negligence or inadvertence. *See Taylor*, 82 F.3d at 1563.

Even if the reference to Spiehs being asked to leave and not doing so promptly was material, the uncontroverted facts do not support Plaintiff's assertion that this description was inaccurate. Even under Spiehs's version of events, Sheriff Armbrister approached him and told him to "get out." DSOF ¶ 31. Spiehs responded, "For what?" and Sheriff Armbrister identified the basis for the direction as "disorderly conduct." DSOF ¶ 31. Spiehs undisputedly did not respond by "leav[ing] right away. Instead, according to Spiehs, he repeatedly refused, telling Sheriff Armbrister "No" three times, then asking "For what?" seven additional times while remaining seated. DSOF ¶¶ 32, 33. Spiehs also undisputedly never stood up on his own and instead had to be physically assisted from his seat by Sheriff Armbrister and Deputy Kruzel. DSOF ¶ 34. These uncontroverted facts support Deputy Kruzel's statement that Spiehs was asked to leave and "did not leave right away," and therefore do not establish a false statement or material omission under *Franks*. Nor do they suggest any intentional or reckless misrepresentation, as opposed to, at most, an immaterial characterization of undisputed events. *See Taylor*, 82 F.3d at 1563; *Stonecipher*, 759 F.3d at 1142.

3. Whether the BOCC had to wait for Spiehs to lower his voice before beginning the meeting.

Finally, Spiehs appears to dispute the accuracy of Deputy Kruzel's assertion that "[t]he meeting, which was scheduled to start at 1730 hours, was delayed [due to Spiehs's] actions." DSOF ¶ 42. As explained above, the materiality inquiry under *Franks* turns on whether striking the challenged statement would vitiate probable cause for the charged offense. Whether the BOCC was required to wait to begin the meeting is not determinative of whether probable cause existed to believe Spiehs engaged in disorderly conduct. The offense does not require that a meeting be delayed, postponed, or formally interrupted; it turns on whether Spiehs engaged in "noisy conduct tending reasonably to arouse alarm, anger or resentment in others." Accordingly, even if this statement were excised from the affidavit, probable cause would still exist, and the statement is therefore immaterial as a matter of law.

Even assuming there is a discrepancy between Deputy Kruzel's statement that the meeting was delayed and the facts that the arrest occurred at approximately 5:25 p.m. while the meeting minutes reflect a 5:30 p.m. start time, DSOF ¶ 40, that discrepancy does not satisfy the mental state required for a *Franks* violation. Deputy Kruzel testified that he believed the meeting had been delayed because he saw the Commissioners were already out, which he interpreted to mean they were ready to begin but were waiting for the situation involving Spiehs to be resolved. DSOF ¶ 43. That explanation reflects a contemporaneous inference drawn from what Deputy Kruzel observed, not a deliberate effort to mislead. Even if that assumption later proved incorrection, at most, it reflects a mistaken inference or imprecise characterization of timing, not a knowing or reckless falsehood. A *Franks* claim requires that a decision to include or omit facts be made "knowingly or with reckless disregard for the truth, rather than out of negligence or inadvertence." *Taylor*, 82 F.3d 1563. And the "failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely

suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to betoken negligence at most." *Stonecipher*, 759 F.3d at 1142. Because the record reflects, at most, that Deputy Kruzel had an imprecise understanding of when the meeting was ready to start, Spiehs cannot establish either materiality or the requisite mental state, and therefore cannot support this component of a *Franks* claim.

Even modifying Deputy Kruzel's affidavit as Spiehs suggests—by (1) construing the references to "yelling" as instead describing raised, unpleasant speech rather than literal shouting, (2) clarifying that Spiehs did not immediately comply with the direction to leave, and (3) disregarding any characterization of whether the meeting was formally delayed—the affidavit still amply establishes probable cause. In this scenario, the affidavit would still contain facts establishing that Deputy Kruzel observed Spiehs turn toward Michael Almon, seated directly behind him and state, "I don't give a fuck what you think about me," in a voice audible to others in the room, and observed that, after being told by Sheriff Armbrister to "get out," Spiehs did not immediately comply and instead remained seated until he was physically assisted from the room. Viewed in its totality, this modified affidavit establishes a fair probability that Spiehs engaged in "noisy conduct tending reasonably to arouse alarm, anger or resentment in others," and therefore still supports probable cause for disorderly conduct under K.S.A. 21-6203(a)(3).

In sum, Spiehs cannot establish any of the elements necessary to sustain a *Franks* claim. The record does not support that Deputy Kruzel knowingly or recklessly included false statements or omitted material facts from the affidavit, and the challenged statements are either immaterial or, at most, reflect non-actionable imprecision. Moreover, even when the affidavit is modified in the manner Spiehs proposes, it continues to establish probable cause for disorderly conduct under

K.S.A. 21-6203(a)(3). Because Plaintiff cannot show a constitutional violation or the absence of probable cause, Deputy Kruzel is entitled to summary judgment on Count X.

**B. Prong Two: The April 20 arrest was supported by arguable probable cause.**

Because, as set forth in Section III.A, Deputy Kruzel did not violate Spiehs's Fourth Amendment Right, the Court need not fully address the second prong of the qualified immunity analysis—whether the right was clearly established. Briefly, however, as discussed in Section II.B, in *Stonecipher*, the Tenth Circuit made clear that, at the second prong of the qualified immunity analysis, Courts must ask whether the officer's affidavit rested on "arguable probable cause"—an objectively reasonable, even if mistaken, belief that probable cause exists. 759 F.3d at 1141. Put differently, the inquiry is whether an Deputy Kruzel's "conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* As set forth in Sections II and III.A, because actual probable cause exists, there can be no genuine debate that at least *arguable* probable cause also exists.

The generic argument that it is clearly established an officer may not lie in a probable cause affidavit misstates the *Franks* analysis and fails to satisfy Plaintiff's burden. "[T]he clearly established law must be particularized to the facts of the case." *White v. Pauly*, 137 S.Ct. 548, 552 (2017). Plaintiff cannot identify any binding precedent capable of putting every reasonable officer in Deputy Kruzel's position on clear notice that Plaintiff's conduct did not violate K.S.A. 21-6203(a)(3). To the contrary, cases such as *City of Wichita v. Griffie*, 318 Kan. 510, 524–26, 544 P.3d 776 (2024), confirm that the plain language of the statute, at the time of Plaintiff's arrest, encompassed disagreeable, unpleasant, or loud sounds directed at others that tended reasonably to arouse anger or resentment. At a minimum, *Griffie* demonstrates that a reasonable officer could conclude, based on the statute's text as it existed in April 2022, that Spiehs's conduct fell within

the statute's scope. Accordingly, even if Deputy Kruzel were mistaken, his assessment rested on an objectively reasonable interpretation of then-existing law, entitling him to qualified immunity.

## IV. Lieutenant Channel and Deputy Coleman are entitled to qualified immunity from the wrongful arrest claim asserted in Count IX.

Finally, in Count IX, Spiehs asserts a separate wrongful arrest claims against Lieutenant Channel and Deputy Coleman in conjunction with his separate arrest on May 1, 2024. The same qualified immunity standards set forth in Section II apply to these claim and therefore are not restated here. Like Sheriff Armbrister and Deputy Kruzel, Lieutenant Channel and Deputy Coleman are entitled to qualified immunity under both prongs of the analysis.

### A. Prong One: The May 1, 2024 arrest was supported by probable cause.

The probable framework set forth in Section II.A, *supra*, applies equally to Plaintiff's wrongful arrest claim against Lieutenant Channel and Deputy Coleman and therefore is not restated here. Plaintiff was arrested for interfering with the conduct of public business in violation of K.S.A. 21-5922. As relevant here, that statute prohibits (1) "knowingly refusing . . . to leave any . . . public building upon being requested to do so . . . if such person is committing . . . any act which . . . disrupt[s], impair[s], interfere[s] with or obstruct[s] the lawful missions, processes, procedures or functions being carried on in such public building," K.S.A. 21-5922(a)(3), and (2) "knowingly impeding, disrupting or hindering the normal proceedings of any meeting or session conducted by any . . . legislative body . . . at any public building by any act of intrusion into . . . areas designated for the use of the body . . . conducting such meeting or session[.]" K.S.A. 215922(a)(4).

Spiehs is expected to challenge whether his conduct truly "disrupted" the BOCC meeting. That contention misunderstands the Fourth Amendment inquiry. Probable cause does not require that arresting officers personally witness every element of an offense, or that the suspect ultimately

be guilty. See *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) ("The validity of the arrest does not depend on whether the suspect actually committed a crime[.]"). The question is whether, based on the facts and circumstances known to the officers at the time, a person of reasonable caution could believe an offense had been or was being committed. *See Brinegar v. United States*, 338 U.S. 160, 175–76 (1949).

It is undisputed that Lieutenant Channel and Deputy Coleman arrived after the BOCC meeting had already been recessed and therefore did not personally observe Spiehs's earlier conduct. DSOF ¶ 66. Upon arrival, however, they were told by Deputy Favre, whom they knew had been the one to request their assistance, that the BOCC and County Administrator Plinksky had repeatedly asked Spiehs to move away from the staff area or leave the room, that Spiehs was standing in an access path adjacent to staff, that staff felt threatened by his proximity, and that the meeting had been recessed and could not continue until Spiehs was removed. DSOF ¶ 67. Officers are entitled to rely on reasonably trustworthy information relayed by other officers when assessing probable cause, and Lieutenant Channel and Deputy Coleman had no reason to doubt Deputy Favre's account. *See Oliver v. Woods*, 209 F.3d 1179, 1190–91 (10th Cir. 2000).

That information was independently corroborated by County Administrator Plinsky, who confirmed that Spiehs was blocking an access path, standing next to staff in a manner that caused staff to feel threatened, that a staff member had been moved as a result, and that Spiehs had repeatedly refused requests to move away from the table or sit with the public audience. DSOF ¶ 69. This representation came from one of the officials responsible for managing the meeting and maintaining order in the building, and there is, again, no evidence Lieutenant Channel or Deputy Coleman had any reason to question its reliability. *See Cortez v. McCauley*, 478 F.3d 1108, 1121

(10th Cir. 2007) ("[O]rdinarily, the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement not trustworthy.").

The deputies further corroborated some of these reports through their own observations. When they entered the meeting room during the recess, they observed that the room appeared to be configured to separate the audience from the commissioners and staff by a walkway area, and they observed Spiehs standing in that area, near the staff table. DSOF ¶¶ 70, 71. Lieutenant Channel personally instructed Spiehs to move away from staff, and he refused multiple times. DSOF ¶¶ 72, 73. When Lieutenant Channel then informed Spiehs she was directing him to leave on behalf of the County Commission, he again refused. DSOF ¶¶ 72, 73.

