**In The Matter Of:**

*JUSTIN SPIEHS v.*

*JAY ARMBRISTER, ET AL.*

---

*JUSTIN SPIEHS, Ph.D.*

*October 16, 2025*

*Video Deposition*

---

*iReport Solutions LLC*
*#297 - 7111 West 151st Street*
*Overland Park, Kansas 66223*
*816.223.3156 or 913.972.2029*
*admin@ireportsolutions.com*

Original File 10.16.2025JustinSpiehsPhD.txt

**Min-U-Script® with Word Index**

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JUSTIN SPIEHS,
Plaintiff,
vs. Case No.
JAY ARMBRISTER, et al., 5:24-CV-4005-JAR-BGS
Defendants.

VIDEOTAPED DEPOSITION OF JUSTIN SPIEHS, Ph.D., the Plaintiff, taken on behalf of the Defendants before Laurel A. Woodbridge, Missouri CCR No. 898 and Kansas CCR No. 1327, RPR, CSR, and CRR, pursuant to Notice To Take Videotaped Deposition on the 16th day of October 2025, at the law offices of Fisher Patterson Sayler & Smith, L.L.P., 51/300 Corporate Woods, 9393 West 110th Street, Overland Park, Kansas.



APPEARANCES

APPEARING FOR THE PLAINTIFF:

Mr. Linus L. Baker
Attorney at Law
6732 West 185th Terrace
Stilwell, Kansas 66085-8922
913.232.8734
linusbaker@prodigy.net

APPEARING FOR THE DEFENDANT DOUGLAS COUNTY, KANSAS BOARD OF COUNTY COMMISSIONERS:

Ms. Michelle R. Stewart
The Hinkle Law Firm LLC
Suite 400
8711 Penrose Lane
Lenexa, Kansas 66219-8179
913.345.9205
mstewart@hinklaw.com

APPEARING FOR THE DEFENDANTS JAY ARMBRISTER, TYLER KRUZEL, JIMMY would, KRISTEN CHANNELS AND CHASE COLEMAN:

Mr. Andrew D. Holder
Fisher, Patterson, Sayler & Smith, LLP
300/51 Corporate Woods
9393 West 110th Street
Overland Park, Kansas 66210
913.339.6757
aholder@fpsslaw.com

VIDEOGRAPHER:

Mr. Justin Bond
TBC
Suite A
415 Southeast Douglas
Lee's Summit, Missouri
816.221.3376

ALSO PRESENT:

Mr. Jay Armbrister



INDEX


| WITNESS: | PAGE, |
|---|---|
| JUSTIN SPIEHS, Ph.D. | |
| Examination By Ms. Stewart | 5 |
| Examination By Mr. Holder | 113 |
| Further Examination By Ms. Stewart | 167 |

EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE REFERENCED |
|---|---|---|
| 1 | Plaintiff's Response to Interrogatories | 104 |
| 2 | Plaintiff's Rule 26 Disclosures | 104 |
| 3 | Color Photocopies of Photographs Bates Numbers DGSO 00023 - 24 | 113 |
| 4 | Plea Agreement No Bates Numbers | 137 |
| 5 | Color Photocopies of Photographs No Bates Numbers | 138 |
| 6 | Color Photocopy of Photograph No Bates Number | 144 |


NOTE: Original Exhibits were attached to the original transcript



THE VIDEOGRAPHER: Stand by, Everybody, and I'll get us on the record just give me a couple seconds of silence.
Thank you.
(Deposition commenced at 9:54 a.m.)
THE VIDEOGRAPHER: Good morning.
Today is October 16th, 2025. We are on the record at 9:54 a.m.
Today we will take a videotaped deposition in the matter of Justin Spiehs versus Jay Armbrister, et al.
Counsel, please state your appearance for the record.
MR. BAKER: Linus Baker for Plaintiff.
MS. STEWART: Michelle Stewart on behalf of the Defendant Douglas County, Kansas.
MR. HOLDER: Andrew Holder on behalf of Defendant Armbrister and the remaining individual defendant deputies.
THE VIDEOGRAPHER: Thank you.
Would you please swear in the witness.
JUSTIN SPIEHS, Ph.D.
of lawful age, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

Page 5

EXAMINATION
BY MS. STEWART:
Q. Can you please state your name for the record?
A. Justin Spiehs.
Q. Mr. Spiehs, I want to confirm, we had an off-the-record conversation, the cell phone that's in front of you is not recording currently; is that correct?
A. That's correct.
Q. Okay. Have you ever given a deposition before?
A. No.
Q. Have you ever testified in court?
A. Yes.
Q. Okay. The oath that you were just given is the same oath that you would have been given if you were testifying in court, we just don't have a judge present. Although as you are aware we could call one, but it's a little less formal than having a judge sitting here making rulings on questions.
If from time to time your attorney objects to a question, I would ask that you allow him the chance to object and then go ahead and give that answer unless he instructs you not to.

Page 6

If you don't understand one of my questions, please stop me. I'm happy to clarify anything for you. I want to make sure that you understand and have given me the best answer.
Is that fair?
A. I won't agree to that. I mean it's up to you to ask a question that's understandable.
Q. Okay. If you don't understand one of my questions will you tell me you don't understand it?
MR. BAKER: Object to form.
A. I don't agree to that.
BY MS. STEWART:
Q. Okay. What don't you agree about?
A. That I'm --
MR. BAKER: Object to form.
A. That I'm -- that I'm required to do something like that. I mean....
BY MS. STEWART:
Q. All I'm asking is if you don't understand one of my questions will you tell me you don't understand what I'm asking?
A. I've already answered that question. I don't agree to that.
Q. Okay. And why don't you agree to that

Page 7

again?
MR. BAKER: Object to form.
A. I don't think that's my responsibility to do that.
BY MS. STEWART:
Q. Okay. So you would answer the question if you don't understand it.
MR. BAKER: Object to form.
A. I didn't say that.
BY MS. STEWART:
Q. Okay.
A. I didn't say that.
Q. So if you answer my question can I assume that you did understand it and gave me the best answer that you had?
MR. BAKER: Object to form.
A. I have no idea what you could assume. I don't know. I don't know. I don't even know how to answer that.
BY MS. STEWART:
Q. Okay. Are you on any medication that would affect your ability to understand or give truthful and honest answers to questions today?
A. I think that's irrelevant. I think that's irrelevant.

Page 8

Q. So are you on any medication?
A. What does that have to do with the case?
Q. Are you on any medications that would affect your ability to understand or give truthful and honest answers today?
MR. BAKER: You can go ahead and answer that. I mean if --
A. No.
BY MS. STEWART:
Q. Okay.
A. I'm not -- no.
Q. I'm just asking if there's something that would impair your ability to understand questions today or give honest testimony.
MR. BAKER: Object to form. But you're not on medication, is that what you --
THE WITNESS: That's what I said.
MR. BAKER: Okay.
BY MS. STEWART:
Q. Sir, other than meeting with Mr. Baker to prepare for the deposition, have you done anything to get ready for today's deposition?
A. Yes.
Q. What did you do?

A. I read the Third Amended Complaint.
Q. Okay.
A. And I watched videos of the incidents.
Q. Can you be more specific? What videos?
A. On what?
Q. What videos did you watch?
A. Of the incidents that are in the Third Amended -- in the complaint.
Q. Okay. And I think specifically there -- there are some certain dates that are specific to that Third Amended Complaint, are those the videos that you watched?
A. Some of 'em, yeah.
Q. Okay. What other videos did you watch?
A. What do you mean?
Q. Well, you said "some of them."
A. That doesn't mean I've watched other videos. I watched some of the videos from those dates, yeah.
Q. Okay. So what dates -- do you remember what dates of the videos you watched?
A. The arrest dates, which was April 20th, 2022; May 1st, 2024; and then there was



the removal in May of 2022, I believe that was May 11th, I believe is what it was, or 20th, something like that.
And then there were multiple incidents at meetings in the spring of '24 that I watched as well in April and May as well.
Q. Okay. And when you say videos, are those videos -- what videos are you talking about?
A. I'm talking about videos that had captured the events that took place on those days.
Q. Are you talking about the official Douglas County Commission recordings or are you talking about videos that I believe your attorney has produced that are on -- available on YouTube that are kind of compilations of multiple videos?
A. Well, I don't know what you mean by a compilation of multiple videos.
Q. Sure. And your attorney has produced some videos in this case that are on YouTube that have multiple events contained in one video. So, for example, there might be a clip of a Commission meeting in 2024, but then refers back to something that happened in 2022 and it's all part of one video. That's what I mean by compilation.
A. You're talking specifically about the



videos that -- that we supplied, is that what you're talking about?
Q. No, I was asking what you watched. I was trying to differentiate if you watched those videos that you produced.
A. Well, what videos are you talking about? Are you talking about specific videos that do that?
Q. I'm -- I'm asking you. You told me you watched some videos to get ready for today so I was trying to figure out which ones --
A. You characterized it as a compilation. I'm asking are you aware of videos like that? I mean, I don't know why you characterize it as a compilation.
Q. That was my characterization. I apologize if that was wrong or confusing. I was referring to videos that you produced.
A. That I produced?
Q. In this lawsuit.
A. Yeah, I've the -- I've watched the videos that I produced, yeah.
Q. Okay. In getting ready for the deposition were you watching those videos or were you watching the official videos from the Douglas County



meetings?
A. I watched those videos and -- it's not an "or," it's an "and also" the -- the Douglas County videos as well.
Q. Okay.
A. And -- and there's other videos as well, so....
Q. What other videos?
A. Well, I know there was other people that were recording inside of those -- inside the meetings, so....
Q. And were those videos that you watched to get ready for the deposition?
A. Yes.
Q. Okay. Whose videos did you watch?
A. I don't recall.
Q. Were they of the same dates that you've already shared with me?
A. In terms of what? Like each one --
Q. You said other videos, were they the same dates?
A. Well, to clarify you are -- you were asking me specifically to pin down dates so -- and I said I think that May removal was like May 11th or 20th. I -- I -- I don't recall the -- the exact

date. But it -- it's an official date. I just -- I'm -- I'm not committing to like I watched a video from a date that didn't happen. I'm trying to give you the -- the correct dates.
Q. And that's fair. I'm not trying to -- I'm just trying to get your best understanding and I'm not trying to hold you to --
A. Yeah.
Q. -- something specific.
A. So I'm saying -- so then it's hard to -- to -- if you're referring to one video with another date that I -- you know, I'm not saying that that's not that date, but it's hard to say if I watched that video or not.
Q. Anything else that you watched or reviewed to get ready for the deposition today?
A. Not that I recall.
Q. Other than speaking with your counsel, have you -- have you spoken with anyone else to get ready for your deposition?
A. No.
Q. Are you currently barred or subject to trespass orders in any locations within Douglas County, Kansas?
A. Yes.



Q. And where?
A. Lawrence Public Library.
Q. Okay. Anywhere else?
A. The Lawrence Public School District buildings, property.
Q. Anywhere else?
A. I don't think so.
Q. Okay. Are you married, sir?
A. I think that's irrelevant.
No.
Q. Okay. Do you have any children?
A. It's irrelevant as well.
Q. Do you have any children?
A. Can you define what you mean by "children"?
Q. Yes. Do you have any children?
A. Meaning, like, of -- of minor age or what do you mean?
Q. Any children?
A. Any children?
Yeah.
Q. Okay. And are any of them over the age of 18?
A. Yeah.
Q. And what are their names?



A. I think this is irrelevant and unnecessary. What do they have to do with this?
Q. I'm just asking the question, sir.
A. What does their names have to do with this?
Q. I'm asking their names, if you have any relatives that are over the age of 18 that live in Douglas County or the surrounding areas?
A. What does that have to do --
MR. BAKER: Just go ahead and answer. Just get past it.
A. So what's the question again?
BY MS. STEWART:
Q. Do you have any children that are over the age of 18?
A. Yeah, I answered that.
Yes.
Q. Yes. And so what are their names?
A. Kadin and Amber.
Q. Could you spell that?
A. Spell what?
Q. Kadin.
A. K-a-d-i-n.
Q. Last name Spiehs?
A. Yep.



Q. Okay. And Amber, A-m-b-e-r?
A. Yep.
Q. Also last name Spiehs?
A. Yep.
Q. Okay. When did you first start attending Douglas County Commission meetings?
A. August 18th of 2021.
Q. And during that meeting, were you present when the Douglas County Commissioner read their public comment policy?
A. I don't recall.
Q. You don't recall if you were there when that was read?
MR. BAKER: Object.
A. I don't recall if I was there at the time that it was read and I -- I don't recall if it was read.
BY MS. STEWART:
Q. Okay. Do you recall at any time after you attended your first meeting you heard the commissioners read a public comment policy that the County reserves the right to shut off the microphone and remove any speaker from the meeting if they are vulgar, rude or inappropriate?
A. And say -- what's the question again?

Page 17

Q. After attending your first meeting you may not have heard it at your first meeting, but did you hear that policy being read when you attended subsequent meetings?
A. I have.
Q. Okay. And have you also heard, even if it wasn't August 18th of 2021, at subsequent meetings at the Douglas County Commission restricted campaigning for office during the public comment period?
A. I have.
Q. Okay. And also, that the Douglas County Commission required public comment to be related to the general business of the Douglas County Commission?
Did you hear that?
A. Not word for word related to the business of the -- the general business of the --
Q. The general business of the County.
A. Of the County, yeah.
Q. Okay. I know you said one of the videos you watched and one of the subject matters of your Third Amended Complaint is the April 20th, 2022 meeting that you attended. So I wanted to -- that's what I want to talk about with you right now.

Page 18

You attended that commission meeting on April 20th of 2022; is that correct?
A. I never made it to the meeting. I was arrested before it started. I -- I tried to attend that meeting.
Q. Okay. And when you arrived at the -- where -- where was that meeting held?
A. At the Douglas County Courthouse.
Q. And I know that there have been different locations because of construction, so that April 20th, 2022 meeting was in the actual commission building; is that correct?
A. It was at the courthouse.
Q. Okay. The old courthouse?
A. The old courthouse.
Q. In the commission room?
A. I don't know if it's called the commission room.
Q. Okay. Do you remember what time you arrived?
A. I -- I don't recall exactly what time. 5:20ish.
Q. And why were you attending the meeting on April 20th?
A. Because I wanted to.

Page 19

Q. Okay. Was there a topic that you were interested in hearing about?
A. Possibly.
Q. Okay. But you don't recall as we sit here today?
A. I don't recall.
Q. And you brought a sign into the meeting that read, "Dr. Spiehs for DGCO Commissioner. Fuck these liberal motherfuckers"; correct?
A. Correct.
Q. Okay. And was there also a stick attached to that sign?
A. What do you mean by "a stick"?
Q. Was there some sort of stick or device -- a pole, something that you could hold the sign up with?
A. Well, but when you say stick, what -- what kind of material are you talking about there? 'Cuz then you said pole as well, are you referring to the same thing?
Q. Yeah, I don't know what you would call it. Did you have something affixed to the sign itself that would allow you to hold it up?
A. More or less.
Q. What do you mean?

Page 20

A. Well, what do you mean by affixed?
Q. Was it taped on? Was it part of the sign?
A. I had something stapled to the inside of the sign.
Q. Okay. Well, tell me -- how -- how big was the sign? Was it -- what kind of paper was it on?
A. It was on cardboard.
Q. Okay. How big was it?
A. Oh, probably -- oh, I don't know. Probably 18 inches by 30 inches, probably. I don't know. Something like that.
Q. Okay.
A. If I had to guess (indicating).
Q. And what did you have stapled to the sign?
A. I had -- there was like a -- a wood -- a piece of wood that went -- ran up and down the middle of it and stuck out the top of it that I could hold like this (indicating).
Q. Okay. That you could put your hand around?
A. Yep.
Q. And the only reason I'm asking you to

describe that is because we obviously have Laurel, our court reporter, taking down everything that is being said, and so when you're gesturing or you're making -- gripping it with your hand, we're not going to know later what that means. So that was -- I'm not trying to be rude. I'm just trying to ask for clarification, so I appreciate --
MR. BAKER: Object to form. We have a video here. So I think that misrepresents what's going on here, but anyway....
BY MS. STEWART:
Q. So you had this piece of wood stapled into kind of the interior between -- were there just essentially two pieces of cardboard and then you had that piece of wood stapled in between?
A. Uh-huh. Yes.
Q. Thank you.
And when you entered the Douglas County old courthouse building, where did you go?
A. I walked in the direction of the table to sign up to speak for general public comment.
Q. Okay. And did you sign up?
A. I did.
Q. And then where did you go?
A. To the front row of the meeting room.



