IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JUSTIN SPIEHS,
Plaintiff,
vs. Case No.
JAY ARMBRISTER, et al., 5:24-cv-4005-JAR-BGS
Defendants.

DEPOSITION OF JAY ARMBRISTER, a Defendant, taken on behalf of the Plaintiff before Sharon R. Larrick, CSR No. 767, CCR No. 765, RMR, CRR, CRC, pursuant to Notice on the 1st day of August, 2025, at the offices of Stevens & Brand LLP, 900 Massachusetts, Suite 500, Lawrence, Kansas.

**EXHIBIT B**

APPEARANCES

APPEARING FOR THE PLAINTIFF:
MR. LINUS L. BAKER
Attorney at Law
6732 West 185th Terrace
Stilwell, KS 66085
913.486.3913
linusbaker@prodigy.net

APPEARING FOR DOUGLAS COUNTY, KANSAS SHERIFF'S OFFICER DEFENDANTS:

MR. ANDREW HOLDER
FISHER, PATTERSON, SAYLER & SMITH LLP
9393 West 110th Street
Suite 300
Overland Park, KS 66210
913.339.6757
aholder@fpsslaw.com

MS. LESLIE M. MILLER
STEVENS & BRAND LLP
900 Massachusetts
Suite 900
Lawrence, KS 66044
785.843.0811
lmmiller@stevensbrand.com

APPEARING FOR DEFENDANT DOUGLAS COUNTY, KANSAS BOARD OF COUNTY COMMISSIONERS AND COMMISSIONER DEFENDANTS:
MS. MICHELLE R. STEWART
HINKLE LAW FIRM, LLC
8711 Penrose Lane
Suite 400
Lenexa, KS 66219
913.345.9205
mstewart@hinklaw.com

ALSO PRESENT:

Dr. Justin Spiehs



INDEX


| WITNESS: | PAGE |
|---|---|
| JAY ARMBRISTER | |
| Examination by Mr. Baker | 4 |


EXHIBITS


| EXHIBIT NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| Exhibit 1 | Minutes of 4-20-22 Commission Board Meeting | 110 |
| Exhibit 4 | 4-10-22 Incident Report | 78 |
| Exhibit 8 | Photographs | 179 |
| Exhibit 9 | Still photographs of frames of video | 101 |
| Exhibit 10 | K.S.A. 21-6203 statute | 65 |
| Exhibit 11 | Complaint - State of Kansas vs. Spiehs | 54 |
| Exhibit 12 | Armbrister's Supplemental Answers to Plaintiff's First Interrogatories | 46 |
| Exhibit 13 | Photograph of wrist compliance maneuver | 142 |
| Exhibit 14 | Training Archive for Jay Armbrister | 194 |
| Exhibit 15 | Officers Summary Report for Jay Armbrister | 194 |


NOTE: Previously marked Plaintiff's Deposition Exhibits 1, 4, and 8 were attached to the original transcript. Plaintiff's Deposition Exhibits 9 through 15 were attached to the original transcript.



(Deposition commenced at 9:03 a.m.)
JAY ARMBRISTER,
being first duly sworn, testified under oath as follows:
EXAMINATION
BY MR. BAKER:
Q. Would you state your name, please.
A. Jay Armbrister.
Q. And have you had a deposition before?
A. I believe I did one probably ten plus years ago.
Q. Good. And today, I don't know -- you're not in uniform, are you?
A. I am in the clothes I normally wear to work every day, yeah.
Q. Okay. Are you on duty right now?
A. I'm on duty 24/7.
Q. All right. And so you're carrying your weapon with you?
A. I am not.
Q. You're not? All right. And as a Sheriff of Douglas County, so -- let me strike that. So are you on duty 24 hours a day?
A. Yes.
Q. So are there some things that you can't



do at all because you're on duty 24 hours a day such as drink alcohol?
A. I'm sorry. Are you asking if I can drink alcohol?
Q. While on duty.
A. Well, the term "duty," on duty is different. I have to be available. So yes, I have to limit my intake of certain things at certain times.
Q. Well, okay. So let's be -- when I said if you're on duty, you said you're on duty 24 hours.
A. Yeah.
Q. That may not be necessarily correct. You're available --
A. Yes.
Q. -- to be on duty?
A. Yes. Thank you for the clarification. You're right.
Q. Okay. So how do you know or when do we know when you're on duty and when you're not on duty?
A. Context, I suppose, is that I'm -- I'm available when needed. I'm available at all times, but I'm on duty when my schedule deems

Page 6

that I need to be on duty, so to speak.
Q. Okay. Let's talk about schedule. So when do you schedule yourself to be on duty?
A. Daylight hours. I mean, I'd say the typical work week for me is 9:00 to 6:00, 9:00 A.M. to 6:00 P.M.
Q. Okay. Monday through Friday?
A. Monday through Friday.
Q. And then would it be fair to say beyond that, you're off duty?
A. Beyond that I'm on call.
Q. Okay. Off duty, but on call?
A. Fair.
Q. Okay. And when you're on duty, I guess you don't normally wear some sort of uniform like you're wearing here today?
A. This is -- this is what I wear every day, something similar.
Q. All right. Would you call that a uniform, someone would recognize that as you being a law enforcement officer?
A. Oh, I wouldn't call this necessarily a uniform, but if somebody is in close proximity, they could probably deduce that I'm a member of the Douglas County -- or a Sheriff's office.

Page 7

Q. Because of --
A. The badge.
Q. -- this --
A. The star on my chest.
Q. -- insignia? Okay.
A. Yes.
Q. Do you actually have a Sheriff's uniform?
A. Yes.
Q. Do you ever wear it?
A. Rarely.
Q. So I guess the answer is when you're on duty, you don't regularly wear a uniform in which a citizen could say that fellow is a deputy or a sheriff, right?
A. That's correct.
Q. Okay. So on April 20th, 2022, you know that date?
A. I do.
Q. Okay. And that's the date that Dr. Spiehs was arrested by you, correct?
A. Correct.
Q. Now, were you there before Dr. Spiehs came into that room?
A. Yes.

Page 8

Q. And where were you when you saw him come into the room?
A. I believe I was standing maybe around the podium area. I was not sitting and I was not up at the dais, but I was somewhere in the room. I believe I was standing, but I don't recall for sure.
Q. And the dais and the podium, they're up front?
A. Yes.
Q. Okay. And so when you saw him, what did you see?
A. I saw Dr. Spiehs.
Q. Did you see anything else?
A. I saw he was carrying a sign.
Q. All right. And did you see what the sign said?
A. Eventually, once I -- the position was -- I was able to read it, yes.
Q. All right. Now, and then what did Dr. Spiehs -- when he entered the room, where did he go?
A. He proceeded straight up to, I believe, the dais or at least next to the podium to sign in for public comment.

Page 9

Q. All right. And what did you do?
A. I approached him.
Q. Okay. And why did you do that?
A. I wished to have a brief interaction with him, to talk to him about his sign.
Q. Why?
A. I believed there was something he needed to be concerned about with his sign.
Q. What was that?
A. Information had been relayed to me that -- through the county administrator's office that YouTube was threatening to shut down the channel due to the vulgarity on his signs or other signs that were being displayed, and I thought he would want to know that.
Q. Okay. Why did you think it was your job to tell him that?
A. I believed that I was doing him a favor by giving him a heads-up, which is not the first time I've done that in my career.
Q. Well, if -- what, was he under some sort of jeopardy of committing a crime or being ejected out of the room by having that sign?
A. No.
Q. Well, then --

Page 10

A. Not by me. I apologize. Not by me.
Q. But from someone else?
A. I believe that there was a circumstance that could pose that issue for him.
Q. Just the mere fact that he carried that sign in?
A. Based on information that I had, I believed that he would want to know that.
Q. And who relayed that to you about YouTube and signs and vulgarity?
A. I don't recall specifically, but it was somebody out of the county administrator's office.
Q. Let's expand that. Who could it have been?
A. It could have been County Administrator Plinsky. It could have been Associate County Administrator -- I don't remember her title -- Jill Joliceur. It could have been the PIO, Karrey Britt. I don't recall.
Q. But why would they be telling you that? What concern of a Douglas County Sheriff would it be as to a meeting and YouTube?
A. They were letting me know -- whoever it was, letting me know that their YouTube is under

Page 11

threat of being shut down.
Q. Why would that be of concern to the Douglas County Sheriff's Office?
A. I'm an elected official for Douglas County. That's relevant information for any elected official.
Q. As to what YouTube wants to do with its livestreaming?
A. Yes.
Q. Okay. Well, so tell me verbatim, if you can recall, what it is that you actually said to Dr. Spiehs when you went up to, I guess, where the podium was where he was signing in?
A. To the best of my recollection, I said something like they're not going to let you show your sign, or something to that effect.
Q. All right. Now, when you say "something to that effect," you're not remembering verbatim, are you?
A. I am not.
Q. You're kind of paraphrasing in your own language as to what you -- the gist of what was said?
A. I believe it was something very similar to that, but you're correct. It could be

Page 12

paraphrased into something similar or to that effect.
Q. Right. So any time you say "something to the effect," you're not quoting, you're not claiming to remember exact verbiage, correct?
A. Correct.
Q. And you said something to the effect that they aren't going to let you have that sign in here?
A. That's correct.
Q. And the "they" being who?
A. The County Commission.
Q. And did you say why?
A. He -- as I recall, he said something like "Why." And I said, "Because of the language on your sign," I believe is what I said, or something to that effect.
Q. All right. And what do you remember him saying in response to that?
A. Something to the effect of "These are my words, you can't sensor me," or "It's my First Amendment right," or something to that effect.
Q. Do you know if he was correct?
MR. HOLDER: Object to form.

Page 13

MS. STEWART: Join.
MR. HOLDER: Go ahead.
A. I don't think I'm in a position to litigate whether that is correct or not.
BY MR. BAKER:
Q. Okay. Well, did you have an opinion at the time as to whether or not he had a First Amendment right to bring that sign in and display it?
A. No.
Q. Do you have one today?
A. No.
Q. So anything else you can remember in that conversation between you and Dr. Spiehs at that moment?
A. No.
Q. And so what did you do after that?
A. I turned on my heel and went and sat down in my seat.
Q. You sure you didn't go up and talk to the Commissioner?
A. At some point I spoke with him. Whether that was before Dr. Spiehs entered the room or after, and -- but you're correct in that I did have a conversation with one, if not two

Page 14

of the Commissioners.
Q. Right. My question is specific. Do you -- could it have been that after that conversation with Dr. Spiehs, you went immediately to the dais where the Commissioners were?
A. Yes.
Q. That is possible?
A. Yes.
Q. Okay. And what was that conversation?
A. I believe it -- sorry. I said, "We're not throwing anybody out because of a sign," or something to that effect, and that they would have to let us know if they want somebody removed, period.
Q. And so why did you say that they'd have to let you know to have somebody thrown out?
A. Because -- because I'm not in a position to litigate whether or not that sign was a violation of First Amendment free speech or of the YouTube agreement, or whatever it is that they were concerned with.
Q. Okay. But if they wanted that sign out, they'd have to tell you?
A. If they wanted an individual removed,

Page 15

they would have to tell me.
Q. And if they wanted an individual removed because of that sign, they'd have to tell you?
A. Yes.
Q. Okay. And is that part of your law enforcement obligation at those meetings?
A. To maintain the peace, that is part of my statutory oath.
Q. Whether or not the Commission wants a person removed because of a sign, you think that is a safety concern?
A. I think that it is a peaceful -- a public peace issue in keeping the peace.
Q. Well, how -- well, help me. How was he disturbing the peace by simply sitting in the chair holding a sign, if at all?
A. He was not.
Q. Well, so then his response to you was what? He wasn't going to leave?
A. I've -- asked and answered.
Q. Well, your attorneys have to make objections, not you.
A. Well, I'm telling you, you've asked and I've answered it.

Page 16

Q. Yeah, but go ahead and answer my question.
A. Okay. He said, "Why?" I explained why, and he said it was his First Amendment right or something to that effect.
Q. Anything else?
A. Not that I recall.
Q. And from his response, what did you take from it? Was he leaving?
A. No.
Q. Did he take the sign out and come back?
A. He did not.
Q. Okay. Then you -- your deputies have, what, walkie-talkies? What do you call those?
A. Portable radio.
Q. Portable radio, okay. Did you have one of those on you?
A. I did not.
Q. When you saw that Dr. Spiehs was there and he had that sign, did you think he was in violation of the Commissioners' rules at that point or was going to be in violation of the Commissioners' rules at that point?
A. I can't speak to whether or not they thought he was against the rules, or his sign.

Page 17

Q. Well, you were sure that they didn't want that sign in there, correct?
A. I believed I had information that Justin or Dr. Spiehs would appreciate knowing about his sign.
Q. That the Commissioners didn't want that sign in there?
MS. STEWART: Object to the form. Misstates his testimony. You can answer.
MR. HOLDER: Go ahead. You can answer. You're good.
THE WITNESS: Could you repeat your question? I'm sorry.
MR. BAKER: Sharon?
(The following questions and answer were read by the reporter:
"QUESTION: Well, you were sure that they didn't want that sign in there, correct?
"ANSWER: I believed I had information that Justin or Dr. Spiehs would appreciate knowing about his sign.
"QUESTION: That the Commissioners didn't want that sign in there?")
A. Yes.

Page 18

BY MR. BAKER:
Q. So whether that comes from a rule or something, we know bottom line you understood the Commissioners didn't want his sign in that meeting, correct?
MS. STEWART: Object to the form.
MR. HOLDER: Go ahead.
A. I understood that the Commissioners were going to have an issue with the sign, yes, sir.
BY MR. BAKER:
Q. And that issue was what?
A. That it was going to violate the terms of the YouTube livestream and could threaten the channel.
Q. And because of that, what might happen to Dr. Spiehs?
MS. STEWART: Object to form.
MR. HOLDER: Join. Go ahead.
A. I'm not sure I want to speculate on what could happen to him.
BY MR. BAKER:
Q. Well, you said you were doing a favor. Why would he be concerned about whether or not YouTube cares about what he's got on his sign?

Page 19

A. Are you asking me if Dr. Spiehs cares about whether or not the county's YouTube is active?
Q. Yes. You're the one that said you were doing him a favor, right?
A. It has become -- it had become clear at that point that Dr. Spiehs very much wanted the Douglas County Commission's Zoom and YouTube link to be active.
Q. So what?
A. Is there a question there? I'm sorry.
MS. STEWART: Object to form.
BY MR. BAKER:
Q. Sure. Connect the dots for me. Why is that relevant to anything?
MS. STEWART: Object to the form.
A. I don't understand the question.
BY MR. BAKER:
Q. Okay. You say that you understood at that time that Dr. Spiehs wanted his sign to be displayed on YouTube at that meeting, correct?
A. That is my opinion.
Q. And because of that, at least you went up and said to him something to the effect of the Commissioners are going to have an issue

Page 20

with that sign being displayed on YouTube?
A. You're right.
Q. Okay. And so what -- beyond that, the issue that the Commissioners had, what might that entail when you said that to him?
A. I'm not going to --
MS. STEWART: Objection. Asked and answered. Go ahead.
A. I'm not going to speculate as to what might have happened.
BY MR. BAKER:
Q. No, what you were thinking. What did you think would happen if Dr. Spiehs displayed that sign at that meeting?
A. I didn't know what was going to happen. I thought Justin would like to have this information.
Q. Did you think he needed the information because he might get kicked out?
MS. STEWART: Object to the form.
A. I didn't know what was going to happen.
BY MR. BAKER:
Q. Well, I'm asking about that question. Did you think, because you'd given him the courtesy, that one of the things that might

Page 21

happen if he displayed that sign was he was going to get kicked out of the meeting?
A. What I thought was probably going to happen is that they were going to ask him to not display his sign where the cameras could see it.
Q. All right. Now, I may ask that question, but my question is different. Was one of the things that you thought that might happen when you told him was that he might get kicked out because of that sign?
A. No.
MS. STEWART: Object to form.
BY MR. BAKER:
Q. Okay. Did you think one of the things that might happen is that they wouldn't let him make public comments?
A. No.
Q. So when you realized that Dr. Spiehs wasn't leaving and was sitting up front with that sign, did you contact any of your other deputies?
A. No.
Q. When you went to that meeting on April 20th, 2022, you were there because you anticipated problems at this public meeting;

Page 22

isn't that right?
MR. HOLDER: Object to form.
MS. STEWART: Join.
MR. HOLDER: Go ahead.
A. I anticipated a large crowd.
BY MR. BAKER:
Q. Could that be problematic?
MS. STEWART: Object to the form.
A. Speculation, but it could be, yes.
BY MR. BAKER:
Q. I'm asking what you thought at the time.
A. It could be, yes.
Q. Okay. So one of the reasons you were there, what you were thinking was it could be problematic because of the number of people at that meeting?
A. I was there because it was a hot button issue of solar energy and I wanted to be informed on what was going on. I knew that would draw a large crowd, which at times can be contentious, but I was not there for security reasons due to safety concerns.
Q. Were you there just to be a citizen to get informed?

Page 23

A. I was there as the Sheriff --
Q. Oh.
A. -- to be informed.
Q. I'm a little bit confused now. You were there as a Sheriff, but not to make sure there weren't any safety concerns?
A. That's correct.
Q. And what -- you said problematic. What kind of problems could have arisen at that meeting that you might have anticipated?
A. I'm sorry. In what context did I say problematic?
Q. You said here today it could be problematic due to the number of people at that meeting.
A. Okay. I just know that there had been high emotions surrounding this issue itself.
Q. And how would that be problematic?
A. Well, people with high emotions have a tendency to become emotional or upset, and I wanted to make sure that I understood all sides of the argument.
Q. Well, how would people getting emotional be problematic? What was your thought process?