These uncontroverted facts supplied probable cause under K.S.A. 21-5922(a)(3). The Public Works Training Room is a public building in which the BOCC was conducting its duly noticed public business meeting, *i.e.*, a lawful governmental function. DSOF ¶ 44. Lieutenant Channel and Deputy Coleman had reason to believe Spiehs was committing acts that interfered with those functions: his continued presence in an access path adjacent to staff, his refusal to comply with repeated directives intended to restore order, and the resulting recesses of the meeting while the BOCC waited for his removal. Based on the reasonably trustworthy information provided to them and Spiehs's own refusals to comply with lawful directions, the deputies could reasonably conclude that Spiehs was knowingly refusing to leave a public building while engaging in conduct that disrupted or interfered with the lawful functions being carried on there.

Probable cause also existed under K.S.A. 21-5922(a)(4). While holding its normal business meeting, the BOCC acts as a legislative body. *See Tri-Cnty. Concerned Citizens, Inc. v. Bd. of Cnty. Comm'rs of Harper Cnty.*, 32 Kan. App. 2d 1168, 1175, 95 P.3d 1012 (2004) ("Local governing bodies, including boards of county commissioners, necessarily have some duties that

are legislative, some that are executive, and some that are quasi-judicial."). Lieutenant Channel and Deputy Coleman were informed, and personally observed, that Spiehs was standing beyond the public audience seating area, in close proximity to staff, despite repeated requests to step back or relocate to areas designated for public attendance. DSOF ¶¶ 69, 70, 71. They were further advised that the BOCC had recessed the meeting multiple times and directed deputies to remove Spiehs so the meeting could continue. DSOF ¶¶ 67, 69. Under these circumstances, Spiehs's continued intrusion into areas designated for the use of the BOCC and its staff, coupled with his refusal to comply with repeated directives intended to allow the meeting to proceed, reasonably constituted knowingly impeding or hindering the normal proceedings of a legislative meeting.

Based on the totality of the circumstances known to them at the time, Lieutenant Channel and Deputy Coleman had probable cause to believe Spiehs violated K.S.A. 21-5922. Spiehs therefore cannot establish a Fourth Amendment violation arising from the May 1, 2024 arrest and both officers are entitled to qualified immunity.

**B. <u>Prong Two: The May 1 arrest was supported by arguable probable cause.</u>**

As discussed in Section II.B, the applicable standard under the second prong of the qualified immunity analysis is "arguable" probable cause. Even assuming for argument's sake that the circumstances did not support actual probable cause to arrest Plaintiff for violating K.S.A. 21-5922stop (which Defendants dispute), Spiehs cannot point to clearly established law, particularized to the facts of the case, that would have made it sufficiently clear to every reasonable officer would that probable cause was lacking.

Kansas appellate courts have addressed K.S.A. 21-5922 only sparingly, and even those decisions involve factual scenarios that do not resemble the circumstances confronting Lieutenant Channel and Deputy Coleman. Nothing in that limited body of case law would have placed beyond

debate that the conduct reported to and observed by the deputies fell outside the statute's reach. In the absence of any analogous precedent, the deputies were entitled to rely on the statute's plain language, which, as discussed in Section III.A, at a minimum supported an objectively reasonable belief that Plaintiff's conduct violated K.S.A. 21-5922. Accordingly, even if the Court were to conclude that actual probable cause was lacking, Lieutenant Channel and Deputy Coleman are still entitled to qualified immunity because the undisputed facts establish at least arguable probable cause as a matter of law.

## CONCLUSION

For the above-stated reasons, Sheriff Armbrister, Lieutenant Channel, and Deputies Kruzel and Coleman are each entitled to summary judgment on qualified immunity grounds.

Respectfully submitted:

FISHER, PATTERSON, SAYLER & SMITH, LLP

/s/ Andrew D. Holder
Andrew D. Holder, #25456
51 Corporate Woods, Suite 300
9393 West 110th Street
Overland Park, Kansas 66210
(913) 339-6757/Fax: (913) 660-7919
aholder@fpsslaw.com
**ATTORNEY FOR SHERIFF DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing pleading this 23rd day of January 2026, with the Clerk of the Court by using the ECF system and served said pleading by *email* to the following:

Linus L. Baker, #18197
6732 W. 185th Terrace
Stilwell, KS 66085-8922
(913) 486-3913
(913) 232-8734 Fax
linusbaker@prodigy.net
**ATTORNEY FOR PLAINTIFF**

Michelle R. Stewart, #19260
Ashley Jarmer, #24722
HINKLE LAW FIRM, LLC
8711 Penrose Lane, Suite 400
Lenexa, KS 66219-8197
913-345-9205
913-345-4832 Fax
mstewart@hinklaw.com
ajarmer@hinklaw.com
**ATTORNEYS FOR COUNTY DEFENDANTS**

/s/ Andrew D. Holder
Andrew D. Holder, #25456

**INDEX OF UNPUBLISHED OPINIONS**

1. *State v. Heyder*, 2000 WL 36745844, at *1-2 (Kan. Ct. App. Feb. 11, 2000) (unpublished)

2. *City of Paola v. Ammel*, 2007 WL 2767953, at *3 (Kan. Ct. App. Sept. 21, 2007) (unpublished)

3. *State v. Mead*, 2017 WL 4082240, at *4-5, 12 (Kan. Ct. App. Sept. 15, 2017 2017) (unpublished)

4. *State v. Hughs*, 2018 WL 2374766, at *1, 4 (Kan. Ct App. May 25, 2018) (unpublished)

2000 WL 36745844
Only the Westlaw citation is currently available.

NOT DESIGNATED FOR PUBLICATION. SEE SUPREME COURT RULE 7.04 PRECLUDING CITATION AS PRECEDENT EXCEPT TO SUPPORT CLAIMS OF RES JUDICATA, COLLATERAL ESTOPPEL, OR LAW OF THE CASE.

NOT DESIGNATED FOR PUBLICATION
Court of Appeals of Kansas.

STATE of Kansas, Appellee,
v.
Russell L. HEYDER, Appellant.

No. 82,810
|
Opinion filed February 11, 2000.

Appeal from Lyon District Court; JOHN O. SANDERSON, judge.

**Attorneys and Law Firms**

Laura L. Miser, of Kansas Legal Services of Emporia, for appellant.

Joe E. Lee, county attorney, and Carla J. Stovall, attorney general, for appellee.

Before GERNON, P.J., GREEN, J., and DAVID PRAGER, Chief Justice Retired, assigned.

MEMORANDUM OPINION

Per Curiam:

***1** Russell L. Heyder appeals his misdemeanor convictions of disorderly conduct and obstructing legal process or official duty.

Heyder had an altercation at a toll booth of the Kansas Turnpike when he was unable to pay the toll and the collector informed him that a postdated check could not be accepted.

Misdemeanor charges of disorderly conduct and obstructing legal process or official duty arose out of an exchange between Heyder and the toll collector and Heyder's refusal to cooperate with the Kansas Highway Patrol trooper who was called to assist the toll collector.

Heyder was found guilty by a jury of both counts, convicted, and sentenced to 18 months' probation with an underlying jail term of 90 days. He appeals, contending the evidence was insufficient for conviction.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998).

Heyder argues without authority that the State must prove his actions *substantially* hindered the trooper in his official duties. He claims the fact the trooper was able to take him down and handcuff him in a matter of seconds proves he did not substantially hinder the trooper.

"Obstructing legal process or official duty is knowingly and intentionally obstructing, resisting or opposing any person authorized by law ... in the discharge of any official duty." K.S.A. 21-3808(a). Heyder admitted he knew the trooper's status, and he does not claim the arrest was not lawful. He simply claims he did not resist substantially. The fact that he disobeyed the trooper's order to move out of the lane of traffic and resisted when the trooper moved to handcuff him, forcing the trooper to take him down in order to arrest him, demonstrates sufficient resistance to support the jury's verdict.

Although Heyder does not dispute that he engaged in noisy conduct, he claims he did not intend to threaten the toll collector, did not direct obscene language to her personally, and raised his voice because of the noise of trucks in the background.

In relevant part, the statute defines disorderly conduct as "with knowledge or probable cause to believe that such acts will alarm, anger or disturb others or provoke an assault or other breach of the peace ... engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others." K.S.A. 21-4101(c).

The question is whether Heyder knew or had reason to believe his conduct would reasonably alarm others. By the plain language of the statute, his subjective intent is irrelevant. The evidence establishes conduct which a reasonable person in Heyder's position would believe would cause alarm. The toll collector testified Heyder was angry, "had so much motion," and was using profanity in a raised voice. She further testified a truck driver waiting to exit observed the exchange, left his truck, and approached the tollbooth to ask if she needed help. The trooper testified that when he approached, he saw Heyder still standing in the exit lane blocking traffic, shouting and motioning with his arms, and apparently upset.

***2** Heyder does not dispute the conduct but offers explanations for his conduct, which the jury did not accept. We conclude that the evidence provides a sufficient basis from which the jury could reasonably infer Heyder had or should have had the requisite knowledge of the likely effect of his actions.

Affirmed.

**All Citations**

Not Reported in Pac. Rptr., 2000 WL 36745844

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

167 P.3d 387 (Table)
Unpublished Disposition
(Pursuant to Kansas Supreme Court Rule 7.04(f), unpublished opinions are not precedential and are not favored for citation. They may be cited for persuasive authority on a material issue not addressed by a published Kansas appellate court opinion.)
Court of Appeals of Kansas.

CITY OF PAOLA, Appellee,
v.
David AMMEL, Appellant.

No. 96,301.
|
Sept. 21, 2007.
|
Review Denied April 23, 2008.

Appeal from Miami District Court; Richard M. Smith, judge. Opinion filed September 21, 2007. Affirmed.

**Attorneys and Law Firms**

David Ammel, appellant pro se.

Lee H. Tetwiler, of Law Office of Lee H. Tetwiler, of Paola, for appellee.

Before MARQUARDT, P.J., MCANANY, J., and BRAZIL, S.J.

MEMORANDUM OPINION

PER CURIAM.

***1** In this pro se appeal, David Ammel appeals convictions for disorderly conduct and resisting arrest. We affirm.

In March 2003, Sergeant George Kennedy was called to the Paola Public Library. Sergeant Kennedy's duties with the Paola Police Department included administering the City's e-mail accounts. The head librarian notified Sergeant Kennedy that she was having trouble with several e-mail accounts. When Sergeant Kennedy and Deputy Chief Donald Poore got to the library, the librarian explained that the problem had resolved itself.

Deputy Chief Poore testified that as he and Sergeant Kennedy attempted to leave the library, Ammel tore through the interior library doors and screamed, “What're you goin' to accuse me of now, you lyin' bastards?” Deputy Chief Poore testified that Ammel, who is a large man, had his fists clenched and was trying to appear intimidating. Deputy Chief Poore reportedly instructed Ammel to calm down and return to the library.

However, Ammel did not comply and continued to curse and accuse the officers of being “bastards” and “criminals” and was poised in a “fighting stance.” Deputy Chief Poore testified that he was concerned that Ammel was going to attack him.