Sat down.
Q. Were the Douglas County commissioners seated at the dais or the commission table ready to start the meeting?
A. I don't believe all of 'em necessarily were there when I walked in.
Q. And while you were sitting in the front row, did Sheriff Armbrister approach you and tell you that the Commission wasn't going to let you display your sign during the meeting?
A. No.
Q. He didn't say that to you?
A. He said that before that.
Q. Okay. Tell me when he said that.
A. Okay. When I walked into the County Commission room, I walked over to the table to sign up and as -- right as I got to the table is when he approached me and said that, that I couldn't be in there with that sign is when he said that.
Q. So he told you you couldn't be in there with the sign or you wouldn't be able to display it during the meeting?
A. Couldn't be in there with that sign.
Q. Okay. What did you do?
A. I said, "Why is that?"



I said, "Oh, yeah. Why is that?"
Q. And what did he say?
A. He said because of the language on it. "It's got cuss words," he said.
Q. Okay. What did you say?
A. "Horse shit it does."
Q. That's what you said?
A. That's what you asked me.
Q. And I'm just asking if that's what you said.
A. That's what you asked me. I answered your question.
"Horse shit it does," is what I said to him.
Q. Okay. And what did he say?
A. He said, "Okay, then."
Q. What did you do at that point?
A. I signed up to speak at the meeting.
Q. And then you went and sat in the front row?
A. Then I went and sat in the front row.
Q. Okay. Where did Sheriff Armbrister go after he said, "Okay, then"?
A. Up to the commissioners' table.
Q. Did you have any other conversations



with Sheriff Armbrister?
A. What do you mean by "conversations"?
Q. Maybe I shouldn't have characterized that as a conversation. Did -- did -- after Sheriff Armbrister went to the -- the Commission table -- well, let me ask you, who was up there? Because I think you said not all the commissioners were up there. I just --
MR. BAKER: Object to form.
A. As to when I walked in, I -- I said not all of them were up there is what I said.
BY MS. STEWART:
Q. Okay. Not all the commissioners were up there. Did you see who he was talking to?
MR. BAKER: Object to form.
A. When I walked in, I said not all of them were up there is what I said.
BY MS. STEWART:
Q. Okay.
A. I didn't say anything about how many were up there when he walked up there.
Q. When he walked up there, how many were up there on the dais?
A. All of 'em.
Q. They were all up there?

A. Yep.
Q. Okay. Did you hear what they were talking about?
A. No, I did not, but I found out later what they were talking about.
Q. What do you mean?
A. What do you mean what do I mean?
Q. You said, "I found out later what they were talking about," and how did you -- what do you mean you found out later what they were talking about?
A. You want -- what -- what are you asking? I don't understand your question.
Q. Okay. You -- when you went back to sit in the front row you said you couldn't hear, you didn't know what the Sheriff and -- was talking with the Commission about?
A. I don't think I said when I went to the front row I couldn't hear. I said that I couldn't hear their conversation. Their conversation started when I was still signing in and then went and sat down.
Q. Okay.
A. So I didn't say that.
Q. When did you -- you said you found out



later, what did you find out later?
A. Oh. I found out later that the Commission had told Armbrister to get me out of there before the meeting started.
Q. Who told you that?
A. Deputy Kruzel.
Q. When did he tell you that?
A. He told me that in the sallyport of the jail.
Q. Was Deputy Kruzel there when you arrived?
A. Yes.
Q. Where was he located when you --
A. Right next to the table where the commissioners were standing -- or sitting.
Q. So when you went to sign up, you noticed Deputy Kruzel there?
A. Yes.
Q. Okay. After Sheriff Armbrister talked with the Commission, did he speak with you?
A. Who? Armbrister?
Q. Yes.
A. Did he speak with me?
Q. Yes.
A. After that?



Q. Yes.
A. At a certain point, yeah.
Q. Okay. Where did he go after he -- or did you see where he went after he spoke with the commissioners?
A. Yeah, he went and stood at the -- the back of the seating area.
Q. Did he have to walk past you to go back there?
A. He would have had to, yeah.
Q. Did you have any interaction or conversation with him as he walked to stand in the back of the meeting room?
A. No.
Q. And he did not tell you that you had to leave the meeting; correct?
A. He did tell me I had to leave.
Q. At that time. I should have --
A. At what time?
Q. When he saw you -- when you first had your conversation with -- about the sign and then when he walked back to stand in the back of the meeting room, he didn't tell you that you needed to leave?
MR. BAKER: Object to form.



A. Well, I said that he didn't say anything to me. I already said that.
BY MS. STEWART:
Q. Okay. So that's correct?
A. That would include he didn't say anything.
Q. There were people in the meeting room other than yourself; is that correct?
A. Correct.
Q. Members of the public; is that correct?
A. I assume so. I mean....
Q. Sitting in the gallery?
A. Yeah.
Q. And was someone sitting behind you wearing a face mask?
A. Yeah.
Q. Did you know that person?
A. No.
Q. Okay. Did you ask why someone would still be wearing a mask?
A. Did I ask that in general?
Q. Yes.
A. In general, yeah.
Q. Who were you -- were you speaking to

Page 29

anyone directly?
A. Armbrister.
Q. Okay. Did the gentleman behind you respond?
A. In some fashion, yeah.
Q. Did you hear -- do you remember what he said?
A. I don't recall exactly what he said.
Q. Did you say anything to him?
A. Yes.
Q. What did you tell him?
A. I said, "I don't get a fuck what you think of me."
Q. Did you say anything else to him?
A. No.
Q. Did you tell him that you can fuck off?
A. Not that I recall.
Q. Did Mr. -- did this gentleman behind you say anything to you when you told him that?
A. He said something, but he's wearing a dang mask, so I -- that's -- you know, what he said, I don't recall.
Q. Do you recall saying anything in response to his comment to you?

Page 30

A. I didn't say anything. It's not that I don't recall. I didn't say anything.
Q. You didn't say anything back after he said something to you?
A. I've already answered what I said.
The thing that I said to him was, "I don't give a fuck what you think of me."
Q. Right. And then I asked if he said anything in response and you said you couldn't understand what he said because he was wearing a mask.
So my question was after he said something you couldn't understand, did you continue to speak with this gentleman?
A. No, I didn't say anything to him.
Q. Okay. Had you turned around in your seat to face him?
A. I turned around to see who was talking to me.
Q. Okay.
A. Like I said, that mask, it's hard to hear so I turned around to see who was even talking to me.
Q. Were you yelling?
A. No.

Page 31

Q. Were you raising your voice?
A. No.
Q. Did you also tell Sheriff Armbrister that he was a pussy for wearing a mask?
A. Yeah.
Q. And why did you say that?
A. 'Cuz he's a pussy for wearing a mask.
Q. Okay.
A. I mean, I call 'em like I see 'em, you know.
Q. Did you say anything else to Sheriff Armbrister at that point?
A. Not that I recall, no.
Q. Did you say, "I don't give a fuck what you or anybody thinks of me"?
A. I already said that I said that.
Q. And I know you said that to the person sitting behind you, did you say that again to Sheriff Armbrister?
A. Yeah.
Q. Did any of the members of the public tell you to watch your language?
A. I believe so, yes.
Q. And what did you do?
A. I didn't do anything.

Page 32

Q. Did you say anything in response to that?
A. The only -- what I said is -- 'cuz I was a Douglas County commission candidate at that time, and so there was a possibility that I could actually be elected there, and so what I said is, "How would you guys like it if you-all came in here and said 'Back The Blue no matter who,' and I'm up on the Commission and I tell you guys to get out of here? How would you like that?"
That's what I said to the crowd.
Q. Okay. Did anybody respond to you?
A. There was -- yeah, peoples' -- there was more response, but I don't recall exactly what was said by them.
Q. Did anyone tell you to sit down?
A. I was already sitting down.
Q. Okay. I apologize.
Did anybody tell you to watch your language again?
A. I -- again, I -- I don't recall exactly what was said.
Q. Okay. What happened at that point?
A. At what point?
Q. After you said, "How would you guys

like it if I said 'Back The Blue no matter who,' and I told you to leave"?
A. Well, so that -- that was -- I -- I think maybe your timeline is off a little bit there. So the -- the point where anything further was even said was at that point, but anything that happened further was once I had turned back around in my seat from looking to see who was talking to me.
So like the "Back The Blue no matter who" was a -- was a comment that was made, and then -- then the conversation that you referenced earlier about the guy sitting behind me saying something then took place and that's when I turned back to -- to see who it was. And when I turned back around, that's when Armbrister approached me.
Q. Okay. So I just want to make sure I'm understanding because obviously I wasn't there. So I just -- and we've got video and pictures, but I want to make sure I understand from what you're telling me.
You go to sign up, you have a conversation with Sheriff Armbrister about the sign, he then goes up to talk to the Commission, while he's doing that, you go take your seat; is that correct?
MR. BAKER: Object to form.



BY MS. STEWART:
Q. I just want to make sure -- I want to make sure I get the timing correct.
MR. BAKER: Still object to form.
A. Well, the -- the timing -- I think you've mischaracterized some of the -- what you would call, like, a conversation with Armbrister, but yeah, the -- the timing of that.
BY MS. STEWART:
Q. And then Sheriff Armbrister walked past you and stood in the back and you were still facing forward when you said, "Why the fuck would anybody wear masks anymore?" Is that the first comment that was made?
A. Well, I'm -- I'm getting a little off here, because of what you just said there, "Why the fuck would anyone still be wearing masks?" Did you ask me that?
Q. Yeah, I thought that's what you said. You -- the first thing that you said when you were still facing forward you asked why somebody would still be wearing a mask.
A. Okay.
Q. Is that -- I -- I'm just trying to get the chronology, 'cuz you said I was off. So I want



to make sure I'm getting things in order.
A. Right. Yep. And then at that point then I had turned around to see who was talking to me and then turned back facing forward and that's where that video starts up, and that's when Armbrister approached me.
Q. Okay. And when you turned back around to see who was talking to you, that's when you said, "I don't give a fuck what you think of me"?
A. Well, is that what I said earlier? I don't think that's what I said earlier either. That -- that was a -- that was a -- a comment that I think was before that as well.
Q. So you're facing forward, you'd taken your seat and you said, "Why would anybody still be wearing a mask"?
A. Uh-huh.
Q. And someone behind you said something and you turned around to see who was talking to you?
A. Right.
Q. And then you said, "I don't give a fuck what you think of me"?
A. No. That -- that wasn't when I -- I didn't turn around and say, "I don't give a fuck what you think of me." That -- that was a comment that



was made before that, and then I turned around to see who -- who had said it.
Q. So I'm -- I'm -- help me understand.
You're facing forward, you say, "I don't know why anybody would still be wearing a mask," and you hear someone behind you make a comment that you couldn't understand; is that correct?
A. Uh-huh.
Q. And then you're still facing forward, and you say, "I don't give a fuck what you think about me"?
A. Right.
Q. And then another comment from behind you was made, did you -- and you didn't hear exactly what was said and that's when you turned around?
A. Right.
Q. Okay.
A. To see who had said it.
Q. And then that's when you told this person behind you again, "I don't give a fuck what you think of me"?
A. I said that, yeah.
Q. Okay. And was that also when you told Sheriff Armbrister that he was a giant pussy for wearing a mask?

Page 37

MR. BAKER: Object to form.
A. That was -- that would have been -- I would have said that before that, yeah.
BY MS. STEWART:
Q. When in the timeline, I guess, then, did you say that to Sheriff Armbrister?
A. Before I had said, "I don't give a fuck what you think of me."
Q. Okay.
A. So it was the -- the first comment of why would anybody still be wearing a mask and then that was the comment about Armbrister being a pussy for wearing a mask.
Q. Okay. And then once you turned back to face forward did you make any other comments?
A. No.
Q. When did -- what did Sheriff Armbrister say when he approached you at that point?
A. He said, "Get out."
Q. What did you say?
A. I said, "For what?"
Q. What did he say?
A. He said, "Because" -- he -- he threw his hand up -- "disorderly -- disorderly conduct."
Q. What did you say?

Page 38

A. "Disorderly conduct?"
Q. Did you remain seating?
A. Yeah. Yes.
Q. And then what happened?
A. He -- he arrested me.
Q. Did you say anything else?
A. Yeah, I asked him repeatedly, "For what?"
I -- I hadn't done anything and I certainly wasn't being disorderly, so it -- it came as a surprise to me that he was saying that I was -- I had -- had done disorderly conduct and that he was telling me to get out of the meeting.
He never said that I was under arrest. I was under the impression all the way up until they got me out in the hallway putting the handcuffs on me that I was being thrown out of the meeting like bouncers would throw you out at a bar and they'd throw you out and say, "Get out of here." That -- that's what I was under the impression of.
And that's why in the video when Armbrister gets my sign and angrily throws it across the room, I say, "I want my shit back," 'cuz I thought they were throwing me out onto the steps. I knew they damn well couldn't do that. It's a public

Page 39

meeting, a public building. Couldn't just throw me out of there. But I thought that's what they're -- I -- I -- he had never said that I was under arrest. So I thought they were just throwing me out.
Q. I know you said you repeatedly asked, "For what? I haven't done any-" -- and said, "I haven't done anything." Did you stand up?
A. Well, I don't think I said or testified now that "I haven't done anything" in that conversation. I don't think I said, "I haven't done anything."
I asked him, "For what?"
And I asked him that repeatedly.
"For what?"
Q. Okay.
A. "For what?"
I did not stand up on my own. I was forced up by him and Kruzel. And the only other thing that I said to him is when he put his hands on me for no reason, I told him, "No. No. No."
Three times: "No."
And I said seven times:
"For what?"
"For what?"
"For what?"

Page 40

"For what?"
"For what?"
"For what?"
"For what?"
And then that's when him and Kruzel both grabbed me again and removed my sign from me and lifted me out of my seat and began to apply a use of force on my -- on my wrists to, like I said, get me out of the -- get me out of the building is what I thought was happening, but they arrested me out in the hallway.
Q. Did either Deputy Kruzel or Sheriff Armbrister respond to you when you said, "For what"?
A. No. Huh-uh. Nope.
Q. So --
A. Didn't have an answer. Didn't have an answer. Didn't have an answer.
Q. Except for the first time when he said, "Disorderly conduct"?
A. Uh-huh.
Q. Is that correct?
A. That's correct.
Q. Okay.
A. I mean I knew that he couldn't explain it, the "for what" of the disorderly conduct. I knew

he couldn't explain it. Just knew it. And he didn't, because he couldn't, so he didn't. And he knows it.
Q. So did he --
A. And he knew it at that time.
Q. Okay.
Were the commissioners --
A. Which is surprising to me 'cuz he's the head law enforcement officer in Douglas County.
Q. And the commissioners were seated at the time this happened?
A. I don't recall if they were seated or not.
Q. They were present -- I think you said they were present when Sheriff Armbrister went up to talk to them?
A. Present.
Q. Okay. But during these events they were present?
A. I believe so.
Q. Okay. And you were in fact arrested for disorderly conduct?
A. That's correct.
Q. Okay. And at that point when you brought your sign in, were you aware of the Douglas



County Commission's stated policy about prohibiting campaigning during public comment?
A. No.
Q. Okay.
A. That wasn't something that had ever been mentioned till later.
Q. I thought that was something that was mentioned back in August of 2021 when you started attending meetings?
A. I don't know why you would think that, because I said I don't recall what was said at the August 18th meeting so I wouldn't have said that. And I don't know why you would have thought that that was the case.
I said at a later -- I believe you asked me at later meetings did they say those things, and I said, yeah, at later meetings is what I said. I didn't say August 18th.
Q. I know. I said after August 18th, but in the year 2021.
A. You said, "I thought you said it August 18th." I didn't say that.
Q. After the August 18th meeting, but in the year of 2021, did you -- were you aware of and had you heard the -- the Douglas County Commission



policy restricting campaigning for public office?
A. No.
Q. Okay.
A. Not in -- that -- that -- to -- to my knowledge, it wasn't something that was said until after 2021 and after 2022 and I believe even after 2023. I think it -- it might have come at the end of 2023 and the beginning of 2024 when something like that was said, that I recall.
Q. Okay.
A. But either way -- but either way, it's -- it's -- it's not something that's constitutional, but they can say that anyways, so....
Q. Okay.
After you were -- after the April 20th meeting you came back to another meeting at the Douglas County Commission; is that correct?
A. After which meeting?
Q. The April 20th --
A. Of 2022?
Q. -- of 2022.
A. I've come back to meetings since then.
Q. And I think May 11th --
A. I've been arrested at another one as well.