Page 24

A. Well, I don't know that I had a thought process.
Q. Was there any other problems other than people getting emotional that you anticipated at that meeting?
A. No.
Q. So you didn't anticipate people standing up and shouting at each other or anything like that?
A. I didn't know what to expect.
Q. Now, on April 20th, 2022, you don't need the Commissioners' permission to arrest someone in that meeting for a violation -- or for committing a crime, correct?
A. That's correct.
Q. And you'd do that on your own, correct?
A. That's correct.
Q. But when you talked about things being problematic or problems at that meeting, there could have been other problems that did not constitute a crime on that date, correct?
MS. STEWART: Object to the form.
MR. HOLDER: Join. Go ahead.
A. So I understand your question, did I anticipate other problems within that meeting

Page 25

that did not constitute a criminal arrest; is that correct?
BY MR. BAKER:
Q. A crime.
A. A crime?
Q. A crime being committed, yes.
A. Did I anticipate problems outside of a crime? I have spent my career anticipating problems everywhere I go outside of a crime.
Q. And you've already identified one. You said people were going to get emotional. That was a problem, correct?
A. Correct.
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. So what was your understanding -- if the Commissioners did inform you that they wanted an individual removed, what would be your response?
A. That we would -- that the individual would be asked to leave the meeting.
Q. By who?
A. First by the Commissioners.
Q. Okay. Then what?
A. Then they would ask us to have the

Page 26

person -- we would ask them again to leave.
Q. Now, who is "us"?
A. The Sheriff's Office, sorry.
Q. Your deputies there, correct?
A. Yes.
Q. And when you say "ask," is that a suggestion or is that a command?
A. It's a -- it's an ask.
Q. So they --
A. We're asking you to leave.
Q. Right. But they don't have to do that, right, because you're just asking?
A. They have the right to refuse to leave.
Q. Right. But you're not ordering them to leave when you say "ask," correct?
A. I'm not ordering them to leave when we ask them, no.
Q. All right. So how would you phrase moving from a question to an order regarding someone leaving?
A. Well, it would go something like we're asking you to leave. And then if they refuse, then we would say we are telling you you must leave.
Q. All right. And same with the

Page 27

Commission, when they say we're asking --
A. Uh-huh.
Q. -- that's another suggestion, but not a command, correct?
A. That would be my opinion, yes.
Q. Okay. So what if the Commission then said we're telling that person to leave, what would be the Sheriff's Department response in that event?
A. We would start with asking them to leave.
Q. And then do what after that?
A. Then we would tell them that they have to leave.
Q. And if they didn't leave?
A. Then they would leave with us.
Q. Why?
A. They've been given a lawful command.
Q. By?
A. Douglas County Sheriff's Office.
Q. And even if no crime has been committed, correct?
A. That's correct.
Q. And you think that you can just give lawful commands to people at a Commissioners

Page 28

meeting to leave even when no crime has been committed?
A. In April of 2022, that was my belief, yes.
Q. Well, what's your belief today?
A. I believe it's more nuanced than that.
Q. Well, tell me the nuance.
A. I don't think everything is black and right, and I'm not going to sit here and litigate a host of possibilities or hypotheticals.
Q. Well, but you said your understanding has changed, so I'm asking that you tell me how it's changed from what you understood back then to what it is now.
A. Well, I think that, as we've seen different examples and we've learned different things, that it doesn't always require an arrest or removal, but sometimes it does. And in this case, this example that you're providing me with -- strike that. End of my answer.
Q. Well, I think you said that you had an understanding back on April 20th, 2022 that you could just tell people to leave and they had to leave, correct?

Page 29

A. Correct.
Q. Now you're saying that in 2025, the date of this deposition, you have a different understanding, correct?
A. I'm saying that there are more options available to us.
Q. It's a different understanding, though, correct?
A. Yes.
Q. Well, let's ask it this way. Do you still think that you have the authority to tell a person to leave a Commissioners meeting when no crime has been committed?
A. Yes.
Q. And if they don't leave, they have to leave because you told them to?
A. Yes.
Q. Well, how is that different than what you had an understanding on April 20th of 2022?
A. Because I believe there are options available to us leading up to that point.
Q. Okay. Well, so if you told me to leave this meeting room today and I didn't want to, you think you have the authority to make me get out of this room?

Page 30

A. That's not what I'm saying at all.
Q. Well, wouldn't it be a lawful order?
A. I am not telling -- if Stevens & Brand says that we want this individual removed --
Q. Oh.
A. -- then yes --
Q. Okay.
A. -- I do believe I have that authority.
Q. All right. And the same would be on public property, same equation, thought process for you, correct?
A. Public property --
MS. STEWART: Object to the form.
A. Public property is different.
BY MR. BAKER:
Q. Ah. How is it different?
A. Because it's public property.
Q. Well, how is public property different than private property?
MS. STEWART: Object to the form.
MR. HOLDER: Join. Go ahead.
A. How is public property and private property different?
BY MR. BAKER:
Q. Yeah.

Page 31

A. They're spelled differently. They are inherently different things.
Q. Well, so if a private owner said for somebody to get out and they didn't get out, you could give a lawful order and they'd have to get out, right?
A. Yes.
Q. Does that equation work on public property?
A. In some circumstances, yes.
Q. Well, tell me those circumstances.
A. Limited public forums.
Q. Okay. Explain.
A. During a limited public forum, while it may be taking place on public property, authority is granted to remove somebody from that event or gathering, or whatever it is, based on the authority granted -- that's not the right word. Authority is granted -- is -- I'm not answering this correctly. Authority exists to remove somebody from a limited public forum.
Q. For who to remove someone from a limited --
A. Law enforcement.
Q. Law enforcement?

Page 32

A. Correct.
Q. And that's even when a crime has not been committed?
A. That is my opinion, yes.
Q. Okay. And in that circumstance, you're merely enforcing whatever the Commissioners want to happen, correct?
A. It is their limited public forum, yes.
Q. All right. But again, you're taking instructions or directives from the Commission as to removing someone from that limited public forum, correct?
A. Correct.
MS. STEWART: Object to the form.
A. Sorry. Correct.
MS. STEWART: You're fine.
BY MR. BAKER:
Q. Now, and that's what you thought you might be doing back on April 20th of 2022?
A. Yes.
MS. STEWART: Object to the form.
THE WITNESS: Sorry.
BY MR. BAKER:
Q. So I think -- is it a fair statement that you told Dr. Spiehs the Commissioners would not let Dr. Spiehs display his sign during the meeting?

Page 33

A. Is that my recollection? Yes.
Q. Okay. And what was your understanding as to how the Commission was not going to let Dr. Spiehs display his sign?
A. I didn't have an understanding of what was going to happen.
Q. Did you think you might be part of that exercise of which the Commission said you can't have that sign in this meeting?
MS. STEWART: Object to the form.
MR. HOLDER: Join. Go ahead.
A. I believe -- I believe there was potential for me to be -- me, not me necessarily, but the Sheriff's Office to be involved if the sign was refused to be removed.
BY MR. BAKER:
Q. So telling Dr. Spiehs about the Commissioners' directive about his sign had what to do with your official duties as a Sheriff of Douglas County?
A. Nothing.
Q. And when you did confront Dr. Spiehs on April 20th, '22, you weren't in uniform,

Page 34

correct?
A. When you say "confront," what are you referring to?
Q. The conversation that you had.
A. The first conversation?
Q. Yes.
A. Because there are two separate incidents that occurred on this date.
Q. That's correct.
A. You're talking about the first one? I was not in uniform, correct.
Q. Well, and you weren't in uniform at all on April 20th, '22?
A. Correct.
Q. Okay.
A. Yeah, if I'd had a safety concern, I would have showed up with handcuffs and gun and a uniform.
Q. And so you weren't wearing a badge that could be seen, correct?
A. Correct.
Q. So under what authority are you claiming that you had in telling Dr. Spiehs the Commissioners were not going to permit his sign to be displayed at that meeting?

Page 35

A. Under what authority? Me trying to be helpful.
Q. Just you, your authority?
A. Yeah.
Q. Not the authority of the Sheriff's Department, right?
A. No.
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. You agree with me?
A. Agree with you about what?
Q. You weren't going to Dr. Spiehs -- when you told him about the sign, you weren't doing that as your authority as a Sheriff of Douglas County, correct?
A. Well, I think that would be a question for Dr. Spiehs to answer, whether or not he thought I was there in my personal or professional standard.
Q. Well, I'm asking what you thought.
A. I thought he would -- he would just know that I am the Sheriff, but I'm also a guy who had tried to help him in the past and I'm just trying --
Q. Yeah, I'm asking -- I'm sorry. I'm

Page 36

asking a different question. I'm asking if you --
MR. HOLDER: Well, I think he was answering. I don't think he got to finish his answer.
BY MR. BAKER:
Q. What do you want to say?
A. Well, I've lost my fucking train of thought here, so ...
Q. All right. When you told him the first time, did you think you were doing that under the authority as a Douglas County Sheriff?
A. I had -- I had no inclination of whether or not I was acting in a personal or professional. I was simply approaching Dr. Spiehs to give him information I thought he would want.
Q. Well, I'm still entitled to the answer as to what you thought.
A. I didn't have a thought.
Q. Today do you think you were acting under the authority of the Douglas County Sheriff's Office?
A. Today I think -- I still think I was acting under the authority of a guy who wanted

Page 37

to tell another guy information I thought he wanted.
MR. BAKER: Object to that as nonresponsive.
BY MR. BAKER:
Q. I'm not asking about that. I'm asking specifically if you thought you were acting under the authority of the Douglas County Sheriff's Office when you confronted Dr. Spiehs that first time?
MS. STEWART: Object to the form. Asked and answered. Go ahead.
A. And I'm saying that was not a thought I had.
BY MR. BAKER:
Q. Okay. So the answer is no, you didn't think that, did you?
A. I'm not giving you that answer.
Q. Well, I want an answer.
A. My answer is that I did not have a thought as to whether or not this interaction was going to be under the umbrella of a Sheriff or of a guy named Jay.
Q. All right. And so it could have been either way, you could have been acting just as

Page 38

an individual or you could have been acting under your authority as a Douglas County Sheriff's Office?
MS. STEWART: Object to the form.
MR. HOLDER: Object to form.
A. I don't understand how I can answer that question.
BY MR. BAKER:
Q. Do you have any facts to say that it's untrue that you were acting as a Douglas County Sheriff on April 20th, 2022?
A. Any --
MS. STEWART: Object to the form.
MR. HOLDER: Join.
MS. STEWART: Go ahead.
A. Confusing, how is that? Did I have any facts to show that I was not operating as the Sheriff in that instance, is that your question?
BY MR. BAKER:
Q. (Nods head up and down.)
A. You're nodding your head yes. I don't understand that -- I don't believe that I can even present facts one way or the other.
Q. Well, you say -- you say that you just went up to Dr. Spiehs, and I'll use my phrase,

Page 39

as a "good old boy," I'm just going to try to help Dr. Spiehs out and let you know, you may get in harm's way with that sign with these Commissioners --
MR. HOLDER: Object to form.
BY MR. BAKER:
Q. -- is that a fair statement?
MS. STEWART: Object to the form.
A. I believe that Dr. Spiehs' perception of what I'm saying decides whether or not he feels I was acting in a professional manner or in a personal manner.
MR. BAKER: Well, object as nonresponsive.
BY MR. BAKER:
Q. So let's ask it this way. Did you intend that Dr. Spiehs would perceive you as a Douglas County Sheriff when you first talked to him on April 20th, 2022?
A. I had --
MS. STEWART: Object to the form.
MR. HOLDER: You're fine.
A. I had no intentions to -- as to what his perceptions would be.
BY MR. BAKER:

Page 40

Q. As to whether or not you were acting as a law enforcement, correct?
A. Correct.
Q. All right. And you could have been acting as law enforcement that day when you talked to him or you may have been just simply talking to him as an individual distinct from law enforcement, correct?
A. That would be his decision or his perception to decide.
Q. I'm talking about your intent.
A. And I'm telling you that I had no intent.
Q. All right. So you didn't identify yourself to Dr. Spiehs as a Douglas County Sheriff, did you?
A. No.
Q. The message that you conveyed, it was on behalf of the Commissioners to Dr. Spiehs?
MS. STEWART: Object to the form.
MR. HOLDER: You're fine.
A. No.
BY MR. BAKER:
Q. Was it part of your police work?
A. No.

Page 41

Q. And he wasn't breaking any laws by bringing that sign into that room, was he, on April 20th, 2022?
A. No.
Q. You agree with me?
A. I just did, yeah.
Q. Well, sometimes when you say "no," it could mean you disagree or you agree, so ...
A. Fair.
Q. Okay. Now, when you told Dr. Spiehs about the Commissioners' feelings about his sign, that was before the meeting started?
MS. STEWART: Object to the form.
MR. HOLDER: Join. Go ahead.
A. Yes.
BY MR. BAKER:
Q. What time was the meeting supposed to start on April 20th, 2022?
A. They call it the 5:30 meeting, so my -- and historically, I believe it's always started at 5:30.
Q. Okay. And I meant to say if you need to take a break --
A. No, I'm doing good. Thank you.
MS. STEWART: I actually do need

to take a break, if you're offering.
MR. BAKER: I'm offering. We'll take a break right now.
MR. HOLDER: I wouldn't mind.
(A recess was taken.)
BY MR. BAKER:
Q. All right. We're back from the break. Mr. Armbrister, you said you had prior interactions with Dr. Spiehs prior to April 20th, 2022; is that correct?
A. I believe it was prior to that date, yes.
Q. And what would those prior interactions be?
A. We had had some passing contact through various other meetings and whatnot, but there was one specific incident where I actually sought him out to try to assist him in a matter that I thought he would be appreciative of.
Q. Now, you used the plural "we." Are you talking about you?
A. I'm sorry. "We" as in Dr. Spiehs and I.
Q. Okay. And this -- you say passing contact. You had some actual conversation with



Dr. Spiehs?
A. I don't know -- during those, I don't know that he and I ever actually spoke. I don't recall specifically ever speaking with him prior to.
Q. April 20th?
A. No, prior to me contacting him in a more personal fashion.
Q. What would be the date of that interaction?
A. I don't know. I was thinking it was within the first year of my term, so I was thinking it was in 2021 somewhere.
Q. And you think -- but this interaction, you say you didn't have a conversation with him?
A. I did, but in the other passing ones where -- at various meetings and stuff, he and I had not, to my recollection, had conversations.
Q. And you're not counting that as prior interactions, are you?
A. I'm only counting the one incident where he and I actually spoke, but all others, I am not.
Q. Okay. So sometime you had this prior interaction and you can't remember what it was



about or what the matter was?
MS. STEWART: Object to the form. Misstates his testimony. You can answer.
A. I absolutely recall what that one was.
BY MR. BAKER:
Q. Go ahead.
A. A tag repossession came through the Sheriff's Office. And what happens is, is when somebody writes a bad check for their registration, we get a letter saying we need you to go to this address, look for this tag on this vehicle and take it off that car.
Q. And so how did you have a --
A. I'm not done answering the question.
MS. STEWART: Yeah, let him finish.
A. It came up for Dr. Justin Spiehs on a vehicle that was registered to him that a check had been written that did mot have sufficient funds to cover it. So I went to where I thought I could find Dr. Spiehs -- and I did -- and I gave him a heads-up, saying hey, this came up. We're not going to come and take your tag if you can come in and get it taken care of.
I'm not done. He was thankful but



defiant in that moment, but did come up and take care of that. And he made some statements to me about family issues and whose car it was and what was going on. That was the extent of that conversation.
BY MR. BAKER:
Q. Can you document the date of that?
A. No, I don't remember what day it was.
Q. It could have been in October of 2022, couldn't it?
MS. STEWART: Object to the form.
A. I'm not going to disagree with that, that it could have been.
BY MR. BAKER:
Q. Yeah. That would have been after April 20th, 2022?
A. Okay. Well, if you say that's what it was. I trust Dr. Spiehs on that.
Q. Well, that wouldn't be a prior interaction, would it?
A. Then I misspoke. We had that interaction afterwards then.
Q. Okay. So there wouldn't be any prior interactions?
A. That would --

Page 46

MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. Agree.
BY MR. BAKER:
Q. Okay. And then you were wearing a mask April 20th, 2022, correct?
A. Yeah.
Q. So let me hand you Exhibit 12. And you recognize that as your answers to interrogatories?
A. I believe that is, yes.
MS. STEWART: Is that the original or the supplemental?
MR. HOLDER: Supplemental.
MS. STEWART: Okay.
BY MR. BAKER:
Q. And these answers, they're true?
A. To the best of my knowledge, yes.
Q. Now, Exhibit 12, page 1, if you look at the last paragraph and the sentence that says "Before the meeting."
A. The sentence that says "Before the meeting." Okay.
Q. Would you read that out loud, please?
A. "Before the meeting, Sheriff Armbrister

Page 47

told Commissioner Shannon Reid, and possibly Commissioner Shannon Portillo, that if there was a problem and the Commission wanted someone removed, they needed to let him know, because he was not going to do it on his own."
Q. And so that conversation was the one you were talking about when you went up to the dais that we've already talked about, correct?
A. The dais, yes.
Q. Yes. And that was before the meeting started?
A. Yes.
Q. And this was after you told Dr. Spiehs about the Commissioners not letting his sign into the meeting?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I don't recall if it was before or after, but it was before the meeting. And if -- if there was -- if somebody said that it happened after I spoke with Justin, I would not disagree with that.
BY MR. BAKER:
Q. But you're actually holding the possibility that you could have had this

Page 48

conversation first and then went and talked to Dr. Spiehs about the sign?
A. I am holding that possibility, yes.
Q. Then if you look at page 2 of your answer, if you look at the third down, RFA 22.
A. Uh-huh.
Q. Do you see that?
A. I do.
Q. Would you read that, please, out loud?
A. "Sheriff Armbrister told Plaintiff the BOCC would not let him display his sign during the meeting because it contained vulgarity but did not say the sign was not allowed."
Q. When you say "display," display how?
A. In this context, I meant being displayed on the camera on the YouTube channel.
Q. And how would he have displayed it in that fashion?
A. He would like to set his sign in front of him against the railing. Now, this -- I don't recall if this happened at a meeting previous to the 20th or after, but he would also carry his sign to the podium to where it was in view of the camera.
Q. All right. So it wasn't that -- your

Page 49

understanding that he couldn't bring his sign into the meeting, correct?
A. Correct.
Q. The issue was they'd let him have the sign, they just didn't want that sign to be seen by YouTube, correct?
A. Yeah.
Q. And, of course, when he came in, he didn't have the sign in a bag, did he?
A. No.
Q. I mean, he was already displaying it when he walked in, correct?
A. Yes.
Q. You're trained to recognize when a crime is committed under Kansas statute?
MS. STEWART: Object to the form. Go ahead.
A. I don't think I could be trained to recognize every crime in the statute book.
BY MR. BAKER:
Q. Okay. How about any crime, are you trained to recognize any crime --
A. I am.
Q. -- under -- okay. Thank you.
And are you familiar with the phrase

Page 50

"actus reus"?
A. No.
Q. Okay. Do you understand the concept that crimes in Kansas have elements that have to be completed before a crime is committed?
A. Yes.
Q. So would it be fair to say sometimes there has to be a physical act?
MS. STEWART: Object to the form, vague.
MR. HOLDER: You're fine.
A. Sometimes, yes.
BY MR. BAKER:
Q. They have to do something, correct?
A. Sometimes, yes.
Q. Okay. And then sometimes they have to think something while they're doing something, correct?
A. I don't believe that I can criminalize thoughts.
Q. Well, they have to have a state of mind such as we intend to break into the house, for example, right?
A. I don't believe intent is proven through somebody's thoughts so much as the facts

Page 51

of a case.
Q. Do you have an understanding that some crimes in Kansas involve a mental state or an intent in order to be committed?
A. Are you asking if mental state and intent are the same or are those two separate things?
Q. No, I'm not even asking that.
A. Then ask the question again, please.
Q. Thank you.
MR. BAKER: Would you re-ask it, please?
The following question was read by the reporter:
"QUESTION: Do you have an understanding that some crimes in Kansas involve a mental state or an intent in order to be committed?")
A. That sounds like the "or" in between those means that they can be the same thing, intent or mental state.
BY MR. BAKER:
Q. No, it means they could be different. You could have a mental state or an intent.
A. I understand that intent is very

Page 52

paramount within criminal statutes.
Q. Okay. So let me just ask it again. You're familiar with the fact that Kansas statutes, an element of a crime could involve the mental -- intent; is that a fair statement?
A. Yes.
Q. And intent is a mental state, correct?
MS. STEWART: Object to the form.
MR. HOLDER: Join. Go ahead.
A. I don't think I agree with that.
BY MR. BAKER:
Q. Okay. And then there is -- are you familiar with the concept of concurrence?
A. Concurrence, yes.
Q. So that a crime in Kansas, you have to perhaps do a physical act, then there has to be intent, and those have to concur somewhere in a similar point in time --
MR. HOLDER: Object to --
BY MR. BAKER:
Q. -- for a crime to be committed?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I feel like that's a confusing question.