Deputy Chief Poore told Ammel that he was being placed under arrest. Ammel screamed, “You cannot arrest me.” Deputy Chief Poore and Sergeant Kennedy each grabbed one of Ammel's arms, which resulted in an intense struggle and the officers were dragged back into the library. They told Ammel to get down on the ground and quit resisting. Ammel continued to struggle and in the process knocked over a table and broke a computer. Deputy Chief Poore testified that he was kicked twice by Ammel.

After 4 to 5 minutes of struggling, Deputy Chief Poore asked the librarian to call for back-up. Eventually, Chief Eugene Smail and another officer arrived. The officers were eventually able to handcuff Ammel. Then, Ammel refused to get up from the floor, which necessitated the officers carrying Ammel while he tried to ram the officers into the wall.

Ammel was told that if he did not quit resisting, he was going to be sprayed with pepper spray. After three warnings, Deputy Chief Poore used pepper spray; however, he said it did not affect Ammel's resistance. In fact, Ammel wrapped his legs around a stair railing to prevent the officers taking him from the building. The officer's account as to what took place was supported by the librarian and a library patron.

Pastor Kirk Johnston testified that on the day of the incident, Ammel confessed to him that he was involved in an altercation with two Paola police officers, and that he called one of them a “lying bastard.”

Ammel's son, Joseph, testified that he and his father were at the library when he heard his father say, “Are you goin' to blame this on me, too?” Joseph testified that when he got up to investigate, he saw Deputy Chief Poore looking very angry. According to Joseph, when Ammel refused to move

after several requests, Deputy Chief Poore "shot up the stairs" and punched Ammel in the face between five and a dozen times.

***2** Joseph testified that the beating escalated, with Deputy Chief Poore punching Ammel in the torso while Ammel stood "motionless and expressionless." Joseph also testified that the officers used a "take-down maneuver" to throw Ammel to the floor, but that resulted in the officers throwing him into a counter. Joseph testified that Ammel is disabled and uses a cane or a wheelchair.

Paola police issued Ammel two citations charging him with disorderly conduct and resisting arrest. He was found guilty and appealed his case to the Miami County District Court. In district court, Ammel's case was tried to a jury, with Ammel acting as his own attorney. After hearing the evidence, the jury found Ammel guilty of one count of resisting arrest and one count of disorderly conduct. Ammel received a sentence of 3 months' imprisonment on each count, with the sentences to be served consecutively. The district court suspended the sentences, and Ammel was placed on probation. Ammel timely appeals his convictions.

I. Jurisdiction

Ammel claims that the City of Paola (City) failed to file a complaint in municipal court; therefore, it lacked jurisdiction over him. Whether jurisdiction exists is a question of law over which an appellate court's scope of review is unlimited. *Foster v. Kansas Dept. of Revenue,* 281 Kan. 368, 369, 130 P.3d 560 (2006).

Prior to trial, Ammel raised the jurisdiction issue in a motion to dismiss. The district court ruled there was jurisdiction because both a bill of particulars and a complaint were filed in the district court prior to Ammel's trial. However, the district court did not address the issue of whether the prosecution was ever properly commenced in municipal court.

K.S.A. 12-4202 establishes the requirements for a municipal complaint. The tickets that were served on Ammel substantially complied with K.S.A. 12-4202. The tickets contain the city and county designations, the offense charged, the ordinance number, the arresting officer's signature, and the notice to appear.

Ammel's statement that the record on appeal does not contain original copies of the tickets is irrelevant. The record on appeal shows that the form of the ticket complies with the relevant requirements of K.S.A. 12-4202. Therefore, the action was properly commenced in municipal court. The district court acquired jurisdiction because of Ammel's appeal from the municipal court verdict. The district court had both a bill of particulars and a complaint. Therefore, we do not see any jurisdictional defects in this action.

The district court should have addressed the propriety of the complaint filed at the municipal court level. However, the trial court correctly determined that it had jurisdiction to proceed with the merits of Ammel's case. If a trial court reaches the right result, its decision will be upheld even though it relied upon the wrong ground or assigned erroneous reasons for its decision. *State v. Nash,* 281 Kan. 600, 602, 133 P.3d 836 (2006). The trial court correctly settled the issue of jurisdiction.

II. Motion for Acquittal

***3** After the jury returned its verdict, Ammel filed a motion for judgment of acquittal. In the motion, Ammel stated that the City "relied entirely on testimony at trial" and the City failed to prove all of the elements of disorderly conduct. The trial court denied the motion.

On appeal, Ammel argues that the City failed to prove that he used fighting words. Ammel claims that no witness could prove that he used words other than "lying bastards" or "criminals." Ammel maintains that his speech was protected under the First Amendment to the United States Constitution.

In reviewing the decision on a motion for a judgment of acquittal, our court examines the sufficiency of the evidence in support of a conviction. *State v. Cavaness,* 278 Kan. 469, 479, 101 P.3d 717 (2004). When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Kesselring,* 279 Kan. 671, 679, 112 P.3d 175 (2005).

Ammel did not include the text of the disorderly conduct ordinance in the record on appeal. However, we have a copy of the jury instruction, which reads, in relevant part:

> "The defendant is charged with the crime of disorderly conduct. The defendant pleads not guilty.
>
> "To establish this charge, each of the following claims must be proved:
>
> "1. That the defendant:
>
> "A. Engaged in brawling or fighting;
>
> OR
>
> "B. Engaged in noisy conduct of such a nature that it would tend to reasonably arouse alarm, anger or resentment in others;
>
> OR
>
> "C. Used offensive, obscene or abuse language that would tend to reasonably arouse alarm, anger or resentment in others."

See K.S.A. 21-4101 (disorderly conduct). The instruction also defines "fighting words" as words "of such a nature that by their very utterance inflict injury or tend to incite the listener to an immediate breach of the peace."

The head librarian testified that Ammel was "very noisy" and "shouting." In fact, she testified that Ammel was loud enough to be heard all through the library, including in the basement. The librarian was able to ascertain this even though she only had hearing in one ear. She said that Ammel's volume and words "disturbed" her. The librarian hoped that she never experienced such conduct again. She testified that she was shocked, worried, scared, and "very alarmed" by the melee.

Carol Martin was the only other patron in the library at the time of the incident. Martin testified that Ammel was yelling vulgarities "at the top of his voice." She believed that the police officers were going to be injured by Ammel. Martin testified she was alarmed because such conduct "should not happen in the library."

The jury heard testimony that Ammel engaged in noisy conduct and that both witnesses to the noisy conduct were alarmed. Thus, the City proved the elements of the crime which supported the disorderly conduct conviction. The trial court did not err by denying Ammel's motion for judgment of acquittal.

## III. Paola City Code § 205.110 (Resisting Arrest)

***4** Ammel argues on appeal that it was impossible for him to know whether he was accused of a misdemeanor or a felony, since the resisting arrest ordinance contains no designation.

The interpretation of a statute is a question of law over which this court has unlimited review. An appellate court is not bound by the trial court's interpretation. *State v. Bryan,* 281 Kan. 157, 159, 130 P.3d 85 (2006).

Ammel's claim that he did not know the severity level of his offense is belied by the record on appeal. The tickets issued by the arresting officer shows that both offenses were misdemeanors. Therefore, Ammel was appropriately apprised of the severity of his offenses well in advance of trial.

Beyond this, we cannot address the remaining merits of Ammel's argument on appeal, as the record on appeal does not contain a copy of Paola City Code § 205.110. The burden is on the appellant to furnish a record which affirmatively shows that prejudicial error occurred in the trial court. Without such a record, an appellate court presumes the action of the trial court was proper. *State v. Holmes,* 278 Kan. 603, 612, 102 P.3d 406 (2004). We cannot view the text of the ordinance and cannot make any further findings regarding this section of the City Code.

## IV. Multiplicitous Convictions

Ammel contends that the jury instructions contained some similar elements, such as the physical engagement of the police officers. He argues that his conduct constituted only one continuing offense rather than two separate crimes.

Multiplicity is the charging of a single offense in several counts of a complaint or information. The primary concern with multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Our standard of review on questions of multiplicity is plenary. *State v. Vontress,* 266 Kan. 248, 255, 970 P.2d 42 (1998).

In *State v. Schoonover,* 281 Kan. 453, 133 P.3d 48 (2006), the Kansas Supreme Court clarified the law surrounding issues of multiplicity. The court clarified that the overarching inquiry must be whether multiple convictions are for the same offense. There are two components to this inquiry. First, do the convictions arise from the same conduct? Second, by statutory definition, are there two offenses or only one? 281 Kan. at 496.

In the instant case, it seems clear under *Schoonover* that the court would deem Ammel's conduct unitary, as it was committed at roughly the same time, without any intervening impulse. Thus, we must consider the second part of the analysis and determine whether, by statutory definition, there were two offenses involved. See 281 Kan. at 496-97.

Ammel was convicted of violating two different ordinances. In these circumstances, the test is whether each offense requires proof of an element not necessary to prove the other offense. Under this test, when analyzing the claim under the Double Jeopardy Clause of the Fifth Amendment, the same-elements test serves as a rule of statutory construction to discern whether the legislature intended multiple offenses and multiple punishments. 281 Kan. at 498.

***5** The jury instructions show that the disorderly conduct ordinance required proof of brawling, fighting, noisy conduct, or offensive or obscene language. The resisting arrest ordinance required the City to prove that Ammel knowingly and intentionally obstructed, resisted, and opposed arrest. These ordinances require proof of very different elements; thus, Ammel's multiple convictions do not violate the Fifth Amendment to the United States Constitution.

V. Hearsay Evidence

At trial, Pastor Johnston testified that Ammel told him that Ammel called one of the officers a "lying bastard." Cheryl Studna was present during the meeting and said she was upset because Ammel appeared to have many scrapes and bruises. Ammel asked Studna to explain to the jury the conversation Ammel had with Pastor Johnston. The City objected on hearsay grounds, since there was no guarantee Ammel would testify at trial. Studna was allowed to testify only regarding her memories of what Pastor Johnston said.

On appeal, Ammel argues that it was erroneous for the trial court to admit Pastor Johnston's hearsay evidence while rejecting Studna's testimony.

The admission of evidence lies within the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *Holmes,* 278 Kan. at 623.

Ammel did not object to Pastor Johnston's testimony. A timely and specific objection for the admission of evidence is necessary to preserve the issue for appeal. *State v. Torres,* 280 Kan. 309, 319, 121 P.3d 429 (2005). This issue has not properly been preserved for appeal, and we will not address the merits of Ammel's argument.

VI. Prosecutorial Misconduct

Ammel complains of prosecutorial misconduct. Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Swinney,* 280 Kan. 768, 779, 127 P.3d 261 (2006).

The first issue involves the prosecutor's cross-examination of Studna when he asked her, "Mrs. Studna, are you familiar with Pastor Kirk Johnston's reputation in this community for truth and veracity?" Studna responded that she learned some things about Pastor Johnston which troubled her, and she directed the prosecutor to speak with the Presbyterian Counsel if he

had questions. The prosecutor also asked Studna if she was “suggesting to the ladies and gentlemen of the jury that Rev. Johnston's not telling the truth?”