Q. May 11th of 2022 you came to a Douglas County Commission meeting?
A. Is that the -- is that the date that's in the complaint?
Q. It is.
A. All right.
Q. And I think it's one of the dates you referenced in watching the video before?
A. That's right.
Q. Does that refresh your memory?
A. Uh-huh. Yes.
Q. And were you present at the beginning of that meeting when the Douglas County commissioners read the public comment policy that the county reserves the right to shut off the microphone and remove any speaker from a meeting if they are vulgar, rude or inappropriate?
A. I recall being there for when they read the rules, but I don't recall if that's what the rules were specifically what they said at that time.
Q. Do you recall the rule -- the public comment rules being stated that they must -- the public comments must be related to the general business of the Douglas County Commission?
MR. BAKER: Object to form.

A. I don't recall if that was said, those rules or not. I -- I recall the rules being read, but I don't recall what was read is what I'm saying.
BY MS. STEWART:
Q. Back in May of 2022 had you gone on to the Douglas County Commission website and looked at any of the posted rules for the Commission meetings?
A. Prior to May 11th?
Q. Yes.
A. Yeah, I read the rules.
Q. Okay. So if you didn't hear them at the Commission meeting you had -- had seen them on the website; is that fair?
A. Well, hold on a second. So I -- I've said that they did say their meeting rules. I didn't say I didn't hear them. I said I don't recall what they -- what they had said. So they did read the meeting rules and I was present for that.
Q. Okay. So you were aware there were rules governing public comment?
A. Supposed rules.
Q. For example, you're aware that public comment was limited to three minutes?
A. That's right.
Q. And you were also aware that the



Commission would take unlimited public comment in written form, but the public commentary --
A. I don't know if I was aware of that or not.
Q. Okay. And you brought the same sign with you to the May 11th, 2022 meeting that read, "Dr. Spiehs for DGCO Commissioner. Fuck these liberal -- liberal motherfuckers"; correct?
A. No.
Q. You did not bring that sign to the May 11th, 2022 meeting?
A. No, they -- they still have the sign. I don't have that sign. They still have it.
Q. Who is "they"?
A. As far as I know, the -- either the sheriff's department or the prosecutor. Whoever took it and took possession of it has that sign.
Q. Okay. You didn't bring a new sign that said that?
A. I didn't say that.
Q. Okay. Did you bring a new sign that said, "Dr. Spiehs for DGCO Commissioner. Fuck these liberal motherfuckers"?
A. No.
Q. Okay. Did you speak at public comment



-- or did you sign up to speak at public comment on the May 11th, 2022 meeting?
A. I don't recall if I signed up to speak or not at that meeting.
Q. Okay. Did you get up to speak during the public comment?
A. Yes.
Q. Okay. And is that the meeting when you started speaking and said, "Evening, They'S; Evening, Beta Male. I'd like to start off with a quote by Einstein. The thing about smart motherfuckers is that they sound like crazy motherfuckers to stupid motherfuckers"?
A. That's right.
Q. Okay. And Commissioner Reid, I believe instructed you that your microphone was going to be turned off, explaining that you had violated the County's decorum requirement; is that correct?
MR. BAKER: Object. Object to form.
A. No, she didn't say that. She didn't -- she didn't explain that they violated the decorum forum.
BY MS. STEWART:
Q. What did she say?
A. She said that I directed inappropriate



language to them. I'm not allowed to say -- basically not allowed to use that language there while I'm speaking.
Q. Okay. And did you stop speaking?
A. Well, she had Sarah Plinsky turn the microphone off.
Q. So your microphone is muted, but did you continue speaking?
A. Well, the thing about it is that at that point what I intended to say was completely, you know, side -- side -- you know, thrown off the rails, sidetracked, done and over with, so did I continue to say what I intended to say during my allotted three minutes?
No, but I did ask Shannon Reid why she was doing what she was doing. I told her she was a tyrant; that I had the right to speak in there.
She said, "You directed inappropriate vulgar language at us."
And I said, "And? And?"
And then she directed the deputies to remove me from the dang meeting again. Again. For some cuss words.
Q. Well, let me ask you, at the May 11, 2022 meeting when you --

Page 49

A. It's unbelievable.
Q. -- when you said, "The thing about smart motherfuckers, is they sound like crazy motherfuckers to stupid motherfuckers," what viewpoint were you trying to express?
A. What difference does that make?
Q. I'm just asking.
A. My viewpoint.
Q. What viewpoint is that?
A. My own viewpoint.
Q. What message were you trying to convey to the Commission?
A. Just what I said.
Q. "The thing about smart motherfuckers is that they sound like that crazy motherfuckers to stupid motherfuckers"?
A. Is there a question in there?
Q. Yes, that's -- that's the viewpoint --
A. What's the question?
Q. That was the viewpoint you were trying to express?
A. That's my viewpoint.
Q. Okay. What matter of Douglas County business were you expressing in that remark?
A. That they had used a previous

Page 50

perception of me through my prior public speaking engagements and protests there that I was somehow some crazy person that was worthy of losing their constitutional rights inside that meeting room and were allowed to be unlawfully arrested, kidnapped, and battered and held against my will and paid for my freedom to get out of Sheriff Armbrister's unlawful custody.
But at the same time in those three minutes, you don't got to explain all of what you're -- what you're -- I mean, if you had to preface every little thing you said you'd never get to the point of what you're saying, you only got three minutes.
Q. Well, that's why I was asking what specific matter of Douglas County business you were commenting on.
A. And I just told you.
Q. Okay.
A. All of them. The commissioners, Plinsky, Armbrister. It's all county business, how -- what -- how they conspired against what they thought was some crazy, bizarre-acting person that didn't deserve to dig into any of that and to attend a meeting like every other American gets to. Totally

Page 51

within their business.
Q. And so did you leave that meeting?
A. I was forced out of that meeting by the deputies.
Q. One of the next meetings that's in your complaint anyway is an April 3rd of 2024 meeting.
Do you recall attending that commission meeting?
A. Yeah.
Q. Okay. And at this point, it's Commissioner Willey was chairing the -- the meeting and do you recall hearing her read a public comment policy?
A. She read a policy.
Q. Okay. That said "all comments must address topics within the jurisdiction of the County Commission and we reserve the right to mute and remove any speaker whose comments are threatening, aggressively hostile or belligerent"?
A. I don't recall if that's what she read.
Q. Okay. Do you remember any of the specific public comment rules that were read?
A. I don't recall.

Page 52

Q. But you were present when they were read, you just don't recall what -- the exact words that she used?
A. I don't recall if I was present when she read that either.
Q. Okay. Did you provide public comment during this meeting on April 3rd of 2024?
A. I believe so.
Q. Okay. And you provided public comment and at the same time was hold- -- were holding a sign that said "Patrick Kelly's a giant pussy"?
A. I believe so.
Q. Okay. And you were allowed to speak for your allotted three minutes and your microphone was not muted and you were not removed from the meeting; correct?
A. I don't think that's correct. Do you -- do you have the complaint here that I could take a look at?
Q. A copy of the complaint? I don't have a copy of the complaint with you -- with me.
A. Can we pull the video then?
Q. I'm just asking for your memory.
At the April 3rd, 2024 meeting, if you remember, having your sign that said "Patrick Kelly

Page 53

is a giant pussy," and speaking for your three minutes?
A. There's a question?
Q. Yes.
Do you remember that?
A. What's -- what's the question?
Yeah. Yep. I remember being there.
Q. Okay. And then you also attended the April 17th, 2024 meeting; is that correct?
A. I believe so.
Q. And again, were you present when Commissioner Reid read the County's public comment policy that "all comments must address topics within the jurisdiction of the County Commission and we reserve the right to mute and remove any speaker whose comments are threatening, aggressively hostile or belligerent"?
A. Well, are you saying that that was Commissioner Willey that read that?
Q. At the April 17th meeting Commissioner Reid read that.
A. Yeah, 'cuz I think you just said Commissioner Willey. So Commissioner Reid, I think, was the -- the presiding on that one.
Q. On the April 17th, yes, but --

Page 54

A. I believe so.
Q. -- Commissioner Willey was April 3rd. So I -- I know they're -- I think on the April 17th meeting Commissioner Willey was appearing remotely which is why Commissioner Reid read the public comment.
A. I believe that's correct.
Q. Okay. Were you there when that was read?
A. I believe so. I -- I don't recall, but I believe so.
Q. Okay. And were you present when Commissioner Reid also said that the public comment policy prohibited campaigning for public office during the public comment policy -- or excuse me, public comment period?
A. The thing about that purported rule that they had there is it came and went out of their -- their rules. So sometimes they said it and sometimes they don't. So I don't recall if they said at that time or not. So they -- they added it and removed it. Added it and removed it.
Q. Okay.
A. So it -- yeah. So....
Q. But you did hear the public comment

Page 55

policy that comments must address topics within the jurisdiction of the County Commission?
A. I didn't say that I heard that. I actually said I don't recall what their -- what their rules say. Their -- their rules change so dang much that it's -- you know, it's -- it's one thing to keep track, you know, what -- what they're trying to say to me. They just change however they want, whenever they wanna change 'em without notice.
Q. So at the -- are you telling me that at the April 17th, 2024 meeting you were unaware that topics during public comment must be within the jurisdiction of the general business of the County Commission?
A. I was unaware of that, is that what you're asking?
Q. Yeah, were you -- were you not aware of that?
A. Yeah, I don't recall what -- what they said were the rules.
Q. So at any time you spoke at any Douglas County Commission meeting you don't recall being -- having heard or known about public comment rule -- or public comments being limited to matters that were within the jurisdiction of the County

Page 56

Commission?
MR. BAKER: Object to form.
A. I didn't say that. I didn't say that.
BY MS. STEWART:
Q. Okay. Well, on April 17th of 2024 were you aware that public comment was to be limited to topics within the jurisdiction of the County Commission?
MR. BAKER: Object to form.
A. I don't -- I think I answered that already. I don't recall what they -- what they said about that.
BY MS. STEWART:
Q. Well, I'm just asking if you're -- you were aware --
MR. BAKER: Object.
BY MS. STEWART:
Q. -- when you spoke?
MR. BAKER: Object to form.
A. What's the question?
BY MS. STEWART:
Q. Were you aware that public comments were to be within -- limited to topics within the jurisdiction of the County Commission?
MR. BAKER: Object to form.

Page 57

A. Well, it's an interesting thing, because although they try to say that in -- in their rules at times, they themselves are all over the -- all over the place with what topics are allowed in there and what they allow for, you know, topics related to their general business from -- from other speakers as well.

So it's one of those things, like, they created all this confusion, and I'm trying to recall it all, you know. Because, you know, they're not clear on all of their -- how they operate their meetings.

BY MS. STEWART:

Q. You brought the same sign with you to the April 17th meeting that said, "Patrick Kelly is a giant pussy"; correct?

A. You know, I don't recall that either. I -- I had a sign, but it might have -- the wording -- the wording changed around that time as well, so I -- I don't remember if it was that one specifically or not.

Q. What was the purpose of your public comment on April 17th of 2024?

A. To exercise my First Amendment right.

Q. What viewpoint were you expressing?

Page 58

A. On which date?

Q. April 17th, 2024.

A. Can you tell me what I said then?

Q. Sure. This was a -- I believe you made comment -- and I think this is out of the complaint.

You said, "A few weeks ago I came here to say that Patrick Kelly is a giant pussy because he refused to meet with a constituent because Commissioner Kelly said he did not feel safe with the tone and words used by the constituent. Sarah Plinsky has met individually with that same colleague and there was a video made of the meeting and Patrick says like a giant beta that his feelings were being invalidated by the constituent. So the last time I was here I read some of the comments from the YouTube video, and there have been some additional comments so I wanted to read about -- read those new comments as well."

Does that refresh your recollection of what you were talking about?

A. Well, and so, I had made it clear, then, because I was stopped from speaking by Shannon Reid, and I had made it clear and -- that the -- the -- the thing that I was talking about was Patrick

Page 59

Kelly's character as a county commissioner, which is entirely 100,000 percent within the general business of the County Commission and what the public is concerned about as part of their business and Shannon Reid said that, well, that that wasn't allowed.

And the interesting thing about that is the prior speaker at a previous meeting had said to -- her general public comment had started off by saying, "You know, Karen, I really appreciate how you listen to us and you give the impression you listen to us. And I -- I just appreciate your stoicism and I want to let you know that," and that was perfectly fine, perfectly acceptable. She's talking about her character, because it was a positive thing that was said.

So when I go up and say, "Well, you know, when you have" -- what I said there, that you read there about Patrick Kelly's character, all of a sudden that's off limits. That's off limits. You can't talk about their character like that. That's not part of our business.

Well, then, why in the world is Karen Willey's character about being stoic and a good listener, why -- why is that allowed, why wasn't she stopped if it falls out of some sort of not the

Page 60

business of the Commission like Shannon Reid tried to tell me right then and there when she shut off my microphone.

That's what's called viewpoint discrimination, and so does that answer your question on what my viewpoint was?

Q. Well, I'm -- to go on --

A. Yeah. The viewpoint that was discriminated against was my viewpoint that I was expressing.

Q. And I think before your --

A. And which was done in an unequal manner because they allowed that positive viewpoint to be expressed there on her character, but the negative one not allowed. That's viewpoint discrimination.

Q. You went on to say, "To be clear, this is not the only instance of Patrick Kelly outing himself as a giant pussy. He did this when he forced two-year-old children to wear masks during COVID and he also shows it in his job as Director of Curriculum for USD 497 where he developed policies for gender identification," and that is when Commissioner Reid asked you to speak about specific items specific to the County Commission.

A. I think she had stopped it before that, but as I was talking I think she was stopping me.
Q. Then did you go on to say, "He also shows it as his director -- as his role of Director of Curriculum for USD 497 where he developed and implemented the gender identity and sexual development curriculum for adults to talk to kids beginning at age 5 about sexual development, gender identity and the roles society has on genders"?
A. Did I say that?
Q. Yes.
A. Yes, I said that.
Q. And so you then go on to say, "Yes, Patrick, you are less of a person. You are far, far below being a real man."
A. That's right.
Q. And then you read another comment, "Another coward scared of accountability. This guy sounds like an absolute wimp. Grow up and be a man."
A. That's right.
Q. Okay. And then Commissioner Reid again told you that you were not speaking about items that are specific to the business of the County Commission?



A. She tried to say that, yeah.
Q. Okay.
A. And I said, "No, this -- this has to do with his character. That -- that definitely has to do with your guys' business."
And in this belief, I said, "You mean to tell me that the commissioner's character has nothing to do with the County Commission?"
How -- how could that -- how could that possibly not -- it not be a thing? And -- and along with that, like I said, I mean if they're going to allow positive comments about their character, then they have to allow negative -- a perceived negative one. They just have to. I mean that's viewpoint discrimination. All day long and that's why we're here right now.
Q. And the director --
A. All day long.
Q. Commissioner Reid's [sic] position as Director of Curriculum for USD 497 is not business of the County Commission, do you agree with me?
A. I disagree with you.
Q. How do you disagree -- why do you disagree with that?
A. I mean, it's -- it's part of who he



is. And I would also say -- so -- so the things that he does in his job absolutely are a reflection of who he is and his character as a county commissioner. How -- why would it not be?
And on top of that, if you're going to say that, that that has nothing to do with it, people go in there and say that a lot. There are other instances where people go in and talk about Patrick Kelly as a -- as a crook as the director there. That's perfectly fine for them to say it. They've said it, no -- no questions whatsoever. No stopping, no nothing. No stopping, no nothing.
This is you guys just trying to reach for a reason to say that I couldn't say negative things about him, because you allow other people to do it; that's unequal protection. That's unequal protection. And it's an inconsistency in their -- the way that they administer their rules. They allow people to talk about Patrick Kelly's job at USD 497, curriculum coordinator and the second I say something, "Whoa. Whoa. Whoa. Whoa. Not germane. Not germane. Hold on a second."
It's a little fishy, wouldn't you say?
Q. What is germane to the county business, when you say, "I have more balls" -- "A



woman says I have more balls than Patrick Kelly too"?
A. It's character. Like I said, it's character. He's got no balls. You have to have balls to be a commissioner.
Q. So you have to be male?
A. Did I say that?
Q. You said, "You have to have balls to be a commissioner"?
A. But did I say that? Did I say that?
Q. You said you have to have balls; right?
A. What does that mean?
Q. I don't know; you said it.
A. Do you know there's other meanings for the word balls other than your feminist worldview? Do you know that? Do you know it means things like fortitude and courage? Do you know it means that? That you can actually have different definitions for different words.
Q. I'm just asking you what you said.
A. Do you realize that?
Q. I'm asking you what you said, sir.
MR. BAKER: Object to form.
A. No, you're not.
You said do you think that you have to

be a male to be a commissioner?
I didn't say that. Never once said that.
BY MS. STEWART:
Q. I think you're misunderstanding my question.
A. I never once even implied it. Well, why did you ask that? I never once even implied it.
Q. You said, "You have to have balls to be a commissioner." And I asked you, does that mean you have to be male?
MR. BAKER: Object.
BY MS. STEWART:
Q. And you told me no?
MR. BAKER: Object to form.
BY MS. STEWART:
Q. Is that correct?
MR. BAKER: Object to form.
A. Can you read it back? I don't know; is that what was said?
BY MS. STEWART:
Q. My question to you was you read a comment about Commissioner Kelly that says, "A woman commented, 'I have more balls than Patrick Kelly too.'"