Page 53

BY MR. BAKER:
Q. Let me ask it this way. Do you agree with this statement, that concurrence element of a Kansas crime sometimes requires the actus reus and mens rea to occur at the same time or concurrently?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I don't know what -- I'm sorry.
MR. HOLDER: You're fine.
A. I don't know what "actus reus" and "mens rea" mean.
BY MR. BAKER:
Q. Okay. Let me ask it this way. Do you agree with this statement: The concurrence element requires the physical act and the intent of the individual to occur at the same time or concurrently?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I still don't really understand the question. Is intent and an act must occur together or in concurrence in some criminal statutes? I don't -- is there another way you can ask this question where it would be more

Page 54

clear?
BY MR. BAKER:
Q. We'll talk about disorderly conduct, all right?
A. Okay.
Q. Did you make a determination on April 20th, 2022, while waiting for the Douglas County Commission's meeting to begin that Dr. Justin Spiehs committed a crime under Kansas statute on that date?
A. Yes.
Q. What was the crime you claim Dr. Spiehs committed on April 20th, 2022?
A. Disorderly conduct.
Q. So I'm handing you Exhibit 11.
A. Are you done with this one?
Q. No, maybe not. Just leave it. Just keep it with you.
A. Okay. Got it. Okay.
Q. You're familiar what Exhibit 11 is?
A. This is, I believe, a document prepared by the District Attorney's office.
Q. And in Exhibit 11, this says the alleged crime was a violation of K.S.A. 21-6203(a)(2). Do you see that?

Page 55

MS. MILLER: There's the statute.
A. Okay. Thank you. (a)(2), yes, I do see that.
BY MR. BAKER:
Q. Let me -- I'm really going to object to counsel handing you documents --
A. Okay.
Q. -- during this deposition. We call that coaching and interfering.
A. Okay.
Q. So if you want to take that back, I don't --
A. I've got my own copy, thank you.
Q. Oh, you're going to pull out your own statute now?
A. Yeah, I've got a copy of it.
Q. What other documents do you have in that little book?
A. Oh, let's see, here's a thing about my boat property tax. Here's a speech I gave at an awards assembly. This is a list of mental health conditions that I learned about, some notes I took. Oh, here's one of my favorite Tyler Childers quotes from a song.
Q. So the only thing in that book that you

Page 56

had relevant, you think, to this deposition was a statute you want to pull out?
A. Yeah.
Q. All right. Now, Exhibit 11, it says alleged crime was a violation of K.S.A. 21-6203(a)(2). And you agree?
A. That's what it says, correct.
Q. Do you agree that was the crime that was committed?
A. I do not agree.
MS. STEWART: And I'm sorry. Mr. Baker, can you tell me what the title of Document 11 is just so I can pull it up on my screen? I'm sorry.
THE WITNESS: It's the DA's complaint affidavit filed in court.
MR. BAKER: Dated May 9th, 2022.
MS. STEWART: Okay.
BY MR. BAKER:
Q. So would you read out loud Count 1?
A. "That on or about the 20th day of April, 2022, in Douglas County, Kansas, one Justin P. Spiehs, did then there" -- "then and there unlawfully commit an act that Justin P. Spiehs knows or should know will alarm, anger or

Page 57

disturb others or provoke an assault or other breach of the peace, to-wit: disturb an assembly, meeting, or procession, not unlawful in its character, all in violation of K.S.A. 21-6203 (a)(2)."
Q. Okay.
A. In parentheses, "Disorderly Conduct, Class C Misdemeanor."
Q. And having read that, you disagree that that is the crime that you claim Dr. Spiehs committed on April 20th, 2022?
A. This subsection is not the subsection for which he was arrested for.
Q. I'm asking about a crime.
A. This subsection is not the subsection of the crime that he was arrested for.
Q. All right. Well, I'm asking as to the crime. The crime that is alleged in Count 1, is that a correct statement of the crime that you claim Dr. Spiehs committed on April 20th, 2022, yes or no?
A. That's not a yes-or-no answer, question.
Q. It is. Did he commit this crime on April 20th, 2022, according to you?

Page 58

A. In the parentheses is the word "Disorderly Conduct Class C Misdemeanor." To that I say yes.
Q. But the narrative, you don't think that was a crime he committed on that date?
A. The subsections of that particular criminal statute that are listed in this exhibit are not the ones that he was arrested for.
Q. All right. So what you're claiming is the narrative and the citation to the statute are not the right ones, correct?
MS. STEWART: Object to the form.
MR. HOLDER: You're good.
A. I'm saying that they charged him under the wrong statute subsection in my opinion.
BY MR. BAKER:
Q. All right. As to the narrative?
A. The narrative of this document?
Q. Yes.
A. Okay.
Q. What they describe, putting aside the citation to the statute. You understand so far?
A. You're asking me if I agree with the wording listed above the statute number?
Q. Yes.

Page 59

A. I do not.
Q. Okay. So forget about the citation to the statute. Let's just look at what the prosecutor narrates as the crime. You follow me so far?
A. Yeah.
Q. Okay. And that narration, and I want to -- and my question is do you agree that that is a crime that is cited in the narrative?
A. I agree that they cited a crime in this narrative.
Q. Okay. Thank you. Is that the crime cited in the narrative that you claim Dr. Spiehs committed on April 20th, 2022?
A. No.
Q. Okay. Thank you. You claim that Dr. Spiehs committed a different crime on April 20th, 2022, other than the one described in the narrative in Exhibit 11; isn't that correct?
A. What I'm saying is that he committed a crime under the disorderly conduct statute, but under a different subsection, not the one listed in this so-called, quote, unquote, narrative, as you call it.
Q. Okay. In your opinion, did Dr. Spiehs

Page 60

know or should have known that what he did would alarm, anger or disturb others or provoke an assault or other breach of the peace on that day?
A. Do I think that he should have known? I don't think that's a question for me to answer on what he should or should not know.
Q. Well, this says knows or should have known.
A. I would -- this is not something I wrote or something that I'm willing to stand behind.
Q. Did Dr. Spiehs do anything on April 20th, 2022 to alarm, anger or disturb others or provoke an assault or other breach of the peace?
A. He committed a crime that I believe fell under a different subsection that does talk about alarm and anger and resentment.
Q. Well, I'm not talking about another statute.
A. Okay.
Q. I'm talking about this.
A. Okay.
Q. I'm just talking about this action.
A. Sure.

Page 61

Q. Did he do -- in your opinion, did he do anything that would alarm, anger or disturb others or provoke an assault or other breach of the peace on April 20th, 2022, in your opinion?
A. He did -- he committed acts that breached part of that.
Q. What parts did he not commit that I just read?
A. I don't think -- he did not attempt to provoke an assault.
Q. Okay. Anything else?
A. I suppose breach of the peace is -- would be something that could be argued.
Q. Well, I'm not asking to -- what you thought is what I'm asking. Did you think he did something that breached the peace?
A. In my opinion, yes.
Q. And how did he breach the peace on April 20th, 2022?
A. By creating a disturbance loud enough to involve multiple individuals.
Q. And how did he do that?
A. By calling a bunch of people a motherfucker.
Q. Anything else he did?

Page 62

A. He also said that he didn't give a fuck what they said, he didn't give a fuck what they cared about or they thought of him, he didn't give a fuck about me. He said all of this in an extremely loud, aggressive and angry tone, causing a breach of the peace, in my opinion.
Q. While sitting?
A. He was.
Q. Anything else other than what you just said?
A. No, I think that pretty well sums it up.
Q. So as far as I know, everything you say he did that breached the peace was simply words that came out of his mouth, correct?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I don't -- sorry. I don't agree with that.
BY MR. BAKER:
Q. Well, what -- he was sitting. What was he doing when words came out of his mouth that you say breached the peace?
A. Dr. Spiehs was sitting facing away from everybody until he began to call me a pussy

Page 63

about me wearing a mask, and to which I replied to him that it was my face and my choice, at which time he turned his entire body towards me and said I don't -- it wasn't my -- I'm sorry. "You didn't give a fuck about my face when it was my choice." And he was yelling so loud at me, that other people became involved. And it was loud, angry, aggressive, and it was vulgar. So it was not simply a two-dimensional words only, as you would like to say.
Q. Now, aggressive, was it aggressive that he turned around and said that, is that the aggressive part?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
BY MR. BAKER:
Q. Well, let's do it this way. You said he was aggressive. Describe the conduct that you say was, quote, unquote, aggressive.
MS. STEWART: Object to the form. He just did.
A. Thank you. He turned his body and his verbal -- the way he verbalized his words was aggressive.
BY MR. BAKER:

Page 64

Q. Okay. So the fact he -- that's the behavior, turned, looked at you. Did he point at you?
A. At the time I thought he did, but as I think back now, I'm not sure that he did.
Q. Did he ball up his fist like he wanted --
A. No.
Q. Did he stand up and take a posture of "I'm going to fight you"?
A. No.
Q. No? And so the only behavior that I hear you say so far is that at the front row, he turned around and directed his comments to you --
A. Yeah.
Q. -- right?
A. In order to -- in order to -- but by and through that, he caused great amount of alarm with the people in the nearest proximity.
Q. How did you determine that at that time?
A. A man to my right said, "Hey, watch your mouth. There are ladies present."
Q. Okay.

Page 65

A. That tells me somebody not involved in A-B conversation is upset, alarmed, angered, or is feeling resentment based on his actions.
Q. All right. And to be clear, Dr. Spiehs was talking to you?
A. At that time he was.
Q. Okay. So counsel wanted you to see the statute. You've got it there. Let me give it to you in Exhibit 10.
A. Okay.
Q. You recognize Exhibit 10?
A. Let me read it. Yes.
Q. Can you identify the actus reus contained in that statute?
A. Can you define "actus reus"?
Q. Physical conduct.
A. Physical conduct?
Q. Yes, the actus reus. Can you identify the actus reus in Exhibit 10?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
BY MR. BAKER:
Q. With the understanding that "actus reus" means somebody is doing something, physical conduct, you realize that, right?

Page 66

MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I'm not sure ...
BY MR. BAKER:
Q. Let me ask it this way. Can you identify in Exhibit 10 the things that someone has to do to commit a crime under that statute?
MS. STEWART: Object to the form.
A. The statute lists out several things that a person would have to do.
BY MR. BAKER:
Q. Go ahead.
A. Brawling or fighting; disturbing an assembly, meeting or procession that's not unlawful in character; using fighting words or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others. That's what I see.
Q. So you've just identified everything you think someone would have to do, one or the other, in order to commit disorderly conduct under that statute, correct?
MS. STEWART: Object to the form.
MR. HOLDER: Go ahead.
A. I just read a list of things that can,

Page 67

but not all things have to occur.
BY MR. BAKER:
Q. And let's go through the things. No. 1, "Brawling or fighting," Dr. Spiehs didn't do that?
A. No.
Q. All right. "Disturbing an assembly, meeting or procession, not unlawful in its character," he didn't do that either?
A. No.
Q. All right. Well, we've got one left. "Using fighting words or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others," that's the one you said he did?
A. Yes.
Q. And who do you claim, if at all, was the victim of this paragraph 3 conduct?
A. Michael Almon.
Q. Anyone else a victim?
A. No. I'm going to qualify my last answer in that no other victims were listed in the investigation.
Q. Well, that's not what I asked. I said --

Page 68

A. You asked if we had identified any other victims.
Q. No, I said who -- were there any other victims, and you said no.
A. Isn't that what I just said?
Q. No. You said something --
A. I said no, you're right. I'm sorry.
Q. Okay. Were there any other victims besides Michael Almon?
A. There were other people who could have claimed to be victims, but we did not identify them or investigate that portion.
Q. So as we sit here today, you can't identify any other victim other than Michael Almon, correct?
A. I cannot identify any other victim that was listed in the report as a victim.
Q. Well, who is listed in the report as victims?
A. Michael Almon.
Q. Anyone else listed as a victim other than Michael Almon?
A. They are listed as witnesses, but could have -- had they wished to pursue charges, could have been listed as victims.

Page 69

Q. But as far as being actually listed as a victim, the only person that was actually identified as a victim was Michael Almon, correct?
A. Yes.
Q. All right. And this conduct that you say that Dr. Spiehs engaged in on April 20, 2022 in paragraph 3 was fighting words?
A. I did not say that.
Q. Was that the conduct that he engaged in, fighting words, that was part of that crime you claim he committed on April 20th, 2022?
A. No.
Q. So what's left? If he didn't engage in fighting words, what's left?
A. "Noisy conduct tending reasonably to arouse alarm, anger or resentment in others."
Q. All right. So you didn't arrest him because he engaged in fighting words, you arrested him because you say he engaged in noisy conduct tending reasonably to arouse alarm, anger or resentment in others, correct?
A. Correct.
Q. If you look at page 3 of Exhibit 1 -- or Exhibit 12, rather.

Page 70

A. Page 3?
Q. 3. And in the paragraph at the bottom of the photo --
A. There's two paragraphs below the photo. Which one?
Q. The last.
A. Okay.
Q. Starting with "Plaintiff, from his seat." See that?
A. How far down are we looking? Oh, I'm sorry. "Plaintiff, from his seat," got it.
Q. Would you read that, "Plaintiff, from his seat," and just end -- stop where it says "to the best of Sheriff Armbrister's recollection."
A. Okay. So about a little over half of the paragraph?
Q. Yeah.
A. All right. Making sure I've got the right ...
"Plaintiff, from his seat, called Sheriff Armbrister a 'pussy' for wearing a mask. Sheriff Armbrister responded, 'My face, my choice.' At that point, Plaintiff turned and loudly responded to Sheriff Armbrister, with

Page 71

words to the effect of, 'You didn't give a fuck when it was my face, or when it was my fucking choice, you're a fucking pussy,' and 'I don't give a fuck what you say, I don't give a fuck what anybody thinks about me.' At that point, citizen Michael Almon, who can be seen in the still shot above, directly behind Plaintiff, wearing a white mask and gesturing with his right hand, interjected, telling Plaintiff something to the effect of 'Watch your language.' Plaintiff responded by turning and looking at Mr. Almon, who was in close proximity to him, and loudly remarking words to the effect of, 'I don't give a fuck what you think of me. You can fuck off.'"
Q. So when you use the word "you" in that statement you just made, who were you referring to?
MR. HOLDER: I think there are multiple you's and multiple statements.
MR. BAKER: No, let him -- he can clarify however he wants.
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. In the first instance where he says,

Page 72

"You didn't give a fuck when it was my face or when it was my fucking choice, you're a fucking pussy."
BY MR. BAKER:
Q. Who is that?
A. That was me.
Q. Okay. And there's --
A. Okay. I'm working on it. And then he says, "I don't give a fuck what you think of me. You can fuck off." That was directed towards Michael Almon.
Q. All right. Did Dr. Spiehs say these things standing up?
A. He did not.
Q. Did you ever see him stand up prior to your -- I'm going to use the phrase "use of force" on him April 20th, 2022?
A. I did not have a use of force on him.
Q. Well, let's talk about that.
A. Okay.
Q. What is a use of force?
A. A "use of force" is a subjective term, but it's any time that physical contact is made in order to restrain or take somebody into custody.

Page 73

Q. Using that definition, you don't think you did that to Dr. Spiehs on April 20th, 2022?
MS. STEWART: Object to form.
A. By nature, as I said -- I'm sorry.
MS. STEWART: Go ahead.
A. By nature, you're right. It's a subjective term. I suppose that you could believe that it was a use of force.
BY MR. BAKER:
Q. No, I'm not asking what I believe. You just defined it. Tell me in your opinion if you had a use of force on Dr. Spiehs on April 20th, 2022.
A. Using -- I suppose it would be reasonable to say that we, as an agency, and me did have a use of force, whether minor or not.
Q. Well, you used -- had a use of force on Dr. Spiehs and Deputy Kruzel used force on Dr. Spiehs on April 20th, 2022, correct?
A. Can you explain what you mean by "use of force" in that incident?
Q. The definition you gave at this deposition.
A. And what was that?
Q. Whatever it was. You defined it. You

Page 74

remember, don't you?
A. I don't remember what I said specifically.
Q. Well, whatever the definition you gave in response to the question of what is use of force, that's the same definition I've been using all along. And Deputy Kruzel --
A. Is that a question?
Q. And Deputy Kruzel did engage in a use of force on Dr. Spiehs on April 20th, 2022; isn't that correct?
A. It would depend on your definition of "use of force."
Q. I'm using your definition.
A. And that was what?
Q. Let's ask it again. Do you know what a use of force is?
A. I have my own belief as to what a use of force is.
Q. And what does your training tell you what a use of force is?
A. Any time that you have to physically manipulate a person to place them under arrest or to restrain them in some way.
Q. Did you do that to Dr. Spiehs on April

Page 75

20th, 2022?
A. I suppose it's reasonable to say that yes, we did.
Q. Now, having said that, did you see him ever stand up prior to your use of force on him on April 20th, 2022?
A. Yeah, I saw him standing.
Q. As he came in and went to the podium, right?
A. Correct.
Q. But after he sat down, he didn't stand up until you used force on him, correct?
MS. STEWART: Object to the form.
A. He refused to stand up when told to.
BY MR. BAKER:
Q. Hence he didn't stand up until you used force on him, correct?
A. Correct.
Q. Yeah. When you confronted Dr. Spiehs about his sign that you've already described, this is before you say Dr. Spiehs committed the crime of disorderly conduct?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. You're asking if I contacted him about

Page 76

his sign prior to the arrest?
BY MR. BAKER:
Q. Prior to the commission of a crime.
A. Then the answer would be yes.
Q. He had not committed a crime at the point in which you confronted him first about that sign; isn't that correct?
A. I did not --
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I did not confront him.
BY MR. BAKER:
Q. When you talked to him, he had not committed a crime at that point in the first occasion you've described in this deposition; isn't that correct?
A. That is correct.
Q. All right. Did Deputy Kruzel ever ask you what you said to Dr. Spiehs when you first approached him about what the Commissioners thought about the sign?
MS. STEWART: Object to the form. Misstates his testimony.
MR. HOLDER: Join.
MS. STEWART: You can answer.