***6** On appeal, Ammel argues that the question was improper because it was argumentative and prejudicial, as it put Studna in the position of questioning the truthfulness of a sympathetic witness. Ammel contends that the prosecutor's question asked Studna to comment on the credibility of another witness, which was improper.

Questions which compel a witness to comment on the credibility of another witness are improper. It is the province of the jury to weigh the credibility of the witnesses. *State v. Dean,* 272 Kan. 429, 438, 33 P.3d 225 (2001).

It is undisputed that the prosecutor's question was improper. We must now determine whether the error was so prejudicial as to deny Ammel a fair trial. After Studna was asked by the prosecutor if Pastor Johnston was lying, she responded, “Sir, I'm telling you what I heard and I'm-I do not know what Rev. Johnston testified to.”

We are not prepared to find that the error was so serious that it denied Ammel a fair trial. Numerous witnesses testified that Ammel called the police a variety of unsavory names. Ammel's son testified that Ammel called the police liars. We do not find that the complained-of question and resulting testimony was so prejudicial as to have impacted Ammel's right to a fair trial.

Ammel next complains about a statement made by the prosecutor during closing argument. The prosecutor said:

> “Who's tellin' the truth and who isn't? That's what it really boils down to. You hate to get into what they got into with regard to calling a local minister a liar, I guess. He didn't tell the truth. That's the innuendo. That's what they're obviously saying or that's what Mr. Ammel's son, who testified, is saying about the officers.”

Ammel argues that these comments are not based on evidence from the trial transcript, and he believes the argument was designed to antagonize the jury.

The Kansas appellate courts have held that no rule governing oral argument is more fundamental than that requiring counsel to confine their remarks to matters in evidence. The stating of facts not in evidence is clearly improper. However, in summing up a case, a prosecutor may draw reasonable inferences from the evidence and is allowed considerable latitude in discussing the evidence. *State v. Foster,* 259 Kan. 198, 207-08, 910 P.2d 848 (1996).

Although it gets close to the bounds of acceptability, the prosecutor's comments regarding claims of Pastor Johnston's credibility were a fair comment on the evidence presented at trial. It did appear that Studna was trying to discredit Pastor Johnston's testimony and, as we noted above, the role of both Studna's and Pastor Johnston's testimony was minor given the totality of the evidence presented at trial.

Ammel next complains of the prosecutor's comments about Joseph Ammel's testimony. We have reviewed the entirety of Joseph's testimony, and he never suggested, either overtly or covertly, that the police officers were lying. Instead, he simply stated his version of the events as he remembered them. In closing argument, an attorney may indulge in impassioned bursts of oratory or may use picturesque language as long as he or she introduces no facts not disclosed by the evidence. *State v. Burden,* 30 Kan.App.2d 690, 703, 46 P.3d 570, *rev'd on other grounds* 275 Kan. 934, 69 P.3d 1120 (2003).

***7** The prosecutor commented on evidence not introduced at trial; as such, the comments were erroneous. During closing argument, the prosecutor said:

> “I hate to talk about Mr. Ammel's son.... He lived at home with his father and mother when this occurred and he still lives there. I-Personally, I feel sorry for him. He had to come to court and testify and you'll have to decide if he told the truth. Everybody is entitled to a difference of opinion, but

> think about this when you're deciding whether he told the truth."

The prosecutor also said, when commenting on Joseph's testimony:

> "But that's not the facts. That's not true. I don't know. I don't know if his dad told him to say that or why he said that, but his testimony is not-doesn't square with everyone else that was there with regard to what Chief Smail did and when he got there."

Finally, the prosecutor said, "And I think you can separate the wheat from the chaff on who's tellin' the truth." Ammel complains that all of these comments regarding Joseph's testimony were prejudicial, a "foul blow against Joseph's credibility," and an inference that Ammel coached his son.

In general, prosecutors are allowed to point out to the jury that testimony is inconsistent and that only one version could be correct. *State v. Kraus,* 271 Kan. 810, 819, 26 P.3d 636 (2001). However, we believe the prosecutor in the instant case went beyond that when he suggested that Joseph was being coached by his father and also by twice implying that Joseph was not telling the truth. Although the prosecutor did not use the word "liar," he did go beyond the language approved in *Kraus.* Once again, the prosecutor's comments were improper; therefore, we must now determine whether the remarks were so improper as to deny Ammel a fair trial.

In the second step of the two-step analysis, an appellate court considers three factors: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. *Swinney,* 280 Kan. at 780.

In the instant case, we are not prepared to hold that the prosecutor's misconduct was gross or flagrant, and we do not believe it showed any particular ill will on the prosecutor's part. The jury heard the testimony of the various witnesses and was able to pass on the credibility of each. But in cases such as this, a suggestion that the main defense witness was less than truthful is of special concern.

However, after viewing the evidence in its totality, we do not believe the remarks were so improper as to deny Ammel a fair trial. The comments should not have been made, but given the scope of the evidence presented at trial and the entirety of the prosecutor's closing argument, we do not believe the comments require reversal.

***8** Affirmed.

**All Citations**

167 P.3d 387 (Table), 2007 WL 2767953

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

401 P.3d 687 (Table)
Unpublished Disposition
This decision without published opinion is referenced in the Pacific Reporter. See Kan. Sup. Ct. Rules, Rule 7.04.
NOT DESIGNATED FOR PUBLICATION
Court of Appeals of Kansas.

STATE of Kansas, Appellee,
v.
Barclay Garrett MEAD, Appellant.

No. 115,989
|
Opinion filed September 15, 2017.

Appeal from Jefferson District Court; GARY L. NAFZIGER, Judge.

**Attorneys and Law Firms**

Barclay Mead, appellant pro se.

Thomas E. Knutzen, of Jefferson County Attorney's Office, and Derek Schmidt, attorney general, for appellee.

Before Malone, P.J., Leben and Bruns, JJ.

MEMORANDUM OPINION

Per Curiam:

***1** Following a trial before a judge, the district court found Barclay Mead guilty of battery and disorderly conduct based on an altercation at a motorcycle rally. On appeal, Mead argues that the evidence wasn't sufficient to support these convictions. But we are required on appeal to take the evidence in the light most favorable to the State; that's because the fact-finder (here, the trial judge) found the facts in the State's favor by convicting Mead. In that light, there was sufficient evidence to convict Mead: He committed battery by making physical contact with a private security guard at the bike rally in a rude and angry manner; witnesses said he was yelling and screaming and flailing his arms when he made contact. And he committed disorderly conduct based on noisy conduct that would reasonably alarm another person; witnesses said he came toward several people while yelling, screaming, and flailing his arms in an aggressive manner.

Mead makes several other arguments on appeal, but most of them were not raised before the trial court and either are not properly before us or can't be fairly evaluated on the record before us. We have carefully reviewed all of Mead's arguments and have found no reversible error in his trial. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Mead was charged with battery and disorderly conduct stemming from an incident that happened at a motorcycle rally in the late night and early morning hours of September 6 and 7, 2015. The charge was tried to the court, sitting without a jury. Because Mead argues on appeal that the evidence wasn't sufficient to convict him, we necessarily review the evidence in some detail.

Del White, a volunteer security guard at the rally, testified to one version of the events. He said that around 11:30 p.m. on September 6, another security guard, Bill Cooper, reported that someone in a golf cart had "blown through a gate" and entered into a motorcycle-only area. According to White, Cooper told him the golf cart had no lights and was driving fast and erratically. Cooper asked for help with the situation and, according to White, said, "There's no emergency, but the person is getting pretty mouthy with me at this time."

When White arrived at the area, he saw Mead and Cooper engaged in "a very heated conversation back and forth," cursing and yelling at one another. He testified that the golf cart was just off the roadway and a gentleman was sitting in it. White told Cooper that he would handle the situation, so Cooper went back to his post. White testified that he explained to Mead that Mead needed to remove the golf cart from the area but Mead "just rambled and ranted" that he could do this and everyone kept hassling him and wouldn't leave him alone. White testified that he believed Mead was intoxicated or under the influence of something else as Mead was not "behaving as a sober person would."

According to White, Mead said he couldn't move the golf cart because it was out of gas. White told Mead to walk back to the camp and get gas for the cart so he could drive it out of the area. White testified that the other person in the golf cart said he would go get gas, so White thought that the matter was resolved and started walking away. As he was walking away, White said he heard arguing behind him, so he turned around to speak to Mead again. White testified that, at that point,

"[Mead] just blew up, and he jumped at me and bumped into me and it was something about.... 'Why would you go behind my back? Why would you do this?' " White claimed that Mead bumped his chest into White's shoulder while shouting at White in a "very threatening, very belligerent" manner and was within 6 inches from White's face.

***2** In response, White said he stuck his flashlight under Mead's chin to create some space between them. White testified that most people at the rally have at least one knife on them, so he wanted to get control of Mead's arms in case Mead reached for a weapon. During the resulting struggle, White and Mead ended up in the roadway and were struck by a motorcycle. White testified that after they had fallen to the ground, he tapped his flashlight against Mead's forehead and told Mead to knock it off. White also testified that he put his hand on Mead's neck to hold him down and told Mead to stop fighting while Mead said he couldn't breathe. White called for an ambulance after noticing that Mead was bleeding from his head.

Rick Gitchel, another security guard, also responded when Cooper asked for additional security assistance. He testified that when he arrived on the scene, he saw Cooper and Mead arguing and swearing at one another. Gitchel said that he joined White in talking to Mead about moving the golf cart, and Gitchel said he had believed they had the situation under control. He reported that when he and White turned to leave, Mead shouted something at them, but he couldn't recall what was said. Gitchel said that when White turned back to Mead, Mead headed towards White and reached to grab White's face or throat. According to Gitchel, White put Mead in a headlock and took him to the ground. Gitchel said that as White and Mead were going to the ground, they hit the front wheel of a motorcycle that had pulled up in the area and knocked it over. Gitchel testified that he believed Mead was injured when he hit the motorcycle. On cross-examination, Gitchel said that White hit Mead with the flashlight once while the two were going to the ground.

Ronald Vawter, head of security for the rally, also witnessed the incident and testified for the State. He reported to the scene after getting a call on the radio about a disturbance. When he arrived, he saw White and Gitchel talking to Mead about the golf cart and Mead was arguing loudly. According to Vawter, the scene "seemed to get loud at times and then it would calm down." In his opinion, White was doing a good job of deescalating the situation and calming Mead down. Vawter testified that when they went to leave, Mead "got real loud" and "was coming at us." According to Vawter, Mead was out of control—walking fast towards them, flinging his arms, yelling, and cussing. Vawter testified that White stepped towards Mead and took him to the ground. Vawter said he believed that if White hadn't stepped in, Vawter would have been hurt. Vawter said that Mead hit his head on the front wheel of a motorcycle that was trying to going around them as he went to the ground. Vawter said White tapped Mead twice on the top of his head or his forehead with the flashlight as they were going to the ground. He said he thought that Mead's head injuries were from hitting the motorcycle because there was a lot of blood on the brake calipers and brake rotors.