And I asked you --
A. And that's --
Q. Hang on. My question was, what viewpoint -- I'm sorry.
How is that the business of the County Commission?
MR. BAKER: Object to form.
A. But that's not what I said though. It said, "Women have more balls than Patrick too." That's what I said.
BY MS. STEWART:
Q. And I believe at this meeting you read a comment that says, "This lady here says, 'I have more balls than Patrick Kelly too.'"
A. Right. Yeah.
Q. So my question was, what -- what is -- how is that the business of the County Commission?
A. I already answered that.
Q. Okay.
A. I said that that has to do with his character, having balls is a -- is a character thing, fortitude and courage. And you tried to say that it was some kind of biological thing. No. No. I was talking about his character as the commissioner, which has to do with the business of the Commission,



which I made clear there.
As well as said that other people were allowed to talk about commissioners' characters as long as it was positive. So I guess you -- what -- how -- yeah. If it's -- if -- if their character in a positive way is allowed because that's considered business, well then saying that his character is another thing is also allowed then as well as part of their business.
Q. We'll get to that meeting where you made that comment, but I'm sticking with this April 17th meeting.
A. That's what I'm talking about. Yeah, that's what I'm talking about.
Q. So the viewpoint that you allege the county was preventing you from expressing at that meeting was in reference to Commissioner Kelly being a pussy?
MR. BAKER: Object to form.
A. That's not what I said. I said that -- that I wasn't allowed to talk about his character in a negative way.
BY MS. STEWART:
Q. Okay.
A. A perceived negative way. A truthful



way. A truthful way. But a perceived negative way. They didn't want the truth. They didn't want the truth talked about like that. But they'll allow the -- the nice comments. The -- the untruths to be talked about their -- their character.
Like I said, with Karen Willey, that -- that speaker was allowed to say that "You know, I really appreciate how you listen to us. You give the impression that you listen to us. And I just really appreciate your stoic demeanor." There was no stopping. There was no muting. There was no "We're going to call the -- the deputy -- or the Sheriff." None of that. None of that.
Q. I think during the April --
A. So that viewpoint was allowed and then I go and I express, well, you know, I'm not -- I'm not too happy about their -- their character there and how they are, and boom, shut down. Can't do it. Can't do it. Off limits all of the sudden. But in that same meeting, same meeting, it was allowed.
Q. Well, I think in the April 17th meeting Commissioner Reid did not ask -- interrupt you until you started talking about Patrick Kelly's job as Director of Curriculum for USD 497.
A. I don't believe that's the case. I

think she stopped -- tried to stop me before that.
And -- and regardless, she says there, "You're talking about his character."
And I said, "Yeah, that's part of the business."
So even if she's trying to say now "Well, it's 'cuz you were talking about him being the director," first of all, they allowed people to mention that before.
But she also said, "Well, you're talking about his character." She makes it clear that I'm stopping you because "You're talking about his character and that doesn't have to do with the business of the Commission."
And I said, "You're telling me that the Commission's character -- a commissioner's character has nothing to do with this Commission right here?" How could that be? Their character influences the decisions and the votes and the things that they take on, the way they even conduct the meetings right now. How in the world could their character not be part of the business of the -- the -- of what -- of what they do and how they conduct themselves? How could it -- how could it not be? On top of the fact that they allowed another speaker to



say positive things about Karen Willey. Why? Why is that allowed? How is that related to their business?
If they're going to say it's not related to their business if I'm saying something they perceived negative about it.
MR. HOLDER: Hey, Michelle, if you're going to shift gears can I ask for a quick break?
MS. STEWART: Yeah, let's take a quick break. Yeah.
THE VIDEOGRAPHER: Taking us off the record at 10:58.
(Brief recess taken.)
THE VIDEOGRAPHER: Stand by, I'll put us back on the record.
Back on the record at 11:12.
BY MS. STEWART:
Q. All right. Mr. Spiehs, we're back after a quick break. Are you ready to continue?
A. I'm ready.
Q. Okay. And just to confirm again, your phone is not recording?
A. That's right.
Q. Okay.
A. Are you going to ask me that every time?



Q. Yes.
A. How come?
Q. Because it's propped up facing you so I can't see --
A. Is your phone recording?
Q. -- if you're recording or not.
Pardon me?
A. Is your phone recording?
Q. No, it's not.
Sir, I want to talk about the May 1st, 2024 meeting. Were you present at that meeting when Commissioner Willey read the County's updated public comment policy?
A. I believe so.
Q. Okay. And she indicated that it was based, in part, on guidance from a federal court decision.
Do you recall that?
A. I don't recall if she said it at that meeting or not.
Q. Okay. And that policy that she read at the May 1st meeting was that time -- speaking time was limited to three minutes.
You -- did you hear that?
A. The -- the three minutes has always



been a part of their speaking -- their ---- what they say there. The other stuff comes and goes. It's inconsistent. So that one, the three minutes, I think is what -- they always say that. So if they -- if they read their -- their policy there, then they would have said that.
Q. And one of the other policies is you can't donate unused time to other speakers, did you hear that?
A. I believe so.
Q. Okay. And part of the policy that Karen -- Commissioner Willey read during the May 1st meeting was that comments must address topics within the jurisdiction of the County Commission and that the Commission needs to maintain decorum of the meeting and therefore prohibits public comments that are threatening, aggressively hostile or belli- -- belligerent, fighting words or slander or speech that invades the privacy of individuals, unreasonably loud, disruptive, or repetitive, or that interrupt or substantially interfere with the board's ability to conduct County business.
A. What's the question?
Q. Did you hear that?
A. I don't recall if she said that.

Q. Do you recall if she said the Commission reserved the right to mute or remove any speaker who violated the public comment rules?
A. I believe so.
Q. And at that meeting you were standing at the front of the -- this meeting was not held at the old courthouse; is that correct?
A. That's correct.
Q. Okay. This was held at the annex building?
A. What do you mean by "annex building"?
Q. Sure. It -- it was held at a building that's adjacent to the Douglas County Jail, close to?
A. It's -- it's in that area. I think it's called like the public works building. I -- I don't remember exactly what it's called, but it is by the jail.
Q. Okay. Different building than -- than the old county courthouse where the Commission meetings typically were?
A. Yes.
Q. Okay. And do you know what the purpose of the May 1st meeting was for, was there a specific topic that was being addressed?
A. They had topics on their agenda.



Q. Okay. Was the subject of wind energy on their agenda on May 1st, 2024?
A. Yes.
Q. Okay. And there were lots of members of the public in attendance at that meeting; is that true?
A. What do you mean by "lots"?
Q. Almost all the seats were full?
A. All the seats were full.
Q. Okay.
A. Not almost. All the seats were full.
Q. Okay.
A. But does that mean lots? What do you mean by that?
Q. I tried to clarify that, but all the seats were filled with people, members of the public?
A. All -- all the seats were full.
Q. Okay. And at the beginning of that meeting you were standing up by the front next to county staff holding a sign that read "Women have more balls than Patrick too"; is that correct?
A. No, I think you're mischaracterizing that again.
Q. Okay.
A. You said at the beginning of the



meeting. So when I got there, that's where I -- that's where I was.
Q. Did you get there at the begin- -- before the beginning of the meeting?
A. I don't believe so.
Q. When did you get there in relation to when the meeting started?
A. Minute or two or so. I -- I don't recall. Poss- -- possibly. I -- I -- I don't think -- I don't think I got there when the meeting started.
Q. Do you know how far into the meeting --
A. I said like maybe a minute or two, I think. I'm not sure.
Q. Okay. When you arrived you went up to the front of the room and stood next to county staff holding a sign that read "Women have more balls than Patrick too"; is that correct?
A. I stood in the area at the front of the meeting.
Q. Okay.
A. A -- a spacious area.
Q. Were you standing next to the county staff?



A. What do you mean by "next to"?
Q. Were you standing next to them?
A. What do you mean by that?
Q. Were they seated and you were standing next to county staff?
A. Well, actually what I was standing next to was they had a -- a table right there. A table, and that's what I was standing next to.
Q. And the commissioners were seated on -- on the opposite side of the -- the table; is that correct?
A. A different table.
Q. A opposite space?
A. They were on the opposite side of the room at a different table.
Q. Okay. And so the people sitting at the table that you were standing next to were the county staff not the Commission?
A. That's not what I'm saying.
Q. Okay.
A. I said I stood next to a table. The table was empty.
Q. No one was sitting at the table?
A. They had tables -- I believe there were tables on either side of the podium to -- to

Page 77

speak at and I stood next to that.
Q. Did you sign up --
A. In that area.
Q. Okay. Did you sign up for public comment that evening?
A. No.
Q. Did you make public comment that evening?
A. I tried to. I got stopped again by Karen Willey for my sign. She stopped me because I had the sign.
Q. Okay.
A. During general public comment for a sign.
Q. And I think you started the -- your public comment discussing the comment that you have been -- you discussed earlier about a woman made a comment about Commissioner Willey and she appreciated her listening to her and her stoic demeanor, that's how you started your public comment on May 1st; is that correct?
A. Well, I don't necessarily think that's how I started. I -- I think I made a comment that the people there are lucky that they have a sign that they agree with. I think that's when I said that.

Page 78

Because there were signs in that meeting. The people in attendance had signs as well, and I -- I remember commenting on that.
"Well, you guys sure are lucky they agree with your signs, 'cuz you'd be out of here if they don't agree with it like they are with me." And so I -- I think that's how I started it, but I did say what you just said. I did say that.
Q. Okay. So you were standing with your sign and you said, "Karen, I want to begin by saying I appreciate your stoic demeanor and that you give the impression that you're really listening to us"?
MR. BAKER: Object to form.
A. Well, I think I was quoting somebody that had said that at a prior meeting.
BY MS. STEWART:
Q. You said, "She was allowed by the Commission to say that without interruption or muting her microphone"?
A. Yep.
Q. And then after you spoke the words that are on your sign, you were interrupted?
A. That's -- I was stopped --
Q. Or stopped.
A. -- from speaking.

Page 79

Q. Okay. And --
A. I had my rights violated.
Q. -- Commissioner Willey asked you to put your sign down; is that correct?
A. She -- she said, "I'm afraid we're not going to allow the sign."
Q. And what did you say?
A. "Why not? What's wrong with the sign, Karen? What's wrong with the sign?"
Q. And what did she say to you?
A. Nothing.
Q. Okay.
A. Couldn't get an answer. Couldn't get an answer.
Q. Did she tell you you were allowed to stay at the meeting?
A. I don't think so. I don't know. Did she say that? That I'm allowed to stay at the meeting.
Q. Yes, you were allowed to stay at the meeting.
A. Are you saying she responded to me saying, "What's wrong with the sign"?
She said, "You're allowed to stay at the meeting."

Page 80

Q. "But we're done with your public comment. Thank you."
Did she say that?
A. I think she -- she said, "We're done -- you're done with your public comment."
Q. And so when you were speaking with your sign, what viewpoint were you trying to convey at that point?
A. What I was speaking?
Q. Yes.
A. What I was speaking.
Q. That "Women have more balls than Patrick Kelly too"?
A. What I was conveying is what I said I said.
Q. What matters of Douglas County business were you expressing?
A. With what?
Q. When you were speaking on May 1st, 2024 with your sign that said, "Women have more balls than Patrick too"?
A. Seems like you got more than one question there. Are you saying like what -- what was I conveying with my sign or --
Q. No. I asked you what matter of county

business were you expressing?
A. With what? With what I said or with my sign?
Q. Both.
A. Both?
Commission character is what I said. That's the words that I said is what I was conveying. My viewpoint. It's my own personal unique viewpoint.
Q. And at that point you -- is when you turned around to the members of the public and spoke to them?
MR. BAKER: Object to form.
A. No, I was speaking to the Commission. It was -- it was still during my three minutes, so....
BY MS. STEWART:
Q. Okay.
A. Whether she stopped me or not I had the three minutes. And as a matter of fact it was ruled that in this case, that once your three minutes start how -- how could you -- how could you be a disruption when that three minutes is -- is your three minutes. And so I was still in my three minutes of allotted time. And Karen Willey tried to say that she could stop that -- end it prematurely,



but I had three minutes, so....
Q. And during that three minutes, you turned around and addressed members of the public generally?
MR. BAKER: Object to form.
A. I -- I addressed an obvious thing that was taking place in the meeting of the unfair treatment and discrimination that was taking place with people allowed to have signs and viewpoints and I wasn't allowed to as well. I was commenting on what was taking place in the meeting right then and there.
BY MS. STEWART:
Q. So you agree you did turn around and address members of the public?
MR. BAKER: Object to form.
A. No, I don't. I -- I -- what I said was, I was still within my three minutes. What I said was still part of my three minutes. Of public comment, in my mind.
BY MS. STEWART:
Q. Had you turned around to speak directly to the people sitting behind you in the gallery?
A. I turned around, but as I said, my



comments were general public comment about something else taking place in the meeting right then and there. The -- there should have never have been a stop to what I was saying. Like it should never have -- once it was stopped, that -- that was something that shouldn't have happened, because I have the right to be speaking in there, and so entirely threw off what I was going to say. And you talk about an inter- -- interruption. It's a total interruption.
Like the judge said, I mean once the three minute starts, you know, you can't be a disruption, so there's no reason for them to -- to stop you while you're speaking, so once that happens, as you can imagine, it just throws you off. I mean you have three minutes, you know what you want to say, you know what you're going to say and then you got -- you know, then they stop you telling you you can't speak. Can't speak. And so totally -- total -- total disruption of what I was trying to say. Total -- total disruption of that from Karen Willey and the Commission.
Q. Okay. And you remained at the meeting; is that correct?
A. I was arrested at that meeting.



Q. Well, you left the podium and you stood in the front of the meeting next to county staff with your sign?
MR. BAKER: Object to form.
A. I went and stood back in the same place I was before that I described as an area, there was a -- a table there, a spacious area, that's where I stood. You're trying -- you just said I went and stood next to county staff, but what I said is that I had stood and described it as a different kind of area than what you're describing it as.
BY MS. STEWART:
Q. You were standing holding your sign in the front of the room near a table?
A. That's right.
MR. BAKER: Object to form.
A. That's right.
BY MS. STEWART:
Q. Okay. And I think you remain standing in that same spot for about the next half hour during the Commission discussion; is that correct?
A. More or less.
Q. And Commissioner Reid then asked you to stand -- to move -- to stand back next to the wall because you were standing in a walkway and people

were trying to exit from their public comment?
MR. BAKER: Object to form.
A. She said -- she said that -- she stopped the meeting and said that I needed to stand -- step back and that I was close to staff, whatever that means. I guess some sort of a rule violation: close to staff.
And -- and that -- yeah, that's what she had said. That's what she said.
BY MS. STEWART:
Q. Did she tell you you were standing in a walkway in an area where people are exiting from public comment?
A. She tried to say that, yeah.
Q. And you did not move; is that correct?
A. I wasn't in that area that she said I was in, so there was -- I didn't move.
Q. You didn't move from your -- the place you had been standing?
A. That's right. Yeah. Uh-huh.
Q. Okay. And so when she asked you to step back you did not do that?
MR. BAKER: Object to form.
A. Why would -- why would I do that? First of all --



BY MS. STEWART:
Q. I'm just asking --
A. First of all --
Q. -- if you did it or not.
A. -- she -- she asked me. And second of all, I'm allowed to stand there as -- as was shown when the -- when the prosecutor declined to even press the charge against me and was shown when the qualified immunity was removed from those officers. I had a right to stand there. I wasn't in the way. I wasn't blocking nothing. I wasn't blocking anything.
As a matter of fact, I mean you're -- you're trying to say that she said that I was blocking areas, but throughout all of that, Sarah Plinsky's walking by, people are walking by. Clearly -- clearly, a gas light to try and say I was doing something wrong. But I was standing in an area that allowed more than enough room for people to freely walk through there, not blocking a dang thing. You can see it on video as well. People -- people just freely walked by there, no problem whatsoever, including Sarah Plinsky throughout there. And it's a total gas light. Total gas light to try and get law enforcement to once again kidnap me and batter me and



-- and hold me -- hold me captive for no reason, and they did it. They did it again.
Q. When Commissioner Reid again asked you to step back or leave the room, you didn't move; is that true?
MR. BAKER: Object to form.
A. I didn't move.
BY MS. STEWART:
Q. Okay.
A. I didn't need to. There was no reason for me to. Public building. Public space. Wasn't blocking anything. Wasn't preventing anything. Clear as day.
Q. Is there a reason you did not stand next to the wall when you were asked?
MR. BAKER: Object to form.
A. I was fine where I was.
BY MS. STEWART:
Q. And because you did not follow the directions of the Commission you were removed?
MR. BAKER: Object to form.
A. Well, you'd have to ask them, but I would say they're unlawful directions. They didn't have authority to tell me to move in a different location in that public space, but you'd have to ask



them.
BY MS. STEWART:
Q. You were removed at that time?
A. I was arrested.
Q. Okay. And after you were arrested you came back to the meeting; is that correct?
A. That's right.
Q. Okay. And you made -- you were allowed to present public comment?
A. I was stopped from making public comment.
Q. You started your public comment by saying, "I heard someone say that they trusted you. They trusted that you did your research on this, and I gotta tell you, I don't trust that. I don't trust that you did your research on this, because aside from the fact that you're incompetent, there's no trust, because earlier tonight I was standing here with my sign and I got unlawfully arrested and taken to jail for doing nothing wrong. And now I've come back to the meeting to speak about how your incompetence leads you to make bad decision -- decisions and it leads me to make signs that say" -- and then Commissioner Willey asks you to pull it back to the wind conversation.