Page 77

A. I'm sorry. Can you repeat that? I don't understand your question.
BY MR. BAKER:
Q. Have you and Deputy Kruzel ever talked about what you said to Dr. Spiehs in that first encounter that you've described in this deposition?
A. I don't know that we have. I don't recall having that conversation with him.
Q. About that?
A. About that first encounter.
Q. Okay. Have you had a conversation with him about what you talked to the Commissioners about in that conversation where you say if you want him removed, you got to tell me?
A. I don't --
MS. STEWART: Object to the form.
A. I don't recall ever having that conversation with him.
BY MR. BAKER:
Q. You say Dr. Spiehs was on the front row; is that correct?
A. That is correct.
Q. How far away would you estimate Deputy Kruzel from Dr. Spiehs?

MR. HOLDER: Object to form.
A. 20, 25 feet.
BY MR. BAKER:
Q. Okay. And when he was up at the podium where he was signing in where you say you had this initial conversation, how far away is Deputy Kruzel at that point?
A. I don't even know that he was in the room yet.
Q. Okay. Did you -- so when you saw Dr. Spiehs in the meeting, did you have any kind of communications with any of your deputies or your office to say we want some more people, more deputies in here?
A. No.
Q. Exhibit 4, you've seen that before?
A. Okay. This appears to be copies of the reports prepared by three deputies.
Q. You're familiar with Exhibit 4 then?
A. Yeah.
Q. Did you review -- you've reviewed these reports prior to this deposition, haven't you?
A. I've read them, yeah.
Q. Have you ever corrected any of the reporters on anything that was stated in Exhibit



4 as being incorrect or untrue?
A. I have not corrected anything, but I have located one -- one error.
Q. All right. Before we get to that --
A. Okay.
Q. -- when you were reviewing that, were you looking for errors?
A. I was not.
Q. And you were the only one that confronted Dr. Spiehs before the meeting started about his sign?
A. I did not confront him.
MS. STEWART: Object to form.
A. I did not confront Dr. Spiehs.
BY MR. BAKER:
Q. What word would you use?
A. I had a conversation with Dr. Spiehs.
Q. And you initiated that conversation?
A. I did.
Q. Okay. What would you say -- how would you say it when you initiate a conversation with someone, one word?
A. I talked to Justin.
Q. When you initiated that conversation with Dr. Spiehs that first time --



A. Sure.
Q. -- you were the only one that did that before the meeting started about his sign, correct?
A. Correct.
Q. And that's before the video that you are aware of was taken, correct?
MS. STEWART: Object to the form.
A. Are you asking me if my conversation with Justin occurred prior to the video that was taken by the freelance reporter?
BY MR. BAKER:
Q. Yes.
A. Yes, that did.
Q. All right. If you look at Exhibit 4, page 3.
A. Exhibit 4, page -- are you counting one, two, three -- page 3 of 11 at the top?
Q. I think so.
A. Okay.
Q. If I can see Exhibit 4 for a second.
A. Yeah.
Q. On page -- okay. So on page 3, it states that -- Deputy Kruzel says: "Justin was informed he would not be allowed to present that



sign during the meeting due to the explicit language." Do you see that?
A. It does say that, yes.
Q. And that information he got from you?
A. He got that from somewhere. I'm not saying he got it from me.
Q. Well, how -- you're the one that said it --
A. Right.
Q. -- correct?
A. (Nods head up and down.)
Q. You're the source of that quote or whatever that statement is, correct?
A. Source of what statement?
Q. The statement that "Justin was informed he would not be allowed to present that sign during the meeting due to the explicit language."
A. The source of that statement is Deputy Kruzel.
Q. Where did he get it?
A. I don't know. You would have to ask Deputy Kruzel.
Q. Since you're the source of that statement, where else could he have gotten it?

Page 82

A. I'm not the source of that statement.
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. Is that not a correct statement?
A. What?
Q. Exhibit 4, page 3, that we just read.
A. If he wrote it and believes it to be a correct statement, I trust him. But I'm not going to say -- I'm not going to testify to whether or not he thinks it's a correct statement.
Q. I'm not asking if he thinks it is. You see the statement. You know what you made to Dr. Spiehs. Is what he recited what you said to Dr. Spiehs?
A. What he recited is his own perception or understanding of what occurred. I did not tell him what I told Dr. Spiehs, that I recall.
Q. I'm asking this question then. In his report he states: "Justin was informed he would not be allowed to present that sign during the meeting due to the explicit language."
Is that a correct statement of what you told Dr. Spiehs on that day?
MS. STEWART: Object to the form.

Page 83

A. Are you asking if I -- if I told Dr. Spiehs his sign would not be allowed or are you asking if I told Deputy Kruzel that I had told Justin?
BY MR. BAKER:
Q. No, I'm asking if you told Dr. Spiehs this.
A. I have testified to that.
Q. I'm asking if you used this language when you talked to Dr. Spiehs? This is what your deputy said you said to Dr. Spiehs, correct?
MS. STEWART: Object to the form.
A. That's not true.
BY MR. BAKER:
Q. He put it in quotes, didn't he?
MS. STEWART: Object to the form. Misstates the document.
MR. HOLDER: Join.
A. No, he didn't.
BY MR. BAKER:
Q. Well, let me ask this then. You'll acknowledge that he said: "Justin was informed he would not be allowed to present that sign during the meeting due to the explicit

Page 84

language"? You acknowledge he wrote that?
A. I acknowledge that that is in the report and you are accurate.
Q. All right. And that is a fact that he's putting in his report, correct?
A. That is.
Q. Is that a correct fact?
A. That would be a question for Deputy Kruzel.
Q. I'm asking you. You were there. Did you say that?
A. I said something to Justin Spiehs. What he heard could have been from me. There could have been somebody else that said it. He may have overheard us. I'm not going to testify to what his belief was or how he got that information.
Q. I'm not asking about any of that. Your deputy claims this is what was said to Dr. Spiehs, correct?
A. He claims in his report that Dr. Spiehs was informed, but he does not say how, why or by whom.
Q. I got it. So let's try to eliminate the suspects. Did you tell Dr. Spiehs what

Page 85

Deputy Kruzel claims he was told in this statement, "Justin was informed he would not be allowed to present that sign during the meeting due to the explicit language"?
A. I believe I've testified to that quite clearly that, yes, I did tell Justin that.
Q. Thank you. So this would be accurate as to what you said to Dr. Spiehs?
A. That is accurate to what Deputy Kruzel wrote in his report.
Q. Is it accurate -- you just said it's accurate.
A. But the context around the accuracy I don't think that you and I are agreeing upon.
Q. Did it really happen --
A. Yes.
Q. -- the way that Deputy Kruzel describes in that statement?
A. I believe it did, yes.
Q. Okay. And you don't know of anyone else that could have recited that same statement to Dr. Spiehs other than you?
A. I do not know of anyone else.
Q. Okay.
A. But there were 30 plus people within

Page 86

that room.
Q. Can you think of anybody else that would have come up to him and told him that the Commission was not going to allow him to present that sign during the meeting?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I can speculate, if you'd like, but yeah, there are plenty of people.
BY MR. BAKER:
Q. You were there. You saw it?
A. Right.
Q. Anybody come up to Dr. Spiehs and have a side conversation with him other than you?
A. I turned and walked away from him. My back was turned. He could have talked to anybody in that room.
Q. And so was this common knowledge, if you know, about the YouTube livestreaming? Was that common knowledge out into the public?
A. Common knowledge into the public?
Q. Yeah.
A. No.
Q. Okay.
A. In my opinion.

Page 87

Q. All right. So the only people that knew that this livestreaming YouTube was an issue and this sign containing that vulgar language was people like you in on the know, correct?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I can't speculate to who all knew that.
BY MR. BAKER:
Q. And you're not claiming that Deputy Wold came up and told him that?
A. I'm not claiming that, no.
Q. How about Deputy Kruzel, do you think he came up and told Dr. Spiehs that?
A. No, Deputy Kruzel did not.
Q. Okay. And the language he says is "not be allowed to present that sign during the meeting," that's what he says, correct?
A. That's what he wrote in his report, yes.
Q. Now, he doesn't say present to YouTube or anything like that, does he?
A. In his report?
Q. Right.
A. No.

Page 88

Q. And so just looking at what he said, Dr. Spiehs was already presenting his sign when he walked in that day, correct?
MS. STEWART: Object to the form.
A. I don't -- I don't think I agree with your term "presenting."
BY MR. BAKER:
Q. Well, it's used in the report, right, "present"?
A. It's used in Deputy Kruzel's report --
Q. Yes.
A. -- yes.
Q. And he says that Dr. Spiehs was not allowed to present his sign at the meeting, correct?
A. That is --
MS. STEWART: Object to the form.
A. That's what he wrote in his report.
BY MR. BAKER:
Q. All right. And that's not one of the things that you were going to point out to me that was inaccurate today, was it?
A. No.
Q. Okay. And we've already talked about when you use the phrase "something to the

Page 89

effect," that's simply you're paraphrasing, you're not quoting, correct?
A. I wouldn't say paraphrasing so much as recollection. That's how I recall a statement going or being made.
Q. Well, but you specifically qualified "something to the effect" as it's not an exact quote, but you're trying to give the gist of what was said; is that fair?
A. Absolutely.
Q. Okay. And so when we see what you say "to the effect of," you're not claiming those are exact quotes, rather, it's something you're paraphrasing as a gist of what was said, correct?
A. Yes.
Q. Now, you didn't claim to be the victim, did you, on that day?
A. No, I was not.
Q. And you weren't identified as a victim, were you?
A. Because I was not a victim.
Q. Even though Dr. Spiehs was calling you all kinds of names, right?
A. Correct.

Page 90

Q. Even though he said -- well, you said the things he said to you directly, right?
A. Yeah.
Q. Okay. And you told Deputy Kruzel to interview the victim; is that correct?
A. I believe it was Deputy Coleman.
Q. Deputy Coleman. You told Deputy Coleman to interview the victim?
A. That's correct.
Q. And the victim you had in mind was who?
A. Michael Almon.
Q. Okay.
A. And I believe I pointed at him and indicated who that was.
Q. All right. We'll get to that in a minute.
So was he the victim simply because Dr. Spiehs turned to him and said, "I don't give a fuck what you think of me"?
A. No.
Q. Was that part of it?
A. That is part of the context, yes.
Q. Okay. Anything else that you say Dr. Spiehs did to Michael Almon other than say those words --

Page 91

A. In --
Q. -- that made him a victim?
A. The other things besides the words themselves was the entire context and totality of his tone, the vulgarity, the proximity of him and his sign with a four-foot stick, and the nature in which -- I said aggressive earlier, but I'll just say the nature in which these comments were made to -- directly to Mr. Almon within a close proximity.
Q. Well, the only statement that we've identified that he actually made directly to Mr. Almon you say was "I don't give a fuck what you say," that's it?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
A. I believe there was more to it than that, but it was something to the effect of "I don't give a fuck" -- "I don't give a fuck what you think about me."
BY MR. BAKER:
Q. All right. Anything else you can recall that Dr. Spiehs said directly to Michael Almon?
A. There was -- there was some other "I

Page 92

don't give a fucks" or "fuck yous" in there.
Q. Anything else?
A. No.
Q. You said in your -- I think in your answers, you said that --
A. Where was that?
Q. -- something about "told Michael Almon that you can fuck off."
A. Again, it may have been "fuck you, fuck off." It was something to that effect.
Q. If you look at page 7, Interrogatory 8.
A. No. 8, "Identify," yeah.
Q. It says you can't recall every word verbatim, right?
A. Where does it say -- yes.
Q. And that's true then and true today, right?
A. Yes.
Q. And as far as the exact words, you can't do any better than what you've stated in Exhibit 12, page 7?
A. No.
Q. You agree with me?
MR. HOLDER: Could I just get clarification? Because there's -- looks like

Page 93

there's two different answers on page 7. Are you talking about page 7, Interrogatory 8?
MR. BAKER: Well, I'm talking about anything he said in there.
BY MR. BAKER:
Q. Do you think you can remember better now or better then as to what was said?
A. In answer to No. 8 where it says, "I don't give a fuck what you think of me" and "you can fuck off," I do not recall better or worse today --
Q. Okay.
A. -- what was said.
Q. All right. And so tell me exactly the specific words Dr. Spiehs spoke that you relied on to come to the conclusion that Dr. Spiehs committed the crime of disorderly conduct on April 20th, 2022.
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. Asked and answered.
BY MR. BAKER:
Q. Go ahead.
A. "You can fuck off, I don't give a fuck what you think of me," or something to that

Page 94

effect.
Q. Anything else?
A. And it was not just the words that were said. It was the way in which the words were said.
Q. I'm only asking about words right now.
A. Okay.
Q. Anything else?
A. I can't recall independently anything other than those.
Q. So if Dr. Spiehs, under the same circumstances, had said "I don't care what you think of me" rather than using the word "fuck," would that have constituted the same kind of speech?
A. I don't think that's a fair --
MS. STEWART: Object to form. Go ahead.
MR. HOLDER: Go ahead.
A. I don't think that's a fair question because it's not just words that we're talking about here.
BY MR. BAKER:
Q. I'm just isolating the words part, because you said it's the words he spoke, right,

Page 95

plus other things?
A. And I'm saying even if he had said "I don't care what you think of me," in the manner in which he said it, he would have been arrested.
Q. And "fuck off" means what to you?
A. It means fuck off.
Q. Yeah. Other than using the same phrase to define the same phrase, what does it mean to you?
A. I think it's a subjective term that means many things to many people.
Q. I'm asking what it means to you.
A. It means get the fuck away from me, go away.
Q. How about leave me alone, is that a fair --
A. "Leave me alone" means leave me alone. "Fuck off" means fuck off --
Q. Well --
A. -- and those mean two different things to me.
Q. Then tell me -- other than saying the phrase again, tell me what it means to you to fuck off, other than just repeating the phrase.

Page 96

A. Get the fuck away from me.
Q. Okay. Is that any different than "leave me alone"?
A. Yes.
Q. Tell me the difference.
A. It's spelled completely different.
Q. Any other way it's different in meaning?
A. It conveys roughly the same message with different undertones.
Q. All right. And you're not claiming -- I think you've already said he did not engage in any fighting words that day. So calling you a pussy wasn't fighting words, was it?
A. No.
MR. HOLDER: Object to the form. Go ahead.
A. No.
BY MR. BAKER:
Q. And he didn't commit the crime of disorderly conduct by calling you a pussy, did he?
A. No.
MR. HOLDER: Object to form. Go ahead.

Page 97

A. No.
BY MR. BAKER:
Q. When he called you the name "pussy," did that arouse alarm, anger or resentment in you?
A. Yes.
Q. When he called you the name "pussy," did that inflict injury or intend to incite you to an immediate breach of the peace?
A. I can't testify as to what his intent was by saying that.
Q. No, I asked you --
A. You said the word intended to.
Q. No. I said did that inflict injury or tend to incite you to an immediate breach of the peace?
A. Ask the question again, please.
Q. When he called you a pussy, did that inflict injury on you?
A. No.
Q. When he called you a pussy, did that tend to incite you to an immediate breach of the peace?
A. That would be a question for Dr. Spiehs as to what his intent was.

Page 98

Q. Did it motivate you in any way to an immediate breach of the peace?
A. No.
Q. And, of course, when he called you a pussy while seated in the front row, did he commit the crime of disorderly conduct when you responded, "My face, my choice"?
A. No.
Q. When you say that Dr. Spiehs said, "You didn't give a fuck when it was my face or when it was my fucking choice, you're a fucking pussy," was that the second time he called you that name while sitting in the front row of the room?
A. To the best of my recollection, that would have been the second time, yes.
Q. And when he said, "You didn't give a fuck when it was my face or when it was my fucking choice, you're a fucking pussy," that was not the speech you cited him for the crime of disorderly conduct on April 20th, 2022, was it?
A. That's correct, because that speech was directed at me.
Q. So anything that was directed at you

Page 99

was not a basis for the disorderly conduct crime?
A. No.
Q. You agree with me?
A. I agree with you, yes.
Q. All right. So I'm going to hand you --
MR. BAKER: And I only have one copy, so you all -- if you want to share.
MS. STEWART: What is it? Can you describe what it is?
MR. BAKER: I will represent to you that it's frame-by-frame of the video that was taken.
MS. STEWART: I'm just going to object as it being -- lacking foundation, but --
MR. BAKER: Well, that's really not a proper objection, but --
MS. STEWART: I can make my objection. You can take it up with the court.
MR. BAKER: No, I understand that, Michelle. Just object to form.
MS. STEWART: I can object to foundation as well.
MR. BAKER: Well, we'll see if we can get foundation here.

Page 100

BY MR. BAKER:
Q. So you recall that there was a video taken?
A. Yes.
Q. And that video that you saw was taken by who?
A. August Rudisell.
Q. And did you interview -- did your office interview him?
A. No.
Q. And when did you become first aware of that video?
A. I knew a video existed as the incident was wrapping up.
Q. How did you become aware of that?
A. The cameraman -- Mr. Rudisell, I believe, is his name -- followed us into the vestibule where the handcuffs were placed. And as Justin said, "Why the fuck are you arresting me," the cameraman says, "Because you're being a dick." And I turned to the cameraman and said, "Not another word," or something to that effect.
Q. And that, what you just said, is never recited in anything that you've written?
A. No.

Page 101

Q. That's the first time you've ever said those particular words --
A. No.
Q. -- correct?
A. No.
Q. You put them in -- is it in your interrogatory answers?
A. No.
Q. Okay.
A. That's the first time I've ever said them to you.
Q. Thank you. All right. Exhibit 9, do you recognize that as coming from -- you'd have to look at the pictures.
A. Is this Exhibit 9?
Q. No. Well, watch, I'm going to turn it. There's Exhibit 9.
A. That's Exhibit "blank" 1.
Q. Let me help you.
MS. STEWART: So is the whole book Exhibit 9?
BY MR. BAKER:
Q. Exhibit 9, I'm representing to you, is a frame-by-frame of the video that you just described that was taken of that --

Page 102

A. Do you want to put that on there, too?
Q. Well, I can do that for you, too.
A. It would make me feel better.
Q. I want you in your comfort level. Anything else you want me to put on that?
A. I'm good.
Q. Thanks.
So you recognize the first page, page 1 of Exhibit 9?
A. It appears to be the beginning of that video, yes.
Q. All right. And who do you see in Exhibit 9, page 1?
A. I see Dr. Spiehs, I see Michael Almon, and I see three members of the -- of the audience.
Q. And does that conform to your recollection of what that video depicted?
MS. STEWART: Object to the form.
MR. HOLDER: Go ahead.
A. Yes.
BY MR. BAKER:
Q. So the words that you've quoted Dr. Spiehs saying that we've reviewed, they were spoken prior to page 1 of this Exhibit 9?