Mead called two witnesses who saw the incident. Todd Meyer, the other person in the golf cart, testified that he was driving the golf cart and was not driving recklessly. Meyer and Mead had known each other since childhood. According to Meyer, the golf cart broke down and a security guard approached and told them to get the vehicle out of the middle of the road. Meyer said that the security guard approached Mead, "poked him in the throat with the flashlight, hit him in the head, and [then Mead] went down." Meyer testified that at first there was only one security guard and then others showed up. He said that the security guard who hit Mead hit him very hard with the flashlight, and Meyer saw a lot of blood. According to Meyer, the motorcycle hit Mead after Mead was already on the ground. Meyer said that he tried to film the incident on his cellphone but it was too dark and too noisy from other motorcycles.

***3** Mead's other witness was Matthew Trainor, a vendor at the rally. Trainor said that he had never met Mead before and was sitting outside in a lounge chair by his motor home when he saw an altercation. He testified that he heard a very loud noise and then heard someone say, " 'Take him down.' " Trainor said that he saw a security guard hit Mead very hard with a flashlight practically knocking Mead unconscious before he heard someone say, " 'Take him down.' " According to Trainor, someone then tackled Mead to the ground and then the motorcycle hit him. He said that the security guard hit Mead again while they were on the ground. Trainor testified that the security guard was the aggressor in the altercation he witnessed. He also characterized the security force at the rally as unprofessional, difficult, and unpleasant to work with. Trainor said that Mead was bleeding heavily from the top of his head. He believed that the blood came from the blow from the flashlight and not from being hit by the motorcycle because he saw blood before Mead was hit by the motorcycle.

In addition to these witnesses, Mead took the stand in his own defense. Mead said he was a member of ABATE (the group that hosted the motorcycle rally) and had volunteered to mow and to set up things before the rally for several years. Mead owned a nearby restaurant and saloon and an IT consulting firm. He said that on the night of the altercation, he and Meyer went to the rally after closing up the restaurant. According to Mead, they took a three-wheeled golf cart to get there and Meyer drove. As they were driving, the golf cart "started cutting out real bad." Mead said he told Meyer to turn into a vendor area where a sign was posted "Four-Wheel Vehicles Not Allowed" to get the golf cart off the main street. He refuted the claims that they were speeding around the corner in the golf cart; he said the cart would have flipped due to its design if driven too fast around a corner.

Mead said that after they had pulled off the road onto the shoulder and grass, Bill Cooper "came at [them] yelling and screaming very loudly" to get the cart moved. Mead said he told Cooper that the cart had run out of gas or broken down and that he would get it out of there as soon as they could. He said Cooper replied that until then, they would drag the golf cart away. Mead testified said he told Cooper that they couldn't do that because dragging the golf cart would damage it. Mead testified that Cooper said, " 'I'm calling security, and you're going to be sorry.' " White, Gitchel, and Vawter then responded to the scene.

According to Mead, White was at first listening to what Mead had to say, but the argument turned violent. Mead testified that he told White, "I've had enough of this" and told White to call the site coordinator on the radio to settle the matter while turned and pointing towards the site coordinator's campsite. Mead testified that, in response, White said, " 'I've had enough of his mouth' " and " 'Take him down.' " Mead said White then shoved the flashlight into Mead's throat and hit Mead on the top of the head with it. Mead said White then got him in a headlock and hit him again with the flashlight before they fell to the ground and were hit by the motorcycle. Mead said that he never bumped into White and did not swing at him, lunge at him, or grab at his face.

As a result of the incident, Mead received two cuts on his head that required 26 staples. In Mead's opinion, one of the cuts was from the flashlight and the other was from the motorcycle. Mead also testified that he wasn't drinking that night as he was on blood thinners for a recent heart attack; he said that some symptoms of his multiple sclerosis and side effects of medications could sometimes be confused for signs of intoxication. Mead said he thought that the police were biased against him and more willing to reject evidence suggesting White was the aggressor because Mead had recently been charged with violating a protective order and was out on bond at the time of these events.

The State called Captain George Welch from the sheriff's department to testify as a rebuttal witness. Welch testified that the other person in the golf cart told him that Mead was driving and had been drinking that night. According to Welch, the other person claimed to have recorded the events but refused to turn over the video; Welch never got the other person's name. Welch said that Mead had bloodshot, watery eyes and clenched his teeth while talking to Welch, which Welch believed was to avoid breathing on the officer. Welch testified that police intended to test Mead for alcohol consumption, but Mead became unresponsive as they were getting the test ready. Welch also reported that police found a beer bottle and a small glass jar that contained "green, leafy vegetation" in the golf cart. Welch testified that the green, leafy vegetation was not tested because no one was criminally charged for it.

***4** After hearing all the evidence, the district court found Mead guilty of both charges, battery and disorderly conduct. The court first discussed that Mead had driven a vehicle into an area where he was not permitted to be and, when stopped, "became confront[ational], belligerent, recalcitrant, loud, [and] argumentative." The court found, based on witness testimony, that Mead "came toward the victim, grabbing toward the victim's throat, yelling, screaming, out of control, arms swinging, walking fast and menacingly." The court said it concluded beyond a reasonable doubt that this resulted in battery as charged—Mead made unlawful and knowing physical contact with White in a rude, insulting, or angry manner.

The court also concluded beyond a reasonable doubt that Mead had committed disorderly conduct because he had "intentionally, knowingly engage[d] in noisy conduct of such a nature that would tend to reasonably arouse alarm or resentment in others" by his "verbal comments and barrage" that "were essentially fighting words."

The district court sentenced Mead to six months on probation, but if he failed on probation, he would have to serve the underlying sentence of six months in the county jail.

Mead then appealed to our court.

ANALYSIS

*I. Sufficient Evidence Supports Mead's Convictions for Battery and Disorderly Conduct.*

Mead first contends that no rational fact-finder could have convicted him of battery and disorderly conduct because the evidence was insufficient to support the convictions. He also argues that he is immune from conviction because he was defending himself, his occupied vehicle, and his personal property.

When the sufficiency of the evidence is challenged in a criminal case, an appellate court must look at the evidence in the light most favorable to the State since the fact-finder (here the district judge) has ruled in the State's favor. We then determine whether a rational fact-finder looking at the evidence in that light could have found the defendant guilty beyond a reasonable doubt. *State v. Kendall*, 300 Kan. 515, 523, 331 P.3d 763 (2014). We do not reweigh evidence, resolve conflicts in the evidence, or make witness-credibility determinations. *State v. Belt*, 305 Kan. 381, 397, 381 P.3d 473 (2016).

Let's start with the battery charge. To convict Mead of battery, the State had to prove beyond a reasonable doubt that Mead knowingly caused physical contact with White in a rude, insulting, or angry manner. K.S.A. 2016 Supp. 21–5413(a)(2).

All three security guards reported Mead yelling and making contact with White, even though the stories varied considerably. White said that Mead charged and bumped into him while yelling and shouting at him. Gitchel reported that Mead yelled something at them as they were walking away, causing them to turn around. When Mead and White started heading towards one another, Gitchel said that Mead grabbed for White's face or throat. Vawter reported that he heard Mead yell something and then saw Mead coming at them, walking fast, flinging his arms, and yelling and screaming. According to Vawter, White took at least a step toward Mead to stop him as Mead was still coming at them, and Mead and White made contact with one another at the same time.

In finding Mead guilty, the district court credited the version of events portrayed by these witnesses: that Mead made physical contact with White while Mead was yelling, screaming, grabbing at White's throat, swinging his arms, and generally acting out of control. Viewing the evidence in the light most favorable to the State, a rational fact-finder could conclude beyond a reasonable doubt that Mead knowingly caused physical contact with White in a rude, insulting, or angry manner.

***5** To be sure, Mead makes some good points in his brief. For example, he notes that White's written statement to police didn't say that Mead had initiated physical contact, even though White testified differently at trial. Mead argues that because White's story changed, he wasn't a credible witness. Similarly, Mead attempts to discredit Gitchel's and Vawter's testimony by arguing that from their vantage points, they could not fully see what was happening. But what Mead is doing here is asking this court to reweigh evidence, resolve conflicts in the evidence, and make credibility determinations, tasks that are not ours to do. In his reply brief, Mead contends that so long as he can provide an alternative explanation using the facts found or admitted, he has proven that a reasonable person could not find him guilty beyond a reasonable doubt. That's simply not the standard. When reviewing the evidence for sufficiency determinations, this court must view the evidence in the light most favorable to the State without reweighing the evidence, resolving evidentiary conflicts, or making credibility determinations. Under that standard, sufficient evidence supports his conviction for battery.

Mead also argues there is insufficient evidence to convict him of disorderly conduct because the State failed to establish that Mead had used fighting words. Here, his argument turns mainly on the specific charge made by the State; it was for a form of disorderly conduct that's based not on so-called fighting words but instead on noisy conduct that would reasonably cause alarm, anger, or resentment, not on the words he used.

Under K.S.A. 2016 Supp. 21–6203, disorderly conduct is when a person commits one or more of the listed acts that “the person knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace.” The listed acts are: (1) brawling or fighting; (2) disturbing a lawful assembly, meeting, or procession; or (3) “using fighting words *or* engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others.” (Emphasis added.) K.S.A. 2016 Supp. 21–6203(a)(1)–(3). Subsection (3) offers two paths for the State to prove an act sufficient to support a disorderly-conduct charge—fighting words *or* noisy conduct that would reasonably arouse alarm, anger, or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

resentment in others. The State chose the second option in Mead's case, so we must look to see whether the evidence was sufficient to convict under that option.

White, Gitchel, and Vawter all testified that Mead was shouting and screaming as he came toward them. White characterized Mead's behavior as belligerent and threatening. Vawter testified that he viewed Mead coming at them while yelling with his arms in the air as an "aggressive act." This evidence supports the district court's conclusion that Mead engaged in noisy conduct that reasonably caused alarm and anger. Likewise, Mead knew or should have known that yelling and screaming while coming at people would reasonably alarm, anger, or disturb others. Sufficient evidence supported his conviction for disorderly conduct as well.

Mead also claims that because his actions were in self-defense and in defense of his golf cart to stop it from being damaged, he couldn't be convicted of battery or disorderly conduct. Mead apparently is trying to invoke immunity from prosecution under a specific statute, K.S.A. 2016 Supp. 21–5231. Under that statute, a person who used force in self-defense or in defense of property is immune from prosecution unless the State can establish probable cause that the defendant's use of force was not justified. See *State v. Hardy*, 305 Kan. 1001, Syl. ¶ 1, 390 P.3d 30 (2017). But a defendant must invoke immunity under K.S.A. 2016 Supp. 21–5231 before the trial begins and cannot raise the issue for the first time on appeal. *State v. Jones*, 298 Kan. 324, 334, 311 P.3d 1125 (2013); *State v. Gaines*, No. 111,708, 2015 WL 1514075, at *4 (Kan. App. 2015) (unpublished opinion). Mead did not raise this issue before the trial court; we therefore will not consider it on appeal.