Do you recall that?
MR. BAKER: Object. Object to form.
A. Are you reading that from the complaint?
BY MS. STEWART:
Q. Yes.
A. I said that.
Q. Do you recall Commissioner Willey asking you to pull it back to the wind conversation?
A. Yeah, she said that.
Q. Okay. And you responded to her that you were doing an analogy?
A. Yep.
Q. You said, "So bear with me, Karen. Can you give me the same courtesy that you gave the other guy there that was doing an analogy? All right."
A. Yep.
Q. "So anyways, like I was saying, my lack of trust in your judgment leads me to hold a sign that says 'Patrick Kelly is a pussy.' So I want to know, Patrick, as a giant pussy how much research have you done?"
Do you recall saying that?
A. Well, yeah, I recall saying that. And



this -- this is another example of the inconsistencies and the discrimination towards me is that a speaker -- a few speakers before me on that item was a Zoom speaker and the -- he -- he was completely off topic, completely off topic to that agenda item.
And he said, "Oh, I'm just -- I'm doing an analogy. I'm doing an analogy. Can you let me -- just let me say what I'm gonna say?"
And so, of course, they -- they let him. They let him. Even though it wasn't related to the jurisdiction of their business like you guys try to say about me. I have a -- I have a hair thin -- like, oh, soon as they think that, this guy he can go off on a tangent on something else and say it was an analogy, and so I wasn't afforded the same leeway that they afforded him. So when I went up and tried to speak about the wind, the -- the energy there -- item there about that, the same thing with an analogy that they let somebody else do, I -- I was not allowed that. And she tried to stop me right then and there.
So just more discrimination.
Q. When the commissioner asked you to pull it back to the wind conversation again, you



said, "Patrick is a giant pussy. How much research have you done on the wind turbine issue"?
A. Right.
Q. Okay. And it was at that point that Commissioner Willey told you that you were using fighting words and you argued with her and then she asked you to sit down?
A. That's a mischaracterization. I didn't argue with her. I asked her -- I said, "Fighting words"?
"So is this disorderly conduct then? Are you saying I'm engaged in disorderly conduct?"
'Cuz if she's gonna say I'm doing fighting words, then that's -- would be considered disorderly conduct then. I didn't argue. I don't know why you said that. I was asking for clarification.
Was I gonna be arrested again then for disorderly conduct? If that -- she's saying that's fighting words, I was looking for clarification. I was just fresh out of jail for another unlawful arrest. I wanted to know if they were gonna do it again based on what she said was fighting words and, of course, she didn't answer. She didn't answer.
And that ain't fightin' words,



anyways, so....
That ain't fightin' words.
Q. And you remained at the podium and continued speaking after Commissioner Willey asked you to sit down?
MR. BAKER: Object to form.
A. After she unconstitutionally stopped my time from speaking for -- for no reason, I continued for my three minutes and Sarah Plinsky -- you talk about mis- -- you know, confusing signals, she kept the timer running and kept signaling how much time I had left until the very end. She stopped it. But so on one hand they're saying I'm done; on the other hand, the timer's still running, so, you know.
Do I have the green light? Do I not? You know, the Constitution says I do, but....
BY MS. STEWART:
Q. So after that three minutes expired, you remained at the meeting?
A. I went and stood where I was standing before.
Q. Okay.
A. Interestingly enough, they didn't arrest me again for that. I mean I stood in the same

Page 93

place, and I sat as well, but when I got there, I stood there, and -- and I mean, if -- if they did it the first time, they didn't do it the second time.
As a matter of fact, subsequent meetings -- subsequent meetings I stand in that same spot. They don't call the Sheriff anymore to -- to remove me for blocking stuff or being too close to staff, and I'm allowed to stand there. I'm allowed to stand there. I think it has something to do with them -- the prosecutor declined to even press that charge. It's so bogus. So bogus. And so I'm still able to still stand in that same spot. No -- no issues. Because they know. They know. We all know. They couldn't do what they did. Couldn't do what they did.
Q. What viewpoint were you trying to express during that public comment about when you were commenting on Commissioner Kelly?
A. The viewpoint that I expressed.
Q. That he was a giant pussy?
A. The viewpoint that I expressed.
Q. Well, what matter of Douglas County business were you expressing when you were commenting about Patrick -- Commissioner Kelly being a giant pussy?

Page 94

A. Read the whole thing that I said.
Q. Do you want me to read it again?
You said, "So anyway like I was saying, my lack of trust in your judgment, leads me to hold a sign that says 'Patrick Kelly is a pussy.' So I want to know, Patrick, as a giant pussy how much research have you done on the wind turbine issue?"
A. Yeah. So how much research had he done on the -- the item under discussion? The discussion's very relevant. Very relevant. I mean, they -- they had talked in that meeting and other people had talked about how much research they had done into this issue.
Same viewpoint I'm expressing there. Hey, how much research have you actually done? It's a legitimate question that I'm raising to an elected official and bringing his character into it 'cuz, you know, as a giant pussy, you know, how much -- you know, how much research do you really do into something like this? It's a legitimate question. Legitimate question about how much time he puts into something, and looks -- looks into something, and takes it seriously. Other people asked the same thing.
Q. So calling him a giant pussy was

Page 95

trying to get a reaction out of him?
MR. BAKER: Object to form.
A. Who said that?
BY MS. STEWART:
Q. That's my question. Was it?
A. I was just stating the truth. I mean -- I mean, no -- no -- no different than somebody else that says, "Hey, Karen, you're -- you're stoic. You're stoic."
Q. You think being stoic and being called a giant pussy is the same thing?
MR. BAKER: Object to form.
A. I didn't say they're the same thing. But if you can say something about somebody's character being a good thing, why can't you say something that's the opposite of that? Why couldn't you do that? Why -- why do we have to just say nice things to these people, and if you don't, then you're out of there? Why would that be the case? It's called free speech. They can't -- they can't shape the narrative of what gets said inside there. They can't do that. Why would they be able to do that? Somebody will watch the meeting and just see that they're -- they're great. They're good -- they're good people. Only positive comments here.

Page 96

And the reason why is because all the negative comments are not allowed, and if you say something negative you get Armbrister called and you get arrested for no reason. So why would they be able to just allow one viewpoint in there, the positive one? Why? Total viewpoint discrimination. And it's -- it's compelling speech as well. It's compelling speech as well. It's basically saying "Justin, you can talk here. Don't call us a pussy. Say we're stoic and then you can talk."
That's compelled speech. That's compelled speech. And -- and serious consequences as well: I get arrested for it. Serious compelling of speech. Serious compelling of speech. That's illegal. It's not allowed under The Constitution. Just think about that. People watching these meetings all -- all they're gonna see is just these nice -- these nice great things that are said, everything's just fine there, but the reality of it is there might be -- there might be a different viewpoint about those commissioners, scrubbed from the record. Scrubbed from the record. Were all the people that dissent to these people, is everyone happy with this Commission? Well, yeah, but they're in jail. The people that dissent, is in jail.

So, yeah, it's a -- it's a total -- it's a total narrative shaping of the official record of what's allowed to say inside there. Totally illegal.
BY MS. STEWART:
Q. So, again, calling Commissioner Kelly a giant pussy you believe is a matter of Douglas County business?
MR. BAKER: Object to form.
A. His character is a matter of Douglas County business.
BY MS. STEWART:
Q. How is that his character?
A. Well, again --
MR. BAKER: Object to form.
A. Haven't we been through this already?
MR. BAKER: Justin, let me -- let me make my objections.
THE WITNESS: Okay.
BY MS. STEWART:
Q. I'm just asking how you believe that calling him a giant pussy is his character?
MR. BAKER: Object to form.
A. That's not what you asked. You asked does it have to do with county business. And I'll



just say, "Well, how does calling Karen Willey stoic, how's that County Commission business?" If you're gonna apply that standard as well.
BY MS. STEWART:
Q. You told me that the county business was talking about his character, and so my question was, how is calling him a giant pussy a reflection of his character?
MR. BAKER: Object to form.
A. What are you talking about? I don't understand how that wouldn't be.
BY MS. STEWART:
Q. That's why I'm asking you. What does that mean to you?
MR. BAKER: Object to form.
A. It means what it means. It means what I said it means.
BY MS. STEWART:
Q. You -- you haven't told me what it means to you, so that's why I'm asking.
MR. BAKER: Object to form.
A. But see, that's -- that's the thing like during that -- during that three minutes, there's not like a -- you don't need to qualify everything that I say to get it -- "Please. Please,



listen to what I'm saying. Please let me get it past this hurdle here so that you guys don't shut me down."
It's my viewpoint about him being a pussy and it affects his job, very clearly. He put in a mask mandate during COVID for two-year-old children. One hundred percent not something that a man would do. And under my First Amendment rights to freedom -- free speech and to redress my government, I can tell him that. No different than somebody doing the same thing saying they're stoic and that they appreciate them.
BY MS. STEWART:
Q. After the May 1st meeting you did return to Douglas County Commission meetings and spoke during public comment; is that correct?
A. That's correct.
Q. Okay. And during -- at the beginning -- were you present at the beginning of those commission meetings when the Commission announced their public comment rules?
A. Some of 'em, I'm sure.
Q. Okay. So the three-minute time limit as well as the restrictions of public comment be related to the business of Douglas County and



maintaining decorum of the meeting, you did hear those rules expressed by the Commission?
A. I didn't say that. They're -- they're so inconsistent with their rules, so some meetings they're in, some meetings they're out. Some it's this. Some it's that. Who knows.
Q. So are you telling me that during public -- during meetings you've attended that the County Commission has said you can talk on any -- about anything you want, it doesn't have to be related to the public -- or to the business of Douglas County?
A. I didn't say that.
Q. Okay. You said they're in and they're out. So I'm just trying to figure out, are sometimes they're read and sometimes they're not?
A. The -- the rules change from -- from time to time.
Q. Okay.
A. Unannounced. Unannounced. They're just different. And they're not clear and they won't clarify, so you mentioned earlier about they said, so the recent federal ruling. They -- they won't clarify what that even means. Now they've taken that out. They've taken it out because another recent

Page 101

federal ruling happened as well, so -- that says they can't do what they're doing. So they took that out, that part out. They've taken other parts out. They've taken the campaigning part out, they've put it back in. They're just all over the place.
Q. When you're using words like fuck and motherfuckers and pussy, you're trying to get a reaction out of someone; correct?
A. Who says that?
Q. I'm asking you, is that what you're doing it for?
A. No.
Q. Okay. You can't think of any other words to use?
A. Why would I --
MR. BAKER: Object to form.
A. Why would I -- why would I need to.
BY MS. STEWART:
Q. You don't think those are derogatory terms?
MR. BAKER: Object to form.
A. I think that they're protected speech.
BY MS. STEWART:
Q. Okay.
A. As a matter of fact I know they're

Page 102

protected speech. I think you know it as well. I mean, just think about it, they're gonna say you can't say fuck or motherfucker. For what reason? That's viewpoint discrimination.
Q. What viewpoint?
A. Even -- even you right now trying to say, "Oh, you could have said something else," that's -- that's not free speech, that's a restriction of speech.
Q. What viewpoint are you trying to express when using those words?
A. The viewpoint that I expressed and that I answered earlier.
Q. Your personal opinion?
MR. BAKER: Object to form.
A. Well, I mean, we, you know -- certainly people can speak during general public comment and give their personal opinions. I mean, that lady saying that Karen Willey's being stoic is her personal opinion, that's allowed; why is that allowed? But yeah, my personal opinion wouldn't be? It sounds like you'd be a commissioner throwing me out too is what it sounds like. For words.
BY MS. STEWART:
Q. I'm just trying to figure out what

Page 103

viewpoint you were trying to convey.
A. I already told you.
MR. BAKER: Object to form.
BY MS. STEWART:
Q. Sure. And you've told me your -- that was your personal viewpoint?
MR. BAKER: Object to form.
BY MS. STEWART:
Q. Is that correct?
A. I said that -- that what I said was my viewpoint. How I express my viewpoint; not how you express it, but how I express it, as an American. As an American. I mean, how ridiculous would it be, seriously, if you really -- there were some -- some words you couldn't say. Is that free speech?
Q. I'm sorry to get into your background, but I -- I need -- you don't -- you didn't attend law school; is that correct?
A. That's correct.
Q. Okay. What amount of damages are you claiming from Douglas County in this matter?
A. Say that again.
Q. What amount of damages are you claiming from Douglas County in this matter?
A. What have I claimed in there in the

Page 104

Third Amended Complaint?
Q. That's what I'm asking you.
A. Whatever is -- is claimed in there.
Q. Well, I've got two different sets of numbers. There's something called a Rule 26 Disclosure and you've asked for compensatory damages of $500,000 and then answering the County's interrogatories you asked for $300,000, so I'm just trying to figure that out.
A. And what's the question?
Q. Which is the correct number?
A. What's in -- so where did those numbers come from again?
Q. Here. I'll show you.
A. Yeah. You know what else is interesting --
MR. BAKER: Let her do what she wants.
(Whereupon, Spiehs Deposition Exhibit Numbers 1 and 2 were marked for identification.)
BY MS. STEWART:
Q. I'm going to hand you two documents we've marked as Exhibit 1 your responses to the County's interrogatories and Exhibit 2 as the Rule 26 disclosures. Because you asked me where they came

from.
MR. BAKER: Here. Let me take a look at that.
MS. STEWART: Here's copies for you, Linus, if you want to take a look at them.
MR. BAKER: Oh, good.
MS. STEWART: I don't have another copy of the interrogatories. I only have one.
MR. HOLDER: That's fine.
MS. STEWART: I'm sorry.
MR. HOLDER: I probably have them.
BY MS. STEWART:
Q. Have you seen those documents before today?
A. I've seen these, but isn't there a more recent one?
Q. Not that I've seen.
A. Didn't we just submit one just a week or two ago?
MR. HOLDER: Are you talking about mine?
BY MS. STEWART:
Q. These are to the County. These are things you answered to the County.
A. Oh. The County, okay.