Page 103

A. Which words are we talking about?
Q. The words that you say that he called you a pussy --
A. Yes.
Q. -- that one. The words that he said, "I don't give a fuck what you say," that was spoken before Frame 1?
A. And when you -- when you mean "I don't give a fuck what you say" --
Q. Yes.
A. -- that was directed towards Michael Almon.
Q. Okay.
A. And yes, that statement occurred, I believe, previous to No. 1.
Q. All right. And in fact, all the words that you say that Dr. Spiehs used all occurred prior to Exhibit 9, Frame 1?
A. Yes.
MR. HOLDER: Object to form.
A. Sorry.
BY MR. BAKER:
Q. Now, and at least by -- you'll agree that Exhibit 9, Frame 1, at that point, Dr. Spiehs had not committed the crime of

Page 104

disorderly conduct, in your opinion?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I disagree. He had committed the crime of disorderly conduct at the -- at the image of No. 1.
BY MR. BAKER:
Q. Okay. So before this video started, you say he committed the crime of disorderly conduct according to you?
A. If this frame was this much larger, you would see me standing up to walk towards him --
Q. I'm just asking --
A. -- because I had already made the decision that he was going to jail.
Q. Okay. Going to jail, okay. And so with that, then, everything that follows in this video and the frames depicted, you say that he's already committed the crime of disorderly conduct and you were going to arrest him, correct?
A. Asked and answered. Yes.
Q. Okay. So if you look at Exhibit 9, and I'm going to ask you to kind of describe what -- as we go through that -- so, for example, Frame

Page 105

73, you're claiming that Dr. Spiehs had already told Michael Almon, "I don't give a fuck what you say"?
A. Yes.
Q. If you'd turn over to 272.
A. I was almost close.
Q. You see your right hand?
A. I do.
Q. What are you doing with your right hand?
A. It appears that I'm motioning with my right hand as if an umpire was calling somebody out.
Q. Were you saying anything to Dr. Spiehs at that point?
A. I told him it was time to go or something to that effect.
Q. Anything else you were telling him?
A. I don't recall specifically.
Q. Had you told him -- when you said "It's time to go," you didn't say "You're under arrest"?
A. When I told him it was -- he needed to leave or time to go or something like that, he said, "Why?" And I said, "Because you're under

Page 106

arrest."
Q. And you think you had that conversation before 272 or after 272?
A. I'd say it's right around that exact time.
Q. So it could have been prior or it could have been after?
A. Yes.
Q. Both?
A. It could have been either one, because there's no audio with these pictures so I can't tell you for sure.
Q. Okay. And you think you could -- the audio would tell you exactly what you said?
A. No, it would not.
Q. It would not? So how about -- did you say "Out"?
A. Did I say "Out"?
Q. When you were thumbing up.
A. To the best of my recollection, I said something like "You're out of here, it's time to go, you're out," something to that effect. This is a natural -- if I was to tell somebody that it's time to go, that is definitely a motion I would make to tell them you're out.

Page 107

Q. Okay. And you don't remember if you said at the same time "You're under arrest, you need to go"?
A. I said, "You're out of here, it's time to go." He said, "Why?" And I said, "Because you're under arrest."
Q. So if he would have -- oh, is that what you think you said?
A. I've testified to that already, yes.
Q. All right. Well, why tell him he needs to get out if he's under arrest?
A. Because I wanted him to walk outside with me calmly and not make a scene, and we could place him under arrest out in the vestibule.
Q. Well, aren't you putting him under arrest when you say -- you're putting him in custody when you say you got to get out, right?
A. Absolutely. I wanted to place handcuffs on him in a safer, less -- less conspicuous --
Q. Okay.
MR. HOLDER: Just a minute. I don't think he was done with his answer.
MS. STEWART: Let him finish his

Page 108

answer.
A. For officer safety reason, I would rather have him out in the vestibule, plus I didn't want to disturb the meeting. So I asked him to leave with me, and he refused.
BY MR. BAKER:
Q. Well, you kind of disturbed the meeting when you used force on him, didn't you?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. No.
BY MR. BAKER:
Q. Okay. Well, because the meeting hadn't started by then, had it?
A. Correct.
Q. Did Dr. Spiehs change his demeanor when you told him he would not be allowed to present that sign during the meeting due to the explicit language on that sign?
A. I don't --
MS. STEWART: Object to form.
A. I don't know what his demeanor was when I told him that.
BY MR. BAKER:
Q. Well, after you told him that?

Page 109

A. You asked me if he changed his demeanor, and I don't know what it was to begin with.
Q. Well, do you -- I mean, you're the one that talked to him when you went up to the podium, right?
A. I was.
Q. Did you look at him?
A. Yes.
Q. And you could see what his demeanor was then, right?
A. He was writing, yes.
Q. Did his demeanor change after you said what you said, "The Commissioners are not going to let you have that sign in here"?
A. Yeah, he stopped writing.
Q. How about facial demeanor?
A. I don't know. It's hard to tell with him.
Q. Meaning you can't tell when he's angry versus when he's not?
A. I don't know that I've ever seen him not angry.
Q. How do you know he's angry then?
A. I don't know that I've ever seen him

any other way than what I perceive to be angry.
Q. Okay. So you just see him as angry all the time?
A. It appears to me that he is angry all the time.
Q. And you thought he was angry during that -- before that meeting started?
A. I thought he was angry when he stopped writing and looked at me.
Q. Did he continue -- I mean, you continued to see him there in the meeting, right, before the meeting started, right?
A. I turned my back and walked away from him for a short period of time, yes. But otherwise, yes.
Q. Well, can you describe any more than what you've just said as to how he changed his demeanor?
A. I don't --
MR. HOLDER: Object to form. Go ahead.
A. I don't understand that I really said he changed his demeanor. I can tell you what his demeanor was after I had contact with him.
BY MR. BAKER:



Q. All right. And Exhibit 1, that is the agenda meeting, you've seen that?
A. I have.
Q. And it says that the meeting started on time at 5:30?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. It does not say that quote on there.
BY MR. BAKER:
Q. What does it say? When do you think the meeting was supposed to start?
A. It was supposed to start at 5:30.
Q. And do you know whether it started at 5:30?
A. I do not know that.
Q. Do you have any information that anything contained in Exhibit 1 is incorrect?
A. I have no information to contradict any information in there.
Q. Did you remain in the room after Dr. Spiehs was handcuffed and taken to the station?
A. No.
Q. Why?
A. Because I wanted to go to my office and



watch the remainder of the meeting via Zoom in my office.
Q. But I thought you were there because you thought all these people were going to get emotional?
A. I was, yeah.
MS. STEWART: Object to form. Go ahead.
A. Sorry. Yes.
BY MR. BAKER:
Q. So you could still effectuate that same purpose by going to your office and watching it by Zoom?
A. Yes.
Q. Why didn't you go back?
A. Because I -- the arrest had been made. I wanted to go ahead and send an email to notify the Commissioner -- or not the Commissioner, the County Administrator as to what had occurred, and I wanted to watch the rest of the meeting.
Q. So after he was arrested, there was no need for you to stay, correct?
MS. STEWART: Object to form.
MR. HOLDER: Join.
A. I don't -- the term "need," I suppose,



is -- I was not needed at any point to be at that meeting, but I chose not to go back.
BY MR. BAKER:
Q. Okay.
MR. HOLDER: Mr. Baker, whenever you get to a transition point, could I ask for a quick break?
MR. BAKER: You bet. We can do it now.
MR. HOLDER: Okay.
(A recess was taken.)
MR. BAKER: We're back on the record.
BY MR. BAKER:
Q. You mentioned that you could identify something in Exhibit 4 that you thought was incorrect. Before you point it out, just tell me yes or no.
A. Yes.
Q. When did you discover something was incorrect in Exhibit 4?
A. I actually noticed it yesterday while I was reading through this report.
Q. All right.
A. Yeah.

Page 114

Q. And you had read through the report before?
A. I had.
Q. And never noticed whatever it is you want to say is incorrect?
A. That's correct.
Q. And what is it on Exhibit 4 that you say is incorrect?
A. On page -- let's see. Hold on. Let me make sure I'm in the right ...
On page 8 of 11, paragraph No. 3 starts "At approximately 1720." In the second sentence it says: "Spiehs was standing next to the front row of the south seating section. Spiehs turned around and yelled." He was not standing next to. He was seated.
Q. Okay. Now, that's a pretty obvious fact. How is it that you didn't see that -- when it said he was standing, you knew he never was standing, correct?
A. He was never standing while he was having his conversation with Mr. Almon and me.
Q. Right. And that's a pretty obvious mistake, isn't it?
A. Yes.

Page 115

Q. Okay. On page 3 of his report, he indicates that Dr. Spiehs had engaged in noisy conduct before?
A. The report I just read from was from Deputy Wold.
Q. Okay.
A. When you say "his," you are now referring to Deputy Kruzel, correct?
Q. I am talking about Kruzel now.
A. Okay. Where does it say that?
Q. Let me see. If you look at the bottom of his first paragraph on there, page 3.
A. Okay. Justin is known to appear weekly and has engaged in noisy conduct by using loud, explicit language towards members of the public and the County Commission. That is what it says.
MS. MILLER: Sorry. What page was that?
THE WITNESS: That is page 3 of 11 in Kruzel's narrative.
MS. MILLER: Oh, there. Okay. Got it.
BY MR. BAKER:
Q. And you have read that before, correct?

Page 116

A. I've read that before, yes.
Q. Is that correct as far as your understanding?
A. Yes.
Q. Was he arrested before?
A. Before what?
Q. April 20th, 2022 for noisy conduct at a Commissioners meeting?
A. Not by me.
Q. By anyone?
A. I don't know. Was he?
Q. You don't know if your office arrested him, had him arrested?
A. Before this date? My recollection is that we had not.
Q. Can you explain why, if he's engaged in noisy conduct at these Commission meetings, why he hasn't -- and that's a crime, right?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. And your statement is incorrect. This says "known to appear weekly to meetings and has engaged." It does not say the County Commission meetings. It just says "meetings."
BY MR. BAKER:

Page 117

Q. Oh. You don't know what meetings he's referring to?
A. I do not.
Q. Well, how would they know if he's appeared before other meetings, not Commissioner meetings?
A. I don't think it's any secret, because Justin has had plenty of press coverage.
Q. And you were aware of that prior to April 20th, 2022, correct?
A. That Dr. Spiehs had been to other meetings and engaged in loud conduct of some sort? Yes.
Q. However you want to -- okay. 1720, he says that's when Dr. Spiehs entered the room or --
A. Who is "he"?
Q. Your deputy. Well, let's just say -- strike all that.
A. Okay.
Q. Do you know when Dr. Spiehs entered that meeting room on April 20th, 2022, what time?
A. I can give you a ballpark, an estimate to the best of my knowledge, but I cannot tell

Page 118

you a specific time, no.
Q. Well, you realize your deputies gave a specific time in that Exhibit 4?
MR. HOLDER: Object to form.
A. Okay.
BY MR. BAKER:
Q. Do you realize that?
A. I believe there are times in here, yes.
Q. And they're specific. They don't say approximately. They say at 1720, he entered the room, right?
A. I'm going to read --
MR. HOLDER: Object to form.
A. I'm sorry. I'm going to read the beginning of the second paragraph on page 3 of 11. "At approximately 1720, I observed Justin Spiehs enter the Commission meeting room."
BY MR. BAKER:
Q. Do you know if that's incorrect or correct?
A. Using the term "approximately," I would agree that it did occur approximately at 5:20.
Q. Okay. Could --
A. I would -- I would say it was closer to 5:25, but Deputy Kruzel's understanding of

Page 119

"approximately" may be 15 minutes either way. I don't know.
Q. Well, okay. And you haven't come here to identify that as being incorrect, have you?
A. I have not.
Q. So doesn't Deputy Kruzel say that after his loud volume, Justin sat back down?
A. Where does it say that?
Q. I think it's the --
A. You can hold on to that, if you'd like.
Q. No, you have to have it. It's my copy. I didn't give you another one. Look at the third paragraph.
A. Okay. I'm looking at it.
Q. Does he say something about after the loud volume, Justin sat back down?
A. He does say that, yes.
Q. That can't be correct, can it?
A. It doesn't -- to my recollection, I don't -- I don't believe the term "sat back down" would be correct.
Q. Yeah. So how did you miss that when you were looking for errors?
A. I missed it.
Q. Well, so far we've identified two

Page 120

things that you'll admit was incorrect in the Exhibit 4 --
A. You're right.
Q. -- right? Now, he puts what Dr. Spiehs says in quotes, do you see that?
A. Where does he do that?
Q. Well, if you look on page 3, look for quotations.
A. Okay.
Q. Do you see any?
A. I do.
Q. And when you see --
A. I see one, two different places.
Q. And when you see quotations, does that mean to you that's the exact verbiage that is being alleged to have been said?
A. Quotations do mean that it is the exact verbiage.
Q. All right. If you look at Exhibit 9 and Frame 311, you'll agree that Dr. Spiehs' right arm is being raised?
A. I don't see that, no.
Q. Tell me --
A. In No. 314, I would agree with that, yes.

Page 121

Q. All right. Well, you've got Exhibit 9. Tell me what frame you say that you started using force on Dr. Spiehs.
A. 314.
Q. Okay. And that's where you say you're raising his right arm? That's where you make physical contact with him, is that what you say?
A. I'm saying that the physical contact occurred at some point around 314. It may have been one of these, but the view is obstructed.
Q. All I'm asking is your opinion. I mean, if you had to say when do you first make physical contact, as depicted in these frames on Exhibit 9 --
A. Okay.
Q. -- when did you do that?
A. I'm willing to say in 314.
Q. Okay. Then -- and I don't think I've asked it this way, but the point where you made physical contact at 314, you'll agree that's when you started using force on Dr. Spiehs, correct?
A. By the definition, yes --
Q. Okay.
A. -- that is the point where I can

Page 122

verify. I'm not saying it did not happen a few frames before. It is obscured from this picture.
Q. Let's go back to Frame 167. Find that. From 167 -- and I'm going to say through 267, tell me what you're doing.
A. You'll have to give me a second.
Q. Okay. So you'll agree that you've come up from behind Dr. Spiehs in 167, correct?
A. Yes.
Q. And what are you doing?
A. It appears that I am talking to him.
Q. And what are you saying?
A. At this point, I can't recall specifically, but it was something that I've already testified to, was the fact of "You're out of here, it's time to go, you're leaving," something to that effect.
Q. Okay.
A. Would you like for me to look all the way through the next 100 pictures?
Q. Well, if it helps you to remember what you said. Do you think it will help you remember what you said?
A. No.

Page 123

Q. Okay. But in any event, you think you're talking to Dr. Spiehs at 167?
A. I would actually say I'm probably listening at this point because it appears that he's talking to me. But give or take, that we were having a verbal exchange at that point.
Q. When do you say in there that you're starting to talk to -- or did you talk to Mr. Almon during this period of time?
A. I have -- to my knowledge, I have never talked to Michael Almon.
Q. So at 167, if you turn the pages --
A. Uh-huh.
Q. -- it looks like you're turning your head back towards Mr. Almon --
A. Right.
Q. -- is that fair?
A. It does indicate that my head is turned, yes.
Q. Keep turning the pages.
A. Okay.
Q. And you see yourself turning actually towards Mr. Almon?
A. Yeah.
Q. What frame are you looking at?

Page 124

A. 182.
Q. And what possibly would you be doing there?
A. I was indicating to Mr. Spiehs, Dr. Spiehs, that he was under arrest for disorderly conduct based on his conduct directed at Mr. Almon.
Q. Were you somehow articulating that by -- I mean, were you saying words to that effect?
A. I believe so, yes.
Q. Tell me the words you were saying as you were looking back at Mr. Almon.
A. I don't know what the quote was.
Q. Give me the gist.
A. I think I just answered that question, is I was telling him that he was under arrest for disorderly conduct based on his actions towards Mr. Almon.
Q. And you weren't asking Mr. Almon anything about "Are you upset" or anything like that?
A. No.
Q. Okay.
A. That's not exactly how the law works.

Page 125

Q. How does the law work?
A. The law works as --
MR. HOLDER: Object to form. Go ahead.
A. I apply the objective reasonable person standard, that a reasonable person similarly situated in Mr. Almon's space would feel this way. That, to me, met the statute. It didn't take him to tell me "I'm alarmed, I feel resentment, I'm angered." That's not how it works.
BY MR. BAKER:
Q. I see. So why even interview him after the fact?
A. Because we needed to get his version of the events in case that I misheard or did not see something that he did.
Q. Or misunderstood?
A. That he had said, yes.
Q. Or misunderstood what you thought he was feeling?
A. No.
Q. What if he told you, "Sheriff Armbrister, you got it all wrong, I wasn't upset at all"?

Page 126

A. Then we would have indicated that in our report.
Q. Right. And you would have been incorrect in your assessment about how he thought at the time?
MS. STEWART: Object to the form.
MR. HOLDER: Object to the form. Go ahead.
A. I don't think it's fair to try to decide what he would or would not feel, but if he had said "I don't feel alarmed, I don't feel," you know, "to be a victim," we would put that in the report, yes.
BY MR. BAKER:
Q. Okay. It says -- on Exhibit 4, page 3, it says: Justin, who was sitting in the front row of the gallery on the south side of the building. Justin was asked to leave based on his conduct towards Michael Almon. Justin refused to leave and he was told --
A. Where are you at? I'm sorry.
MR. HOLDER: Yeah.
MS. STEWART: I don't know where you're at.
MR. BAKER: Do you know where

Page 127

we're at?
MS. STEWART: No, I don't.
THE WITNESS: None of us do.
MS. STEWART: You said page 3, so that's what I'm --
THE WITNESS: Yeah, right.
MR. BAKER: Well, maybe it's a different deputy that said it.
THE WITNESS: I'm going to go ahead and give a 15-minute warning on a break. I need to use the restroom again.
MR. BAKER: Do you want to take one now?
THE WITNESS: If we're at a good spot, then --
MR. BAKER: Yeah, go.
(A recess was taken.)
MR. BAKER: We're back on the record.
BY MR. BAKER:
Q. If you look at the third paragraph --
MS. STEWART: What page? I'm sorry.
MR. BAKER: 3.
A. 3 of 11, the one that begins "County

Page 128

Commission had to wait"?
BY MR. BAKER:
Q. Yeah. So it starts with "Justin, who was sitting in the front row."
A. Let's see, third paragraph. Oh, I see it.
Q. See it?
A. Justin was sitting in the front row?
MS. STEWART: Third line from the bottom.
A. "Justin was asked to leave based on his conduct towards. Justin refused."
BY MR. BAKER:
Q. So read -- it says: "Justin, who was sitting in the front." Would you read that?
A. I'm sorry. Where do you see it? Justin was at -- you said Justin was sitting in the front row, that's how it --
MS. STEWART: The sentence starts "I stood up from."
A. I see now. That's the fourth line.
MS. STEWART: Sorry.
A. No, I'm sorry. "And started walking towards Justin, who was sitting in the front row of the gallery on the south side of the

Page 129

building."
Do you want me to read further? I'm sorry.
BY MR. BAKER:
Q. Keep going.
A. Okay. "Justin was asked to leave based on his conduct towards," blank. "Justin refused to leave and was told he was being placed under arrest for disorderly conduct."
Q. And that blank is Michael Almon?
A. I believe so, yeah.
Q. Okay. And it says "asked." And we've already been through that today about the difference between "asked" and "told" --
A. Yeah.
Q. -- right?
A. Yeah.
Q. He says he was asked to leave?
A. That was his perception of the conversation.
Q. Is that correct? Was he asked to leave?
A. I don't -- I don't recall actually saying "Will you leave," but I did not start with saying "You're under arrest." I said

Page 130

something to the effect of "You're out of here, time to go," something to that effect. But no, if you're asking was it phrased in the form of a question, "Will you leave," I don't believe I said that.
Q. Okay. So this wouldn't be correct, Justin was asked to leave?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. That is correct as that was his perception or understanding.
BY MR. BAKER:
Q. You were there. Was he asked to leave?
A. He was not --
Q. Okay.
A. -- to the best of my recollection.
Q. In this report, he says he was asked to leave, correct?
A. That's what -- that would be a question for Deputy Kruzel as to how he came to that conclusion.
Q. Well, I'm asking you about whether that's another error in this Exhibit 4?
A. I think --
MS. STEWART: Object to the form.