*II. We Cannot Consider Mead's Argument Based on His Constitutional Right to Confront Witnesses Because He Didn't Object to Admission of the Evidence on This Basis at Trial.*

***6** When White and Gitchel testified at trial, they made reference to some statements another man, Bill Cooper, had made. But Cooper didn't testify at trial. On appeal, Mead claims that letting White and Gitchel testify about statements made by Cooper violated Mead's right to confront and cross-examine witnesses at a criminal trial as provided by the Sixth Amendment to the United States Constitution. The State responds that because Mead did not object to the admission of the evidence on those grounds before the district court, he can't raise the argument on appeal. Alternatively, the State argues that any error in admitting the evidence was harmless and did not affect the outcome of the trial.

Here, Mead objected generally to the admission of White's and Gitchel's written statements as hearsay but never objected on the basis he now asserts—that he didn't have a chance to confront Cooper in person and in court. He also did not object when White and Vawter testified about what Cooper had said. Because Mead failed to make a timely objection on confrontation grounds before the district court, he failed to preserve the issue for appeal. See, e.g., *State v. Logsdon*, 304 Kan. 3, 28, 371 P.3d 836 (2016); *State v. Dean*, 298 Kan. 1023, 1035–36, 324 P.3d 1023 (2014) (specifically noting that an objection on hearsay grounds does not equate to an objection on confrontation grounds and holding that the failure to object on confrontation grounds precluded appellate review).

A Kansas statute, K.S.A. 60–404, provides that a defendant must make a timely and specific objection to the admission of evidence at trial to preserve the issue for appeal. See *Logsdon*, 304 Kan. at 28; *State v. Breedlove*, 295 Kan. 481, 490, 286 P.3d 1123 (2012). This means that a defendant must object to offered evidence on the grounds that it violates the Confrontation Clause at trial to preserve the issue for appeal. See *Dean*, 298 Kan. at 1035–36; *State v. Dukes*, 290 Kan. 485, 488–89, 231 P.3d 558 (2010). Additionally, the defendant cannot object to the admission of evidence on one ground at trial and then argue another ground on appeal. *Breedlove*, 295 Kan. at 490; *State v. Richmond*, 289 Kan. 419, 428–29, 212 P.3d 165 (2009).

Mead recognized this potential hurdle and argued in his brief that we should consider the issue for the first time on appeal because it impacts his fundamental rights. As a general rule, an issue not raised before the district court cannot be raised for the first time on appeal, but an appellate court may consider the issue to prevent a denial of fundamental rights. *State v. Rizo*, 304 Kan. 974, 978–79, 377 P.3d 419 (2016). But Kansas courts have "consistently refused to 'review an evidentiary issue without a timely and specific objection even if the issue involves a fundamental right,'" including the right to confront witnesses. *Logsdon*, 304 Kan. at 28 (quoting *Dukes*, 290 Kan. at 488–89); see *State v. Williams*, 299 Kan. 509, 549–50, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *Dean*, 298 Kan. at 1035–36; *State v. McCaslin*, 291

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Kan. 697, 706–09, 245 P.3d 1030 (2011), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 402, 324 P.3d 1046 (2014). The Kansas Supreme Court "has explained that appellants asserting Confrontation Clause challenges may not circumvent K.S.A. 60–404, otherwise the exceptions would devour the statutory rule." *In re Care & Treatment of Thomas*, 301 Kan. 841, 845, 348 P.3d 576 (2015).

***7** Given the clear, consistent Kansas Supreme Court precedent on this point we will not consider Mead's Confrontation Clause challenge since he did not raise the issue in the district court.

*III. Mead's Convictions for Battery and Disorderly Conduct Do Not Violate the Multiplicity Rule.*

Mead's next argument presents a technical legal argument—but one that raises an important issue as well. If the government splits what is really just a single criminal offense up so that the defendant is charged with two (or more) crimes instead of one, that violates a rule against multiplicity. Simply put, multiplicity is the charging of a single offense in more than one count. *State v. Overman*, 301 Kan. 704, 713, 348 P.3d 516 (2015). The legal problem with multiplicity is that the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights prohibit multiple punishments for a single offense. *State v. Pribble*, 304 Kan. 824, 826, 375 P.3d 966 (2016).

Mead argues that his convictions for battery and disorderly conduct are multiplicitous because the same conduct—his verbal comments—was used to prove he was guilty of each crime. The State contends that the convictions were not multiplicitous because the crimes of battery and disorderly conduct do not have the same statutory elements.

The Kansas Supreme Court set out the analytical framework to be used in deciding multiplicity issues in *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006); that remains the test today. See, e.g., *Pribble*, 304 Kan. at 827 (applying *Schoonover*). First, the court asks whether the multiple charges arise from the same conduct, considering several factors including: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *Schoonover*, 281 Kan. at 497. If the acts arise from the same conduct, the court then asks if, by statutory definition, there are two offenses or only one. 281 Kan. at 497. For cases like this one, with multiple convictions under different statutes, the court uses a same-elements test. 281 Kan. at 497. In the same-elements test, the court compares the elements of each statute and asks whether one statute requires proof of an element not necessary to prove the other offense. 281 Kan. at 498. "If so, the statutes do not define the same conduct and there is not a double jeopardy violation." 281 Kan. at 498. Whether convictions violate the multiplicity rule is a question of law, which we review independently. *Belt*, 305 Kan. at 407.

Mead's multiplicity argument fails because disorderly conduct and battery do not have the same statutory elements. To convict Mead for battery under K.S.A. 2016 Supp. 21–5413(a)(2) as charged, the State had to prove he (1) knowingly caused physical contact with White and (2) did so in a rude, insulting, or angry manner. To convict Mead for disorderly conduct, the State had to prove that Mead had engaged in noisy conduct that would reasonably tend to arouse alarm, anger, or resentment in others and that Mead knew or should have known that his conduct would cause alarm, anger, or disturb others or would provoke an assault or other breach of the peace. See K.S.A. 2016 Supp. 21–6203(a)(3). Battery requires establishing physical contact with another person; disorderly conduct does not. Likewise, none of the elements in disorderly conduct are required to prove battery. Because the statutes defining each offense require proof of elements not necessary to prove the other offense, convictions for disorderly conduct and battery are not multiplicitous. See *State v. Fife*, No. 102,488, 2011 WL 6413616, at *10 (Kan. App. 2011) (unpublished opinion) (concluding that disorderly conduct is not a lesser included offense of aggravated battery because it has elements not present in the aggravated-battery statute).

***8** Mead's argument on appeal doesn't focus on the elements test. Instead, he argues that because the same conduct—his verbal comments—was used to prove battery and disorderly conduct, his convictions are multiplicitous. But his argument is based on a test for multiplicity that is no longer used.

It's true that, for a period of time, some Kansas cases held that convictions were multiplicitous if the same evidence or violent act was used to prove the convictions arising under

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

different statutes. See, e.g., *Schoonover*, 281 Kan. at 481–87, 492–93 (tracing the history of multiplicity and double-jeopardy cases in Kansas). In support of his argument, Mead cites two cases from 1995 or before, *State v. Rinck*, 256 Kan. 848, 850, 888 P.2d 845 (1995), and *State v. Warren*, 252 Kan. 169, 180–82, 843 P.2d 224 (1992). These cases followed and applied an action-based test for multiplicity. But the Kansas Supreme Court in the 2006 case of *Schoonover* set out the current analytical framework for multiplicity issues and held that no other test for multiplicity was valid or applicable. 281 Kan. at 493–95. Under the same-elements test in *Schoonover*, Mead's convictions are not multiplicitous.

*IV. We Decline to Address Mead's Argument That the State Failed to Disclose Evidence Helpful to Him Because It Wasn't Raised in the District Court and the Record Is Not Sufficient to Address It.*

Mead contends that the State failed to disclose evidence that might have been helpful to him in violation of its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he alleges that the State didn't provide the defense with Trainor's complete statement to police and didn't provide Vawter's statement to police until the day of trial. The State responds that the issue wasn't raised before the district court and that there is no evidence that the State withheld evidence favorable to the defense.

The State's first point—that we should not consider the issue since it wasn't raised in the district court—is well taken in this circumstance. First, as a general rule, a party may not raise a constitutional claim, like violation of the *Brady* rule, for the first time on appeal. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); *State v. Anderson*, No. 114,447, 2016 WL 3961436, at *3 (Kan. App. 2016) (unpublished opinion). Mead has not explained in his appellate brief why we should consider this issue even though he did not raise it in the district court. See Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34); *Godfrey*, 301 Kan. at 1043–44. Second, even if we were to consider whether to take up this issue so as to avoid potential denial to Mead of an important right, we may decline to do that if the record before us is insufficient to address the merits of the issue. See *State v. Ortega–Cadelan*, 287 Kan. 157, 160, 194 P.3d 1195 (2008). That's true here too.

To understand why our record isn't sufficient to consider the *Brady* issue, we must consider what *Brady* requires. In *Brady*, the United States Supreme Court held that the State has a duty to disclose evidence favorable to the defendant when "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Failure to do so violates a defendant's right to due process. *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 181 L.Ed.2d 571 (2012) (citing *Brady*, 373 U.S. at 87); *State v. Soto*, 301 Kan. 969, 978, 349 P.3d 1256 (2015). Our Supreme Court has said there are three essential elements to establish a *Brady* violation: (1) that the evidence at issue was favorable to the defendant, either because it was exculpatory or impeaching; (2) that the State suppressed the evidence, either willfully or inadvertently; and (3) that the evidence was material so as to establish prejudice. *State v. DeWeese*, 305 Kan. 699, 710, 387 P.3d 809 (2017) (quoting *State v. Moore*, 302 Kan. 685, 700, 357 P.3d 275 [2015] ). For *Brady* purposes, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Warrior*, 294 Kan. 484, Syl. ¶ 11, 277 P.3d 1111 (2012).

***9** Mead makes two claims about information that wasn't provided to him. First, Trainor testified that the written statement he gave to police was longer than the one he was handed while on the witness stand. Second, Vawter's written statement to the police wasn't provided to Mead until the day of trial; the prosecutor said police had initially failed to provide that statement to the prosecutor.

In both situations, since the claims weren't raised in the district court, there's key information we don't know. On Trainor's statement, we don't know what was in the missing part. Was it important? Did it support Mead's case? We have no way to know. Similarly, on Vawter's statement, it has not been included in the record on appeal; we therefore have no way to fairly evaluate its significance. Mead's attorney did have the chance to cross-examine Vawter at trial. We can't tell from our record whether there were any areas not effectively explored in cross-examination that might have been more effectively addressed had the statement been produced sooner. And we are not able to tell whether either alleged *Brady* failure caused actual prejudice to Mead.