Q. So you asked me where the numbers I got came from and that's what I was using these documents for.
So on the -- Exhibit Number 2 has $500,000 and the sworn interrogatories that were marked as Exhibit 1, you indicate you're asking for $300,000?
A. Yep.
Q. So I'm just trying to figure out which is accurate?
A. Well, I don't think either one of them is inaccurate.
Q. Did you say either one is accurate?
A. Inaccurate.
Q. What do you mean?
A. Well, they were submitted, there's nothing inaccurate about 'em.
Q. You agree they're different numbers. I'm just trying to figure out which is the number you say is --
A. Well, I think they're claiming -- they're claiming different things; one's compensatory damages and one is -- is stating the amount claimed for each such item or type of damages. So one is -- would be punitive and one is for things like lost



income and stuff like that. Like it -- like it says right here (indicating).
Q. Well, that's my question. So in Exhibit 1 the answer to Interrogatory Number 3 indicating, "Please state the total amount of damages," you indicate, "$300,000 not including attorney's fees and costs which are ongoing"; is that correct?
A. Well, what I'm saying is that they're -- they're talking about two -- they're two different numbers for two different things.
Q. Okay. Well, let's stick with Number 3 -- the answer to Interrogatory Number 3.
A. For which exhibit is that?
Q. Exhibit 1.
A. Exhibit 1?
Q. Yes.
And your signature is on the last page of these interrogatories; is that correct?
A. That's correct.
Q. Okay. So what do you base the $300,000 number on?
A. Well, things like the amount of money that I was having to spend to defend myself on that charge -- charges that they tried to file against me



along with compensatory for time lost for going to hearings and meeting with attorneys and paying the attorneys and being drug through that whole -- that whole process, and having that continued threat of arrest. Because I know that they'll -- they'll do it and they've proven -- they've done it twice, so having that always looming over my head when I go into these meetings and try to exercise my rights, am I going to be arrested again. All that stuff.
Q. You said time away -- time lost, what -- time lost from what?
A. Oh, like I said, things like meeting with the attorney takes up time out of your day to -- to find one, and meet with one and drive over there and sit with him and talk to 'em, and pay 'em. It takes time out from -- from life, from your life. It's a huge disruption in your life, and for no reason too. I mean, it's -- it's found out that they shouldn't -- shouldn't arrest me. So it was all for no reason. So this has been -- to say that it's been a huge inconvenience on my life is -- is putting it mildly. It's a huge understatement to say that.
It's life altering. Life altering. Being drugged through the papers, things like that. It was reported, just as fact, that I had done

Page 109

something wrong there. And then when it was shown that I hadn't done anything wrong, they're completely silent on it. So that's all out there right now. It's always gonna be out there that I somehow had done something wrong even though the truth of the matter, I didn't do anything wrong and there's been no attempt to correct that public updated record of -- of what exactly happened.

In fact, to say that Armbrister is the one that actually did it wrong. Not -- not me.

So all of that factors into it. Completely -- completely entirely, a huge negative impact on my life. Huge. Impacted my relationship with my kids. Impacted relationships with people that I knew that saw that in the paper. It should never have happened. Should have never even happened at all. It's entirely illegal what happened.

So at that point my life hit that and went this direction when -- because it shouldn't happen. It should just kept going in the direction it was going. It was completely thrown off, all because of that guy over there and the County Commission (indicating).

Q. Okay. What -- and it's my understanding you're not claiming any lost wages?

Page 110

A. In terms from a job?
Q. Yeah.
A. That's correct.
Q. Okay. And you're not claiming any -- you've had any medical treatment or seen any doctors?
A. I'm not claiming that.
Q. Okay. What is your claim for pain? What does that mean in the answer to Interrogatory Number 2 you have -- you stated your loss of constitutional rights, attorney's fees and costs of pain, what -- what does that mean?
A. Well, I mean, as you can see in the -- in the video and as Armbrister testified to, he started putting me in an Armbrister bar, and again, that was -- shouldn't have never happened, because it was an unlawful arrest. So as you can imagine, just think about it for -- for you, you have a sheriff and a deputy and a third one that joins in and they start manhandling your arms and your -- they're bending you over and your back is hurting and as you could imagine, the use of force is gonna -- is gonna cause some pain and so it caused some pain as you can imagine.
Q. And you didn't seek -- you're not claiming any medical expenses or medical treatment

Page 111

for the pain?
A. Didn't I already answer that?
Q. Yes.

I just want to make sure as relates to the pain, you haven't seen any doctors?
A. For this?
Q. Yes.
A. No.
Q. Okay. I also believe you said you haven't seen any doctors and are not making a claim for medically diagnosed emotional distress?
A. Did I claim that?
Q. Yes, you said you're not seeking any damages for --
A. In the -- in the Third Amended Complaint, did I claim that?
Q. That's stated in your answers to the interrogatories if you turn to Question 8.
A. On which one?
Q. On Exhibit 1, Number 8 your answer to that says, "I am not claiming medical expenses or any damage implicating my medical or emotional condition."

Did I read that correctly?
A. Yeah, you did and that's correct.

Page 112

Q. Okay. I just wanted to make sure.

Have you ever had a lawsuit filed against you?
A. No.
Q. Other than the lawsuit we're here about today, how many other lawsuits have you filed?
A. I have filed six other ones.
Q. Okay. I know in the videos that you -- were produced through your lawyer, several came from a YouTube group called The Lawrence Beat, what is your affiliation with them?
A. No affiliation.
Q. Okay. What about Lawrence Accountability?
A. No affiliation.
Q. Okay. Do you have your own YouTube channel?
A. I do.
Q. What is that called?
A. It's called The DReaded Rabble Rouser and the D and the R in dreaded is capitalized.
Q. And when did you start that YouTube site?
A. September of 2022.
Q. Okay.

Page 113

MS. STEWART: I think those are all the questions that I have for you today. I know that Mr. Holder has some questions as well, so why don't we take a quick break and we'll get this finished up.
THE VIDEOGRAPHER: We're off the record at 11:59.
(Brief recess taken.)
THE VIDEOGRAPHER: Stand by. We are back on the record at 12:11.
EXAMINATION
BY MR. HOLDER:
Q. Mr. Spiehs, are you ready to continue?
A. I'm ready. And it's Dr. Spiehs, please. I went to 10 years of school for that.
(Whereupon, Spiehs Deposition Exhibit Number 3 was marked for identification.)
BY MR. HOLDER:
Q. Dr. Spiehs, you've just been handed Deposition Exhibit 3. Do you recognize Exhibit 3?
A. Yes.
Q. Is Exhibit 3 a series of photographs of the sign you were discussing earlier that you brought to the April 20th, 2022 Board of County Commissioners meeting?
A. Yeah.

Page 114

Q. Earlier today you described the sign as being, I believe, stapled to a piece of wood, can you see the wood in Exhibit 3?
A. Yes.
Q. How long would you estimate that piece of wood is?
A. Under three feet.
Q. In your Third Amended Complaint you allege that earlier in the day on April the 20th you were standing outside of the courthouse with that sign; is that accurate?
A. I stood on the corner of the street there.
Q. By the courthouse?
A. By the courthouse.
Q. During what period of the day were you standing on the corner by the courthouse with that sign?
A. Afternoon.
Q. Are you able to estimate for me how many hours you were standing there?
A. I -- I don't recall how long I was there that day. It varied.
Q. Did you go directly from standing on the corner to the meeting?

Page 115

A. Yes.
Q. At any point while you were standing on the corner with your sign did you see any Douglas County sheriff's deputies?
A. Not that I recall.
Q. Did you see Sheriff Armbrister?
A. No.
Q. Any interactions of any kind with Sheriff Armbrister or any deputy while you're standing on the corner with the sign before you went to the meeting?
A. No, the first interaction that I had with Armbrister is when he approached me in the meeting. First time I ever talked to him.
Q. Sitting here today, do you have any facts or information that would suggest Sheriff Armbrister was aware you had been standing outside with your sign before the meeting?
A. No.
Q. I believe you testified earlier that you entered the room where the meeting was happening around 5:20 p.m.; is that accurate?
A. Say that again.
Q. I believe you testified it was approximately 5:20 that you entered the room where

Page 116

the Commission meeting was happening on April the 20th; does that sound right?
A. That's -- yeah, that's what I said.
Q. How many people were in the room when you entered to the best of your memory?
A. At least 15, maybe -- maybe 20. Fifteen to twenty.
Q. Was Sheriff Armbrister already in the room when you entered?
A. Yes.
Q. Where was he located when you entered?
A. He was located -- the -- the meeting room setup has changed since then, but at the time when you walk in there was a -- like a wood fence area, I guess you'd call it. And he was on the other side of that, which is on the side of where the Commission table is.
And on the other side of that is the gallery, is where people would sit to participate in the meeting.
Q. Was Deputy Kruzel in the room when you entered?
A. Yes.
Q. Where was he located?
A. He was in the corner beyond where

Armbrister was standing, so to the right of -- if the commissioners are sitting at their table, just to the right of them.
Q. When you entered were there any other members of the Douglas County Sheriff's Office there besides Sheriff Armbrister and Deputy Kruzel?
A. I believe would was off on the other side there. There's like a -- there's a door that they go in and out of. I believe he was over there. Deputy would.
Q. Anybody other than those three?
A. Not that I recall. Coleman might have been to the left of me. I -- I believe he was.
Q. From the time you entered the room until the time that Sheriff Armbrister spoke to you while you were signing up for public comment, did you -- did any of the law enforcement officers say anything to you?
A. No. Well, so you're saying the -- the first law enforcement officer to speak to me was Armbrister?
Q. I'm asking if you -- if anybody spoke to you before Armbrister?
A. No, not law enforcement.
Q. Is the first thing you did when you



entered the room, walk to the front to sign up for public comment?
A. Well, it's -- it's -- I disagree with how you say that, but the first thing I did was walk over to sign up where the sign-up sheet was.
Q. Okay. Did you talk to anybody before you walked to the sign-up sheet?
A. No.
Q. Did anybody say anything to you?
A. Not that I recall.
Q. Okay. If I understood your testimony earlier, as you were at the sign-up sheet, Sheriff Armbrister told you that you couldn't be in there with that sign; is that right?
A. That's not right.
MR. BAKER: Object to form.
A. That's not right.
BY MR. HOLDER:
Q. Okay. What did he say?
MR. BAKER: Object to form.
A. It's not what he said. It's that -- as I was walking up to the sign-up sheet is when he approached me not -- not while I as at there. He -- he approached me while I was walking up there, and then continued to talk while I was at the sign-up



sheet.
BY MR. HOLDER:
Q. And was the first thing he said when he approached you is that you couldn't be there with that sign?
A. That's right.
Q. And your response was, "Oh, yeah. Why's that"?
A. That's right.
Q. And then he said, "It's got cuss words on it"?
A. That's right.
Q. And then you said, "Horse shit it does"?
A. Right.
Q. And then he said, "Okay then"?
A. Right.
Q. And did he then go back to his -- where he had been standing?
A. No.
Q. Was that the last thing he said to you was "Okay then"?
A. The last thing in terms of what, like, for the day? No. He said other things to me.
Q. Was that the last thing he said as



part of that initial --
A. Before he arrested me?
Q. Yeah.
A. Well, he said other things to me before he arrested me.
Q. Okay. Was that the last thing he said before you took your seat?
A. Yes.
Q. And have we now talked about everything you said to him and he said to you before you took your seat?
A. Yes.
Q. To your knowledge was --
A. Well, no. Huh-uh. No. I -- I had said that -- I had said that I recognize that he was wrong to say that I couldn't be in there with a sign, and so I had said like -- I pointed out that he was wrong and he was crossing the line, what he was doing wasn't right.
Q. And do you remember specifically what you said?
A. I said that he can't do what he's doing. I'm allowed to have the sign in here.
Q. And did he respond to that?
A. Did he respond to that?

Page 121

Q. Yes.
A. He was talking to the commissioners, so no.
Q. Okay. With -- with the addition that you told him he was crossing the line, have we now talked about everything that you said to him and that he said to you before you took your seat?
A. Yes.
Q. There is a video of a portion of your interaction with Sheriff Armbrister at the period where you're arrested that somebody in the audience took. Have you seen that, sir?
A. Do you have it so I can look at it to know what you're talking about specifically?
Q. We can get that, sure. Do you have a memory of looking at a video like that?
A. I -- I don't know if we're talking about the same video is my -- is my thing.
Q. Okay. Have you ever seen any video recording of the discussion that we just talked about, between you and Sheriff Armbrister while you were walking to the podium to sign up for public comment?
A. No.
Q. Sitting here today, do you have any

Page 122

knowledge of anybody recording that part of the conversation?
A. No.
Q. Okay. During this part of the conversation that we're talking about now, you were able to recognize the person you were talking to as Sheriff Armbrister; right?
A. You know, like I said, I had never interacted with the guy before. I never talked to him and he was wearing a dang mask so I -- and he wasn't in uniform. So initially, not really. No. Huh-uh.
Q. Did you at some point during the conversation recognize that it was Sheriff Armbrister?
A. Yeah, I realized it was him. Yes.
Q. When did you recognize it was him?
A. Like after he said that "You can't be in here with this sign." So he was like -- he was already close -- he got closer to me at that point.
Q. By the time you took your seat you knew that the person you'd been talking to was Sheriff Armbrister?
A. I knew the person that approached me was Sheriff Armbrister.

Page 123

Q. Okay. If I understood what you were saying earlier, your comment to Sheriff -- or your comment about Sheriff Armbrister being a pussy for wearing a mask happened while you were seated in the front row; is that right?
A. That's right.
Q. Where was Sheriff Armbrister at that time?
A. Standing in the back of the room.
Q. And when you said that to Sheriff Armbrister, did he respond to you?
A. Yeah.
Q. Did he say something to the effect of "My face, my choice"?
A. Something like that.
Q. Okay. And did you respond to that statement?
A. The only thing that I had said was what I said earlier in here.
Q. I -- I believe there was testimony in another deposition that you responded something to the effect of, "You didn't give a fuck about my face when it was my choice," does that refresh your memory at all?
A. What deposition is that from?

Page 124

Q. Sheriff Armbrister's.
A. That Sheriff Armbrister said that?
Q. Yeah, Sheriff Armbrister testified that -- that was how you responded.
A. Well, that wasn't in -- necessarily directed at him. My -- the County Commission had also put in their mask mandates during COVID as well that I had taken issue with as well. So I was generally saying that.
Q. So you did say -- not directed at Sheriff Armbrister, but generally you said, "You didn't give a fuck about my face when it was my choice"?
A. To that effect, yeah.
Q. Okay. And was that before or after Mr. -- Mr. Alman spoke to you?
A. Before.
Q. You've just been handed what was marked at a previous deposition as Plaintiff's Exhibit 7.
Do you recognize Plaintiff's Exhibit 7?
A. No. No.
Q. I want to direct your attention to the first page of the exhibit. Do you -- does the first

Page 125

page appear to show a still shot or a picture of you, sir?
A. It does.
Q. And you're at that point holding the sign that we previously discussed; is that right?
A. That's right.
Q. And you're seated in the front row of the Commission room?
A. That's right.
Q. And this -- this -- the picture that we're looking at on the first page, does that appear to come from the -- the April 20th, 2022 meeting?
A. It does.
Q. Okay. And are you able to see Mr. Alman on the first page?
A. Yes.
Q. And you can see the gentleman in the row directly behind you?
A. Wearing a mask, yeah.
Q. Okay. And it looks like in the top picture there he maybe has his hand out.
Do you see that?
A. It could be.
Q. Do you have a memory of what was happening at the time this -- of this picture -- or

Page 126

either of these pictures on the front page?
A. That I was turned around to see who was saying something.
Q. Okay. And I believe you testified earlier that at some point you said out loud, "I don't give a fuck what you think about me"?
A. That's right.
Q. Do you remember that?
A. Yep.
Q. And did you say that before or after you turned around?
A. Before.
Q. At the time you said that, did you believe that the volume of your voice was loud enough that other people in the crowd would be able to -- would have been able to hear you say that?
MR. BAKER: Object to form.
A. Well, I mean, when you're talking in there, people can hear ya.
BY MR. HOLDER:
Q. Okay.
A. So it was just a normal conversational voice.
Q. Do you believe at the time that you spoke to Mr. Alman that you used the phrase

Page 127

"motherfucker"?
A. To Alman?
Q. Yes.
A. Not that I recall.
Q. Okay. Just so that I have it, can you tell me to the best you can recall exactly what you said to Mr. Alman?
MR. BAKER: Object to form.
A. Well, what I had said is -- the only thing that I had said was "I don't give a fuck what you think of me." And that was just kind of a general comment.
BY MR. HOLDER:
Q. Okay. And after that happened, Sheriff Armbrister approached you; correct?
A. After what happened?
Q. At -- at some point after you said, "I don't give a fuck when you think of me."
A. Well, after I turned around.
Q. Okay. And had you already provided to the best of your memory everything that Sheriff Armbrister said to you while you were seated in that row?
A. Have I already said everything that he said?