Page 131

MR. HOLDER: Join.
A. I think, compared to the errors that we've discussed previously, I don't find this to be an error. I believe this is a perception that is different than mine.
BY MR. BAKER:
Q. Well, a fact is a fact, Mr. Armbrister. So you were there, correct?
A. I was there.
Q. So is this statement a correct statement, Justin was asked to leave? Is that a correct statement?
A. I think --
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I think that I've answered that, is that I think that is a true and accurate statement, that that is what Deputy Kruzel believed happened, but I am saying that that did not happen.
BY MR. BAKER:
Q. Okay.
A. You're welcome.
Q. As a fact? As a fact?
A. I am -- no, not as a fact. I am not

Page 132

telling you I didn't say "Will you leave." I just don't think I did.
Q. Okay.
A. I don't remember my quote.
Q. Let's try this. I'm interested in facts, not necessarily what someone thinks.
A. All right.
Q. You understand that?
A. I disagree, because you asked for a lot of perspectives and opinions today.
Q. At this point --
A. Okay.
Q. -- I'm asking -- the words that came out of either your mouth or Deputy Kruzel's mouth, those would be facts, correct?
MS. STEWART: Object to the form.
A. I don't understand what you're asking.
BY MR. BAKER:
Q. I'm not asking for your opinion and I'm not asking for Deputy Kruzel's opinion. I'm asking about a fact. Was Dr. Spiehs factually told or asked to leave?
A. I feel like I've been quite clear. I do not recall asking him to leave.
Q. All right. Now, having said that, do

Page 133

you have any facts to controvert this to say that he was asked to leave?
A. No.
Q. Okay. What is the protocol, if any, as to what your training is when witnessing the crime of disorderly conduct?
A. Well, we can't train for every scenario. I don't understand what sort of training you think I have.
Q. Well, we'll get into that, but is there a protocol or any training that you have that would guide you in what to do when you witness the crime of disorderly conduct?
A. Not specifically, no.
Q. Anything generally?
A. We have general training on how to effect arrests, yes.
Q. So you witnessed this crime of disorderly conduct, you claim, on April 20th, 2022, correct?
A. I did witness it, yes.
Q. And you say that it happened before even Frame 1 of Exhibit 9 happened?
A. Correct.
Q. Were you following the protocol or

Page 134

training that you had regarding that?
MS. STEWART: Object to the form.
A. Yes.
BY MR. BAKER:
Q. And you told Dr. -- I mean you told Deputy Kruzel to write the affidavit, the charging affidavit?
A. I don't recall telling him specifically.
Q. Why didn't you do it?
A. Because I don't -- that's not something I do.
Q. Well, you're the one that decided to arrest him, right?
A. Right.
Q. That wasn't Deputy Kruzel's decision, was it?
A. Correct.
Q. And you didn't ask Deputy Kruzel if he had -- "Did you witness a crime being committed," did you?
A. No.
Q. And how was it that Deputy Kruzel was the one to write the affidavit of charge?
A. He must have chose to do it.

Page 135

Q. You didn't tell him to do it?
A. I did not specifically order him or direct him to take the report.
Q. Did you ask him?
A. I might have. I don't know.
Q. Yeah. Well, you think if you asked him, he's going to refuse?
A. No, I don't believe he would do that.
Q. Okay. So it is possible that you -- however you did it, you communicated that you wanted Deputy Kruzel to write these reports and be the charging officer?
A. Are you asking if it's possible?
Q. Yes.
A. Yes.
Q. Okay. And again, I'll ask it differently. Any facts to say that didn't happen?
A. I don't recall. So the fact that I don't recall saying that can be construed as a fact that it didn't happen -- possibly didn't happen that way as well.
Q. Well, you were the one that made the decision that Dr. Spiehs committed a crime, right?

Page 136

A. Yes.
Q. And wouldn't you be the likely one to write the charge since you were the one that made that decision?
A. No.
MR. HOLDER: Object to form.
MS. STEWART: Join.
BY MR. BAKER:
Q. Have you asked Deputy Kruzel if he thought Dr. Spiehs had committed the crime of disorderly conduct on April 20th, 2022?
A. I don't believe I have.
Q. Why?
A. How is it relevant?
Q. Why?
MR. HOLDER: Object to form.
A. Asked and answered.
BY MR. BAKER:
Q. Go ahead.
A. Why what?
Q. Why is it irrelevant?
A. Did I say it was irrelevant?
Q. You sure did.
A. So whether or not Deputy Kruzel believes, witnessed, saw, heard, felt that a

Page 137

crime was committed is not part of the statute that you referenced earlier where you have to fit certain things into a statute. Did a witness feel like this crime occurred, then yes, I would have to speak with that witness. I witnessed this crime. I took action. Deputy Kruzel wrote the report.
Q. And he didn't -- at the time, he wasn't taking any action, he wasn't effectuating an arrest based on the same things you saw and heard, did he?
A. I don't know what he was doing at that time.
Q. You didn't see him in the room?
A. I was concentrating on your client.
Q. Okay. Is there any reason you can think of that Deputy Kruzel didn't see a crime of disorderly conduct on April 20th, 2022 and you did?
MS. STEWART: Object to the form.
A. I think the --
MR. HOLDER: Go ahead.
A. The proximity would have limited his ability to see, hear, feel, and understand what was happening in that -- in that immediate area

Page 138

where I, Mr. Almon, and your client were.
BY MR. BAKER:
Q. Yeah. Well, do you know where the other deputies were stationed?
A. I don't.
Q. So if you look at 279, is that about the first part where we see Deputy Kruzel appearing?
A. No.
Q. Go back prior. Tell me if you see him.
A. Okay. Prior to --
Q. No, in the use of force that you're using.
A. You just said go back.
Q. Right.
A. Where do you want me to go?
Q. Let me ask it again. When you started initiating a use of force on Dr. Spiehs, we don't see Deputy Kruzel until Frame 279; is that fair?
A. No, that's not fair. That's not him. You don't see him until -- okay. That is the top of his hair.
Q. Right.
A. I mean, good God.

Page 139

Q. Yeah, yeah. So I'm correct --
A. Yeah. Okay.
Q. -- that's the first time you see Kruzel?
A. You totally got me there, Linus.
Q. I got you. So we've got 279 frames occurring and you say a crime has been committed, and we don't see Kruzel appear at least until 279 in this video, correct?
A. How many frames per second was this being filmed there?
Q. Sir, I don't know. I'm trying to be fair with --
A. How many --
Q. Hold on.
A. How many seconds do you think it took?
Q. I'll try to ask the questions. I'll be happy to talk to you after the deposition.
A. I don't think so.
Q. Well, all right. I won't take that as an offense.
But we have the video, we have the frames. 279, that's a fair statement, that's the first appearance of Kruzel?
A. I mean, I suppose it could be argued

Page 140

that 279 -- yes.
Q. All right.
A. For the purposes of this, yes.
Q. All right. And you say that Dr. Spiehs had committed the crime of disorderly conduct even before Frame 1. Do you have any explanation as to why you're the only one reacting?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I think that's a pathetic question because from 279 to where Deputy Kruzel was, in my opinion, was 20 plus feet. I was six feet away, so it only takes me one to two seconds, where it would take him seconds to get there.
BY MR. BAKER:
Q. All right. And are you aware of Deputy Kruzel being trained to arrest for disorderly conduct or provide assistance to you in your arrest?
MS. STEWART: Object to the form.
A. I don't -- I don't know what his specific trainings are. That would be a good question for him.
BY MR. BAKER:

Page 141

Q. And why doesn't the Sheriff know about his training?
A. Because I have over 200 employees. I don't know what everybody is trained in.
Q. I see. How many times have you attended these County Commission meetings?
A. In my life?
Q. You can start as far back -- as a Sheriff.
A. As a Sheriff?
Q. Let's go as a Sheriff.
A. I would say -- I would estimate it less than ten times.
Q. Okay.
A. Or close to ten, I suppose.
Q. And I think you say you were about six feet away from Dr. Spiehs?
A. Maybe eight, I suppose, depending on the spacing of the -- there was -- he was in the front pew, Michael Almon. I believe there was an empty pew in front of me, and then I was directly behind that.
Q. You know what a wrist lock is, don't you?
A. Yes.

Page 142

Q. What is a wrist lock?
A. It's a technique used to gain compliance.
Q. Pain? Pain compliance, right?
A. It can be, yeah.
Q. Well, it works because it's inflicting pain on the subject, correct?
A. It can, yes.
Q. Do you know when it wouldn't?
A. Some people don't feel pain.
Q. Okay. But it's designed as a pain compliance technique?
A. It is designed -- I believe in the broadest sense of that interpretation, I would agree with you, yes, sir.
Q. Handing you Exhibit 13, does that depict what you've been talking about as a wrist compliance maneuver?
A. Yes. That is a version, yes.
Q. Okay. And why -- describe the theory about why you might utilize a pain compliance technique.
MR. HOLDER: Object to form. Go ahead.
A. I suppose there's a litany of reasons,

Page 143

but the main one would be to exert control over a person in order to get them to do what you are trying to get them to do.
BY MR. BAKER:
Q. Right. It's something you're doing that's beyond a verbal command, you're doing something in terms of pain to get to compliance, correct?
A. That can --
MS. STEWART: Object to form. Go ahead.
A. That can be an interpretation, yes.
BY MR. BAKER:
Q. You've been trained in martial arts?
A. No.
Q. No?
A. No.
Q. Okay. And hyperflexing a wrist lock, have you heard it like that, hyperflex?
A. I have not.
Q. Have you heard of a gooseneck kind of maneuver like this in Exhibit 13?
A. I don't think I've ever heard of it called a gooseneck.
Q. But you've seen a wrist compliance?

Page 144

A. I have seen that technique.
Q. Okay. And you were using that?
A. I was not.
Q. Then what was I referring to?
A. The wrist lock that you just showed me a picture of.
Q. You weren't using any kind of pain compliance on Dr. Spiehs --
A. No.
Q. -- when you effected the arrest?
A. No.
Q. And if you were bending his wrist back, you don't consider that a pain compliance maneuver?
A. If I --
MS. STEWART: Object to the form.
MR. HOLDER: Go ahead.
A. If I was, then yes, I would consider it.
(Reporter clarification.)
A. Yeah, that's what I said.
BY MR. BAKER:
Q. All right. Look at Frame 506 of Exhibit 9.
A. Okay.

Page 145

Q. Tell me what you see as far as what you're doing.
A. I see -- I see me standing behind Justin.
Q. His left arm is extended, right? Correct?
A. It's behind him, but the forearm is extended away from his side, yes.
Q. But you have his right arm, correct?
A. That would be my assumption, but this doesn't show because the view is obstructed on his right arm.
Q. Well, we'll get to it.
A. Okay.
Q. You're not denying that you had his right arm?
A. No, I'm not denying that.
Q. Okay. And his right arm is being bent behind him?
A. Yes.
Q. And you're doing that?
A. He might have been doing it by himself, but I would assume I was doing it.
Q. All right. So let's look at 510.
A. Okay.

Page 146

Q. What do you see there?
A. Not much different. He's still in the same position.
Q. And you've got -- you're holding his right wrist?
MS. STEWART: Object to form.
A. It doesn't show that.
BY MR. BAKER:
Q. Are you denying that you're holding his right wrist as depicted in Frame 510?
A. I'm saying that I'm holding some proximity of his arm, his lower arm.
Q. If I say you were holding his wrist, is that correct or incorrect?
A. I would -- I don't think I would agree with that because that's very specific.
Q. Where do you think your hands were at Frame 510?
A. Probably on his forearm or his wrist.
Q. Okay. So you're not eliminating? It could be -- in fact be on his wrist?
A. I think I've been pretty clear, yes, it's possible, but I'm not going to say it was his wrist when it does not show it in the picture you're asking about.

Page 147

Q. All right. 513, where are your hands?
A. I don't know. It doesn't show them.
Q. Well, you were there. Tell me, irrespective of what the frame shows, where were your hands?
A. Somewhere on his lower arm.
Q. Okay.
A. My left hand might be on his back. I don't know.
Q. You really don't remember any of it?
A. Not really. This happened in a matter of seconds and it was over -- it was three years ago.
Q. Yeah. How about 515, what do you see there?
A. It looks like -- it looks like I've got a hand on his lower forearm and maybe a hand on the back of his tricep -- in his tricep area, his upper arm.
Q. And then 516?
A. Same.
Q. Right hand gripping Dr. Spiehs, right wrist?
A. It's --
MS. STEWART: Object to form.

Page 148

A. I don't think it's his wrist.
BY MR. BAKER:
Q. And your left hand is where?
A. It looks like it's behind his tricep, his upper arm area.
Q. Okay.
A. But I can't say for sure.
Q. Right. And you're not denying that you could be, in fact, doing some sort of pain compliance with his wrist at that point?
A. I am denying that fact.
Q. Oh, you are?
A. Yes.
Q. So you actually remember that?
A. I remember I didn't -- I didn't intentionally try to inflict any pain in order to get him to walk forward.
Q. I'm asking a different question.
A. No, you're not.
Q. Were you torquing his wrist?
A. No, I was not.
Q. You weren't doing any manipulations to his wrist?
A. To my knowledge, I had a hold of his lower left arm, and I think I had my right hand

Page 149

on his upper arm or back to get him to walk forward. I was not torquing, twisting, bending, hyperflexing --
Q. Well --
A. -- to my knowledge.
MS. MILLER: Mr. Baker, will you let him finish his answers before you start the next question?
BY MR. BAKER:
Q. Let's look at 5 -- you'll admit that your technique that you're using is different than what Kruzel is using?
A. I don't know. It's kind of similar. It looks like he's got his left hand on his left wrist area and his right hand on his upper right arm.
Q. But he's doing it with the arm extended, correct?
A. Yeah.
Q. Okay. And you're not doing the same extension on Dr. Spiehs' right arm, are you?
A. I have a different angle and his arm is further backwards.
Q. Yeah.
A. But it is not outside of the normal

Page 150

radius of motion.
Q. I get it. I'm just asking you to concede that the way that Kruzel is manipulating the left arm is different than yours on the right arm?
MS. STEWART: Object to the form.
A. I'm also stipulating that he was in a different position than I was and had different footing.
BY MR. BAKER:
Q. Okay. So 523, what do you see?
A. The same thing.
Q. You have both hands on his right wrist?
A. I don't know if -- I can't see what my left arm is doing.
Q. How about one hand on his right wrist?
A. It does appear --
MS. STEWART: Object to form. Go ahead.
A. I'm sorry. It does appear that my right hand is in his lower arm area.
BY MR. BAKER:
Q. How about right wrist?
A. I'm not -- I'm not ruling that out.
Q. Okay. 549.

Page 151

A. 549.
Q. What do you see?
A. I see Justin being walked out.
Q. How about his right arm is further back behind him?
A. It is. And it appears Deputy Wold now has a hand on him as well.
Q. 552. What do you see?
A. I don't see anything different, really.
Q. What is Wold doing?
A. It looks like he's looking at Dr. Spiehs' lower arm to find a place to grab, but that's -- that's my opinion. I don't know what he's doing.
Q. Well, he's looking at what you're doing versus what Kruzel is doing --
MR. HOLDER: Object to form.
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. -- is that fair?
A. No. I can't tell you what he's looking at because I wasn't in his brain.
Q. Oh, okay. But you can tell me what it appears he's looking at?
A. It appears he's looking at Justin.

Page 152

Q. At any part of his body? Or you can't tell, can you?
A. It looks like he's looking at his lower arm.
Q. Okay. The arm that you have?
A. Presumably, yes, but you can't see it in that photo.
Q. 555, what do you see?
A. The same thing. Looks like somebody's hand is on Dr. Spiehs' lower right arm.
Q. It could be your hand?
A. Could be my hand.
Q. You don't think it's Wold's hand, do you?
A. Judging by where the pinkie is, I would say that is my hand.
Q. Okay. Left hand, you're holding his arm. Your right hand is doing what?
A. That appears to be my right hand, judging by the pinkie.
Q. What's the other hand doing?
A. I don't know.
Q. You couldn't be necessarily bending his wrist, could you?
A. I don't know what it's doing. It

Page 153

doesn't depict it in this picture.
Q. Well, are you telling me you're not bending his wrist at 555?
A. At no time -- what I'm trying to tell you and I've already testified to is that at no time do I recall intentionally bending or trying to use pain compliance. I simply picked his ass up and walked him out the door.
Q. All right. And while you were picking his ass up and walking him out the door, could you have done that accidentally?
MS. STEWART: Object to the form.
A. Walked him out the door accidentally?
BY MR. BAKER:
Q. No. Used force on his wrist.
A. It was not intentional, but no, I don't believe I did.
Q. How about 557?
A. Yep, got it.
Q. What do you see there what you're doing to him?
A. I think it shows more clearly that that is my left hand because you can see my wedding ring. And in the next photo, you can see my watch, which is on my left hand.