Even after the initial, direct appeal (like the one now before us), a defendant can still challenge the effectiveness of his or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

her attorney or the failure of the State to comply with *Brady* requirements in a habeas corpus action under K.S.A. 2016 Supp. 60–1507. See, e.g., *Wilkins v. State*, 286 Kan. 971, 190 P.3d 957 (2008); *Ludlow v. State*, 37 Kan. App. 2d 676, 157 P.3d 631 (2007). Thus, if the State did violate *Brady* here and that violation truly prejudiced Mead, a mechanism to raise the issue remains in place. We therefore decline to consider the issue in this direct appeal, given that the issue was not raised in the district court, the district court has made no factual findings about it, and key documents relevant to the claim are not in the record on appeal.

*V. Mead Failed to Preserve His Argument that the Admission of Evidence Suggesting Drug Use by Him Violated K.S.A. 2016 Supp. 60–455.*

Mead's next argument is that the district court improperly admitted evidence that he had committed another crime—here, the possession of marijuana. An evidentiary statute, K.S.A. 2016 Supp. 60–455, generally prevents evidence that a defendant has committed a crime not charged in the case unless it's otherwise relevant to some issue like the defendant's motive. The State responds that Mead failed to preserve this issue for appeal and that, even if the evidence was improperly admitted, the error was harmless.

At trial, White reported that he had first come into contact with Mead the night before the altercation. And in White's written statement to police, White alleged that he saw Mead smoking a marijuana cigarette with others when he responded to the scene. Mead objected to the admission of the written statement based on hearsay but did not otherwise object. On direct examination, the State did not ask White about the allegation of marijuana use. On cross-examination, however, Mead's attorney asked White several questions about the allegation and asked White to confirm that he thought it was a marijuana cigarette. Mead's attorney also called a witness who testified that Mead was not smoking a marijuana cigarette that night, although other people nearby were. Mead testified that he had not been drinking or smoking marijuana that night.

***10** On appeal, Mead argues that the district court erred in admitting the evidence of the prior incident regarding possible drug use. Under K.S.A. 2016 Supp. 60–455(a), evidence that a person committed a crime on a specified occasion is inadmissible to prove that the person had a disposition to commit crimes or as the basis to infer that the person committed a crime on another specified occasion. But the evidence can be used when it's relevant to prove some other material fact, such as motive, opportunity, intent, knowledge, identity or absence of mistake. K.S.A. 2016 Supp. 60–455(b).

The problem with Mead's argument is that Mead never objected at trial on the grounds that the evidence violated K.S.A. 2016 Supp. 60–455. Accordingly, since we don't normally address issues for the first time on appeal, the issue is not properly before this court. Another evidentiary statute, K.S.A. 60–404, requires that a defendant make a timely and specific objection to the admission of evidence at trial to preserve the issue for appeal. See, e.g., *State v. Solis*, 305 Kan. 55, 61, 378 P.3d 532 (2016); *State v. Holman*, 295 Kan. 116, 126, 284 P.3d 251 (2012), *overruled on other grounds by* *State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012) (contemporaneous-objection rule applies to evidence alleged to be admitted in violation of K.S.A. 60–455). Failure to object generally precludes appellate review, though an appellate court's refusal to consider an unpreserved issue is a matter of prudence, not jurisdiction. See *Solis*, 305 Kan. at 64; *State v. Hart*, 297 Kan. 494, 510–11, 301 P.3d 1279 (2013); *Gaona*, 293 Kan. at 956; *State v. Johnson*, No. 109,974, 2014 WL 2225984, at *4 (Kan. App. 2014) (unpublished opinion). Given Mead's failure to object on the basis of K.S.A. 2016 Supp. 60–455 at trial, which deprived the district court of the opportunity to address the issue and take any required steps to avoid prejudice to Mead, we decline to take this issue up on its merits in this appeal.

*VI. Mead's Argument That Some Rebuttal Testimony Shouldn't Have Been Allowed Is Not Properly Before Us Since He Didn't Raise This Objection at Trial.*

Mead next complains that the admission of some rebuttal testimony violated his due-process rights. Mead takes issue with the State calling Captain Welch as a rebuttal witness and putting on evidence about a beer bottle and a jar of green, leafy vegetation. At trial, Mead's attorney did raise an objection to the testimony about the beer bottle and jar of vegetation; the attorney argued that the evidence shouldn't be admitted because the information had not previously been turned over to the defense and had unfairly surprised the defense. The court responded that the State was offering the evidence to rebut evidence presented in the defense's case-in-chief and allowed the State to continue its line of questioning.

The significant point on appeal is that Mead did not object on the grounds that appear to underlie his appellate argument—that the rebuttal evidence was outside the scope of permissible rebuttal evidence or that it violated K.S.A. 2016 Supp. 60–455. Ordinarily, " '[a] defendant may not object to the admission of evidence on one ground at trial and then assert a different ground for objection on appeal.' " *State v. Page*, 303 Kan. 548, 558, 363 P.3d 391 (2015) (quoting *State v. Huffmier*, 297 Kan. 306, 319, 301 P.3d 669 [2013] ). Additionally, we note that the district court has broad discretion in determining the use and extent of relevant evidence in rebuttal. *State v. Kleypas*, 305 Kan. 224, 340, 382 P.3d 373 (2016). Thus, it's especially important that the defendant raise the specific objection so that the trial court can appropriately exercise its discretion. Given the broad discretion given to the trial court over rebuttal evidence and the defendant's failure to raise the issue he now pursues on appeal during trial, we decline to address his claim of error in the scope of the State's rebuttal evidence.

*VII. We Cannot Consider Mead's Claim of an Unreasonable Search.*

***11** Mead's next argument goes to the beer bottle and jar of green, leafy vegetation found in the golf cart. He contends that the search of the golf cart violated his Fourth Amendment right to be free from unreasonable searches and seizures.

Once again, though, Mead is raising an issue he did not bring up at trial. The only objection made at trial was that the defense did not know about the beer bottle or jar of vegetation and was unfairly surprised. Mead did not claim at trial that the evidence should have been suppressed because it was the product of an unlawful search. So Mead again runs up against the rules that a party must object to the admission of evidence at trial to preserve an issue for appeal and cannot raise an objection on other grounds on appeal. See K.S.A. 60–404; *Page*, 303 Kan. at 558. Additionally, we may generally decline to consider an issue, even a constitutional one, raised for the first time on appeal. *Godfrey*, 301 Kan. at 1043; *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012).

The normal practice in the trial court is to use a pretrial motion to suppress evidence to raise a Fourth Amendment issue. The trial court would then hold an evidentiary hearing, determine the facts, and decide based on those facts whether the search was unreasonable such that the evidence should be excluded. Even when the defense claims surprise from evidence produced immediately before trial, the defense still should raise the issue so that the trial court can determine any facts relevant to the claim of unreasonable search or seizure. Here, since Mead did not raise the issue before the district court, the district court did not make any factual findings that would shed light on whether the search was unreasonable or conducted without proper legal justification. Accordingly, making any fair legal conclusion on appeal regarding the search would be impossible. Because Mead failed to raise this issue before the district court, we cannot reasonably consider it for the first time on appeal.

*VIII. This Court Should Not Consider Mead's Claim of Ineffective Assistance of Counsel Raised for the First Time on Appeal.*

Mead raises one final issue—a claim that his lawyer at trial didn't provide adequate representation, thus leaving him without the effective assistance of counsel guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution. The State again points out that this is an issue Mead didn't raise in the district court.

As a general rule, an appellate court will not address the merits of an ineffective-assistance-of-counsel claim for the first time on direct appeal. *State v. Dull*, 298 Kan. 832, 839, 317 P.3d 104 (2014). This is because there has been no opportunity for the parties to develop the facts and present evidence regarding the trial lawyer's representation or to have the district court judge who presided over the proceedings (and is likely in the best position to assess the merits) to consider and rule on the claims. *Rowland v. State*, 289 Kan. 1076, 1084, 219 P.3d 1212 (2009). Often, the district court must consider conflicting testimony and evidence regarding the lawyer's actions or inactions, the significance of those actions or inactions, and the strength or weakness of a particular argument. *State v. Levy*, 292 Kan. 379, 389, 253 P.3d 341 (2011).

***12** When a defendant raises an ineffective-assistance claim for the first time on direct appeal, we have the option to handle the claim in one of three ways. *State v. Reed*, 302 Kan. 227, 233–34, 352 P.3d 530, *cert. denied* 136 S. Ct. 344 (2015). First, we may follow the general rule and decline to address the claim. 302 Kan. at 233–34. The defendant may then raise the claim before the district court in a timely habeas corpus action under K.S.A. 60–1507.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Second, the appellate court may remand the case to the district court to hold a special hearing on the claim. 302 Kan. at 234. To warrant a special hearing, however, an appellant (usually through his or her new counsel) must conduct some investigation into the claim and attempt to determine the circumstances under which the trial lawyer acted; it's not enough merely to read the record and argue that the case should have been handled differently. *Levy*, 292 Kan. at 389 (citing *State v. Van Cleave*, 239 Kan. 117, 119–21, 716 P.2d 580 [1986] ). Third, in extremely rare circumstances, the appellate court will consider the merits on direct appeal because the appellate record is sufficient to decide the claims; in such cases, the merit or lack of merit of the ineffectiveness claim must be obvious. *Reed*, 302 Kan. at 234 (citing *Dull*, 298 Kan. at 839).

Because Mead is representing himself without the help of a lawyer, it's understandable why he would raise his ineffective-assistance claim on direct appeal—many issues have to be raised on direct appeal or they are deemed waived. Ineffective-assistance claims are unusual in that regard. Mead's case is not one of the rare ones in which this court can decide his ineffective-assistance claim without the district court first considering the claim and developing the record. Some of Mead's grievances with his attorney's performance may have been the product of reasonable trial strategy. See *Shumway v. State*, 48 Kan. App. 2d 490, 497, 293 P.3d 772 (2013). Likewise, Mead has not meet the requirements to warrant remanding the issue to the district court for a special hearing. See *Levy*, 292 Kan. at 389. We therefore follow the general rule and decline to address Mead's ineffective-assistance claim in this direct appeal.

The district court's judgment is affirmed.

**All Citations**

401 P.3d 687 (Table), 2017 WL 4082240

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

419 P.3d 102 (Table)
Unpublished Disposition
This decision without published opinion is referenced in the Pacific Reporter. See Kan. Sup. Ct. Rules, Rule 7.04.
NOT DESIGNATED FOR PUBLICATION
Court of Appeals of Kansas.

STATE of Kansas, Appellee,
v.
Betty Joan HUGHS, Appellant.

No. 118,281
|
Opinion filed May 25, 2018.
|
Review Denied December 31, 2018

Appeal from Osage District Court; TAYLOR J. WINE, judge.

**Attorneys and Law Firms**

Betty Joan Hughs, appellant pro se.

Brandon L. Jones, county attorney, and Derek Schmidt, attorney general, for appellee.

Before McAnany, P.J., Leben and Schroeder, JJ.