Page 128

Q. Right.
A. Up until this point in time right here?
Q. I mean, have you told me everything he said from the time that he approached you while you were seated through the time that you were taken --
A. I've --
Q. -- out of the room?
A. I've told you everything that you've asked me about.
Q. Okay. Is there anything that Sheriff Armbrister said to you from the time he approached you while you were seated there until the time you left the room that you haven't told us about yet?
MR. BAKER: Object to form.
A. Yeah.
BY MR. HOLDER:
Q. Okay. What else -- what else did he say?
A. From what time period again?
Q. From the time that he approached you while you were seated through the time that you left the Commission room.
A. Well, I left under the arrest of them -- well, going into an arrest. I was forced out

Page 129

of there. But one of the things that he said to me on the way out is "I want you to treat people with fucking respect."
Q. Okay. Anything else that you can remember that he said to you during that time period that you haven't told us about?
A. You got the video you can pull it up, probably take a look at it.
Q. Well, I'm asking what you can remember right now, sir.
MR. BAKER: Object to form.
A. Yeah, that's all he said.
BY MR. HOLDER:
Q. Okay. I believe you testified earlier that as the officers were taking you out of the room -- and what I want to clarify about is, did one or -- or did both of the officers put you in an Armbrister bar?
A. Armbrister and Kruzel, yeah.
Q. They both did?
A. Yeah.
Q. Describe for me when you use the word Armbrister bar, what do you mean?
A. Manipulating my wrists and my Armbrister and my shoulder behind my back to control

Page 130

my movements --
Q. Okay.
A. -- as evidenced in the video footage and Armbrister said it as well in his deposition.
Q. When -- after you exited the Commission room, were you placed in handcuffs in sort of the chamber just outside the Commission room?
A. I was.
Q. And did Sheriff Armbrister say anything to you while you were out there?
A. No.
Q. Did Deputy Kruzel say anything to you while you were out there?
A. No.
Q. Was there anybody else out there?
A. Yep.
Q. Who else was out there?
A. Would.
Q. Okay. Did would say anything?
A. Yep.
Q. What did would say?
A. "Stop resisting."
Q. Okay. Anything else?
A. That's it.
Q. Did you say anything to any of the

Page 131

deputies while you were out there?
A. To the deputies?
Q. Yeah.
A. No.
Q. Did you say --
A. Oh. I said, "I'm not resisting."
Q. Okay.
A. I said, "I'm not resisting."
Q. Anything else?
A. I was saying something, but not to the deputies.
Q. What were you saying?
A. Well, you know how I just said Armbrister said, "I want you to treat people with" -- or "treat people with fucking respect," I said, "Me too."
"Me too."
"Me too."
"Me too."
"Me too."
"Me too." I said it seven times as well.
Q. Okay. Did you say, "Me too, Motherfucker"?
A. Yep.

Page 132

Q. Okay. Anything else that you can remember saying out there?
A. No.
Q. Did you go from the -- after you were handcuffed did you go to the detention center?
A. What is that?
Q. Well, let me ask you this:
Where did you go after you were handcuffed?
A. So Kruzel took me over -- across from the courthouse is the judicial and law enforcement center, he took me in through there and then -- and placed me in a -- a patrol car.
Q. Okay. And did Kruzel -- where did he take you from there?
A. Jail.
Q. Okay. And at what point did Deputy Kruzel leave your presence, when you got to jail?
A. I believe it was once I was -- so when -- when I -- when you pull in there to the sallyport, he was with me. He was with me when the Douglas County deputies came out to take me captive into the jail and I believe at that point once I entered from the sallyport into the jail is -- is -- he might have lingered around there a little bit

inside the jail, but that was -- as far as I remember was the last....
Q. And did you bond out?
A. I did.
Q. How long were you in jail?
A. Three hours. Three to four hours.
Q. Where did you go after you bonded out?
A. As far as I recall I went back to my house.
Q. How did you get there?
A. I had -- I had someone give me a ride.
Q. Do you remember who gave you a ride?
A. I don't recall.
Q. Okay. I believe you testified earlier that at some point Deputy Kruzel told you that the Commission had told Sheriff Armbrister to get you out before the meeting started --
A. That's right.
Q. -- is that correct?
A. Yep.
Q. When did he tell you that?
A. When he got -- when we pulled into the sallyport at the -- at the garage -- or at the jail. What I mean by that is when you go to the Douglas County Jail, you pull up there and they open up a



garage door, and the deputies pull in there and they shut the garage door. And he get -- got me out of the -- the cruiser and as we're standing there in the sallyport, he says that to me. And that's when he said that to me.
Q. And did you say anything in response to that?
A. I said, "Well that'll be interesting. That'll be interesting to get." And -- meaning that -- his bodycam, Kruzel's bodycam, of him saying it.
Q. And did he say anything else to you?
A. Not that I recall.
Q. Okay. During the period after you were put in handcuffs and then taken to the patrol car and then taken to the jail did Deputy Kruzel say anything else to you?
A. Yeah, he did.
Q. What else did he say?
A. He said, "Don't you got court tomorrow?"
And I said, "Yeah. Uh-huh. Yeah."
Q. Anything else that you can remember him saying to you other than what you've told me?
A. Not that I recall.



Q. When Deputy Kruzel told you that the commissioners had told Sheriff Armbrister to get you out before the meeting started, had you guys been having a conversation or did he just say that out of the blue?
A. Not that I recall.
Q. You don't recall him saying anything else to you prior to telling you that Sheriff Armbrister -- or that the BOCC had told Sheriff Armbrister to get you out before the meeting started?
A. Yeah, it was out of the blue.
Q. Okay. Is it true that the state agreed to dismiss the charges against you associated with the April 20th, 2022 arrest as part of a plea agreement involving a different matter?
A. Well, I think that mischaracterizes it. It wasn't charges. It was a disorderly conduct charge. Just the one charge. There wasn't charges.
Q. I didn't ask you before I took over, is your phone recording right now?
A. No.
Q. Okay.
A. Is yours?
Q. No.
I want to shift to talking about the



May 1 --
A. Is Armbrister's phone recording right now?
Q. I have no knowledge of that, sir.
A. Can we find out?
Q. He's saying no.
A. What did he say?
Q. He said no.
A. I didn't hear him say anything.
Sheriff Armbrister: No.
THE WITNESS: That wasn't so hard.
BY MR. HOLDER:
Q. I want to talk to you about the May 1, 2024 arrest.
MS. STEWART: I don't think he actually answered your question. He changed it to charges.
MR. BAKER: Hold it. You're not doing the deposition, so let Andrew do it. That's --
MR. HOLDER: Okay. So, yeah, that -- that's -- that's a fair point.
BY MR. HOLDER:
Q. Was -- is it true that -- well, let me just do this.
THE WITNESS: Are they allowed to do

that? She did his job for him.
MR. BAKER: (Indicating.)
THE WITNESS: She did. That don't seem fair, Linus. Is she representing Armbrister?
(Whereupon, Spiehs Deposition Exhibit Number 4 was marked for identification.)
BY MR. HOLDER:
Q. Do you recognize Exhibit 4?
MR. BAKER: Did you say 4 or 5?
MR. HOLDER: I said 4, but am I mistaken?
MR. BAKER: Is it 4?
THE REPORTER: We didn't mark this one as a new exhibit.
MR. BAKER: Well, I -- if you use an exhibit we need to mark it in this deposition so we can identify it.
MS. STEWART: Previously -- he identified it on the record as 7 from the prior.
MR. BAKER: Okay. I'd like to talk to Andrew. Can we mark whatever -- Exhibit 7, since it's been used here, as Exhibit 4 in this case, so I'll know --
MR. HOLDER: Why don't we do it as Exhibit 5 since Exhibit 4 sticker is already on this



other one.
MR. BAKER: So this would be --
MR. HOLDER: We'll call that one exhibit -- that's Exhibit 4. We'll call the one you're holding Exhibit 5. Does that work for you?
MR. BAKER: I guess. So the plea agreement's 4?
MR. HOLDER: Yes.
MS. STEWART: And just so the record's clear, the discussion previously with Exhibit 7 is now going to be marked as Exhibit 5?
MR. HOLDER: Right.
(Whereupon, Spiehs Deposition Exhibit Number 5 was marked for identification.)
BY MR. HOLDER:
Q. Do you recognize Exhibit 4?
A. Is the -- is 2A, is that Case Number -- what is that Case Number in reference to?
Q. Well, sir, I -- I can't tell you the answer to that.
My question is simply do you recognize Exhibit 4?
A. If that's that Case Number.
Q. Does your signature appear on the second page of Exhibit 4?



A. Yes.
Q. And -- and is Exhibit 4 a true and accurate copy of a plea agreement that you entered into in Case Number 21-CR1092?
A. Yes.
Q. All right. I want to shift gears back to the May 1st, 2024 arrest.
In preparing for today's deposition, did you review the Board of County Commissioners' video of the May 1, 2024 meeting?
A. The whole meeting?
Q. Right.
A. The entire meeting?
Q. Yeah.
A. No.
Q. Did you review parts of that video?
A. Yes.
Q. Okay. And did you review the parts where you appear?
A. I -- I reviewed some of the parts where I appeared, yeah.
Q. Okay. And during the parts that you reviewed, to the extent it was captured on microphone, does it accurately depict what was said?
MR. BAKER: Object to form.



A. Well, they muted -- they muted parts of it. So it's -- it's -- no, because it doesn't accurately depict the -- because they -- they -- they edited the official record.
BY MR. HOLDER:
Q. What do you mean "they edited the official record"?
A. Well, they turned off the microphone.
Q. As far as the parts that -- that you could hear, is what you could hear accurate?
A. From all the videos I watched or are you talking specifically --
Q. I'm talking about this one right now.
A. The County Commission meeting?
Q. Yes.
A. That was posted on YouTube?
Q. Uh-huh.
A. Yeah.
Q. Okay.
A. And that -- that was actually recorded; so they went into recess.
Q. Okay. You mentioned earlier that you operate a YouTube page; correct?
A. That's right.
Q. And do you have a video posted that

captures the events of May the 1st, 2024 on your YouTube page?
A. A video?
Q. Yes.
A. Yeah.
Q. And did you prepare that video?
A. Yeah.
Q. And did you watch that video to prepare for today's deposition?
A. Yeah.
Q. Do you believe that the video posted on your page accurately captures all of the events on May the 1st, 2022 that you were involved in?
A. Well, so I think this is kind of a confusing question, because you're saying "a video." Which video are you specifically mentioning? Because I've posted -- I've posted videos and I've -- I've provided them all to you, the videos that I posted, so which video are you talking about?
Q. I'm talking about the video that captures May the 1st, 2024. Have you posted more than one video that captures that?
A. Yeah.
Q. Okay.
A. And I've -- I've given you guys that



list.
Q. How many of those videos did you watch to prepare for today's deposition?
A. I've watched all those videos.
Q. To prepare for today's deposition?
A. Uh-huh. Yeah.
Q. Okay. Did you capture some of the events from May the 1st, 2024 on your cell phone?
A. Yes.
Q. And have other people provided you videos that they captured on their devices from that event?
A. Yes.
Q. Who?
A. Michael Eravi and then I don't recall the names of where the other videos came from.
Q. I believe you testified that you believe -- you thought you arrived to that meeting maybe one or two minutes after it started; is that right?
A. Roughly.
Q. When you arrived, were there any seats available?
A. No.
Q. When you arrived, did you hear the



commissioners talking about an overflow room for people?
A. They said that much later in the meeting.
Q. Okay. Did you ever go to the overflow room?
A. No.
Q. Do you know whether there was seating available in the overflow room?
A. No.
Q. Did you know there was an overflow room on that night?
A. I don't even know what an overflow room is.
Q. Okay.
A. Because there were people standing all throughout there, including -- including news reporters with a tripod that was actually out into -- into the walkway. And as you can see on the video, you can see Channel walking, she has to like step over it. There's a -- there's a walker -- there's a walker there she has to go around. So there were people that were standing throughout there, overflow room or not.
(Whereupon, Spiehs Deposition Exhibit



Number 6 was marked for identification.)
BY MR. HOLDER:
Q. You've just been handed Deposition Exhibit 6. Does Exhibit 6 appear to be a -- a still shot from the May 1, 2024 meeting?
A. From the County Commission camera?
Q. Yes.
A. Yes.
Q. You agree that's what it appears to be?
A. That's what it appears to be.
Q. And are you able to see yourself in the exhibit?
A. Yes.
Q. You were asked some questions earlier sort of describing where you were located during the meeting when you were not addressing the Commission. Does Exhibit 7 [sic] show the general location where you were standing during the meeting?
MR. BAKER: Object to form.
A. Yes. I'm standing there.
BY MR. HOLDER:
Q. And were you standing there -- or in that general area the whole time you were at the meeting other than when you were at the podium?

Page 145

A. Up until the arrest, yes.
Q. And I believe you mentioned earlier that you were standing by some empty tables, were those the ones sort of just in front of the podium kind of running horizontal across the picture?
A. I think you're mischaracterizing what I said. I said I was standing next to a table, not at the tables. That table right there (indicating).
Q. In the picture you can see sort of running up and down on -- on the left side there's some more tables and there's three people seated there.
Do you see that?
A. On this side right here (indicating)?
Q. Yes.
A. Yeah.
Q. And do you know who those people are?
A. Yeah.
Q. Are those commissioners?
A. They are.
Q. And then sort of on the opposite side closer to you, there's another row of tables.
Do you see that?
A. I do.
Q. And there's maybe six people seated

Page 146

there?
A. That's right.
Q. Do you know who any of those people are?
A. I do.
Q. Can you tell me the ones you know?
A. Currently I know two of 'em, Sarah Plinsky and the guy sitting next to her, John Bullock, but I didn't know his name at the time.
Q. And is Sarah Plinsky wearing the, what appears to be red or maybe orange clothing?
A. Yes.
Q. And John Bullock is the person -- it would be to her left in the picture?
A. That's right.
Q. Okay. Do you know who any of those other people are?
A. No.
Q. Okay.
A. Well, I'm sorry. I'm sorry. The one that's in the back row directly behind Sarah Plinsky, I believe, that's an LJ-World reporter. His name is Austin Hornbostel.
Q. And is he the one wearing the darker shirt or the lighter shirt?

Page 147

A. Darker shirt.
Q. And can you see yourself holding a sign in Exhibit 7 -- oh, I'm sorry, Exhibit 6?
A. Yes.
Q. What does your sign say?
A. "Women have more balls than Patrick too."
Q. And the Patrick in there would be Commissioner Kelly; is that right?
A. That's right.
Q. Does your sign have anything on the back of it?
A. Yes.
Q. What does it say on the back?
A. It said something like "Keep fighting the liberal agenda."
Q. On the evening of May the 1st, 2024, when was the first time you had any interaction with any Douglas County Sheriff's Deputy?
A. When was it?
Q. Correct.
A. Are you looking for a time or what?
Q. Yeah. Chronologically in the process when's the first time that any deputy spoke to you?
A. I believe it was when Deputy Favre

Page 148

said -- asked -- she met with Sarah Plinsky and then came over and tried to intimidate me out of that spot by getting up on me and saying -- asking me to take a step back.
Q. Did that take place after you had approached the podium and spoke?
A. It happened after.
Q. And were you standing in approximately the same place you are in Exhibit 6?
A. Yes.
Q. And I believe you said that the deputy had just prior to that spoken to Sarah Plinsky; is that right?
A. Yes.
Q. Do you know what -- did you hear anything from that conversation?
A. Yes.
Q. What did you hear?
A. So heard Sarah Plinsky -- or Sarah Plinsky say something about a charge and Michael Eravi had said, "There's no -- there's no charge. Nothing's happened here." And both Plinsky and Favre were like, "No, we're not saying a charge. We're not -- not -- not a charge, but you gotta get him out of here."

Sarah Plinsky says, "You gotta get him out of here."
Q. Did you hear the deputy say anything in response?
A. I don't think she said anything in response.
Q. Did she then come up and stand behind you?
A. I believe she did that when the -- when the meeting resumed.
Q. Okay. And at that point did the deputy say anything to you?
A. That's when she had said -- well, when she approached me, she said -- like I said earlier, she said, "I'm asking you just to take a step back. That's it. Just take a step back."
Q. And did you respond to that?
A. I had said to the effect of, "Well, you're asking me. I'm -- I'm fine to stand here. I'm good. You're asking me, but I'm going to stand here."
Q. Is your perception based on what the deputy said to you that she was making a request not an order?
A. She was asking me.



Q. Okay. And did the deputy say anything in response to you?
A. No. Not that I recall.
Q. And was that conversation while the meeting was on break or was the meeting ongoing at that point?
A. I believe it -- it was on a recess.
Q. Okay.
A. They -- they -- they kind of would stop their meeting and not make it clear if they were going into a recess or not before they declared a recess.
Q. Did the commissioners tell you that you could stay at the meeting and keep your sign, but they wanted you to stand back against the wall?
A. They had asked me -- Shannon Reid had asked me that.
Q. Okay. And what was your response to that?
A. Well, she had said, "I think you've proven your point," which again, is -- is just more viewpoint discrimination.
And I said, "I'll tell you when I've made my point. It ain't up to you to tell me when I've made my point. I'll tell you when I've made my point."
And that's what I said.