Page 154

Q. And you would admit that his arm is being bent back towards you?
A. It's, yeah, in the same direction it was in the previous, yes.
Q. Right.
A. Yes.
Q. And you're still saying you're not manipulating or doing anything to his wrist at that point in 557?
A. As I've testified to, I have no independent knowledge or recollection of bending his wrist in a pain compliance manner that you were speaking of.
Q. And you don't know if you were actually inflicting any pain upon Dr. Spiehs when you were doing all that, correct?
A. That would be a question for Dr. Spiehs.
Q. No, I'm asking you. You don't know whether or not you were inflicting any pain?
A. Well, I think that's -- yeah, that's what I'm saying. I don't know what he was feeling.
Q. Well, come on, Sheriff. I mean, if he cried out and said ouch, you'd know you're

Page 155

inflicting pain, right?
MS. STEWART: Object to the form.
MR. HOLDER: Object to form.
BY MR. BAKER:
Q. Are you telling me you can't discern when you're inflicting pain on a subject?
A. What I'm telling you is that I don't recall him crying out in pain.
Q. So --
MS. STEWART: Let him finish.
A. Which you're right, which you're right, would have indicated that he was in some pain, and I would have potentially changed my hold or use to not cause pain because that was never my intent.
BY MR. BAKER:
Q. Okay. Thank you. So whatever technique you're using, what kind of technique would you call it?
A. Assisted walking.
Q. If you were training --
A. Or directed walking. I'm sorry.
Q. Well, in terms of -- you're not just getting him to walk, you're doing some restraining on his arm, correct?

Page 156

A. Any movements on his arms were to get him to walk.
Q. I get that. And if you were to train that, what would you train a deputy as to what that maneuver might be?
MS. STEWART: Object to the form.
A. I don't understand your question.
BY MR. BAKER:
Q. Let's ask it this way. Would you train your deputies to do what you did in the manner that you did it --
A. Yes.
Q. -- depicted in Exhibit 9?
A. Yes.
Q. Okay. And you would agree that at least in 559, Deputy Kruzel is using a different kind of restraint than you are?
MS. STEWART: Object to the form.
A. His hands are in different positions than mine, yes.
BY MR. BAKER:
Q. And Dr. Spiehs' arm is in a different position than his right arm, correct?
A. They are not identical, correct.
Q. And it doesn't appear that Deputy

Page 157

Kruzel is attempting to bend Dr. Spiehs' arms -- his left arm behind his back, correct?
A. No, I think it does.
Q. You think he's trying to bend his arm behind his back, 559?
A. I think his chest is in front of his elbow in this picture.
Q. All right. So if we go to 560.
A. 560.
Q. Yeah, 560 through 564. What would you describe? Is there any technique that you would say you're using on Dr. Spiehs' wrist or arm?
A. The same, an assisted walk.
Q. Well, an assisted walk, I mean, is that how you would help an elderly person across the street?
MS. STEWART: Object to the form.
A. If I've placed them under arrest for disorderly conduct and they're refusing to go where I tell them to go, then yes.
BY MR. BAKER:
Q. Is that what happened to Dr. Spiehs, he refused to the ask?
A. He refused --
MS. STEWART: Object to form.

Page 158

MR. HOLDER: Join.
A. He refused to follow lawful commands. He was refusing a lawful order.
BY MR. BAKER:
Q. And who gave the lawful order?
A. I did.
Q. And verbatim, what was that lawful order?
MS. STEWART: Asked and answered.
A. Asked and answered.
BY MR. BAKER:
Q. Go ahead. You realize you don't make your own objections, don't you?
A. Do you realize you're asking the same question over and over?
Q. Don't argue, Mr. Armbrister. Look, I don't want to --
MS. STEWART: He is the Sheriff.
A. Yes.
MS. STEWART: You can address him properly.
MR. BAKER: Oh, you think he can argue with me because he's the Sheriff?
MS. STEWART: No, I think you can show some respect.

Page 159

MR. BAKER: No, Michelle, you show some respect. Quit interrupting.
MS. STEWART: Then quit being disrespectful.
MR. BAKER: No, you quit being disrespectful. Stop.
BY MR. BAKER:
Q. Now --
MS. STEWART: Is that an order or a command?
MR. BAKER: No, I'm asking. Just follow the local rules.
MS. STEWART: I am.
MR. BAKER: Object to form and leave it at that.
MS. STEWART: I did.
MR. BAKER: No, you did not.
BY MR. BAKER:
Q. Now, Mr. Armbrister, what verbatim was the lawful order that you just referred to that you say that Dr. Spiehs did not comply with?
A. I told him that he had to leave the room and he was under arrest.
Q. Okay. Anything else?
A. And it was something -- that was not

Page 160

verbatim. That is the best -- that is -- something to that effect.
Q. All right. So in terms of, you're just paraphrasing what you think you might have said, correct?
A. I'm paraphrasing what I did say.
Q. Okay. But in terms of a quote, you can't identify verbatim what you just --
A. I feel like I've been quite clear. No.
Q. Now, and you say that he said -- once you said that to him, what was his response?
A. Said what to him?
Q. The statement you just said, the lawful order, once you said that, what was his response?
A. As I've testified, I said, "You're out of here," or something to that effect. He said, "Why?" And I said, "Because you're under arrest."
Q. So was "you're out of here" part of the lawful order that you gave him?
A. Yes.
Q. And because he asked why, that was disobeying your lawful order?
MS. STEWART: Object to the form.

Page 161

A. No. We continued to tell him that he needed to leave and he refused. He sat there. The video is clear. I think he even crossed his arms at one point. I'd have to look through your pictures here, but if you look at the video --
BY MR. BAKER:
Q. No, I don't need it. I mean, I'm just asking what he said.
MS. STEWART: He's trying to answer your question.
A. I think you do need it, because if you think that he is complying with me from the point where I -- let's see. Right here, 100. You're out of here.
BY MR. BAKER:
Q. I'm asking what he said.
A. I'm not done answering.
Q. Well, I'm asking what he said.
MS. STEWART: He's not done answering.
MR. BAKER: He's not responsive. I'm not asking this.
A. I'm looking through your exhibit.
MR. BAKER: I'm objecting to the

Page 162

narrative.
BY MR. BAKER:
Q. You're not even being responsive.
A. You can object to form, but you need to let me answer.
MR. HOLDER: He can complete his answer.
MR. BAKER: Well, he's really obstructing this deposition.
MS. STEWART: Well, do you want to get the -- we can call Magistrate James and see if she'd like to get on a call, because he needs to be able to finish his answer.
MR. BAKER: He's not answering.
A. At 186, you can see me motioning to Mr. Almon, which I believe is where I'm telling him, "You're under arrest for your actions toward Mr. Almon."
BY MR. BAKER:
Q. Do you remember what my question was?
A. I'm still answering your question.
Q. You're obstructing.
A. And then from -- up until the point of --
MR. BAKER: I object as

Page 163

nonresponsive.
A. Is this an "object to form" but I get to keep answering, or are you making up the rules?
MR. HOLDER: Finish your question.
BY MR. BAKER:
Q. You're not responding to anything that I've asked.
MS. STEWART: If you're not going to let him finish the question, then we need to get the magistrate on the phone and have a discovery conference.
MR. BAKER: You're not running this deposition, Michelle.
MS. STEWART: That's how we handle it. That's how we handle it.
MR. BAKER: No, it's not how we do anything, Michelle.
MS. STEWART: I beg to differ.
MR. HOLDER: Finish your answer.
A. It is the belief, from what I'm hearing on that side of the table, is that he was compliant and was forced to leave, when I'm telling you that your exhibit shows that from

Page 164

187 until 40 -- whatever you're using, is that he was told he needed to leave and we had to assist him to his feet and out the door because he was noncompliant.
BY MR. BAKER:
Q. Tell me when you're done.
A. I'm done.
Q. When you say "assist," you're not -- you forced him out, correct?
A. Correct, yeah.
Q. And you didn't charge him with resisting arrest, did you?
A. Nope.
Q. He wasn't resisting arrest, was he?
A. He was, but we didn't charge him with it.
Q. Oh. How come that is not in any of the reports, resisting arrest?
A. Because it was not a charge that we felt merited an arrest.
Q. Even though he committed that crime, in your opinion?
A. Yes.
Q. Any other crimes you think he committed that he wasn't charged with?

Page 165

A. I'm sure there's some obscure -- no. The answer is no.
Q. So resisting arrest was a crime you thought he committed but he wasn't charged with, correct?
A. I believe it's a charge that could have been leveled against him, but it was not because we did not feel that it merited an arrest.
Q. Well, let me ask this question. Did he resist arrest -- commit that crime of resisting arrest on April 20th, 2022?
A. Yeah. In my opinion, I'm saying that yes, I think he could have been charged under that statute, but I'm not going to -- I'm not going to litigate whether or not he would have been convicted of it.
Q. By saying he could be charged, you're saying he did commit the crime of resisting arrest, correct?
A. I believe there was evidence to show that a jury and a judge could determine that, or a District Attorney's office.
Q. Did you believe at the time he committed the crime of resisting arrest on April 20th, 2022, yes or no?

Page 166

A. Yes.
Q. And why didn't -- were you interviewed by Deputy Kruzel?
A. I provided him with my information.
Q. Did you provide him with that information, you thought he committed the crime of --
A. No, we didn't want to charge him with it.
Q. "We" is you?
A. I didn't want to charge him with it.
Q. So when you say that he committed the crime of disorderly conduct before Frame 1, that means that he would have had to have told Michael Almon "I don't give a fuck what you say" before Frame 1, correct?
A. Asked and answered. Yes.
Q. And there were how many people in that room before the meeting started?
A. I don't know.
Q. Could it have been 30?
A. Could have been, yes.
Q. Exhibit 4, page 6.
A. Which one is 4? I got 10, 11, 12. 4, gotcha. 4, page 6.

Page 167

Q. Page 6.
A. Page 6 of 11 at the top, is that what I gather?
Q. Deputy Coleman says: "At approximately 1725 hours, I arrived at 1100 Massachusetts Street in Lawrence, Douglas County, Kansas, for a special assignment. I was to monitor the County Commissioner's meeting which takes place on the second floor in the County Commission Meeting Room."
Did I read that correctly?
A. Yes.
Q. So what does it mean to have a special assignment?
A. It means something outside of your normal workday.
Q. And what was his normal workday that day?
A. I believe he was -- sorry. I believe he was assigned to court and security, which runs the same hours as the courthouse, which ends at 5:00.
Q. So how did he get a special assignment?
A. We assign a rotating schedule, I believe, of courtroom security deputies to

Page 168

provide -- to stand by at County Commission meetings that happen after our normal hours.
Q. So if you look at page 8.
A. 6, 7, 8.
Q. And this is Deputy Wold.
A. Yeah.
Q. You see where he says he was assigned to the Douglas County Commission meeting as security?
A. Yes.
Q. And your testimony is that it had nothing to do with Dr. Spiehs' presence at that meeting?
A. What had nothing to do?
Q. Their assignment.
A. You think we assigned them just because of Justin? No.
Q. Or how about in part because of?
A. No.
Q. So if you look at Exhibit 4, page 3.
A. Exhibit 4, page 3.
Q. It says: "Deputy Jimmy Wold and Deputy Chase Coleman were also present due to past issues with Justin Spiehs."
A. Okay.

Page 169

Q. See that?
A. Yeah.
Q. Explain that.
A. That's Deputy Kruzel's perception of why they were there.
Q. Is that a true statement?
A. If he believes it to be a true statement, then that's why he put it.
Q. I'm not asking what he believes. I'm asking factually, is that a true statement?
A. No. Justin Spiehs is not part of our assignment.
Q. Okay. So that's another incorrect statement of fact?
A. Again --
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. Again, that is what he believes.
BY MR. BAKER:
Q. Let me make the statement and tell me if you think this is true. Deputy Jimmy Wold and Deputy Chase Coleman were also present due to past issues with Justin Spiehs. Is that a correct statement?
A. No.

Page 170

Q. Okay. Is this the first time you've realized that's not a correct statement?
A. I don't agree with the fact that you say it's an incorrect statement, but -- because I believe that that is Tyler Kruzel's perception and understanding. Whether or not it was incorrect, his understanding, is up to him. I do disagree that they were there simply because Dr. Spiehs was going to be there because we -- he doesn't take up the kind of space in our world that you think he does.
MR. BAKER: I object as nonresponsive.
BY MR. BAKER:
Q. You disagree with this statement, then, that they were present due to the past issues with Justin Spiehs, correct?
A. Correct.
Q. Okay. And is that the first time you've realized that this factual allegation contained in that report is incorrect?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. It's not a factual allegation. That is his belief.

Page 171

BY MR. BAKER:
Q. No, he said it as a fact: "Were also present due to past issues with Justin Spiehs." Do you see that?
A. And I've agreed that --
MS. STEWART: Object to the form.
A. I've agreed that that is incorrect.
BY MR. BAKER:
Q. That's not a true statement, correct?
A. I believe that is an incorrect statement, but that was his understanding.
Q. Well, any idea how he would have come to that conclusion?
A. You'd have to ask him.
Q. Okay. I'm asking you.
A. I have no idea.
Q. Okay. But according to that report, they -- Wold and Chase were there because of past issues with Justin Spiehs, you agree to that?
A. That is what the report says, yes.
Q. All right. Did you know that Dr. Spiehs was going to be attending on April 20th, 2022?
A. No.

Page 172

Q. And the Board didn't talk to you about whether Dr. Spiehs had signed up to speak?
A. No.
Q. Can you show me anything in Exhibit 4 where you all are there and you're there because of the topics that are going to be discussed at the meeting?
A. No.
Q. Did you give an affidavit or statement?
A. Did I give an affidavit or a statement?
Q. Yes.
A. To whom?
Q. Any of your deputies.
A. No.
Q. Why?
A. I provided the information that I observed to them, but it's not -- I guess in my -- in my understanding of the words "affidavit" or "statement," I did not provide a signed copy of anything.
Q. Why?
A. Because it's not required.
MS. MILLER: Can we take a break sometime soon? I apologize. Just whenever. I need one.

Page 173

MR. BAKER: Okay. Let's take a break.
MS. MILLER: Well, it doesn't need to be now.
THE WITNESS: It doesn't have to be now. Keep going.
MS. MILLER: I just meant in the next few minutes, I need to go. Sorry.
MR. BAKER: Well, I'm willing to break now.
MS. MILLER: Okay. Thank you.
(A recess was taken.)
MR. BAKER: All right. We're back on the record.
BY MR. BAKER:
Q. So when you saw Dr. Spiehs enter the room on April 20th, 2022, it was uneventful, I guess, until he got up to the podium, or what -- strike that.
Do you remember him saying anything as he entered the room, as he went up to the podium to sign up?
A. No. And in fact, now that you say that, that is another inconsistency in the report that -- I don't remember which deputy,

Page 174

but somebody said he came in cursing and that is not correct.
Q. Well, you anticipated my question.
A. Now when you said that, it reminded me that you're correct. You're right.
Q. Now, how could Wold have misheard that, if you know?
A. I don't.
Q. I mean, that's a way -- I mean inaccuracy, you'd agree to that?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I would agree that -- to the fact, but I believe -- I could make excuses, but I will agree to that, yes.
BY MR. BAKER:
Q. Well, in Exhibit 4, page 8, he says at 5:20, Dr. Spiehs was standing next to the front row and turned around and yelled at Almon, and that's not true, is it?
A. I've already -- asked and answered. I've already indicated that that is incorrect.
Q. Okay. How many inconsistencies are we up to in this deposition from these reports?
A. Four.

Page 175

Q. Okay. And you saw that one. When was the first time you realized that was an inaccuracy?
A. Last night.
Q. Okay. He says: "Upon entering the room, Spiehs began cussing and/or addressing various people as he walked across the room to the south section of seating in the Commission room gallery." That's incorrect, isn't it?
A. That is.
Q. And he says that Dr. Spiehs was directing those comments not to you, but Michael Almon, the man seated, correct?
A. Where does it say that? I'm sorry. That's on page 8 still?
Q. I think so.
A. Where did you read that part from? I'm sorry.
Q. You've got the exhibit. I don't have it.
A. Can you give me the quote again so I can find it?
MS. MILLER: Do you want mine?
MR. BAKER: No, it's fine.
BY MR. BAKER:

Page 176

Q. "Began cussing."
A. Turned around, yeah. Okay. I'm sorry. I was in the wrong paragraph. "Spiehs began cussing and/or addressing various people as he walked across the room to the south section of seating in the Commission room gallery."
Q. That's not correct, is it?
A. That is not correct.
Q. In fact, he walked quietly through the room up to the podium, didn't he?
A. I'll take it one step forward. This says that he walked towards the gallery, which to me is the seats. He actually approached the podium and/or dais to sign in, and then there. And yes, he did not say anything until he and I had our conversation.
Q. You would agree with me, according to Wold, it sounds a lot worse than what actually happened?
A. Yes.
MS. STEWART: Object to the form.
THE WITNESS: I'm sorry.
BY MR. BAKER:
Q. It says "RO" -- which is the reporting officer, correct?

Page 177

A. Yes.
Q. -- "watched as Sheriff Jay Armbrister, who was seated in the gallery near the back of the room, approached Spiehs and told him to leave. They exchanged words."
Do you see that?
A. I do.
Q. His chronology is off, isn't it?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
BY MR. BAKER:
Q. Well, is his chronology off?
A. In that statement you just read to me?
Q. Yeah.
A. No. I was seated in the back of the gallery, I approached Spiehs, and I told him to leave in that order.
Q. You learned the prosecutor wasn't going to prosecute any of the disorderly conduct charge?
A. They did prosecute.
Q. You learned that they dismissed the charge?
A. As part of a plea agreement, yes.
Q. In this case?

Page 178

A. Yes.
Q. Really? So they didn't prosecute it?
A. They did prosecute --
MS. STEWART: Object to the form.
A. I'm sorry. They did prosecute it.
BY MR. BAKER:
Q. I see. Is it often that prosecutors don't prosecute charges by the Douglas County Sheriff's Office?
MR. HOLDER: Object to form.
MS. STEWART: Join.
MR. HOLDER: Go ahead.
A. I don't even understand your question.
BY MR. BAKER:
Q. You'll agree that the charge against Dr. Spiehs was dismissed by the prosecutor's office?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. As part of a plea negotiation in a separate case, yes.
BY MR. BAKER:
Q. How do you know that?
A. Because I have the paperwork from the District Attorney's office.

Page 179

Q. Do you know what deputy --
A. Would you like a copy of it?
Q. Well, here's what I want to know. Were you aware of what Deputy Kruzel told Dr. Spiehs while in the sallyport?
A. I am not.
Q. Did you talk to Deputy Kruzel about what he heard you say to the Commissioners on April 20th, 2022, after you confronted Dr. Spiehs about his sign?
MS. STEWART: Object to the form.
A. I'm sorry, did I talk to Tyler Kruzel about the Commissioners?
BY MR. BAKER:
Q. Let me ask it again.
A. Okay.
Q. Did you talk to Deputy Kruzel about what he heard you say to the Commissioners on April 20th, 2022, after you confronted Dr. Spiehs about his sign?
A. No.
Q. If you look at Exhibit 8.
A. Which one is 8?
Q. I've got it. I don't think you have it.