MEMORANDUM OPINION

Per Curiam:

***1** Betty Joan Hughs appeals her conviction for disorderly conduct. The facts surrounding the altercation that led to this charge are well known to the parties and need not be repeated here in detail. It suffices to say that the participants consisted of Hughs; Kajeya and Shane Kendall, her daughter and son-in-law; and Joe Hughs, her husband.

Sterling Hughs, a visitor, testified that Hughs and Kajeya were yelling at each other before the pushing and shoving began. Shane got into the shouting match. Hughs then asked her husband, Joe, if he was just going to stand there or if he was going to do something about all this. Kajeya and Shane claimed that the fight started when Hughs hit their son. The boy denied that his grandmother hit him. Hughs claimed the fight began when Shane and Kajeya called their son bad names. She said Shane punched her in the face, and then the three of them began fighting.

The State charged Hughs with disorderly conduct. Kajeya and Shane were also charged. Hughs was convicted following a bench trial, and the court imposed a $50 fine. This appeal followed.

*Self-Defense*

Hughs claims she had the right to use force under K.S.A. 2017 Supp. 21-5222(a) to protect her grandson from Kajeya's abuse and to defend herself when Kajeya and Shane attacked her. She asserts that the State did not meet its burden to prove that she was not entitled to immunity from prosecution under K.S.A. 2017 Supp. 21-5231 based on this justified use of force.

Under the rule in *State v. Ulteras*, 296 Kan. 828, 845, 295 P.3d 1020 (2013), the State has the burden to show there is probable cause to believe that immunity does not apply; that is, that there are no reasonable grounds to believe that Hughs was entitled to use force considering all of the facts and circumstances. See *State v. Hardy*, 305 Kan. 1001, 1011-12, 390 P.3d 30 (2017). In resolving this claim we must determine whether there was substantial evidence to support the district court's factual findings. We review de novo the legal issue of whether Hughs had probable cause to act in self-defense or in defense of her grandson. See 305 Kan. at 1012.

K.S.A. 2017 Supp. 21-5222(a) provides that "[a] person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force."

When the parties to an altercation engage in mutual combat, self-defense does not justify the application of force. "[I]t does not matter who initiated the confrontation when both parties willingly engaged in it." *State v. Friday*, 297 Kan. 1023, 1038, 306 P.3d 265 (2013). Mutual combat is " '[o]ne into which both the parties enter willingly or voluntarily; it implies a common intent to fight....' [Citation omitted.]" *State v. Coop*, 223 Kan. 302, 306, 573 P.2d 1017 (1978).

Here, the district court found that the incident began with yelling and name-calling. Considering the evidence produced

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

at trial, there was substantial competent evidence to support the district court's finding of probable cause to believe that Hughs was not entitled to use force to protect her grandson, because calling her grandson names does not amount to a threat of an imminent use of unlawful force.

***2** Similarly, there was substantial competent evidence to support the district court's finding that Hughs was not entitled to use force to protect herself. The evidence established that Hughs was a willingly participant in the altercation and was not acting simply in self-defense.

The district court did not err in finding that Hughs was not immune from prosecution under her theory that she acted in self-defense and in the defense of her grandson.

*Consideration of Facts Outside the Record*

Hughs claims the district court erroneously found the fact that she had used physical force to defend her grandson when she only used "verbal force" to do so. In considering this claim we review the record for substantial competent evidence. See *State v. James*, No. 115,324, 2016 WL 7429525, at *5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1325 (2017).

In deciding the case the court cannot rely on facts not in evidence, but it can draw reasonable inferences based on the evidence that was admitted. See *State v. Baker*, 281 Kan. 997, 1012, 135 P.3d 1098 (2006).

Hughs was charged with disorderly conduct, which is defined in K.S.A. 2017 Supp. 21-6203(a) as follows:

> "Disorderly conduct is one or more of the following acts that the person knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace:
>
> "(1) Brawling or fighting;
>
> "(2) disturbing an assembly, meeting or procession, not unlawful in its character;
>
> or
>
> "(3) using fighting words or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others."

The district court found that Hughs and her fellow combatants had engaged in a verbal confrontation in which they were screaming and cursing at each other. There is substantial competent evidence in the record of the trial to support this finding. This finding alone is sufficient to support a conviction for disorderly conduct because the offense can consist merely of using fighting words or engaging in noisy conduct tending reasonably to arouse alarm, anger, or resentment in others.

The district court also found that Hughs had engaged in fighting and brawling, which would satisfy the elements of this offense. Based on the testimony of the investigating deputy, as well as the testimony of Sterling and of Hughs herself, there was ample evidence to support this finding.

*Evidence of Prior Bad Acts and Interruptions by the Prosecutor*

Hughs claims that the district court erred in not allowing her to introduce evidence of prior abuse by Kajeya. She also complains that the prosecutor kept interrupting her. She claims these resulted in her being denied a fair trial.

A defendant has the right to present a defense, but the right is not without limits. The defendant's right to present a defense is subject to the rules of evidence and procedure. "[I]f admissible evidence that is an integral part of the theory of defense is erroneously excluded, the defendant's fundamental right to a fair trial has been violated." *State v. Meeks*, 301 Kan. 114, 117, 339 P.3d 766 (2014).

K.S.A. 2017 Supp. 60-455(a) provides that evidence of a person's prior bad acts is generally inadmissible to prove that person's propensity to commit a crime or a civil wrong. But "such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2017 Supp. 60-455(b). A party wishing to invoke this exception to the general rule must make a pretrial motion to admit the evidence and inform the opposition of the intent to use it. See K.S.A. 2017 Supp. 60-455(e). Hughs made no such motion to invoke the exception in K.S.A. 2017 Supp. 60-455(b). Thus, the district court did not err when it sustained the State's objection to her introducing at trial evidence of her daughter's prior misconduct.

***3** The prosecution in this case only interrupted Hughs to make relevant objections, which it was required to do under

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

K.S.A. 60-404 in order to preserve for appeal any improper admission of testimony or exhibits. The prosecution did not infringe on Hughs' right to a fair trial by interrupting her to make timely and relevant objections.

*Assistance of Counsel*
Hughs proceeded in this matter pro se, both at trial and now on appeal. She argues that her Sixth Amendment rights were violated when the district court failed to provide her with counsel. We review this issue de novo. See *Stinemetz v. Kansas Health Policy Authority*, 45 Kan. App. 2d 818, 829, 252 P.3d 141 (2011).

The Sixth Amendment of the United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." As stated in *Argersinger v. Hamlin*, 407 U.S. 25, 37-38, 92 S. Ct. 2006, 32 L.Ed. 2d 530 (1972), " '[N]o person may be *deprived of his liberty* who has been denied the assistance of counsel as guaranteed by the Sixth Amendment.' " (Emphasis added.) We need not consider the right to counsel under the Sixth Amendment when loss of liberty is not involved. Here, the State charged Hughs with disorderly conduct, a class C misdemeanor, which calls for a possible sentence of up to one month in jail or a fine of up to $500 or both. K.S.A. 2017 Supp. 21-6602(a)(3); K.S.A. 2017 Supp. 21-6611(b)(3). But on the day of trial after considering Hughs' motion to dismiss, and before the trial began, the following exchange took place:

> "[THE COURT:] ... Mr. Jones [the prosecutor] indicated ... and I just maybe want to put it on the record again, you're not seeking jail time on either of these, right?
>
> "MR. JONES: No I am not.
>
> "THE COURT: ... [H]e's not seeking any jail time, the Court would not assess any jail time if you were convicted. The only possibility of a sentence then would be a fine."

Here, because the State only sought a $50 fine, the district court did not err in finding that Hughs did not have a right to have counsel appointed for her in these proceedings.

*Miranda Rights*
Hughs claims that the State violated her *Miranda* rights and her right to counsel when it failed to read her the *Miranda* warnings prior to questioning her while she was in police custody. In support of this argument, Hughs asserts that officers conducted an interrogation while they were booking and fingerprinting her and that the officers neither read her the *Miranda* warnings nor provided her with counsel during this interrogation. But she does not identify any statement made by her while in police custody that was introduced into evidence at trial in violation of her *Miranda* rights. Nor do we find any. Hughs fails to support this claim.

*Victim Rights*
Hughs claims her rights as a victim of a crime were violated when the State prosecuted her. She relies K.S.A. 2017 Supp. 74-7333 and the rights of victims guaranteed by Article 15, § 15 of the Kansas Constitution. We review this claim de novo. *Stinemetz*, 45 Kan. App. 2d at 829.

Kan. Const. art. 15, § 15(a) (2017 Supp.) provides in pertinent part:

> "Victims of crime, as defined by law, shall be entitled to certain basic rights, including the right to be informed of and to be present at public hearings, as defined by law, of the criminal justice process, and to be heard at sentencing or at any other time deemed appropriate by the court, to the extent that these rights do not interfere with the constitutional rights of the accused."

***4** K.S.A. 2017 Supp. 74-7333 provides in pertinent part:

> "(a) In order to ensure the fair and compassionate treatment of victims of crime and to increase the effectiveness of the criminal justice system by affording victims of crime certain basic rights and considerations, victims of crime shall have the following rights:
>
> (1) Victims should be treated with courtesy, compassion and with respect for their dignity and privacy and should suffer the minimum of necessary inconvenience from their involvement with the criminal justice system."

The remainder of K.S.A. 2017 Supp. 74-7333 discusses how the victim should be apprised of the prosecution of the crime as it unfolds and that the victim should be given access to any necessary treatment to help deal with the crime that was committed against the victim.

The three main participants in the altercation—Hughs, Kajeya, and Shane—were all prosecuted. With respect to the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

charges against Kajeya and Shane, Hughs was the victim. But that fact does not insulate her from her own criminal liability as a participant in the scuffle.

Prosecuting Hughs for her own misconduct does not deprive her of her rights as a victim vis-à-vis Kajeya and Shane. Hughs was informed of the hearings involving the charges against Kajeya and Shane. She was apprised of events at the various stages of their prosecutions. Moreover, the State gave Hughs as much privacy as is possible for a person who is both a victim of a crime and the suspect of a crime. The State did not request that Hughs take any unreasonable actions and did not take any action to inconvenience her. The State went out of its way to ensure that she had the requisite information as a victim of a crime but also went through the necessary steps to prosecute her as a person who had committed a crime. Neither Hughs' constitutional rights as a victim nor her statutory rights were violated.

*Equal Protection*

Finally, Hughs claims her right to the equal protection of the law was violated because of the way she, an elderly person, was prosecuted. To the contrary, Hughs was not treated differently than any other criminal defendant. She does not come forward with any facts that support the claim that she was treated differently due to her age. See *State v. Kelsey*, 51 Kan. App. 2d 819, 821-22, 356 P.3d 414 (2015) (recognizing that an equal protection violation requires the classification to have been treated differently than similarly situated individuals). There is no support for this claim.

Affirmed.

**All Citations**

419 P.3d 102 (Table), 2018 WL 2374766

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.