Q. At some point in time do you see Lieutenant Channel?
A. Yes.
Q. And when did you first see Lieutenant Channel?
A. When she entered -- well, when I turned to see that she had entered the room.
Q. Okay. And what happened after you saw her enter the room?
A. Well, like I mentioned, she came walking in, she had to go around people that were actually standing in -- in the aisle. Now, they're trying to say that I was blocking the aisle, and meanwhile -- if it -- if it was a crime for me to stand in the aisle, she's like -- like going past other crimes being committed.
As she gets there, she goes around the -- the camera leg that's out in the aisle, the walker-wheelchair thing that's out in the aisle and then she approaches me, and the first thing she says to me is, she lies -- she gas lights me right away, and says, "Well, when I walk into the room and you're actively yelling, that's an issue."



And I'm like, "I wasn't actively yelling. You can look at the video."
The video shows me standing there and I asked Deputy Gonzalez in just a normal conversational voice, "You waiting for the Sheriff to get here? You waiting for the Sheriff to get here? You waiting for the Sheriff to get here?"
And Channel comes up and says I was actively yelling. Total lie. Total lie. Trying to use that as probable cause to arrest me. I wasn't -- I wasn't -- I didn't actively yell then and I didn't actively yell at any point in time throughout that. Any point in time.
Q. Okay. So after she tells you that she has seen you yelling, what was your response to that?
MR. BAKER: Object to form.
A. She didn't say she had seen me yelling. She said, "When I walked in and you're actively yelling."
BY MR. HOLDER:
Q. Okay. And did you respond to that?
A. I said -- like I just said, "I wasn't actively yelling. What are you talking about, actively yelling? I wasn't actively yelling. What are you talking about?"

Page 153

I knew she was lying to me. Straight up lying to me. She made it up out of thin air. You can look at the video. I'm standing there talking to Gonzales, asking him if the sheriff had been called.
As a matter of fact, nobody in that room was actively yelling when she walked in. It's a total lie, which is to be expected. They all lied on the -- the report from the April 20th arrest as well. So it's totally expected they're going to come in and lie like that, because they knew I wasn't doing nothing wrong.
Q. What was the next thing that happened after she said that?
A. She said, "Okay. I'm going to -- here's -- here's the deal. Here's the deal. I'm going to ask you -- you don't have to -- this isn't about your sign, I'm asking you to take a step back."
Q. And did you respond to that?
A. She -- actually, what -- what she addressed -- this is the interesting part of it. Is that she is addressing both me and Michael Eravi, and the same -- same with the Commission. The Commission had also directed him. And I was the only one that got arrested. And somebody needs to explain that to me.

Page 154

So she initially starts talking to Ms. -- me and -- and Michael and she calls him Mr. Eravi or Eravi. But I'm the only one that's taken out of there in handcuffs.
And she says, "Just asking for you to just take a step back."
And we say -- I said, "I decline. I decline. I'm -- I'm going to stand here. This is a public -- public meeting, public forum, public building. I can stand here if I want to, Channel. Let's start the meeting."
And she says, "Well, here's the -- here's the thing, I don't have any other choice but then to ask you to leave the meeting."
And I said, "I'm not leaving the -- the meeting. I have a right to be here. Let's start the meeting."
She said, "Well, that's the issue. They -- they can't start the meeting."
And Michael Eravi says, "Well, they're in recess. What are you talking about? This -- we're not preventing this meeting from going forward. They're in recess."
And I asked her to clarify, "Well, how exactly am I stopping this meeting from going

Page 155

forward? This is absurd. I'm not doing nothing."
And she says, "Well, unfortunately if you don't step back then I have no other choice to ask you, and I'm not asking you I'm telling you to leave."
And I said, "I'm not leaving."
She said, "Well, then I have no other choice but then by the power of -- or the authority of Sheriff Armbrister and County Commission you're going to be under arrest."
Which is an interesting statement, so which shows that, you know, they ordered that arrest. And then she directed Coleman to place me under arrest.
Q. And did she say anything else to you?
A. No.
Q. Did Coleman say anything to you?
A. He said, "Mr. Spears [sic], put your hands behind your back."
Q. Okay. And did you do that?
A. Yeah.
Q. And so at that point did they put you in handcuffs?
A. Yeah, put me in handcuffs.
Q. Okay. And then did he take you from

Page 156

there to the jail?
A. He did.
Q. And did you have any discussion with him on the way to the jail?
A. No.
Q. How long were you at the jail?
A. About roughly the same, I'd say three hours or so.
And in the jail I had asked him, I said, "Hey, Coleman, what exactly does that 21-5922 statute say."
He says -- he said he didn't know.
He said, "You can Google it."
And I said, "Well, don't you think it's more important for you to know what that statute says, because there's nothing in that statute that -- that says I did any -- anything that would be an element for probable cause on that."
And he needed to know that statute not me. And so then the -- the prosecuting attorney, you know, declined to even pursue that charge. Sent me a -- a notarized letter and everything, saying, "Not -- not gonna pursue this one. Not gonna do that, "for what Armbrister did there. Not gonna happen, on that illegal arrest for the second time.

Q. Let me back you up. So the prosecutor sent you a letter notifying you that she was not going to pursue the charge?
A. I didn't say that.
Q. Okay. What did you say?
A. I said she had a notarized letter that said that.
Q. All right. Is that the only correspondence that you have had with the prosecutor about this charge?
A. What do you mean by "correspondence"?
Q. I mean, has she ever talked to you about it by phone, letter, email, text message, anything like that?
A. About the charge?
Q. About the fact that she was declining to charge.
A. So you mean written correspondence?
Q. I mean any -- any correspondence, verbal, written.
A. Well, I had -- no, she hasn't sent me any other -- there's been no other written correspondence. I had approached her and asked her if she would charge Armbrister with battery and kidnapping since he lost qualified immunity on that.



He knew it was an unlawful arrest and he should have never put his hands on me.
And that if I were to walk up to somebody, especially him, and -- and had done the exact same thing -- I said, "You know, if you walk up to somebody and you put your hands on them illegally, force their arms behind their back, and put constraints on them, force them into a car, drive them off to a place and lock them away, take away their freedom, would that be considered battery and kidnapping? And I would like those charges pressed against him."
And that was the conver- -- that was the correspondence that we had.
Q. Okay. Any -- any correspondence about the May 1 arrest?
A. That is that, yeah. That is that, yeah.
Q. Okay. Has she ever articulated to you why she declined to press charges?
A. No.
Q. Okay. Have you told me everything you remember Lieutenant Channel saying to you on May the 1st?
A. I believe so.



Q. What about Deputy Coleman?
A. Coleman had asked me when he put the cuffs on, if the cuffs were too tight and I told him that they had, and he checked 'em and he said that they weren't too tight. And that was that.
And then the conversation that I asked him -- that I just told you about of asking him what the statute said and him saying I could just Google it. And me telling him that I think it's more important that he knows the statute and he understands what it means to see if I met any of the elements of probable cause. That was it.
Q. During the conversation with Channel, did you -- that you were telling me about a minute ago, was the Commission meeting on break at that time?
A. They were on a recess.
Q. Okay. And just prior to that recess, were you asked to step back from where you were standing?
A. By who?
Q. By one of the commissioners.
A. At some point prior to that I had been asked. Like I just had said, to -- to step back against the wall.



Q. Is it true that the Commission -- at some point in the meeting they took a five-minute break, or they announced they were going to take a five-minute break.
Do you recall that?
A. A recess, yes.
Q. Okay. And did they resume the meeting after that recess?
A. Yes.
Q. And when they resumed that meeting is that when you were asked to step back?
A. Yes.
Q. And you declined; true?
A. I don't think I even responded.
Q. Okay. And after you -- after they asked and you didn't respond, did the Commission go on another recess immediately after that?
A. They took "another recess immediately." I don't know what you mean by that, but they took a -- a second recess.
Q. And is that when Lieutenant Channel approached you?
A. During that recess.
Q. Did they articulate --
A. I believe so.

Q. Sorry.
Did any of the commissioners articulate why they were taking a second recess?
A. To me, no.
They had directed a guy named Chad to do something, to get the Sheriff. Yeah, they directed Chad to get the Sheriff. That's why I was asking Gonzales if the Sheriff was coming because they had made the -- the order to some guy named Chad to go get the Sheriff.
They said, "It's time. Go get the Sheriff."
Q. Do you know who Chad is?
A. I know he's a county employee. I didn't know at the time. But he's a county employee. I don't know what his title is.
Q. Just to be clear, did the Sheriff ever show up on May the 1st while you were present?
A. I don't know. I don't know.
Q. Did you ever see him?
A. I never saw him.
Q. You never interacted with him at all on May the 1st?
A. I never interacted with him, but he could have been out in the parking lot.



Q. Okay. You don't know one way or the other?
A. I assumed he was. I assumed he was.
Q. Yeah, I'm not asking what you assume. I'm asking if you know whether he was out in the parking lot?
A. Yeah.
Q. Yeah, you do know that?
A. Oh, no. I'm -- I'm saying I -- I hear what you're saying. I've already answered that question.
Q. Okay. You agree with me you don't know whether he was out there?
A. I don't know if he was out there.
Q. Okay. Are you making any claim for out-of-pocket expenses associated with either the April 20th, 2022 or the May 1st, 2024 arrest?
A. Out-of-pocket expenses in terms of?
Q. Money you've spent as a result of either of those arrests.
A. Can you pull the -- the claim up and see what it says?
Q. Well, I -- I think we looked at it earlier, and it identified, you know, you making a claim for compensatory damages. What I'm trying to



determine is whether part of that includes out-of-pocket expenses of some kind?
A. What does it say in the complaint?
Q. Well, it doesn't say, that's why I'm asking.
A. It doesn't say --
Q. It doesn't say --
A. -- what I'm asking for?
Q. It doesn't say what the compensatory damages are for, so that's what I'm trying to figure out.
A. Well, I'm claiming whatever's in that -- in the complaint.
Q. Right. And what you're claiming in the complaint is just $500,000; I want to know where that figure comes from.
A. But that's not what you asked me. What did you ask me?
Q. I asked if any part of that figure comes from out-of-pocket expenses that you have incurred associated with either of those arrests?
A. Out-of-pocket expenses?
Q. Right.
A. Yes.
Q. Okay. Tell me what those



out-of-pocket expenses were.
A. Lawyers' fees.
Q. Okay. And for which lawyers?
A. Criminal defense and civil.
Q. Okay. I don't need to get into the civil part of that because that's a whole separate deal. But how much did you -- have you spent for criminal defendant attorneys' fees associated with either of those arrests?
THE WITNESS: Is that attorney-client privilege?
BY MR. HOLDER:
Q. Only if you're -- I mean, if you're claiming it as damages I'm entitled to know the number.
A. I've spent thousands of dollars defending the -- the arrest.
Q. Thousands of dollars for criminal defendant attorneys' fees?
A. That's right.
Q. How many thousands of dollars?
A. I'd have to go back and look.
Q. Is it more than $10,000?
A. I'd have to go back and look.
Q. Okay. Could it be more than 10 --

Page 165

A. Could be.
Q. -- sitting here today?
A. Could be. Pretty expensive.
Q. Could it be more than 50?
A. I'd have to go back and look.
Q. Well, let me ask you:
Do you have invoices associated with the money you've spent?
A. Yeah.
Q. Okay. So we could go through and -- and determine the actual number?
A. It's possible.
Q. Okay.
A. Yeah.
Q. Other than attorneys' fees, have you incurred any other out-of-pocket expenses associated with these two arrests?
A. No.
MR. HOLDER: Let's take five, I may be done.
THE VIDEOGRAPHER: I'll take us off the record at 1:11.
(Brief recess taken.)
THE VIDEOGRAPHER: Stand by.
We're back on the record at 1:17.

Page 166

BY MR. HOLDER:
Q. I just have one question. Who's the prosecutor that you spoke to about pressing charges against Sheriff Armbrister?
A. Well, I've spoken to two prosecutors.
Q. And who have you spoken to?
A. At the time it was Suzanne Valdez and then the current one Dakota Loomis.
Q. And which one were you speaking to that you told me about earlier?
A. Valdez.
Q. Okay. And tell me about the other conversation.
A. With?
Q. The current prosecutor.
A. I had approached him and said I -- I was looking to get his help on something because I explained what had happened, that Armbrister unlawfully arrested me, had no probable cause to lay his hands on me, and because of that then he shouldn't have done that, and that if it was me going up and like putting my hands on you and then putting your hands behind your back and putting restraints on and forcing you into my car and driving off to my house and locking you away in a room, you would call

Page 167

that battery and kidnapping and so I'd like to press those charges on Armbrister there.
He said -- and I said, "I got it all on video."
And he said -- he said he'd be willing to take a look at the -- the video.
Q. Okay. Anything else about that conversation?
A. What about?
Q. Is there anything else that you two discussed that you have not told me about yet?
A. That's it.
Q. Okay.
MR. HOLDER: I don't have anything further.

FURTHER EXAMINATION

BY MS. STEWART:
Q. Just really quickly. I wanted to -- I failed to ask you, you don't currently live in Douglas County; is that true?
A. That's true.
Q. Okay. When did you -- when was the last time you resided in -- or were a resident of Douglas County?
A. May of '23.

Page 168

MS. STEWART: Okay. Thank you.
Those are all the questions I have.
MR. BAKER: We will read and review.
THE VIDEOGRAPHER: I'll take us off the record at 1:19.
(Off video record.)
THE REPORTER: Mr. Baker, you also want a copy of the transcript?
MR. BAKER: I just need a copy; not the exhibits.
THE REPORTER: Not the exhibits, all right.
(Deposition concluded at 1:19 p.m.)

_____________________________
JUSTIN SPIEHS, Ph.D.

Subscribed and Sworn to before me this _____ day of _______________, 2025.

_____________________________
Notary Public

County of _________________

State of __________________

JUSTIN SPIEHS vs. JAY ARMBRISTER, et al.



ERRATA SHEET

RE: JUSTIN SPIEHS vs. JAY ARMBRISTER, et al.

DEPOSITION OF: JUSTIN SPIEHS, Ph.D.

| PG/LN NO. | CORRECTION | REASON FOR CHANGE |
|---|---|---|
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |
| :________ | :________________ | :________________________ |

_______ I certify that I have read my deposition in the above case and I request that no changes be made.
_______ I certify that I have read my deposition in the above case and I request that the above changes be made.

SIGNATURE OF DEPONENT: ____________________________

DATED: ____________________



C E R T I F I C A T E

I, Laurel A. Woodbridge, a Certified Shorthand Reporter of the State of Kansas, do hereby certify:

That prior to being examined the witness was by me duly sworn;

That said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

WITNESS my hand and seal this 4th day of November 2025.

_____________________________
Laurel A. Woodbridge RPR-CRR-CSR
CCR No. 898 and CCR No. 1327

November 18, 2025

JUSTIN SPIEHS, Ph.D.
C/O Mr. Linus L. Baker
Attorney at Law
6732 West 185th Terrace
Stilwell, Kansas 66085-8922

EMAIL ONLY

RE: Spiehs vs. Armbrister, et al.

Greetings:

Please find enclosed a copy of the transcript of your deposition taken on October 16, 2025, along with the original Signature Page.

At the conclusion of reading your testimony, please make your corrections, if any, on the Signature Page and sign the same before a notary public.

Please read, make any corrections to your transcript, and sign the Signature Page as necessary within 30 days of the above date. If we do not receive the signed and notarized document within 30 days of the above date, your deposition will be processed accordingly.

Regards,

iReport Solutions LLC
Suite 297
7111 West 151st Street
Overland Park, Kansas 66223

November 18, 2025

Ms. Michelle R. Stewart
Hinkle Law Firm LLC
Suite 400
8711 Penrose Lane
Lenexa, Kansas 66219-8179

RE: Spiehs vs. Armbrister, et al.

Greetings:

The transcript of the deposition of JUSTIN SPIEHS, Ph.D. taken in the above-referenced case has been sent to the witness for reading and signing pursuant to the Rules of Civil Procedure.

If the signature documents are returned to iReport Solutions, the documents will be forwarded on to counsel in the case.

Therefore, we are filing the Original Transcript and the Original Exhibits, if any, with you for filing with the Court as necessary.

Regards,

iReport Solutions LLC
Suite 297
7111 West 151st Street
Overland Park, Kansas 66223

Enclosure