Page 180

A. Okay. I don't.
Q. Yeah. You've seen that before?
A. I just saw this one yesterday.
Q. Have you not reviewed any of the complaints in this matter being filed?
A. By a "complaint," what do you mean?
Q. The lawsuit, the lawsuit allegations.
A. Okay.
Q. Have you not reviewed those?
A. I read it a long time ago. Is that the 70-page document?
Q. There was one originally that had photos in it. Do you remember the first one?
A. I only recall photos of the arrest. I don't recall seeing these before yesterday, but I'll stipulate that these photos look accurate.
Q. And these are your deputies in a Commission meeting?
A. I see three, yes.
Q. And tell me why -- what do they appear to be doing in Exhibit 8?
MR. HOLDER: Object to form.
MS. STEWART: Join.
MR. HOLDER: Go ahead.
A. There's two -- there's two pictures

Page 181

depicting two different things. Which one do you want?
BY MR. BAKER:
Q. Well, let's take the first one.
A. It appears that they're standing by as part of the meeting, providing security.
Q. Do you think they're having any interactions with Dr. Spiehs?
MR. HOLDER: Object to form. Go ahead.
A. No.
BY MR. BAKER:
Q. And what do you think that officer on the bottom is doing?
MR. HOLDER: Object to form.
A. In the -- in the separate picture?
BY MR. BAKER:
Q. Yeah.
A. Then they are having interactions with Dr. Spiehs, but they are not having an interaction in the first picture.
Q. Okay. Could it be possible that the Commission has told Dr. Spiehs he has to leave the meeting?
MR. HOLDER: Object to form.

Page 182

MS. STEWART: Join.
MR. HOLDER: Go ahead.
A. Is it possible? Yes.
BY MR. BAKER:
Q. Well, was there a practice by your deputies that if the Commissioners said an individual has to leave, that your deputies would effectuate that?
A. Yes.
MS. STEWART: Object to the form. Asked and answered. Sorry.
BY MR. BAKER:
Q. And in fact, that's -- at the bottom of the picture, you can see that that's actually what's going on, they're motioning him out, right?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I don't know what's going on in that picture.
BY MR. BAKER:
Q. Have you asked your deputies what went on in that meeting?
A. I've never had a reason to.
Q. And you don't know if Dr. Spiehs

Page 183

violating any Commission rules violate -- or commit a crime under Kansas law, do you?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
A. I'm sorry. Can you re-ask that question?
BY MR. BAKER:
Q. Let me ask it this way. Is it your contention that just simply violating a speech rule in a Commission meeting, that that fact alone, the individual commits a crime?
MR. HOLDER: Object to form. Go ahead.
MS. STEWART: Join.
A. I don't agree that a speech violation in a limited public forum is a crime.
BY MR. BAKER:
Q. Okay. And it was this policy -- or wait. Let me strike that.
You said they did take directives from the Commissioners about having people leave, you've testified to that today, correct?
A. They would take the requests from the Commissioners to have somebody removed, yes.
Q. Yes. And was that your policy?

Page 184

A. Define the word "policy."
Q. Well, custom, practice.
A. Policy and practice are different, and yes, that was our practice.
Q. Okay. And you're the one that says that's what you're supposed to do, deputies?
A. Ultimately, yes.
Q. Yes. I mean, they wouldn't have done that on their own unless you said this is what is supposed to happen, correct?
A. Deputies are trained to make the decisions based on law, ethics, legality, all of those things. They can make decisions without my prior or tacit approval. So I'm not going to sit here and say that I directed them in this specific instance to do this specific thing.
Q. How long has this custom or practice been going on where they're taking directives from the Commissioners to have people removed?
A. I don't know.
Q. Well, was it before your regime?
MR. HOLDER: Object to the form.
BY MR. BAKER:
Q. Well, I said "regime." I don't know. How long --

Page 185

A. I just picture a third world country with some great big decorated general.
Q. Okay.
A. This has been the practice since I became Sheriff in January of 2021. I believe it has been a practice for many years.
Q. Has it changed?
A. By "changed," what do you mean?
Q. Change.
A. Has it changed from the day I took office to today?
Q. Today, that practice that you've said that -- or custom, has that changed at all as we sit here today?
A. Our practice has not changed.
Q. So this custom of taking directives, it's ongoing, correct?
A. Correct.
Q. Okay. And you have not considered changing this idea that your deputies are there to enforce Commissioner rules or take directives from the Commissioners?
A. No.
MS. STEWART: Object to the form.
A. I'm sorry. No, but there's been some

Page 186

case law recently come out that shows that limited public forums do have to follow specific rules.

BY MR. BAKER:

Q. What case law is that?

A. I don't know the names. You'd have to look in the LJWorld.

Q. Okay. And you think that tells you that it's -- deputies should be enforcing Commissioner rules, it's proper?

A. That's not what I'm saying.

Q. You brought it up. I didn't know what the relevancy was.

A. Sure.

Q. Okay. But when you say your deputies are trained, they're trained in enforcing or recognizing crimes, correct?

A. Correct.

Q. And trained in recognizing what might be a safety hazard, right?

A. I think that's an overly broad term. We don't know the smell of certain gasses that could be noxious.

Q. Fair enough.

A. Okay.

Page 187

Q. You said they were there for safety reasons?

A. Security, yes.

Q. Security reasons. Were they there for safety reasons?

A. Anywhere we are is for a safety reason.

Q. Right. But are they trained in discerning how to interpret Commissioners' rules at a Commission meeting?

MS. STEWART: Object to the form.

A. There is no formal training.

BY MR. BAKER:

Q. Is there informal training?

A. No.

Q. I mean, that's why you said if we're going to remove somebody, the Commissioners have to tell me rather than me doing it on my own, right?

A. If it's based on a rule that they have, but they cannot dictate whether or not I remove somebody for a crime --

Q. Right.

A. -- or not arrest --

MS. MILLER: Can you just let him finish?

Page 188

MR. BAKER: I did let him finish.

A. No, you didn't.

MS. MILLER: No, you didn't.

A. I'm still talking, whether I arrest somebody for a crime or they cannot dictate for me to not arrest somebody for a crime.

BY MR. BAKER:

Q. I follow you loud and clear. If it's a rule violation, then you're going to follow their lead, correct?

A. We're going to follow the law, yes.

Q. Well, the Commission's rules is what I'm talking about --

A. Yes. Sorry.

Q. -- right?

A. Yes.

Q. When it comes to the law and enforcing crime, that's in your ballpark, not theirs, correct?

A. Correct.

Q. Okay. So in Exhibit 1 we've just referred to, but I want to make sure we've got.

A. I've got 8 here. Oh, here we go.

Q. No, not Exhibit 1, I'm sorry. Your Exhibit 12.

Page 189

A. It might be in that stack there. Got it.

Q. Page 1. There you say if there was a problem --

A. I'm sorry. Where do I say that?

Q. Page 1.

A. Okay.

Q. I think it's down at the bottom.

A. Okay. That if there was a problem, yes.

Q. Yeah. Go ahead and read that out loud.

A. "If there was a problem and the Commission wanted someone removed, they needed to let him know, because he was not going to do it on his own."

Q. All right. And that's your answer in that interrogatory, correct?

A. Yes.

Q. And that was your custom and practice that you have just cited to?

A. Yes.

Q. Have you seen any of the YouTube videos of the Commissioner meetings involving Dr. Spiehs?

A. No. I'm sorry. By "YouTube," you mean

Page 190

have I gone back and looked at old Commission meetings or have I watched the live YouTube stream or Zoom videos?
Q. Well, YouTube videos of Commission meetings involving Dr. Spiehs, however they come across the Internet.
A. I'd have to say yes, because I've seen him on -- at meetings that are broadcast on YouTube.
Q. And why are you watching that?
A. I watch all County Commission meetings because I'm a county elected official.
Q. Okay.
A. The word "all" is not fair. I can't testify that I've seen every one, but I try to watch as many as I can. Sorry.
Q. You would admit you were the arresting officer on April 20th, 2022?
A. I would say that depends on your interpretation, but I was the one that told him he was under arrest, yes.
Q. You don't -- you're not familiar with "arresting officer"?
A. There's many different connotations.
Q. Give me one.

Page 191

A. At the bottom of the arrest report, it asks for arresting officer and it might even show Tyler Kruzel.
Q. Was he the arresting officer?
A. Because he took him into custody, maybe even had his handcuffs on him, I don't know. And he transported him to the jail in which -- and then filled out an arrest report.
Q. In another nuance, you could be considered the arresting officer?
A. Yes.
Q. Because -- because why?
A. Because I witnessed the crime, I made the contact, I told him he was under arrest, and -- well, no. That's it.
Q. Yeah. You initiated the arrest, correct?
A. Yeah. Yes.
Q. Now, I'll ask this. I mean, just saying the word "fuck" or "motherfucker" is not a crime, is it?
A. No. I use it probably too much.
Q. Okay. And noisy conduct is what you said he, Dr. Spiehs, engaged in. Can you give me any definition that you used on April 20th,

Page 192

2022, for that definition?
MS. STEWART: I object to the form.
MR. HOLDER: Join.
A. I -- just the simple application of the word "noisy" and "conduct."
BY MR. BAKER:
Q. And do you think that noisy conduct -- do you know if it has to be, within it, fighting words?
A. No.
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I'm sorry. The statute is clear, it says "fighting words or."
BY MR. BAKER:
Q. Okay. So you think you can violate that statute simply by the noisy conduct apart from the fighting words, correct?
A. As long as that noisy conduct meets the rest of that statute, which is -- and I quote -- tending reasonably to arouse alarm, anger or resentment in others.
Q. Right, yeah. And irrespective of whether the words spoken constitute fighting

Page 193

words, correct?
MR. HOLDER: Object to form. Go ahead.
A. I've never been good with the word "irrespective."
BY MR. BAKER:
Q. Let me try --
A. Yeah, I'm just -- my ignorance is on "irrespective."
Q. Let me try it again. You've already said he wasn't arrested for fighting words, correct?
A. Correct.
Q. And so then it's the latter part of that statute that you're relying on, which is noisy conduct, correct?
A. Correct.
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. And so -- well, just strike all that. I think I've got my answer.
MR. BAKER: Let me take a break. I think we're done.
THE WITNESS: Okay.
MR. BAKER: Oh, you know what?

I'm not going to be done yet. I've got two more things.
THE WITNESS: Do you want to keep going right now?
MR. BAKER: Yeah, I would. Can we?
THE WITNESS: It's fine with me.
BY MR. BAKER:
Q. I've got two things, and I'm just going to hand you Exhibit 14.
A. Okay.
Q. I meant to ask this. Exhibit -- well, let me give you Exhibit 14 and 15. Can you identify Exhibit 14 and 15 for me?
A. They appear to be training records.
Q. Your training records, right?
A. Yeah. They all have my name listed out to the left of the courses.
Q. And there's a repository that Kansas keeps all law enforcement officers' training --
A. Yes.
Q. -- do you know? So within that 14 and 15, can you identify your training, if there is such, as to how or when to recognize the crime of disorderly conduct?



A. It's not in there --
MS. STEWART: Object to form. Go ahead.
A. It's not in there specifically.
BY MR. BAKER:
Q. Well, would there be anything in here like when I use the phrase "mens rea" and "actus reus," elements of a crime, is there any training you can identify in 14 or 15 about that?
A. I have not taken Latin, no.
Q. Or let me use it in English. Have you gotten any training as to the conduct or intent part of a crime --
A. Yes.
Q. -- in 14 and 15?
A. No. 15 -- I'm sorry, No. 14, the very first line from 1999, which was a long time ago, "KLETC 155th Basic Training Academy."
Q. What does that training give you in terms of being able to identify elements of a crime?
A. I don't recall the specifics, the name of the course, how long it took. I believe it was taught by a lady by the name of Kim



Rodebaugh.
Q. Okay.
A. And it was about Kansas state statutes and elements of the crime.
Q. And as far as anything else in here that --
A. I'd have to look through it line by line, but to my knowledge, I have not taken any specific courses that go towards elements of the crime and recognizing them specifically.
Q. Well, you know -- and I did mean to ask you this, too. When you -- the crime that you claim that Dr. Spiehs committed, that was a misdemeanor?
A. Yes.
Q. And what is your training in terms of how much, if any, you use force on a misdemeanor arrest?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. Misdemeanor has nothing -- misdemeanor versus felony has very little, if nothing to do, especially in this case specifically, as to how much force can or will or should be used to effect an arrest. People have been killed over



misdemeanors.
BY MR. BAKER:
Q. Is it possible that you told the Commission that -- or the Commission told you to have Justin Spiehs removed from the meeting before it got started?
A. No.
Q. Is it possible that Deputy Kruzel told Dr. Spiehs that in the sallyport?
A. I don't -- if you're asking for a possibility, I can't say no because I was not present. I don't believe that happened, but I don't -- and if it did, that would be an incorrect statement.
MR. BAKER: Let's take a break. I want to see if he's -- now I'm almost done.
THE WITNESS: Okay.
(A recess was taken.)
MR. BAKER: I've got one series of questions.
THE WITNESS: Okay.
BY MR. BAKER:
Q. There was another meeting in which you were at and Dr. Spiehs walked up to you and started talking to you; do you remember that?

Page 198

A. Would this have been within the last maybe year or so?
Q. Probably.
A. Then yes.
Q. November of 2024.
A. It would have been in the last year, yeah.
Q. And do you recall that during that conversation or whatever, that you got up and left the meeting and went outside?
A. I did.
Q. And Dr. Spiehs was continuing to ask you, interview you, asking questions, correct?
A. He was continuing to chirp at me, yes.
Q. And when you say "chirp," what does that mean?
A. He was calling me a pussy and a coward, and I don't recall what else he had to say to me.
Q. Okay. Well, and so after that encounter, then you know who Michael Eravi is?
A. Yes.
Q. And he emailed you?
A. Yep.
Q. And what did you say about Dr. Spiehs

Page 199

in that email to Mr. Eravi?
A. I don't recall.
Q. You said that Dr. Spiehs smelled?
A. Yes, that's -- I recall saying that.
Q. What does that mean?
A. He has poor personal hygiene.
Q. He does?
A. Yes.
Q. What did he smell like?
A. Body odor.
Q. Oh. And you were close enough to him for that?
A. I was.
Q. And then -- and what did that have to do with anything?
A. Nothing.
Q. Just something --
A. Yeah.
Q. -- you had to say?
A. No. I mean, it was an observation that I made. And I didn't feel like the people that had accidentally sat beside me needed to be subjected to his presence because he wanted to talk to me, so I left the room.
Q. Well, he stood up and you were sitting

Page 200

down, right?
A. He walked in and came right up on my shoulder, yes.
Q. But he never sat down next to you, right?
A. There was no seat next to me.
Q. Well, and then you told Mr. Eravi that he was a narcissist, do you remember that?
A. I told -- that Michael is a narcissist?
Q. No, you said that -- you told Michael Eravi that Dr. Spiehs was a narcicisstic chaos something --
A. Content creator.
Q. Content creator.
A. I stand by that.
Q. Okay. And why did you say that?
A. Because that's my personal -- personal belief.
Q. What made you think that he was that?
A. His actions.
Q. What actions?
A. Every one of them.
Q. Give me some examples.
A. Dr. Spiehs believes that the world rotates on an axis that is held with him in the

Page 201

center and that everybody in this world is constantly trying to adjust or believe, listen to, think about what he is up to or doing. And I happen to know some information about his personal life that I feel is sad.
Q. What's that?
A. I'd rather not talk about it. That would be a good question for him. But I believe that he is -- that my personal belief is that he doesn't -- no, I'm not going to answer that. Dr. Spiehs lives a life that I believe is based off narcicisstic tendencies.
Q. Well, having said all that, you brought up something in his past that you know --
A. I know allegations and hearsay.
Q. Well, tell me what those are.
A. That he's lost his family. He told me that his kids don't have anything to do with him. I find that actually -- I find -- I feel really bad about that, and that I feel that that may be because of some mental health issues. But that is, again, an undiagnosed -- not from a doctor, my personal opinion.
Q. The fact that he went through a divorce means he has mental issues?

A. No.
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. That is not the case.
BY MR. BAKER:
Q. What makes you think he has mental issues?
A. Because of his inability to rein in his anger.
Q. Does he look --
A. His inability -- and his inability to listen to other perspectives of people.
Q. That encounter that we talked about where he came in, you're claiming he was angry when he talked to you then?
A. I didn't claim that.
Q. Was he angry?
A. Justin is always giving the perception that he is upset or angry, yes.
Q. And that's how you perceived him in that event we just talked about where he came up and you walked out?
A. Yeah.
Q. Okay. Does he appear angry to you today?



A. No.
Q. How do you know?
A. Well, he hasn't said a word.
Q. Can you see it in his facial --
A. Yeah.
Q. Do his facial manners today appear angry to you?
A. No.
MR. BAKER: No further questions.
THE WITNESS: Okay.
MS. STEWART: I don't have any questions.
MR. HOLDER: No questions. The witness will read and sign.
THE REPORTER: Do all counsel want an electronic copy?
MS. STEWART: Yes, please.
MR. HOLDER: Yes, please.
MS. STEWART: With the exhibits attached, please.
(Deposition concluded at 12:43 p.m.)



C E R T I F I C A T E

I, Sharon R. Larrick, a Certified Court Reporter, do hereby certify:

That prior to being examined the witness was by me duly sworn;

That said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

The original transcript is in the custody of:
MR. LINUS L. BAKER
Attorney at Law
6732 West 185th Terrace
Stilwell, KS 66085

WITNESS my hand and seal this 1st day of August, 2025.

Sharon R. Larrick
CCR NO. 765, CSR NO. 767

JUSTIN SPIEHS vs. JAY ARMBRISTER, et al.



Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

August 17th, 2025

To: MR. ANDREW HOLDER

Case Name: Spiehs, Justin v. Armbrister, Jay Et Al.

Veritext Reference Number: 7491543

Witness: Jay Armbrister Deposition Date: 8/1/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7491543
CASE NAME: Spiehs, Justin v. Armbrister, Jay Et Al.
DATE OF DEPOSITION: 8/1/2025
WITNESS' NAME: Jay Armbrister

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

______________ ______________________
Date Jay Armbrister

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7491543
CASE NAME: Spiehs, Justin v. Armbrister, Jay Et Al.
DATE OF DEPOSITION: 8/1/2025
WITNESS' NAME: Jay Armbrister

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

______________ ______________________
Date Jay Armbrister

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date



ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7491543

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________
____________________________________________________________

________________ __________________________
Date Jay Armbrister

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________ DAY OF ________________________, 20______ .

____________________________________
Notary Public

____________________________________
Commission Expiration Date