IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JUSTIN SPIEHS,
Plaintiff,
vs.
JAY ARMBRISTER, et al.,
Defendants.

Case No. 5:24-cv-4005-JAR-BGS

DEPOSITION OF TYLER KRUZEL, a Defendant, taken on behalf of the Plaintiff before Sharon R. Larrick, CSR No. 767, CCR No. 765, RMR, CRR, CRC, pursuant to Notice on the 25th day of July, 2025, at the offices of Stevens & Brand LLP, 900 Massachusetts, Suite 500, Lawrence, Kansas.



EXHIBIT D

APPEARANCES

APPEARING FOR THE PLAINTIFF:
MR. LINUS L. BAKER
Attorney at Law
6732 West 185th Terrace
Stilwell, KS 66085
913.486.3913
linusbaker@prodigy.net

APPEARING FOR DOUGLAS COUNTY, KANSAS SHERIFF'S OFFICER DEFENDANTS:

MR. ANDREW HOLDER
FISHER, PATTERSON, SAYLER & SMITH LLP
9393 West 110th Street
Suite 300
Overland Park, KS 66210
913.339.6757
aholder@fpsslaw.com

MS. LESLIE M. MILLER
STEVENS & BRAND LLP
900 Massachusetts
Suite 900
Lawrence, KS 66044

APPEARING FOR DEFENDANT DOUGLAS COUNTY, KANSAS BOARD OF COUNTY COMMISSIONERS AND COMMISSIONER DEFENDANTS:
MS. MICHELLE R. STEWART
HINKLE LAW FIRM, LLC
8711 Penrose Lane
Suite 400
Lenexa, KS 66219
913.345.9205
mstewart@hinklaw.com

ALSO PRESENT:
Dr. Justin Spiehs



INDEX


| WITNESS: | PAGE |
|---|---|
| TYLER KRUZEL | |
| Examination by Mr. Baker | 4 |


EXHIBITS


| EXHIBIT NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| Exhibit 1 | Minutes of 4-20-22 Commission Board Meeting | 50 |
| Exhibit 2 | Affidavit of Tyler Kruzel | 57 |
| Exhibit 3 | Kansas Standard Arrest Report | 65 |
| Exhibit 4 | 4-10-22 Incident Report | 73 |
| Exhibit 5 | Third Verified Amended Complaint | 111 |
| Exhibit 6 | Defendant Officers' Answer | 115 |
| Exhibit 7 | Photographs numbered pages 1 through 9 | 130 |
| Exhibit 8 | Photographs | 106 |


NOTE: Plaintiff's Deposition Exhibits 1 through 8 were attached to the original transcript.



(Deposition commenced at 9:04 a.m.)
TYLER KRUZEL,
being first duly sworn, testified under oath as follows:
EXAMINATION
BY MR. BAKER:
Q. Would you state your name for the record, please.
A. Tyler Kruzel.
Q. Kruzel?
A. K-r-u-z-e-l.
Q. All right. Now, I notice you're in uniform today.
A. Correct.
Q. Are you on duty?
A. Yes, sir.
Q. Okay. How many guns you got on you today?
A. Just one, sir.
Q. Just a Glock?
A. Yes, sir.
Q. 19?
A. I don't remember which one it is.
Q. A 9-millimeter?
A. Yes, sir.



Q. Okay. Just -- I'm a gun --
A. Yeah, I don't know the specific.
Q. All right. So you're getting paid while you're getting deposed?
A. Correct.
Q. Okay. And what is your position with the Sheriff's Department?
A. Currently I'm a Master Deputy.
Q. And how long have you been that?
A. I'd say almost a year, if not a little bit more.
Q. And prior to that, what rank were you?
A. Just a Deputy.
Q. Okay. Well, don't say "just." You were a Deputy.
A. Okay. A Deputy, yes.
Q. All right. And you were a Deputy back -- well, first of all, strike that.
You recognize Dr. Spiehs here in the room?
A. Correct.
Q. All right. And you were the one who transported Dr. Spiehs to jail on April 20th, 2022, if you remember?
A. Yes, sir.

Q. And you went through a -- there's a sallyport there at the jail?
A. Correct.
Q. And do you know if Dr. Spiehs had any audio recording devices with him, under his shirt or anything like that?
A. Under his shirt?
Q. Well, anywhere.
A. No. I mean, a cell phone, but I don't know if it was activated or not.
Q. Do you know if he had any other recording devices on him?
A. Not that I'm aware of.
Q. Okay. So back on the April 20th, 2022 incident, you know what I'm talking about?
A. Yes, sir.
Q. And who is Jay Armbrister?
A. The Sheriff, my boss.
Q. And Dr. Spiehs was sitting on the front row in that Commission meeting, or before that meeting started, rather?
A. Yes, sir.
Q. And then you saw Sheriff Armbrister walk up to Dr. Spiehs initially, do you recall that?



A. Yes, sir.
Q. Okay. In the room, where were you stationed when Dr. Spiehs was sitting there on the front row?
A. I would say I was in the southwest corner of the room.
Q. Okay.
A. So where he was seated, there's a row of chairs just -- I don't know how to describe it, but I would look to my right to see him, yes.
Q. Okay. And to your left would be the Commissioners?
A. Correct.
Q. All right. Tell me how close you were to the Commissioners, how close you were to Dr. Spiehs.
A. I couldn't tell you. Approximately?
Q. Yeah, yeah. Ballpark me.
A. Two to three feet, I guess.
Q. Okay.
A. That's a rough guess and I'm not sure about it.
Q. Got it. Do you think you were closer to the Commissioners as you were to Dr. Spiehs



or any idea?
A. I was right in the middle, right in the middle.
Q. Two to three feet maybe?
A. Sure.
Q. Close enough to hear what Dr. Spiehs said?
A. Not -- not unless it was an elevated voice.
Q. Okay.
A. Normal talking voice, probably not.
Q. Could not?
A. No.
Q. How about the Commissioners?
A. No.
Q. You were two to three feet from them and you couldn't hear anything?
A. No.
Q. So you saw Sheriff Armbrister come up and, I guess, say something to Dr. Spiehs? You didn't hear what he said?
A. Correct.
Q. And then after Armbrister -- Sheriff Armbrister spoke with him, he went up to the Commissioners?



A. I don't know the sequence of when he went and spoke to the Commissioners.
Q. Well, you did see -- at some point you saw Armbrister go up --
A. Yes.
Q. -- to the Commissioners?
A. Yes.
MR. HOLDER: Try to wait until he finishes his question.
THE WITNESS: Oh, my apologies.
BY MR. BAKER:
Q. And so when he went up to the Commissioners before the meeting started, where was he located, if you remember?
A. He would have been at their desk or table.
Q. And would he have been in the middle or to the left or to the right or do you recall?
A. I don't remember specifically.
Q. And who were the Commissioners that night, that afternoon, I guess, if you remember?
A. I don't remember.
Q. Okay. So you think he went up kind of in the middle of that -- I'll call it the dais, or whatever it's called, where they all -- the

Page 10

three Commissioners sit?
A. I mean, I didn't watch them the entire time, so somewhere up in front of them talking face to face.
Q. All right. And how long was he up there?
A. I don't recall.
Q. You don't recall?
A. Yeah.
Q. I mean -- and I'm just trying to get the outer limits. I mean, he wasn't up there for five minutes, was he?
A. I would say it was brief.
Q. Okay. Maybe a minute or something; is that fair?
A. I really don't know.
Q. Okay. And then after he was up there, you couldn't hear anything he said --
A. Correct.
Q. -- is that what you're saying?
A. (Nods head up and down.)
Q. And where did he go after he was at the Commissioners -- where they were seated, where did he go from there?
A. I don't remember.

Page 11

MS. STEWART: And just for the record, Dr. Spiehs, are you recording this on your phone?
MR. BAKER: Yes, looks like.
DR. SPIEHS: Yeah.
MS. STEWART: I'm not sure that's permitted by the rules.
MR. BAKER: Well, can we go off the record?
THE REPORTER: Off the record?
MR. HOLDER: Yeah, that's fine.
(Discussion off the record.)
MR. BAKER: All right. Let's go back on the record.
BY MR. BAKER:
Q. Were you ever asked about what you heard during -- when Sheriff Armbrister was up with the Commissioners?
A. No.
Q. Now, you would have noted when he went up to the Commissioners? I mean, you would have watched him do that, correct?
A. Yes, sir.
Q. Has Sheriff Armbrister talked to you about what was said when he was up at the

Page 12

Commissioners' --
A. No, sir.
Q. -- desk? Have you read or been made aware of Sheriff Armbrister's responses to the interrogatories the Plaintiff has propounded in this case?
A. I'm sorry. Can you repeat the question?
Q. Sure. Do you know what interrogatories are?
A. No.
Q. Okay. They're questions in writing that the Plaintiff would submit.
A. Oh.
Q. And then Sheriff Armbrister would write out answers, responses.
A. Okay.
Q. Do you follow me?
A. Yes, sir.
Q. Are you aware of any of those interrogatories that were propounded to him and his answers that he's given?
A. I'm not familiar with the specific questions.
Q. Well, how about general?

Page 13

A. I think I've seen the list, but I don't remember the questions.
Q. Okay. How about his answers or responses?
A. No, sir.
Q. Okay. And how would you have been made aware of those interrogatories?
A. I think we reviewed it the other day.
Q. And who is the "we"?
A. Me and Andrew Holder.
Q. When was that?
A. That would have been the 23rd, I believe.
Q. All right. And I'm not going to ask you what you did. How long were you there?
A. I would say two hours.
Q. And so at least you had some preparation to think about the events complained of in the complaint before we --
A. Yes.
Q. -- today? Okay. Thank you.
Well, you said that you couldn't hear what Dr. Spiehs said while he was seated in the Commission meeting; am I reading that correct?
A. Correct.

Page 14

Q. All right. And so if I ask you to tell me what you heard Dr. Spiehs say in the Commission room on April 20th, 2022, what's your answer?
A. Well, I wasn't actively listening to any of his conversations.
Q. Well, actively or not, I mean, you say you didn't hear anything he said, right?
A. When -- before the altercation occurred.
Q. Okay. So before the meeting --
A. When -- when Justin -- and I apologize for interrupting. When Justin raised his voice, I heard him say a phrase that I put in my report.
Q. All right. So let's go back. So this is before the meeting started?
A. Correct.
Q. And so at some point, you heard Dr. Spiehs say what before the meeting started?
A. I don't remember the exact phrase, but I put it in my report.
Q. Well, go ahead. From memory, what do you remember him saying?
A. Something about "I don't care what you

Page 15

think of me, motherfucker," something along those lines.
Q. Something like that? Is that all you heard?
A. That's correct. That's what drew my attention.
Q. All right. And you've looked at that video from the reporter?
A. I've seen it, yes.
Q. When was the last time you've reviewed that?
A. On that day we met with Andrew.
Q. So that was presented to you and you got to review that?
A. Just reviewed it.
Q. Okay. And did that help you remember what happened that day?
A. Yeah, it helped a little.
Q. All right. So I assume, then, that the only reason you heard Dr. Spiehs is because he raised his voice?
A. Correct.
Q. All right. So if I ask you what -- do you know who Michael Almon is?
A. Yes, sir.

Page 16

Q. Okay. So if I ask you what you heard Michael Almon say in the Commission room before that meeting on April 20th, 2022, you wouldn't be able to tell me, would you?
A. That's correct.
Q. All right. And I think we've already confirmed you saw Jay Armbrister in the Commission room on April 20th, 2022, you just don't remember where he was, other than being up front with the Commissioners?
A. And I knew he was also seated somewhere in the back waiting for it to start.
Q. All right. And were you there before him?
A. I believe so.
Q. And do you know if he came by himself?
A. I don't recall.
Q. Did you talk to him prior to the meeting starting?
A. No, sir.
Q. Do you all -- deputies, do you get assigned to these Commission meetings?
A. It is the responsibility of a Court Security Deputy, which was my assignment at the time.

Page 17

Q. So how many Court Security -- you say Court Security Deputy?
A. Correct.
Q. All right. But this isn't court, this is a Commissioner meeting.
A. Correct. Yeah, the assignment or division in the Sheriff's Office Operations Division is court security --
Q. All right.
A. -- and we handle County Commission meetings.
Q. All right. So how many of you are assigned to any given Commission meeting on a regular basis?
A. Somewhere between two and three.
Q. All right. And your task, assignment is what?
A. Maintain safety and security.
Q. Is that it?
A. If there's any laws that are broken in front of you, to act on it, but just the normal official duties of a commissioned officer.
Q. Well, but you all do more than just make sure a crime is not committed? I mean, for example, you take instructions from the

Page 18

Commissioners about telling people to get out?
A. I can.
Q. And you've done that?
A. I don't -- I don't recall any specific time, but I know I have the authority to.
Q. Okay. And that's not because any crime has been committed, correct?
A. Correct.
Q. That's just because the Commissioners don't want the person in there for whatever reason, right?
A. I don't know the specific reasons.
Q. Well, let's do it this way. If they say we want this individual out, you think your task is get them out, correct?
A. If there is good cause and if I have the authority to, yes.
Q. Well, I thought you said you had the authority to tell people to leave?
A. I can.
Q. Well, so what do you do, filter what the Commissioner says, and you figure out do I have the authority to do what the Commissioner is saying when they say get that person out?
A. It just depends on the circumstances.

Page 19

Q. Well, tell me what those would be. A Commissioner says I want somebody out because they broke the rules of -- speech rules and, Deputy, I want this person out.
A. I don't know if I could answer that. Again, it just depends on the totality of the circumstances.
Q. Well, has it --
A. I would be guessing.
MS. MILLER: Mr. Baker, I think it would help if you would let him finish before you start talking because the record, I think, is getting a little unclear and it's hard to follow.
MR. BAKER: Yeah.
MS. MILLER: If you would slow down a little, I think that would be helpful.
MR. BAKER: Sometimes he pauses and so I think he's done.
MS. MILLER: Right. So if you could just wait and make -- I don't think there's even sometimes a pause there and you start talking.
MR. BAKER: Well, I don't know about that. But anyway, it's a conversation so

Page 20

we'll try to get through it, okay?
MS. STEWART: Can you let him finish his answer? I think he was in the middle of it.
MR. BAKER: I don't know.
THE WITNESS: I believe -- I don't -- I believe I'm done, but I --
MR. BAKER: Yeah, I thought you were, too.
MS. STEWART: Maybe I was -- I was slow. Sharon's record will be much better than my typing.
MR. BAKER: I know.
MS. MILLER: I just mean it's been a pattern, not that specific time. I'm just asking if you could slow --
MR. BAKER: Well --
MS. MILLER: Like right now, I'm talking. I was just asking if you could slow down just a little bit and let him finish. I think it would be more helpful.
MR. BAKER: Well, duly noted.
BY MR. BAKER:
Q. And if at any point in this deposition you don't understand what I'm saying, you let me

Page 21

know, please.
A. Yes, sir.
Q. Okay. Well, we're talking about the deputies being there and taking instructions from the Commissioners. We've established that you all do that --
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. -- correct?
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. I thought you said that you, as security there, do take instruction from the Commissioners?
A. I can, yes.
Q. Okay. And you do?
A. I -- sure. I mean, I don't know of any specific time that I have. I can't recall any specific details.
Q. Do you recall any times during a Commission meeting where a Commissioner says, "I want that person removed from the Commission meeting"?
A. Not specifically, no, sir.
Q. Generally?

Page 22

A. No. It was too long ago.
Q. All right. Have you ever heard of it happening?
A. Yes.
Q. Okay. And what have you heard?
A. Just in different areas, things I've seen in the news, just bits and pieces. Nothing specific.
Q. Okay. And in May of 2022, wasn't Dr. Spiehs removed by deputies from the Commissioners meeting?
A. I don't know.
MR. HOLDER: Object to form.
BY MR. BAKER:
Q. Okay. In any event, your understanding is at some point, though, you are -- one of your job descriptions is to take instructions from the Commissioners, depending on variables; is that a fair statement?
MS. STEWART: Object to the form.
A. I have -- I -- my understanding is that the County Commissioners are in charge of the meeting. I'm not going to interfere unless they give me some direction of what they would like. And then based on that, I use my ability as a

Page 23

commissioned law enforcement officer to either act on that or not.
BY MR. BAKER:
Q. And how would you, when they -- so give me the parameters of that. You just described them giving you directions, and then you said you have some discretion whether to follow that or not; is that a fair statement?
A. I really don't know.
Q. Well, tell me when you would follow the directions of the Commissioners at a Commission meeting.
A. If it -- if it fit the means of a crime being committed or within the County Commissioner rules. Again, I don't know them specifically and --
Q. Okay. So putting aside the crime, if a Commissioner says we think a rule, speech rule here has been violated, follow me so far?
A. Okay.
Q. Because they do that all the time, right?
MR. HOLDER: Object to form.
MS. STEWART: Object to form.
A. I don't know.

Page 24

BY MR. BAKER:
Q. You've never been at a Commission meeting where they have said -- they talk to the speaker and say you're not speaking on topic or anything like that?
A. There are people that don't use the appropriate times to say what they want to say, so there are times like that.
Q. Okay. Does the Commissioner then call out to the individual and say hey, that's not right, this is not your time?
A. Correct.
Q. Okay. So you would call that a rule violation; is that fair?
A. Yes, but it's -- yes.
Q. And you're not there to figure out what rule violations are, are you?
A. Correct.
Q. All right. They, the Commissioners, decide that?
A. That's correct.
Q. And you say that if they determine a rule violation has been determined, then they can direct you to do something about that?
MS. STEWART: Object to the form.

Page 25

A. I don't know. I'm not a -- I've never been a County Commissioner, so I don't know what they're allowed to do.
BY MR. BAKER:
Q. No, I'm talking about what you do.
A. I -- I will take into consideration what they're asking. But again, it just depends on the circumstances.
Q. Okay. So that's where I want to drill down.
A. Okay.
Q. Because there's circumstances where you will follow the directions of the Commissioners and others that you will not, correct?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
MS. STEWART: Misstates his testimony.
A. I don't know how to answer that.
BY MR. BAKER:
Q. Do you always take the directions of the Commissioners at those meetings?
A. No.
Q. Okay. When do you not take the directions of the Commissioners at the meetings

Page 26

when they tell you to do something?
A. When it's not appropriate.
Q. When is it not appropriate?
A. It depends on the circumstances of an incident.
Q. Give me -- tell me what those circumstances are.
MS. STEWART: Object to the form. Vague.
MR. HOLDER: Join.
A. I don't have any specific instances.
BY MR. BAKER:
Q. Well, how would we know -- you're exercising some sort of discretion in terms of whether or not to follow the directions of the Commissioners, we know that so far, correct?
A. I believe so.
Q. Okay. And so now I'm trying to figure out how you determine whether or not you're going to follow a directive of the Commissioner at those Commission meetings, you follow me on that?
A. Correct.
Q. And you say it just depends?
A. I couldn't tell you. I'd be

Page 27

speculating. I have no idea.
Q. Well, if -- let's do some hypotheticals then. If the Commissioner says there's been a rule violation of the speaking rules and we want that person to be exited out of the meeting, would you follow that directive?
MS. STEWART: Object to the form. Incomplete hypothetical.
MR. HOLDER: Join.
A. And it would depend on the circumstances of the entire -- of the situation. I can't answer that question. I don't know.
BY MR. BAKER:
Q. Well, what other facts do you need to know?
MS. MILLER: Hold on.
MS. STEWART: Object to the form.
MS. MILLER: Deputy Kruzel, will you let them say their objections?
THE WITNESS: Yes, and I'm sorry.
MS. STEWART: I'm sorry.
THE WITNESS: I'm trying.
MS. MILLER: You're kind of jumping in, too. If you will let them make their objections for the record, I think that

Page 28

will help and give yourself a chance.
THE WITNESS: Okay. Thank you.
MR. BAKER: Well, now you got it. We're getting spanked all over the place here, aren't we? Ha-ha. All right. Strike all that.
BY MR. BAKER:
Q. So you can't really articulate today as we sit here how you exercise that discretion in whether or not to follow a directive of a Commissioner at a Commission meeting, correct?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. To a hypothetical, no.
BY MR. BAKER:
Q. Well, I just want to know what factors you use to determine whether or not you will follow the directive of a Commissioner at a Commission meeting. Please tell me what those are.
MS. STEWART: Object to the form of the question.
A. I don't know how to answer your question, sir.
BY MR. BAKER:
Q. Why?

Page 29

A. I don't know. I don't know how to answer your question.
Q. Well, so far all we know is that you will follow the directives of Commissioners at the Commission meetings sometimes, correct?
MS. STEWART: Object. Object to the form. Misstates his testimony.
MR. HOLDER: Join.
A. Can you repeat the question? I'm sorry.
MR. BAKER: Sure. Sharon, do you want to repeat it?
The following question was read by the reporter:
"QUESTION: Well, so far all we know is that you will follow the directives of Commissioners at the Commission meetings sometimes, correct?")
A. If they're appropriate and it's within the County Commission rules, then yes.
BY MR. BAKER:
Q. Okay. And have you done that?
A. I don't recall any specific times.
Q. And you don't recall -- okay. Forget that.

And do other deputies do the same thing as you in following the directives sometimes of the Commissioners at the Commission meetings?
MR. HOLDER: Object to form.
MS. STEWART: Object to form.
A. I don't know how other deputies perform.
BY MR. BAKER:
Q. Well, let's talk about why you do that. Has the Sheriff told you to do that?
A. No, sir.
Q. You've just done that by yourself?
A. Done what, sir?
Q. This idea of following directives of the Commissioners.
A. I don't understand. My job is to maintain the security -- maintain the safety and security of the County Commission courtroom and any other duties of a commissioned law enforcement officer.
Q. Right. You talked about having the rules enforced.
A. Okay.
Q. Right?
A. I believe so.



Q. Okay. So that part of the equation of being involved in the enforcement of the County Commissioner rules, is that a policy from the Sheriff?
MS. STEWART: Object to the form.
A. I don't believe it is.
BY MR. BAKER:
Q. How did you come up with that understanding that you're going to enforce something beyond safety and crime into the rules of the Commission?
A. I would say the post itself, the assignment that it is, it was just procedural. I had done it for many years and they have specific rules. If they wanted them enforced, then I would do my best to do that.
Q. Okay. Have you --
A. Primarily I was there for criminal issues.
Q. Got it. And had you -- during your times that you've done that, have you seen other deputies do the same thing as you at those Commission meetings?
A. I can't recall.
MS. STEWART: Object to form.



It's vague.
A. I apologize.
BY MR. BAKER:
Q. Have you ever asked Sheriff Armbrister, am I supposed to be there enforcing or helping to enforce the Commissioner rules?
A. No.
Q. Okay. Has he ever said don't do that, don't be involved in the Commissioners' enforcement of rules at these Commission meetings?
A. No.
Q. Okay. Do you know if he's aware of that phenomenon where you all are sometimes enforcing the rules of the Commissioners at the Commission meetings?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
A. No.
BY MR. BAKER:
Q. You have no knowledge?
A. I don't know.
Q. Okay. Prior to the meeting on April 20th, 2022, what was your understanding of whether a person could bring in a sign or a



poster at a Commission meeting?
A. If it was within the County Commission rules and didn't violate any state statutes, then there was no issue.
Q. Well, how would you violate a state statute by bringing in a sign?
A. Again, it probably wouldn't happen, but again, it just depends on the circumstances.
Q. Give me a circumstance where bringing a sign into a Commission meeting would violate a statute.
A. If they --
MS. STEWART: Object to form. Go ahead.
A. If they used it as a weapon to commit battery or some other state statute.
BY MR. BAKER:
Q. All right. Put all that aside. Just merely carrying a sign in --
A. Correct.
Q. -- to a Commission meeting, that's not committing a crime, is it?
MR. HOLDER: Object to form. Go ahead.
A. I would say yes.

Page 34

BY MR. BAKER:
Q. It is violating a --
A. No.
Q. Okay. I'm sorry. You would agree with me it's not a crime to carry a sign into a Commissioners meeting, correct?
A. Correct, criminal.
Q. All right. Now, you mentioned something about the Commissioners' rules regarding signs. You said that?
A. Okay.
Q. I mean, do you agree with me?
A. Yes, I believe we've been talking about the signs, yes.
Q. Okay. And is there some rule that the Commission has that you understood prohibited signs in the Commission meeting?
A. No specific rules to my knowledge.
Q. Any general -- I'm sorry.
A. Not to my knowledge.
Q. Right. There's no rules that you're aware of that says people can't carry a sign into a Commission meeting, correct?
A. I do not know the specific rules for the County Commissioners.

Page 35

Q. I'm just looking for your general understanding.
A. I don't know generally. I don't know what the rules are --
Q. Okay. But --
A. -- to --
Q. Let me ask it this way. Can you say to any extent that there is a Commission rule that says you can't carry a sign into a Commission meeting?
A. No.
MS. STEWART: Objection. Asked and answered.
BY MR. BAKER:
Q. All right. Now, at that meeting, you did see Sheriff Armbrister come up after -- while Dr. Spiehs was on the front with his sign, you saw him come up and talk to him?
A. Yes.
Q. But you couldn't hear what was said?
A. That's correct.
Q. And then after he said that, or whatever he said, you saw him go up to the Commissioners meeting -- where the Commissioners were?

Page 36

MR. HOLDER: Object to form.
MS. STEWART: Object to form.
A. I don't recall the sequence of when he spoke to people.
BY MR. BAKER:
Q. And you're not saying it couldn't have happened that after he spoke with Dr. Spiehs, he went immediately up to where the Commissioners were? You're not denying that, are you?
A. That's correct.
Q. You just don't know?
A. Yes, that's correct.
Q. Had you ever heard of anything about the Commission getting crossways with YouTube about language or signs appearing in the livestream?
A. I recall that there were issues with profanity and that it caused some YouTube violation or fine or something.
Q. How did you come to that knowledge?
A. Just overheard people speaking about it. I don't have -- I don't -- just generally.
Q. Other officers or Commission people?
A. The Commissioners primarily.
Q. Okay.

Page 37

A. I've heard them mention it during a meeting.
Q. All right. And so you say issues with profanity?
A. That's correct.
Q. Okay. And the sign that Dr. Spiehs had on that date of April 20th, '22, do you remember what it said?
A. Not specifically.
Q. Generally?
A. No.
Q. Okay. Could it have been something somebody thought of as -- or you thought of as profanity?
A. Yes.
Q. Okay. And so showing that sign, displaying it on a live feed might have been causing a problem for YouTube?
A. I don't --
MR. HOLDER: Object to form.
MS. STEWART: Join.
MR. HOLDER: Go ahead.
A. I don't know.
BY MR. BAKER:
Q. Okay. Anything else you can tell me

Page 38

about this issue with YouTube having issues with displays or something with profanity?
A. No, sir.
Q. Okay. And was there some talk about if you can't keep the profanity out of it, you're not -- you're going to lose your YouTube channel?
A. I don't know.
Q. Okay. And you're familiar with the term "fighting words" in the crime of disorderly conduct?
A. Yes, sir.
Q. And there is a disorderly conduct statute?
A. Yes, sir.
Q. And tell me your understanding of what constitutes fighting words under the Kansas disorderly conduct statute.
A. I don't remember what it specifically says, but something along the lines of a word that would arouse or cause someone to feel that they may be harmed or something along those lines.
Q. Anything else you can elaborate on that --

Page 39

A. Not specifically.
Q. -- your understanding?
Okay. And did you hear Dr. Spiehs use fighting words before that Commission meeting on April 20th, '22?
MR. HOLDER: Object to form.
A. I spoke to Mr. Almon, and based on that, I believe that the Sheriff had probable cause.
MR. BAKER: Well, object as nonresponsive.
BY MR. BAKER:
Q. I'm not asking you what you found out afterwards.
A. Okay.
Q. You understand that?
A. Okay.
Q. You didn't hear what Mr. Almon said prior to the meeting starting, did you?
A. Correct.
Q. And the only thing you heard Dr. Spiehs say was what you just testified here in this deposition, correct?
A. Yes.
Q. All right. And so the words that you

Page 40

described today that you heard Dr. Spiehs say before that meeting started, were they fighting words, as you understand it, under the criminal disorderly conduct statute?
A. Yes, sir.
MR. HOLDER: Object to form.
A. Sorry.
BY MR. BAKER:
Q. So tell me what the fighting words were.
A. So I can't tell you specific. I just understand that based on the investigation, I believe that the Sheriff had probable cause to charge him with that.
Q. Yeah, I'm not asking about probable cause.
A. Okay.
Q. I'm not asking about what the Sheriff thought. I'm asking about what you heard.
A. I only heard the statement.
Q. Well, you wrote up the arrest report, right?
A. Yes, at the -- or at the -- I was told to write the report.
Q. By?

Page 41

A. The Sheriff.
Q. Okay.
A. And my direct supervisor.
Q. All right. But at the time that, in real time, you heard Dr. Spiehs say what you said, and you say that what he said during that period of time were fighting words?
A. Yes.
Q. Okay. Now, that's before you ever interviewed anybody, correct?
A. Correct.
Q. So you thought a crime had been committed when you heard those words?
A. I believed that -- I was not the person who established the probable cause. I simply heard the statement that was said.
Q. Well, I'm asking you a different question. I'm asking you if you thought Dr. Spiehs committed a crime when he said the words that you just testified to here in this deposition?
A. I believe after the investigation, the totality of the circumstances, yes, I believe that the Sheriff made a good decision.
MR. BAKER: I object as

Page 42

nonresponsive.

MS. STEWART: I'm going to move to strike your objection.

MR. BAKER: Well, I'm going to move to strike your striking my objection. So that's not proper, Michelle.

MS. STEWART: Well, neither is you objecting to him as being nonresponsive.

MR. BAKER: Well, now you're obstructing, Michelle.

MS. STEWART: I don't think so. Should we get the Court on the phone? We can do that.

MR. BAKER: Well, if you want to. It's just object to form and leave it at that.

MS. STEWART: Yeah. You objected --

MR. BAKER: So we don't move to strike during depositions.

MS. STEWART: That's what you just did.

MR. BAKER: Yeah, I'm objecting.

MS. STEWART: No, you said I object and move to strike. So that's exactly what you said, Mr. Baker.

Page 43

MR. BAKER: You're burning up my time, Michelle, so let's go on.

BY MR. BAKER:

Q. I'm asking your state of mind. At that point when you heard him say those words, did you think a crime had been committed?

A. I was not thinking about a crime.

Q. Okay. So the answer is no, you didn't think a crime had been committed?

A. That's not correct.

Q. Did you think a crime had been committed when he said those words?

A. I believe a crime could have been committed, but I was not actively -- I was maintaining safety and security. And the Sheriff was already involved, so my job was to be the second officer.

Q. Tell me every fact that you think, when he said those words, that a crime had been committed at that point in time.

A. At that point in time, I would not have been able to make that decision without talking to somebody.

Q. All right. That's what I thought.

A. Okay.

Page 44

Q. So at the point in time, you did not make a determination that a crime had been committed?

A. Not me personally.

Q. In fact, you had to do an investigation, you say, later?

A. I mean, at some -- I was then told to then transport him. So at that point, I was gone.

Q. All right. Now -- well, did Jay Armbrister tell you that I think a crime had been committed at the moment that Dr. Spiehs said what you said here in this deposition?

A. I wouldn't -- he had told me his statements. He provided me information to help me do the report.

Q. Yeah. That's all after the fact, right?

A. He told me that we were placing him under arrest.

Q. Right. That's after the fact?

A. Okay.

MS. STEWART: Object to the form.

BY MR. BAKER:

Q. I'm just looking for that moment, that

Page 45

snapshot of time when he said it, your testimony here today is you made no determination that a crime had been committed at that point, that's correct?

A. I personally did not.

Q. All right. And you say that Sheriff Armbrister told you later that he made a determination that a crime had been committed?

A. I am basing that off the fact that he was arrested.

Q. You're just assuming that he thought that?

A. I believe the Sheriff had probable cause to arrest Mr. Spiehs, yes.

Q. And that's your opinion?

A. Correct.

Q. Okay. And you didn't see a crime committed at that moment, but you think Sheriff Armbrister did?

A. That's correct.

Q. Okay. Well, explain that. Is he better at identifying crimes than you are?

A. Yes, sir.

MR. HOLDER: Object to form.

A. Sorry.

Page 46

BY MR. BAKER:
Q. You can't identify when fighting words are spoken?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I can.
BY MR. BAKER:
Q. What makes Jay Armbrister better at identifying fighting words than you?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. His experience.
BY MR. BAKER:
Q. So the -- okay. And there was another deputy in the room that day?
A. Yes.
Q. What was his name?
A. I don't recall specifically in the courtroom, but I knew there were other deputies there.
Q. All right. So you're not claiming that Dr. Spiehs' statement, "I don't give a fuck what you think of me," was a crime when you saw it or heard it happen at the time?
A. I wasn't thinking of a crime at that

Page 47

time.
Q. Okay. And you didn't make a determination that it was a crime when he said "I don't give a fuck what you think of me"?
A. That's correct.
Q. All right. And leaving out the word -- and I'm using these words. Leaving out the "fuck," is the phrase "I don't care what you think of me," can that be fighting words under the disorderly conduct statute, in your opinion?
MS. STEWART: Object to the form.
MR. HOLDER: Object to the form.
A. It could.
BY MR. BAKER:
Q. How?
A. Based on how the person felt that it was communicated, the totality of the circumstances.
Q. Okay. So this idea that it depends on the hearer -- how the hearer feels about what that statement says?
A. I would say it just depends on the totality of the circumstances and the facts provided.
Q. Well, does it depend on how the hearer

Page 48

feels about what the statement said?
MR. HOLDER: Object to form.
A. I believe so.
BY MR. BAKER:
Q. So you didn't have enough information to know that -- when he said "I don't give a fuck what you think of me," you didn't know how that affected any of the listeners at the time, correct?
A. Yes, that would be correct.
Q. And you didn't observe Michael Almon stand up and do anything or anything like that after Dr. Spiehs said that, did you?
A. Not that I recall.
Q. In fact, you didn't see any reaction in the crowd when he said that, did you?
A. I wasn't focusing on the crowd.
Q. Great. And so you didn't see any reaction to the statement, "I don't give a fuck what you think of me"; isn't that correct?
A. Not me personally.
Q. Okay. Well, that's all I can ask you, what you saw, right?
A. Correct.
Q. All right.

Page 49

MS. MILLER: Deputy Kruzel, do you want to take a break?
THE WITNESS: No, I'm fine, unless somebody else would like to.
MS. STEWART: I will in five minutes.
MS. MILLER: I do, too. That's why I was asking.
MR. BAKER: You want to take a break?
MS. MILLER: Yeah.
MR. BAKER: Okay. We can take a break.
(A recess was taken.)
MR. BAKER: Back on the record.
BY MR. BAKER:
Q. So I think I heard you say that you did an investigation after Dr. Spiehs was arrested that day; is that correct?
A. I spoke to Mr. Almon.
Q. Well, is that an investigation?
A. I did not do a complete investigation. It wasn't my responsibility.
Q. Why did you talk to Mr. Almon?
A. Because I was asked to.

Page 50

Q. By?
A. My direct supervisor or the Sheriff. I don't remember exactly who, but someone there.
Q. All right. And why -- did they tell you why they wanted you to talk to Mr. Almon?
A. To get a statement.
Q. Other than that, why Mr. Almon and not everybody else in the room?
A. I don't know.
Q. Okay. And did you think about talking to anybody else in the room?
A. No.
Q. Did the supervisor tell you what you were to ask Mr. Almon?
A. No, sir.
Q. Let me hand you Exhibit 1.
MR. BAKER: And I only have one other, so you --
MS. MILLER: That's okay. Thank you.
BY MR. BAKER:
Q. Exhibit 1 are the minutes of the Douglas County, Kansas Commission on April 20th, 2022, do you see that at the top?
A. Yes, sir.

Page 51

Q. And it says the meeting started at 5:30. Do you see that?
A. Yes, sir.
Q. Do you have any facts to say that's untrue?
A. I don't.
Q. If you look at page 3, it says that public comments were made and then it lists individuals at the bottom of the page. Do you see that?
MS. MILLER: Where is that?
MR. BAKER: Page 3.
MS. MILLER: Where it says "Reid opened the item for public comment"?
MR. BAKER: Yes.
A. Okay. I see that.
BY MR. BAKER:
Q. And then if you continue to turn the pages, you'll see numerous other individuals identified; is that correct?
A. Yes.
Q. I count 27 individuals that were signed up or spoke at that meeting. Does that sound right to you, the number of people at that --
A. I don't know the exact number.

Page 52

Q. Right. Does it generally sound correct?
A. I don't know.
Q. Could it have been 27 people at that meeting?
A. Could.
Q. Okay. And then it lists Michael Almon of the Sustainability Action Network on page 4 towards the bottom.
A. Okay.
Q. Do you know -- ever heard of that, the Sustainability Action Network?
A. No, sir.
Q. Okay. So out of these individuals that are listed in this agenda, you were told specifically just to talk to Mr. Almon, correct?
A. Correct.
Q. And you think that person who told you that was Sheriff Armbrister?
MR. HOLDER: Object to form. Go ahead.
A. I don't know who told me to ask -- or to talk to him.
BY MR. BAKER:
Q. When would they have told you to do an

Page 53

interview?
A. After I transported Mr. Spiehs.
Q. Well, is the meeting still going on or where did you take -- strike that.
Where did you interview Mr. Almon?
A. In the County Commission meeting room.
Q. So you went to deliver Dr. Spiehs to the jail and then came back?
A. That's correct.
Q. And then someone told you then to interview Mr. Almon?
A. I don't remember the specific time that I spoke to Mr. Almon.
Q. No, but when you were told to do it.
A. I don't remember that specific time either.
Q. Okay. So it could have been before you left?
A. I don't recall.
Q. Okay. And the person that told -- and you don't remember who it was that told you?
A. That's correct.
Q. Who is your immediate supervisor?
A. At that time it was Dale Flory.
Q. Could Dale Flory have told you to do

Page 54

that?
A. I don't recall if he was there.
Q. Well, who was there that could have told you to do it?
A. Sheriff Armbrister.
Q. Anybody else?
A. Not to my knowledge.
Q. All right. And did -- were you told what to ask --
A. No.
Q. -- Mr. Almon?
A. Sorry. No.
Q. No? What did you think you wanted to ask Mr. Almon about?
A. I don't understand your question.
Q. Well, the person said go talk to Mr. Almon like -- and so what? You know, the color of your tie, your shoes? I mean, what did you think you were going to talk to him about?
A. About the incident that occurred.
Q. Okay. And what is it that he -- the information you thought he might have about that incident?
A. I don't know.
Q. So your thought was Mr. Almon, tell me

Page 55

what you think happened here today?
A. That sounds reasonable.
Q. Well, with that, if that was the question, did you not think in your mind maybe I ought to ask the other -- however many people are out there, too, what they thought?
A. No.
Q. You said, I think, in your report Dr. Spiehs entered the Commission room at 5:20 on April 20th, 2022.
A. Approximately.
Q. And that's before the meeting started, correct?
A. That's correct.
Q. How did you know that was the exact time he entered?
A. I don't know that that was the exact time.
Q. Well, you put an exact time, 5:20.
MR. HOLDER: Object to form.
A. I believe I put "approximately."
BY MR. BAKER:
Q. Okay. How did you come to that conclusion, at approximately 5:20 that he entered the room?

Page 56

A. I don't -- I don't know.
Q. I mean, were you watching for Dr. Spiehs to enter the room?
A. No, sir.
Q. Do you know when the other people entered the room?
A. No, sir.
Q. Can you give me any facts as to how you would have determined that he entered that room at 5:20, approximately?
A. That's why I put "approximately."
Q. Right. Anything you can help me with as to how you made that determination?
A. No, sir.
Q. Okay. And certainly you weren't looking at every individual as to when they entered the room, were you?
A. That's correct.
Q. Did you rely on the video when you watched it to come up with that time?
A. I don't recall when I reviewed that video.
Q. But did you rely on the video to come up with a timeline of maybe 5:20?
A. I don't know.

Page 57

Q. Okay. So if we do the math, he was there for a period of 10 minutes between the meeting started and 5:30; is that fair?
A. Approximately.
Q. And when you made your affidavit, you intended it to be as accurate and complete as you could, correct?
A. That's correct.
Q. You knew that was important in making your affidavit?
A. Yes, sir.
Q. And in that affidavit, you want to make sure you stated every fact that supported charging Dr. Spiehs with the crime of disorderly conduct under K.S.A. 21-6203(a)(3), correct?
A. Yes, sir.
Q. So handing you Exhibit 2, can you identify that for me, please?
A. It says it's an "Order on Request For Disclosure of an Affidavit Or Sworn Testimony."
Q. If you turn the page, what is that?
A. It appears to be the affidavit.
Q. Of?
A. The incident on April 20th of 2022.
Q. Right. Signed by?

Page 58

A. On the front, it's signed by Sally Pokorny, Division 2 judge.
Q. This is your affidavit, isn't it?
A. Correct.
Q. And you're swearing to this statement, these facts under oath, correct?
A. Correct.
Q. I'm curious, if you look at the second page and paragraph 2, you see that big blank space between "Almon" and "who"?
A. Okay. Yes, sir.
Q. What was redacted?
A. I don't know.
Q. Was there a name redacted, do you know?
A. I don't know.
Q. Do you know if anything was taken out of that?
A. It appears it has. I don't --
Q. But you don't know what was taken out?
A. I don't know the specific word.
Q. How about generally, what would have been taken out?
A. I -- I don't know.
Q. Did you take it out?
A. No, sir.

Page 59

Q. I mean, from your memory, what could the blank omitted language be?
A. I don't know what was in that space.
Q. But the one you wrote up, you don't think it had this omission in it?
A. This has been altered.
Q. Okay. And you didn't alter it, did you?
A. That's correct.
Q. And this was submitted. Do you know who submitted this in its altered state?
A. I don't know anything about this, sir.
Q. Okay. You wrote this on April 21st. It was the day after the event, right?
A. Yes.
Q. So it would have been fresh in your mind?
A. Correct.
Q. And did you know at the time that a reporter had videotaped Sheriff Armbrister's use of force on Dr. Spiehs?
MR. HOLDER: Object to form.
A. Not at the time.
BY MR. BAKER:
Q. I said "use of force." You know what

Page 60

I'm talking about?
A. Sorry. Repeat your question. I may not have understood.
Q. I used the phrase "use of force." I think your attorney objected to that. You know what that means, don't you?
A. Yes, sir.
Q. And use of force was on Dr. Spiehs on that day, wasn't it?
A. To effect an arrest, yes.
Q. Okay. So let me ask it again.
At the time that you -- you didn't know that a reporter had videotaped Armbrister's use of force on Dr. Spiehs?
A. Okay. I guess I don't understand. What's the question?
Q. When did you discover a videotape -- that somebody had videotaped that incident, when did you first discover that?
A. I don't know.
Q. You didn't know anybody had videotaped it when that use of force was effectuated on Dr. Spiehs on that date, did you?
A. I did not know anybody was videotaping it.

Page 61

Q. You later found out?
A. Correct.
Q. How?
A. By the video itself.
Q. Well, how did you get the video?
A. I don't recall.
Q. And do you know when you got the video?
A. No.
Q. Did you get the video on the day after when you wrote this report?
A. I don't remember.
Q. Okay. Could you?
A. It's possible.
Q. You don't mention it in the report, in the affidavit, do you?
A. I don't recall.
Q. You're talking about the dialogue recited is a complete recitation of what you heard was said by Dr. Spiehs prior to that use of force, correct?
A. Which part? I'm sorry.
Q. Paragraph 2, you say Dr. Spiehs said, "I don't give a fuck what you think of me." Do you see that?
A. Yes, sir.

Page 62

Q. You're claiming that dialogue that you recited is a complete recitation of what you heard was said by Dr. Spiehs prior to that, correct?
A. As I remember it, yes.
Q. Okay. And why would you leave out the prior interaction with Jay Armbrister and any dialogues that he would have had?
A. I didn't know what those were.
Q. And you know from viewing the video that Sheriff Armbrister came up and confronted Dr. Spiehs from behind?
A. I --
MS. STEWART: Object to the form. Go ahead.
A. I don't know.
BY MR. BAKER:
Q. You don't remember what the video depicted?
A. I don't remember how Jay approached Mr. Spiehs.
Q. Well, Dr. Spiehs was in the front row, correct?
A. Yes, sir.
Q. And Jay Armbrister was behind him?

Page 63

A. I don't remember where Jay was sitting specifically.
Q. Well, he approached from behind, not from the front of Dr. Spiehs, you know that, right?
A. I don't recall.
Q. Okay. You say that you and Sheriff Armbrister approached Dr. Spiehs to ask him to leave.
MS. MILLER: It's in paragraph 3.
MR. HOLDER: He's asking about what you say in the affidavit.
A. Where are you looking at specifically? I'm sorry.
BY MR. BAKER:
Q. 3.
A. Okay. Yes.
Q. You say that's a true statement of fact?
A. I -- I approached him, but I don't know the circumstances at the time.
Q. Well, this says you both approached him and asked him to leave. Do you see that?
A. Okay. Yes, sir.
Q. Is that -- that's not true, is it?

Page 64

MR. HOLDER: Object to form.
MS. STEWART: Join.
A. It's in my affidavit. It's the most accurate information I would have.
BY MR. BAKER:
Q. So your testimony today here is that you and Sheriff Armbrister approached Justin and asked him to leave?
A. That's what it says, yes.
Q. I know it's what it says. Is it the truth?
A. Yes, this is a sworn affidavit.
Q. Well, you can always say "I made a mistake."
A. No, this is true.
Q. Okay. But you know from the video that you didn't approach Dr. Spiehs initially, that was Jay Armbrister who did that?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I don't recall the exact sequences of events.
BY MR. BAKER:
Q. Who confronted Dr. Spiehs first?
A. The Sheriff.

Page 65

Q. And you couldn't hear anything he was saying, or could you?
A. I don't recall exact statements.
Q. Could you hear anything that Jay Armbrister was saying to Dr. Spiehs?
A. Not that I could recall.
Q. Okay. And in fact, during that incident, Jay Armbrister motions to you to come over here?
A. I don't remember that specifically.
Q. Well, we'll look at some photographs, see if that doesn't refresh you.
A. (Nods head up and down.)
Q. You completed a Standard Arrest Report?
A. Yes, sir.
Q. Let me hand you Exhibit 3.
A. Thank you.
MR. BAKER: Here's one for you.
BY MR. BAKER:
Q. You say the arrest -- Exhibit 3 is your arrest report?
A. Yes.
Q. And you say the arrest was at 5:25?
MS. MILLER: Can you give him -- make sure you look at it first.

Page 66

A. I -- are you talking about where it says "Time," and then in parentheses, "HH:MM"?
BY MR. BAKER:
Q. It's whatever your report says.
A. The time there says 17:25.
Q. So the arrest was at 5:25?
A. That's what I put on the arrest report.
Q. Well, is that true? I mean, you put it on the arrest report. I know you --
A. To the best of my ability to recall, yes. I mean, I put it on there.
Q. As we sit here today, you'd still say it was 5:25?
A. Correct.
Q. Okay. And you say the behavior was, quote, profane and loud.
A. Yes, sir.
Q. And what profane and loud behavior are you referring to?
A. Just in general.
Q. Well, describe it.
A. Just loud, noisy conduct, high-volume voice, those type of things.
Q. You mean when he said "I don't give a fuck what you think of me"?

Page 67

A. Correct.
Q. That was -- that's it?
A. Correct. It was loud and profane.
Q. Okay. So that's the only loud and profane thing you're describing in your report?
A. In general, yes.
Q. Well, anything else? I mean, I'm looking -- you made the statement, that's loud and profane. You're not saying he did something loud and profane prior to that, are you?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I guess I don't know how to answer your question.
BY MR. BAKER:
Q. Tell me what -- I mean, other than him making that statement, was there something else he did prior to his arrest that you describe as profane and loud?
A. Not specifically.
Q. Well, when you say "specifically," it kind of leaves open there may have been something. Can you think of anything?
A. No, sir.
Q. Okay. And by that, you meant the

Page 68

offense of disorderly conduct was completed?
A. Correct.
Q. Okay. And you'd have to know when the offense was first completed, correct?
MR. HOLDER: Object to form.
MS. STEWART: Join.
MR. HOLDER: Go ahead.
A. I don't understand your question.
BY MR. BAKER:
Q. Well, we've already -- I think we've already established, you didn't think a crime had been completed at the point where Dr. Spiehs said, "I don't give a fuck what you say"?
MR. HOLDER: Object to form.
BY MR. BAKER:
Q. You've already testified to that today, correct?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I was working under the discretion of the Sheriff.
BY MR. BAKER:
Q. I get it. But your idea of what -- a crime was being committed, you didn't have that idea?

Page 69

A. I did not make the decision that a crime was committed.
Q. I'm not asking that. I'm asking your perception. I get it. Jay Armbrister thought a crime was committed at that point, that's what you think, correct?
A. Yes, I believe he did.
Q. But you, on the other hand, said today you didn't think a crime had been committed?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I did not make the decision.
BY MR. BAKER:
Q. I'm not asking if you made the decision. I'm asking your opinion, your perception at the time. And I think you've testified here today that you did not perceive that a crime was committed the moment Dr. Spiehs said, "I don't give a fuck what you think of me"; isn't that correct?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I don't know how else to answer. I believe I've already answered your question.
BY MR. BAKER:

Q. Well, answer it again.
A. I was working under the discretion of the Sheriff. I did not personally come up with the probable cause.
Q. Yeah, I'm not asking about probable cause. I'm entitled -- I think you've already testified to it, so let's just move on.
You said Dr. Spiehs' noisy conduct caused resentment.
A. Okay. I see that.
Q. Do you see that?
A. (Nods head up and down.)
Q. Now, you wouldn't have known that in the moment, that -- when Dr. Spiehs made that statement, correct?
A. Correct.
Q. But you think Jay Armbrister knew that it had caused resentment in someone --
MR. HOLDER: Object to form.
BY MR. BAKER:
Q. -- at the moment that Dr. Spiehs said that?
MS. MILLER: And, Mr. Baker --
MS. STEWART: Join.
MS. MILLER: Mr. Baker, do you



mind referring to him as Sheriff Armbrister? Just because when you say "Jay Armbrister," I don't know if you mean him as an individual or if you mean him acting as the Sheriff.
MR. BAKER: Yeah, I don't know what that even means.
MS. MILLER: You don't know what that means?
MR. BAKER: Huh-uh. His name is Jay Armbrister.
MS. MILLER: Yeah, but do you mean acting as Sheriff Armbrister? Just like we refer to Dr. Spiehs as Dr. Spiehs.
MR. BAKER: And I'm just -- I'm going to use his name.
MS. MILLER: Okay.
MR. BAKER: So I think it's real clear.
BY MR. BAKER:
Q. I can't remember what I asked you.
A. I don't either.
Q. They messed me up.
Do you know if Jay Armbrister knew at the moment that Dr. Spiehs said that, "I don't give a fuck what you think of me," that he knew



that that had caused resentment at that moment in someone?
MS. STEWART: Object to the form.
A. I don't know.
BY MR. BAKER:
Q. Okay. You didn't know, did you?
MR. HOLDER: Object to the form. Is your question whether he knew whether that statement caused resentment?
MR. BAKER: Yeah.
MR. HOLDER: Okay.
MR. BAKER: I'm just looking for what his state of mind was.
A. I did not know.
BY MR. BAKER:
Q. Okay. But you're saying it did cause resentment in this report?
A. It is the statute that I put in there.
Q. Okay. And you said it caused resentment, correct?
A. I'm not saying it caused resentment. I'm saying that's the statute I used in the AR.
Q. Oh. Well, are you claiming it caused resentment, that statement?
A. I'm not personally.



Q. Okay. But you're claiming Jay Armbrister is claiming that?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. No.
BY MR. BAKER:
Q. Well, this is an arrest report. Is anybody claiming that his statement caused resentment in someone?
MS. STEWART: Well, I'm going to object to the form. I don't think that's complete.
A. I'm only --
MR. BAKER: Michelle, I'm going to -- that's kind of coaching, so --
MS. STEWART: No, it's not. You just represented to him that in this arrest report, nothing was in there and it's not a complete and accurate document, so that's my objection.
MR. BAKER: Well, okay. Well, it's a little bit beyond object to form.
BY MR. BAKER:
Q. Okay. Let's -- here's Exhibit 4. And can you identify that?

Page 74

A. It appears to be my report.
Q. Okay. So going back to this idea of resentment, you didn't survey the crowd as to whether anybody got resentment from the statement of Dr. Spiehs, did you?
A. Sorry. Can you repeat it?
MR. BAKER: Would you repeat that, Sharon?
The following question was read by the reporter:
"QUESTION: So going back to this idea of resentment, you didn't survey the crowd as to whether anybody got resentment from the statement of Dr. Spiehs, did you?")
A. I would say that's correct.
BY MR. BAKER:
Q. When Dr. Spiehs made that statement, you remained where you were, correct?
A. I don't recall.
Q. You didn't move towards him, did you?
A. Not that I remember.
Q. Okay. Do you remember having any reaction at all after he made that statement?
A. I'm sure I drew -- it probably drew my attention over there and I started looking over

Page 75

in that direction.
Q. Well, okay. You're guessing on that? You don't know whether or not --
A. Correct. I don't know.
Q. I'm just asking what you remember.
A. Okay.
Q. And as far as you can remember, you didn't move, you didn't react, you can't recall anything after he made that statement, correct?
A. I'm not sure what you're asking.
Q. Well, let me ask it this way. Do you recall moving towards Dr. Spiehs after he made the statement?
A. No.
Q. Do you recall signaling to Jay Armbrister something immediately after he made that statement?
A. No, sir.
Q. Can you recall doing anything that would be consistent in your mind with a crime being committed the moment that Dr. Spiehs made that statement?
MS. STEWART: I'll object to the form.
MR. HOLDER: Object to form.

Page 76

A. I personally wasn't looking for a crime.
BY MR. BAKER:
Q. Okay. Now, in your report, you say the meeting was delayed. But that can't be true, can it?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I don't understand your question, I guess.
BY MR. BAKER:
Q. Well, we've already established the meeting started on time at 5:30, correct?
MS. STEWART: Object to the form.
A. That's what it said on the notes, but I didn't create those.
BY MR. BAKER:
Q. Yeah, I know. And I asked you if that conformed to your understanding.
A. I was not there when the meeting started.
Q. Okay. You left before the meeting started?
A. I don't recall the exact time when this occurred.

Page 77

Q. Well, I get it. But you left before the meeting started?
A. I left at some point after Mr. Spiehs was arrested.
Q. Yeah. And that was before the meeting started?
A. I don't recall the exact time.
Q. Yeah. Well, you said 5:25 --
A. Okay.
Q. -- right? That's before the meeting started?
A. That's what I put on the arrest report, yes, sir.
Q. Okay. And that's before the meeting started?
A. That's correct, sir.
Q. Okay. So how could it have delayed the meeting that started at 5:30 when he got arrested at 5:25 and taken out of the room?
MS. STEWART: Object to the form.
A. The County Commissioners were out. To the best of my ability, that would mean to me they were ready to start. So that's why I put that in my report.
BY MR. BAKER:

Page 78

Q. Okay. But when you discovered this video -- and you don't know when you saw it, correct?
A. Correct.
Q. You went ahead and reviewed it?
A. At some point, yes.
Q. Okay. And you don't know if you reviewed it prior to your report April 22nd?
A. That's correct.
Q. And Exhibit 3 -- or Exhibit 4, rather, it says at 17:20, or 5:20, he enters the room, correct?
A. Yes, sir.
Q. And you say the Commission had to wait to begin the meeting, right?
A. Where are you seeing that? I'm sorry. Yes, sir. I see that.
Q. Okay. And then you say that when Dr. Spiehs turned toward Michael Almon, you see that?
A. Is that in the same paragraph?
Q. It says: "I observed Justin turn towards a member of the public."
A. Okay. Yes, sir, I see that.
Q. And that's Michael Almon?

Page 79

A. I believe so.
Q. You say he started yelling at the individual. See that?
A. Yes, sir.
Q. What did he yell?
A. It states here: "Justin was yelling 'I don't give a fuck what you think of me.'"
Q. Okay. So that's the yelling you're referring to?
A. Yes, sir.
Q. Okay. And you say the Commission waited for Dr. Spiehs to lower the volume of his voice, correct?
MS. MILLER: Where is that? I believe you. I just -- where?
MR. HOLDER: It's the third paragraph.
MS. STEWART: Third paragraph.
MS. MILLER: Oh.
A. I'm sorry, I'm not seeing it. Oh, yes. Okay. You're talking about the first line, correct? Yes, sir.
BY MR. BAKER:
Q. And that was between 5:20 and 5:25, correct?

Page 80

A. I don't recall the exact time.
Q. Well, it couldn't have been -- it had to be between those two, 5:20 and 5:25, right?
MS. STEWART: Object to the form.
A. I would assume so.
BY MR. BAKER:
Q. Well, if he got arrested at 5:25, he's taken out of the room, right?
A. Again, those times -- I didn't look at a clock. I don't know the exact times when everything happened, sorry.
Q. So you're not sure if these times are correct?
A. I'm basing them off of what I recall at that time.
Q. Well, I'm asking today. Are you not sure the times are correct?
A. Those times were approximate.
Q. So they may not necessarily be accurate?
MS. STEWART: Object to the form.
A. I would say yes to that.
BY MR. BAKER:
Q. Okay. And the only words that you say that were loud during that 5-minute period of

Page 81

time was the "I don't give a fuck what you think of me"?
A. That's what I could recall.
Q. Okay. Now, I don't see anything in your reports that Dr. Spiehs engaged in threatening behavior. Is that correct?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I suppose. I mean, I don't -- I don't see it in here either.
BY MR. BAKER:
Q. I don't see it either. He remained seated at all times until Jay Armbrister used force on him, correct?
MS. STEWART: Object to the form.
A. I don't recall.
BY MR. BAKER:
Q. Jay Armbrister used force on him at some point, correct?
A. To effect an arrest, yes, sir.
Q. And prior to that, Dr. Spiehs was seated, correct?
A. I don't remember specifically.
Q. You weren't watching Jay Armbrister come up and --

A. I don't -- I'm sorry. Go ahead.
Q. Let me --
A. I apologize.
Q. Okay. I mean, you would have been watching the Sheriff come up and confront Dr. Spiehs? You would have been watching that, wouldn't you?
A. That's correct.
Q. Okay. I mean, it wasn't something that -- I mean, that was a security "something," right?
A. Yes, sir.
Q. You were focused on that at the moment?
A. Yes, sir.
Q. All right. And so prior to when Jay Armbrister came up and used force on Dr. Spiehs, he was seated in that chair at the Commission meeting, correct?
MS. STEWART: Object to the form.
A. I believe -- I don't recall.
BY MR. BAKER:
Q. Do you recall Dr. Spiehs standing up prior to Jay Armbrister using force on him?
A. No, sir.
Q. Do you recall Dr. Spiehs waving his



arms or doing anything like that prior to Jay Armbrister coming up and using force on him that day?
A. No, sir.
Q. Okay. Can you think of some other threatening behavior that I haven't identified?
A. No, sir.
Q. In your report, you say: "Deputy Jimmy Wold and Deputy Chase Coleman were also present due to past issues with Justin Spiehs." See that?
A. Okay. Yes, I see it now.
Q. Explain that.
A. I believe they were both present because of the past encounters we've had with Mr. Spiehs.
Q. Did you have a conversation prior to the meeting --
A. No, sir.
Q. -- about Justin Spiehs?
A. I don't decide who comes to these meetings.
Q. Well, how did you know that they were there specifically because of Dr. Spiehs?
A. I guess I don't know that.



Q. Well, you wrote it, right?
A. Correct.
Q. So were they -- did you call them in? You know, hey, Dr. Spiehs is here, Jimmy Wold and Coleman, get over here, did you do that?
A. I did not do that.
Q. Were they there prior to the arrest?
A. Yes.
Q. Were they assigned to security like you were?
A. They are assigned to court security at the time, yes.
Q. So they were in the building already?
A. Correct.
Q. Okay. So you had you, Wold, and Coleman there, correct?
A. Correct.
Q. And then you had Sheriff Armbrister there?
A. Correct.
Q. Is that normal for Sheriff Armbrister to be at these Commission meetings?
A. I believe he was there to present something.
Q. No, I asked a different question.



A. Oh, sorry.
Q. Is it normal for him to be at these Commission meetings?
A. No.
Q. Okay. You say he was there to present something?
A. That's how I remember, yes.
Q. Okay. And so your knowledge about those two deputies being present due to past issues with Justin Spiehs, what were the past issues with Justin Spiehs?
A. Justin -- Mr. Spiehs was known to be loud and vulgar.
Q. By who?
A. By the County Commissioners, by my own personal belief.
Q. Give me the facts that he was loud and vulgar, your personal belief.
A. Raised, elevated voice, profanities, those type of things.
Q. When?
A. I don't know specific dates, sir.
Q. But you had this preconception that he was loud and vulgar?
A. I've had --

Page 86

MS. STEWART: Object to the form.
MR. HOLDER: Go ahead.
A. My apologies. I've had past encounters with Mr. Spiehs.
BY MR. BAKER:
Q. Describe those.
A. I don't remember specific details, sir.
Q. Okay. Any details?
A. He's not very polite and he's extremely rude to me.
Q. How so?
A. Just based on things he's said.
Q. Example, can you remember anything?
A. I don't recall any exact statements, sir.
Q. Okay. So you think he was rude to you?
A. He has been, yes.
Q. He has? And you can't describe how that -- what that means?
A. Just how that feels to me, sir.
Q. Okay. So he's a rude guy, according to you, has been with you, correct?
A. With me, yes.
Q. Yeah. And that's one issue. What other issues required Jimmy Wold and Coleman to

Page 87

be there because of -- other than him being rude to you, what else?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I don't know.
BY MR. BAKER:
Q. Well, you said he was loud, he had been loud.
A. That's my perception of it, yes.
Q. So he'd been rude and he'd been loud when?
A. On previous encounters. I don't have specific dates.
Q. Like you just pull him over in a car or something?
A. No.
Q. Why would you have encounters with Dr. Spiehs?
A. During County Commission meetings.
Q. Oh, during Commission meetings?
A. Correct.
Q. All right. And so he was talked about amongst the deputies about being loud and rude at these meetings?
A. That's correct.

Page 88

Q. Okay. And I guess you -- he shouldn't have been that way, is that what you thought?
A. I'm just describing how I viewed his demeanor.
Q. Why would it require two more deputies just because someone was rude and loud?
MS. STEWART: Object to the form.
A. I don't know.
BY MR. BAKER:
Q. Well, you said they were there because of past issues with Justin Spiehs, correct?
A. Yes, sir.
Q. And those past issues you say were confined to his presence at other Commission meetings, correct?
A. Again, I don't know. I don't make those decisions.
Q. No, this is what you wrote.
A. I wrote --
Q. The past issues you're talking about was at the Commission meetings?
A. Correct, yes.
Q. Yes. And those past Commission meetings that you're referring to was where he was -- your words -- loud and rude, correct?

Page 89

A. Yes.
Q. Why would it require two more deputies to be present simply because this fellow had been loud and rude at a prior Commission meeting?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I don't know.
BY MR. BAKER:
Q. Well, you wrote it, right?
A. Yes, sir. We have established that.
Q. Can you explain why they needed to be there?
A. No.
MS. STEWART: Object to the form.
THE WITNESS: Sorry.
BY MR. BAKER:
Q. Were they assigned to the Commission meeting or did they come in from the building and --
A. I don't know.
Q. Go ahead.
A. They were in uniform. They were stationed there.
Q. So normally there are three deputies in

Page 90

those Commission meetings?
A. I don't -- I don't determine how many people are there.
Q. No, I get that, but I'm just saying as a norm, I thought there was just two. But you're saying three?
A. I'm not there every County Commission.
Q. When you are there, how many other deputies are there in the Commission meeting --
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. -- normally?
A. Depends.
Q. Give me a number.
A. I can't give you an exact number, sir. They're different each time.
Q. So it could be -- could there ever be just one?
A. It's possible.
Q. And then two?
A. Yes, sir.
Q. Three?
A. Anything is possible.
Q. So could the entire force be there?
A. Yes, sir. It's extreme.

Page 91

Q. All right. Did you know if Dr. Spiehs was going to be attending at the April 20th, 2022 meeting?
A. No, sir.
Q. Were you notified or did you have any knowledge from the Board that Dr. Spiehs had signed up to speak for April 20th, 2022?
A. No, sir.
Q. You say: "Justin is known to appear weekly to meetings and has engaged in noisy conduct by using loud, explicit language towards members of the public and the County Commissioners." Do you see that?
A. Yes, sir.
Q. And that was your understanding of why you, Coleman and Wold and Armbrister all came to that April 20th meeting?
MR. HOLDER: Object to form.
A. I was assigned to that meeting, so I was required to be there.
BY MR. BAKER:
Q. Well, that was why Coleman and Wold were there?
A. I don't know -- I put it in my report, but I don't know why they were assigned

Page 92

specifically, why they -- those two specifically were assigned.
Q. Well, in any event, you cite noisy conduct. Now, is that something different than being loud?
A. I don't know the specific meaning of that, sir.
Q. You used the phrase. I'm just asking you when you used it.
A. Can you tell me where that is at exactly, sir? Okay. Yes, sir.
Q. I mean, you used the phrase "noisy conduct." That's kind of a term that comes out of disorderly conduct, doesn't it?
A. Yes, sir.
Q. Okay. And what was the noisy conduct that you say that Dr. Spiehs had engaged in at these prior Commission meetings?
A. I would probably describe it as the elevated, raised voice and the profanities and his demeanor.
Q. Okay. Demeanor being what?
A. Just his demeanor as I view it. I don't have any specific descriptions, I suppose.
Q. Okay. I don't see anything in your

Page 93

report where you claim that any of you were there because of the topics of the meetings.
A. Yeah, I don't know anything about that.
Q. Well, I mean, was there any discussion amongst you and the other deputies that hey, tonight is going to be a hot topic and we better all be there, anything like that go on?
A. No, sir.
Q. Okay. And what, in any of your reports that you cite his language, constituted what you consider to be fighting words?
MS. STEWART: Object to the form.
A. I'm sorry. I got -- I missed -- I missed part, I guess.
BY MR. BAKER:
Q. Okay. In your report, 3 and 4, what in there, in terms of language ascribed to Dr. Spiehs, do you claim constituted fighting words under the criminal disorderly conduct statute?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I would say the -- probably the phrase "I don't give a fuck what you think of me."
BY MR. BAKER:

Page 94

Q. Now, you think that constitutes fighting words?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I did not make that decision.
BY MR. BAKER:
Q. No, I'm asking you what you thought. You're the one who made the report, correct?
A. Correct. I did not make the decision to arrest him, though, and I did not establish the probable cause.
Q. Okay. So you're not the one claiming that "I don't give a fuck what you think" constitutes fighting words, you're claiming Jay Armbrister thinks that?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. That is what I heard.
BY MR. BAKER:
Q. Okay. But you're not making that claim?
A. Correct.
Q. Okay. He just said write a report and he told you some things to write in it, correct?
MS. MILLER: Who is "he"?

Page 95

MR. BAKER: Jay Armbrister.
A. I wrote the report based on the totality of what people told me and my involvements.
BY MR. BAKER:
Q. And part of that was Jay Armbrister said write in there that I think he spoke fighting words?
MS. STEWART: Object --
A. He didn't say that specifically.
THE WITNESS: I apologize.
MS. MILLER: Let us object first.
BY MR. BAKER:
Q. All right. Your report mentions affidavits and statements submitted. And are you aware of any affidavits or statements given by the individuals at that April 20th meeting?
MS. STEWART: Other than what's in Exhibit 4?
BY MR. BAKER:
Q. You can ignore her.
A. I don't understand your question.
MR. BAKER: Could you restate it, please?
The following question was read by the reporter:

Page 96

"QUESTION: Your report mentions affidavits and statements submitted. And are you aware of any affidavits or statements given by the individuals at that April 20th meeting?")
A. No.
MR. HOLDER: Just real quick, can you tell me, just so that I can -- where you're referring to?
MR. BAKER: I can't.
MR. HOLDER: Okay.
MR. BAKER: I don't have it here in front of me. I'm sorry.
MS. MILLER: I'm going to ask for a break again. Is that all right?
MR. BAKER: No. I mean, what, you got to do it again?
MS. MILLER: Excuse me?
MS. STEWART: Wow, I'm going to object to that. That seems just absolutely rude.
MR. BAKER: All right. But you're going to take my witness out again?
MS. MILLER: Yeah, I am. It's my client, so I can.

Page 97

MR. BAKER: Okay. Go ahead. I get it. All right.
MS. MILLER: Wow.
MS. BAKER: Yeah. Me, too, wowie.
MS. MILLER: I'm just asking for a break to use the restroom.
(A recess was taken.)
MR. BAKER: We're back on the record.
BY MR. BAKER:
Q. If you'd look on Exhibit 4 on the second page, and if you go down to the third paragraph, I'm seeing -- we'll go through this whole document, but I see all these blanks. See the third paragraph?
A. Yes, sir.
Q. So it says "later identified as," blank, that's been redacted, hasn't it?
A. That's not how I put it in my report.
Q. Right. Someone else has taken that out?
A. I believe so.
Q. You didn't do it?
A. Correct.

Page 98

Q. And in fact, if we look throughout that other paragraph or that same paragraph, there's blanks? "Making comments toward" -- blank -- "about" -- blank -- "wearing a mask," correct?
A. Correct.
Q. And then it has: "Justin was asked to leave based on his conduct towards," blank. Right?
A. Yes, sir.
Q. You had names in there in your original report, right?
A. I don't recall what was specifically in there. I wrote this report a long time ago.
Q. Okay. But you would agree that's been taken out?
A. Yes, sir.
Q. And if we go through the rest of this report, if you just turn the page, top: "I spoke with," blank --
A. Yes, sir.
Q. -- "after the meeting." Blank. Do you know who you spoke with? "I spoke with," blank. Who was that? "After the meeting."
A. I would -- my memory, Mr. Almon. He's the only person I spoke to.

Page 99

Q. Okay. That's what you think was taken out?
A. Yes, sir.
Q. So I spoke with Mr. Almon after the meeting. Almon, you think this is all Almon?
A. That's the only person I interviewed.
Q. Okay.
MS. STEWART: And, Mr. Baker, I think you have a complete unredacted copy, so it was attached as Exhibit 1 to the Sheriff's motion to dismiss.
MR. BAKER: Well, I don't know that I got it in discovery, so ...
MS. STEWART: It was attached to the Sheriff's motion to dismiss. It was sent to you on May 16th of 2024.
MR. BAKER: Well, I don't --
MS. STEWART: So for completeness of the record, if you're asking him to identify the people, but ...
MR. BAKER: Look, what you attached to a motion isn't discovery and it doesn't tell me that I'm getting something unredacted. So that -- for the record.
BY MR. BAKER:

Page 100

Q. So in Coleman's report, do you see his statement?
A. Yes, sir.
Q. He says at 5:20, Dr. Spiehs was standing next to the front row. See that?
A. No, sir. Where is it, sir?
Q. Well, let me find it.
Well, let me ask it this way. If his report had said that Justin Spiehs was standing, that wouldn't be correct?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I don't know what information he had put in his report or why he put it in there.
BY MR. BAKER:
Q. Okay. He says that "Upon entering the room, Spiehs began cussing and/or addressing various people as he walked across the room to the south section of seating in the Commission room gallery." Do you see that?
A. No, sir, I don't see it. I'm sorry.
Q. Where was Coleman --
A. I don't know.
Q. -- at the beginning of the meeting?
A. I don't know.

Page 101

Q. Prior to the meeting beginning, where was he?
A. I don't know.
Q. You don't recall him being next to you?
A. That's correct.
Q. You don't recall him being on that side of the room?
A. I don't know where he was.
Q. Okay. And you're not claiming that Spiehs began cussing and/or addressing various people as he walked across the room, are you?
A. That -- I did not write this report.
Q. You're not claiming that he did that, are you?
A. Claiming specifically what?
Q. Factually, are you claiming that when Dr. Spiehs entered the room, that he was cussing and addressing various people as he walked across the room to the south section of the seating?
A. I did not observe that.
Q. Okay. And I think you said that -- you said that Sheriff Armbrister told you to make the charging affidavit?
A. Correct.

Page 102

Q. And you learned the prosecutor would not prosecute?
A. I didn't -- I don't know what happened after that.
Q. Well, you know that the prosecutor refused to prosecute your charge of disorderly conduct, you know that?
A. I did not know that.
Q. When did you find out that?
A. I don't know the reason. I don't know the reasons why the DA's office did anything.
Q. Yeah, I'm not asking why. The fact that they said they're not going to prosecute, when did you find that out?
A. I was never told that.
Q. When did you find that out?
A. I would assume since I never appeared in court for it.
Q. Did you wonder why the prosecutor wasn't prosecuting your charge of disorderly conduct against Dr. Spiehs?
A. No, sir.
Q. You weren't curious?
A. No, sir.
Q. Is that normal for you to make charges

Page 103

that the prosecutor doesn't prosecute?
A. Again, I don't -- I don't know the decision-makings of the District Attorney's office.
Q. Yeah, I'm not asking that. Is it a normal phenomenon for you to make charges against people that the prosecutor refuses to prosecute?
MR. HOLDER: Object to form.
A. I don't know.
BY MR. BAKER:
Q. Is that the first time that's ever happened to you?
A. I don't recall.
MR. HOLDER: Object to form.
A. Sorry. I can't recall of any instances whether they did or did not.
BY MR. BAKER:
Q. Do you remember what you told Dr. Spiehs in that sallyport?
A. No, sir.
Q. You don't remember having a conversation with him in the sallyport?
A. That's correct.
Q. So if I recite to you conversations

Page 104

that Dr. Spiehs says he had with you, you couldn't say whether it happened?
A. That's correct.
Q. Okay. So if he said that you all talked about what Jay Armbrister said up at the Commission with the Commissioners, you won't -- you don't know one way or the other what was said in that sallyport?
A. I don't know what was said in that sallyport.
Q. Well, this, I'll call it, practice of the deputies at the Commission meetings taking directives from -- possibly taking directives from the Commissioners, has that changed?
MS. STEWART: Object to the form.
A. I don't -- what changed?
BY MR. BAKER:
Q. What you talked about, the taking directives from the Commissioners at Commission meetings.
MS. STEWART: Object to the form.
A. Again, I don't know what specifically you're talking about, sir.
BY MR. BAKER:
Q. You used the phrase "taking directives

Page 105

from the Commissioners." Do you recall saying that in this deposition?
A. Yes, sir.
Q. And you said that that happens sometimes?
A. It's a possibility.
Q. Okay. And it has happened?
A. I don't know.
Q. Has that custom, that practice, that taking of directives, is that still ongoing as far as your understanding?
A. I have not worked a County Commission meeting in a long time, so I don't know.
Q. All right. So as far as you know, whatever that practice or custom of deputies taking directives from the Commissioners that you referenced here in this deposition, you don't know if that's still an ongoing policy or custom or practice, do you?
MS. STEWART: Object to the form.
A. Correct. I don't -- I don't know.
BY MR. BAKER:
Q. Okay. And Sheriff Armbrister said -- he hasn't told the deputies, hey, we're not going to take directives from the Commissioners

Page 106

anymore at those Commission meetings, he hasn't told you that, has he?
A. No.
Q. Okay. I'm handing you Exhibit 8.
MR. BAKER: Sorry. I only got -- well, here.
BY MR. BAKER:
Q. Do you recognize Exhibit 8?
A. It looks like a video photo of a County Commission meeting.
Q. May 11th, 2022. Do you recognize yourself in that top photo?
A. Yes, sir.
Q. And where are you standing?
A. To the left of Mr. Spiehs.
Q. And you made Mr. -- Dr. Spiehs leave that meeting?
A. I didn't make anybody leave.
Q. Who made him leave?
A. I don't -- I didn't physically make him leave. I don't understand what you're asking.
Q. Well, he was told to leave by the Commissioners, right?
A. I don't recall.
Q. Okay. And you're there and you're

Page 107

right next to him. Why are you right next to him?
A. I don't recall.
Q. Well, what possibly could be a reason why you'd stand next to a public speaker at this Commission meeting?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I couldn't -- I couldn't say.
BY MR. BAKER:
Q. Well, give me some possible reasons.
A. That wouldn't be appropriate. There could be all sorts of reasons for why I would be that close to somebody, and it wouldn't necessarily be a negative thing.
BY MR. BAKER:
Q. Well, you're there.
A. I don't recall the specific incident.
Q. Could it have been because they said they want Dr. Spiehs to leave?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. It's possible.
MS. STEWART: I'm sorry, Mr. Baker. What date was that? I don't have a

Page 108

copy of it and I didn't hear what you said the day of that meeting the photos were.
MR. BAKER: May 11th, 2022.
MS. STEWART: Thank you.
BY MR. BAKER:
Q. And then we see another officer at the top right. Who is that?
A. On which photo?
Q. The top photo.
A. I can't make it out in this photo. It's too blurry.
Q. Well, I think it's the same fellow -- I think that guy is the same guy as that guy.
A. The person in the lower photo, that's going to be Dale Flory.
Q. All right. Could it be the same, Dale Flory in the top picture at the top part of that photo?
MR. HOLDER: Object to form.
A. I'd say it's possible. I can't tell, though. It's too blurry.
BY MR. BAKER:
Q. Okay. And then there's another officer at the bottom right. Who is that?
A. Joe Chavez, I believe, yes.

Page 109

Q. All right. And you don't recall if you saw Dr. Spiehs committing any crime on that date as the photos are depicted here?
A. That's correct.
Q. And if Dr. Spiehs was not committing any crime, why did you get involved?
MR. HOLDER: Object to form.
A. Again, I don't know the specifics of this incident.
BY MR. BAKER:
Q. Well, the second picture shows you down at the bottom and it looks like you're following him, right?
MS. STEWART: Object to the form.
MR. HOLDER: Object to form.
A. If that's how you view it. Again, sir, that's a long time ago. I don't remember the specifics.
BY MR. BAKER:
Q. The bottom photo, why are you next to him now back by that --
A. I don't have a specific reason.
Q. Why would you have -- you went from that part of the Commission meeting and now you're back here. Why would you do that?

Page 110

MR. HOLDER: Object to form.
MS. STEWART: Join.
A. Again, I don't remember the specific information about that day.
BY MR. BAKER:
Q. I get it. What possible reasons would you have done to follow him from where he spoke now back to that point in this picture?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I don't think it would be appropriate for me to guess on why I did something when I don't remember. I don't know why I followed him on the way out.
BY MR. BAKER:
Q. Okay. So if someone said it's because the Commissioners said we want that person to leave, that could be a possibility?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
A. Anything is possible.
BY MR. BAKER:
Q. Okay. And do you see the movement, the hand gesture of that deputy?
A. Which one, sir?

Page 111

Q. Well, it's the bottom picture. His hands are out.
A. Okay.
Q. What's he signaling?
MS. STEWART: Object to the form.
A. I don't know.
BY MR. BAKER:
Q. You don't know?
A. I mean, he did it. I don't -- you would have to ask him why he did that.
Q. I might. Do you have any opinion as to what that body language is conveying?
A. No, sir.
Q. Okay. I'm going to hand you what is marked as Exhibit 5. And that is the --
MS. STEWART: Weren't the photos Exhibit 5? I apologize.
MR. HOLDER: They're Exhibit 8. It's pre-marked.
MS. STEWART: 8, okay.
BY MR. BAKER:
Q. This is the third amended complaint filed in this case. If you'll go over to paragraph 73. Would you read paragraph 73 for me out loud?

Page 112

A. "When asked by Dr. Spiehs as to why, the defendant Reid stated it was because she claimed Dr. Spiehs 'directed derogatory language at us' and because of Dr. Spiehs' vulgar language."
Q. And then read paragraph 74.
A. "Dr. Spiehs objected and defendant Reid then instructed the deputies, which included defendant Kruzel, to have Dr. Spiehs removed. Three deputies made Dr. Spiehs leave while Dr. Spiehs continued to object while being forcibly removed again under threat of arrest."
Q. Do you have any facts as we sit here today to say why any of those allegations are incorrect?
MR. HOLDER: Just a minute. If you're going to ask him about the complaint, I want him to have a chance to read this in the context of it.
MR. BAKER: Well, I don't know what that means, but --
MS. STEWART: And I'm going to object to the form of the question.
BY MR. BAKER:
Q. Okay. But the question still stands.

Page 113

Do you remember it?
A. No.
Q. Okay.
MR. BAKER: Can you re-ask, if you can find it?
The following question was read by the reporter:
"QUESTION: Do you have any facts as we sit here today to say why any of those allegations are incorrect?")
A. I don't know.
BY MR. BAKER:
Q. You don't know if you have any facts or you just don't have any facts?
MS. STEWART: Object to the form.
A. Again, this was a long time ago. I don't remember the facts of the -- of the circumstances.
BY MR. BAKER:
Q. Right. So I'm just asking what you remember today.
A. Correct.
Q. Is there anything here that's factually incorrect that you can tell me today?
A. I don't know what this is. I've

Page 114

never -- I've never seen this before.
Q. All right. Identify anything in statements 73 and 74 that are incorrect in your opinion.
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I wouldn't know.
BY MR. BAKER:
Q. You were there, right?
A. Again, I didn't -- I didn't write this. I don't recognize this.
Q. It says that the three deputies made Dr. Spiehs leave. Do you have any facts to controvert that?
A. No, sir.
Q. It says that Reid instructed the deputies, which included Deputy Kruzel, to have Dr. Spiehs removed. Do you have any facts to controvert that?
A. I don't recall anything like that.
Q. Do you have any facts that controvert it?
A. No. Again, I don't ...
Q. Let me hand you Exhibit --
MS. STEWART: I don't think he

Page 115

was finished answering.
THE WITNESS: Yeah, I am. Sorry.
MS. STEWART: I'm sorry. I couldn't tell.
THE WITNESS: And I appreciate that. Thank you.
BY MR. BAKER:
Q. Let me hand you Exhibit 6, and I'll represent that that is an answer that was made on your behalf. And if you go to page 3 and then look at No. 26 -- or I'm sorry. I got that wrong. If you look at No. 30 on page 3, see that?
A. Yes, sir.
Q. So in terms of the allegations that -- as to what Defendant Reid stated, it was because she claimed Dr. Spiehs "directed derogatory language at us" and because of Dr. Spiehs' vulgar language. The answer here states that you, the officers, lack knowledge or information to admit or deny that allegation. Do you see that?
A. Okay. Yes, sir.
Q. Now, but if you go to the next one, in terms of paragraph 74, it says that the

Page 116

Defendant Officers admit that Spiehs was removed by the deputies. Do you see that?
A. Okay. I see it.
Q. So you did remove Dr. Spiehs from the room on that day?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
A. I never touched him.
BY MR. BAKER:
Q. Well, this says admit -- no, I didn't say -- all you have to say is get out. You don't have to use force on him, you understand that, don't you?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. Okay.
BY MR. BAKER:
Q. Let's talk about that. You're a police officer with a big badge and a big gun, right?
MR. HOLDER: Object to form.
MS. STEWART: Join.
BY MR. BAKER:
Q. Let's do it this way. You have a badge of authority, correct?
A. Yes.

Page 117

Q. And you have a gun, correct?
A. Yes.
Q. And you realize that you can influence people to do things that you say to do because of your authority, you understand that, don't you?
MS. STEWART: Object to the form.
A. I don't -- I don't know how to answer that.
BY MR. BAKER:
Q. Why not?
A. Because I -- I can't control what other people do.
Q. Do you think it influences them, that the fact that you're an officer and have a gun, that they would do what you say?
MR. HOLDER: Object to the form.
MS. STEWART: Object to form.
A. I don't know what someone would do.
BY MR. BAKER:
Q. All right. So when we talk about -- it says here that they admit that Spiehs was removed by the deputies. How did you remove him from that meeting that day?
MR. HOLDER: Object to form.

Page 118

MS. STEWART: Join.
A. I don't know who "they" is.
BY MR. BAKER:
Q. Well, it says "Defendant Officers." You're a Defendant Officer, right?
A. Yes.
Q. And that allegation was made against you, paragraph 74, right?
MS. STEWART: Object to form.
A. Right.
BY MR. BAKER:
Q. It says: "Defendant Reid then instructed the deputies, which included Defendant Kruzel." It says that specifically --
A. Uh-huh.
Q. -- see that?
A. Yes.
Q. And then your answer that was filed says that Defendant Officers, that's you, admit that Spiehs was removed by the deputies. You see that?
A. Okay. Is this -- I'm sorry. Are you saying this is something I said?
Q. They're admitting that you did it.
MS. STEWART: Object to the form.

Page 119

MR. HOLDER: Object to form.
A. I did not make anybody leave.
BY MR. BAKER:
Q. So the fact that you're up there at that podium and then you're down here with him down there, you don't think that had any effect on Dr. Spiehs whether or not he got to stay in that meeting?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I don't know what Mr. --
BY MR. BAKER:
Q. You don't think you --
A. I don't know what Mr. Spiehs was thinking or doing and why he does those things.
Q. Was it your intent to have him leave?
MS. STEWART: Object to the form.
A. It was not my intention.
BY MR. BAKER:
Q. What were you doing then?
A. I don't recall the specific reasons for why I was where I was.
Q. So you don't think you were part of the officers that had Spiehs removed that day, is that what you're saying?

Page 120

A. Nobody removed Mr. Spiehs.
Q. Or influenced him to be -- leave?
MS. STEWART: Object to the form.
A. It was not my intention to influence anybody.
BY MR. BAKER:
Q. You think he just left all by himself --
A. Yes.
Q. -- because he wanted to?
A. I don't know what he wanted to do or not. I can't answer to that.
Q. And you don't recall whether the Commissioner said we want -- tell him to get out? You don't recall that?
A. No, I don't.
Q. I mean, these are YouTube videos, right? There's video evidence of what they said, right? Have you --
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. And again, I don't remember the specific information. I don't have that information in front of me.
BY MR. BAKER:

Page 121

Q. Okay. Well, so from your memory, you're denying that you had anything to do with Dr. Spiehs leaving that meeting as depicted in Exhibit 8?
A. Well, I believe the term was "forcibly removed." I didn't -- I didn't remove anybody and I didn't make anybody leave.
Q. Yeah, it didn't say "forcibly." It says "was removed by the deputies."
A. And again, I did not remove anybody.
Q. Did you help influence him being removed?
MS. STEWART: Object to the form.
A. I had no intentions to influence anybody's behavior.
BY MR. BAKER:
Q. Well, you understand the Commissioners wanted him to be removed, correct?
A. I don't remember --
MS. STEWART: Object to form.
A. -- the specifics of the statement. I'm sorry. I apologize. I don't know how else to answer your question, sir.
BY MR. BAKER:
Q. All right. So you don't think that,

Page 122

just from what we see here in these photos, that your presence next to him had any influence upon Dr. Spiehs as to whether he stayed or left that meeting that day?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. Again, I don't know how he felt or why he felt the way he feels things. I don't have an answer for that.
BY MR. BAKER:
Q. Okay. And you don't think you told him to leave?
A. I don't recall any specific comments.
Q. Do you deny telling him that he had to leave?
A. I don't recall any specific comments.
Q. I'm getting past that part. I know you don't recall it. Now I'm asking a different question.
Do you have any memory right now that you deny the fact that you told him to leave?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I believe I've answered it by saying I don't recall any specific comments, whether I

Page 123

did or did not.
BY MR. BAKER:
Q. If he says you told him to leave, do you have any facts to controvert that?
A. Again, no, I don't believe I do.
Q. Okay. Did you have a prior encounter with Dr. Spiehs in which you arrested him?
A. Not that I'm aware of.
Q. Okay. Or participated in an arrest of Dr. Spiehs?
A. Not that I can recall.
Q. Okay. But you've had prior run-ins with Dr. Spiehs?
MR. HOLDER: Object to form.
MS. STEWART: Join.
BY MR. BAKER:
Q. When I say "run-ins," you know what I'm talking about?
A. I have -- the majority of my contact with Mr. Spiehs is at the County Commission meetings. I can't think of any other time outside of the County Commission meetings where I've had encounters.
Q. All right. Let's see, if you go to page 11 of Exhibit 5 and if you look at

Page 124

paragraph 50, would you read paragraph 50 out loud for me?
A. "Several members of the audience then began making specific remarks directed back towards Dr. Spiehs while Dr. Spiehs was sitting on the front row. They expressed disapproval of Dr. Spiehs, his sign, and his speech. The statements from the audience sitting members were loud enough for the Commissioners to defend sheriff" -- or sorry, "the defendant Sheriff and Dr. Spiehs to hear. None of those attendees speaking were asked or told to leave by any of the defendants and were not threatened with an arrest for disorderly conduct."
Q. Is there anything in that contention of fact that you say is untrue?
A. I don't know. I don't know who wrote this.
Q. Irrespective, these are alleged facts. Do you have any facts to say something within that is not true?
A. I wouldn't know.
MS. STEWART: I'm going to object to the form. Go ahead.
A. Sorry. I wouldn't know.

Page 125

BY MR. BAKER:
Q. Well, you were there, right?
MS. STEWART: I'm going to object to the form. It's taken out of context. You can answer.
MR. BAKER: That's a speaking objection, Michelle. You need to stop it.
MS. STEWART: Well, you're asking him about allegations in your complaint.
MR. BAKER: Don't do that.
MS. STEWART: Then let him read the whole complaint like Andrew asked earlier.
MR. BAKER: No. See, now you're obstructing.
MS. STEWART: Andrew asked the witness to be allowed to look at the entire document.
MR. BAKER: You're obstructing, Michelle. I'm asking you to abide by the local rules.
BY MR. BAKER:
Q. There were several members in the audience that night. You were there, right?
MS. STEWART: I'm going to object to the form.

MR. HOLDER: Can we get a clarification of the day you're talking about? Because we've been talking about two in the last 30 minutes.
BY MR. BAKER:
Q. The day that Dr. Spiehs had use of force by you and Jay Armbrister, that day. Remember that one?
A. What we were originally talking about where he was arrested for disorderly conduct?
Q. That day that he was arrested and you and Jay Armbrister used force on Dr. Spiehs, that's the day I'm talking about on paragraph 50. Do you understand that?
A. So to me, that would mean the day he was seated on the bench and he was arrested for disorderly conduct and I transported him to jail, that's the date we're talking about?
Q. That is the day.
A. Okay.
Q. So paragraph 50 says there's several members of the audience there. That's true, wasn't it?
A. Correct.
Q. Okay. And you know that because you



were there?
A. Correct.
Q. Okay. Now, it says they began making specific remarks directed back toward Dr. Spiehs. Do you have any facts to say that's not true?
A. No, I don't.
Q. Okay. And it says he was sitting on the front row. That's true, right?
A. Correct.
Q. And it says they expressed disapproval of Dr. Spiehs, his sign and speech. You don't have any facts to controvert that, do you?
A. That's correct.
Q. And so if we go through the rest of it, none of those attendees speaking were asked or told to leave by any -- by you, correct?
A. That's correct.
Q. Or any of the other officers there, correct?
A. That's correct.
Q. Okay. And they were not threatened with an arrest for disorderly conduct; is that correct?
A. I did not threaten anybody with an



arrest.
Q. And you didn't witness any other officer doing the same thing?
A. That's correct.
Q. All right. Now, it says in 51 -- would you read that out loud?
A. "While sitting in his chair on the front row, Dr. Spiehs continued to engage in the dialogue with other sitting audience members with no one in particular. It was prior to the time the open meeting was to begin."
Q. And that's true, correct?
A. I don't know. Again, all the times were approximate. I don't remember specific times.
Q. Is there anything in that paragraph that you have a fact that says that's not true?
A. Not to my ability.
Q. Okay. Let's read 52 out loud.
A. You want me to?
Q. Yes, please.
A. "As Dr. Spiehs was seated in the front row, audience attendee Michael Almon seated behind him continued to speak to Dr. Spiehs using" -- I don't know what that --



Q. It's all right.
A. I don't know what that word is, sir. "Names about Dr. Spiehs and the sign Dr. Spiehs was displaying at his side. While seated, Dr. Spiehs turned around to see who was making the comments. Dr. Spiehs was not waving his arms, did not move closer to Mr. Almon, and made no gestures at all during the dialogue with Mr. Almon."
Q. All right. Anything in that statement that you will say is untrue?
A. I wouldn't know.
Q. Okay. Can you give me any facts to say that anything in there is not true?
A. I wouldn't be able to say that.
Q. Well, you were there, right?
A. Correct.
Q. Okay. Dr. Spiehs was not waving his arms, that's a true statement, isn't it?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. I don't recall anything like that.
BY MR. BAKER:
Q. Did you witness Dr. Spiehs waving his arms?

Page 130

A. I did not.
Q. Okay. He did not move closer to Mr. Almon, that's a true statement, isn't that a fact?
A. I believe so.
Q. And he made no gestures at all during the dialogue with Mr. Almon, you didn't witness him do that either, did you?
A. No, sir.
Q. Okay. Let's look at Exhibit 7. And do you recognize Exhibit 7 as being snapshots out of the video that you reviewed?
A. Yes, sir.
Q. And so the first photo shows Dr. Spiehs seated on that front row, correct?
A. Yes.
Q. Do you recall this moment other than what you're looking at here?
A. Yes.
Q. Okay. And so he's turned, Dr. Spiehs is, and it looks like -- who is that fellow with the mask on?
A. I believe that would be Mr. Almon.
Q. All right. And it looks like his hand is out. Do you see that?

Page 131

A. I don't know whose hand that belongs to.
Q. All right. And Mr. Almon is not standing, he's seated?
A. I can't tell based on this photo. He appears to be seated, though.
Q. Okay. And you don't recall anything that's -- in fact, you couldn't even hear anything that's being said at this moment, right?
A. Correct. I don't know what was being said in this exact moment.
Q. Okay. And then if we go to the next picture on page 1 of Exhibit 7, you don't know of anything that's being said there --
A. That's correct.
Q. -- if any?
A. Correct.
Q. So if you turn the page, do you recall Jay Armbrister then coming up from behind of Dr. Spiehs as depicted in this photo on page 2?
A. Yes.
Q. And you would have --
A. It looks that way.
Q. Yeah. And you would have been watching

Page 132

that?
A. Yeah.
Q. Watching that closely, correct?
A. Yes, sir.
Q. Now, at the moment that that was happening, what did you think was happening?
A. I don't know. I didn't know.
Q. You had no idea?
A. Correct.
Q. Did you think Jay Armbrister is just coming up to Dr. Spiehs to say hey, buddy, how is it going, you know, friendly talk?
A. I have no -- I don't know.
Q. Just no idea?
A. (Shakes head from side to side.)
Q. In any event, Dr. Spiehs is there seated, correct?
A. In this photo, he is, yes.
Q. And he's not standing, waving his arms, doing anything like that, right?
A. Based on what I can see from this photo, no.
Q. Okay. And if you look at the two people to the left of him -- you talked about demeanor. Describe their demeanor.

Page 133

MR. HOLDER: Object to form.
A. I -- I don't know.
BY MR. BAKER:
Q. Well, do they look angry to you or upset or --
A. I don't know what these people look like when they're angry or upset.
Q. Just from what -- I mean, you know what proxemics are?
A. I would assume that would be like the facial expressions.
Q. Body language?
A. Uh-huh.
Q. And you're a policeman. You've been trained to kind of discern and read people's body language, right?
A. Correct, in my opinion of their body languages.
Q. Yes, and that's what I'm wanting from you today, your opinion as to what you're reading in that body language of those two people sitting there.
MR. HOLDER: Object to form.
MS. STEWART: Object to form.
A. Well, body language, just based on this

Page 134

photo, I can't tell you that. I don't know if this is normal for these people.
BY MR. BAKER:
Q. From what you see, do they look distressed to you?
MR. HOLDER: Object to the form.
MS. STEWART: Object to form.
A. I don't know. I can't -- I can't make that determination.
BY MR. BAKER:
Q. Just by looking at the --
A. Correct. I don't know.
Q. Okay. And you see Jay Armbrister's hand is out. What does that mean to you?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. It doesn't mean anything to me.
BY MR. BAKER:
Q. You saw it when it happened, right?
A. I see it in the photo. I don't recall seeing it when it was happening.
Q. Let's turn to page 3. Now, you remember seeing that, though, right?
A. I see it in the photo, but again, I don't recall specific instances from several

Page 135

years ago.
Q. Describe what you see Jay Armbrister doing on page 3 of Exhibit 7 --
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. -- in your opinion.
A. Standing next to Mr. Spiehs.
Q. And what is he doing with that right hand?
A. He has it elevated.
Q. And what do you see with that hand?
MS. STEWART: Object to the form.
A. It's open.
BY MR. BAKER:
Q. And do you see a thumb?
A. I see his thumb, yes.
Q. Yeah. Like -- kind of like that (indicating)?
A. I wouldn't say how you're gesturing, no.
Q. You don't think he's gesturing like "I need you to come over here"?
A. I can't speak to his actions.
Q. Well, at some point, Jay Armbrister signaled to you to come over, didn't he?

Page 136

A. I don't recall that specifically, but I knew that he was being -- he was going to be placed under arrest because Jay told me he was.
Q. When did Jay Armbrister tell you he was going to be arrested?
A. As I was walking to both of them. As I walked up to both of them, Jay told me he was being arrested.
Q. Why would you be walking towards them?
A. Because he addressed it, and I must have known that something was going to happen.
Q. Well, you said he told you. Where at in these pictures do you claim that Jay Armbrister told you that he was going to arrest Dr. Spiehs?
A. I don't know the specific time he told me, but it was as I walked up to both of them just before he was arrested.
Q. Well, you don't think he signaled to you to come over first?
A. I don't remember if he signaled to me, but I knew that -- I knew that something was happening and I --
Q. Well -- I'm sorry.
A. -- got closer.

Page 137

Q. Well, let's just -- I'm trying to get an understanding. Your frame of mind was you saw no crime, right, at the time?
A. Correct.
MR. HOLDER: Object to form.
BY MR. BAKER:
Q. And then you see Jay Armbrister walk up to Dr. Spiehs from behind and somehow you then came over there, right?
A. (Nods head up and down.)
Q. And for what reason would you have come over, just the fact that you hadn't even witnessed a crime yet?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. To see what was going on and to assist the Sheriff.
BY MR. BAKER:
Q. Okay. Is it possible that he was motioning you to come over?
A. It's possible.
Q. Okay. And at some point, you say you got close enough for him to tell you that "I'm going to arrest Dr. Spiehs"?
A. Yes, sir.

Page 138

Q. So let's go to page 4. That conversation hadn't happened yet, has it?
A. I --
MR. HOLDER: Object to form.
A. Sorry.
MR. HOLDER: Go ahead.
A. I don't know the specific time he told me.
BY MR. BAKER:
Q. You're not in the picture, are you?
A. Correct.
Q. So you think you could have heard what he said?
A. I don't know where I'm at in this specific picture.
Q. Okay. You're not in the frame, are you?
A. That's correct.
Q. All right. And you think that you may have heard something he said through the mask on his face by the time of page 4 in this exhibit?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. Who are you talking about? It sounds like you switched people.

Page 139

BY MR. BAKER:
Q. You and Jay Armbrister. You say you heard him say "I'm going to arrest him," right?
A. Yes.
Q. I'm trying to find out where in that moment this happened, right?
A. Okay. In that moment, I don't know specifically if that's when he told me in that moment in the picture you're showing me.
Q. Could he have said it to you prior to this depiction on page 4?
A. Again, I couldn't tell you.
Q. Okay. Well, if he said it to you prior to page 4, why aren't you there --
MS. STEWART: Object to form.
BY MR. BAKER:
Q. -- on page 4?
MR. HOLDER: Join.
A. I don't know how to even answer that question. I'm sorry.
BY MR. BAKER:
Q. Well, sure. If you knew that -- let's say by page 2, you say he could have said "I'm going to arrest him," right?
A. It's possible.

Page 140

Q. Okay. But yet page 3, you're not there. Page 4, you're not there. I mean, why would you be not coming to his assistance if he had said "I'm going to arrest Dr. Spiehs"?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I was already walking towards Mr. Spiehs and Jay while they were standing together. And as I approached them -- the specific time I don't recall -- I was told that he was being placed under arrest.
BY MR. BAKER:
Q. All right. So before he said he was going to arrest, you'd already started walking towards Dr. Spiehs?
A. That's correct.
Q. Okay. And the reason you did that was just because Jay Armbrister was next to Dr. Spiehs?
A. I wouldn't say that's the only reason.
Q. What other reason?
A. The totality of the circumstances, but again, that was such a long time ago, I don't remember specific. But again, just my normal protecting and serving, things get elevated the

Page 141

way they did, I may close the distance a little bit. And then I was informed that he was being placed under arrest, and we had placed him under arrest.
Q. Well, when you say totality of the circumstances, what was getting escalated? You used that word. What did you see that got escalated?
A. The yelling.
Q. Well, that already happened, right?
A. And that's what caught my attention.
Q. Right. And then now we've got these other where he comes from behind, right?
A. Yes.
Q. Do you know if Jay Armbrister told Dr. Spiehs, "I want that sign out of here"?
A. I don't know.
Q. Have you ever asked Jay Armbrister about that?
A. No.
Q. Why?
A. I never did. I don't know.
Q. Okay. So you saw him, Jay Armbrister, on page 4 do that motion, right?
A. Okay. I see the motion that's in that

Page 142

picture, yes.
Q. But you don't recall him turning around, doing that?
A. No.
Q. Now, is it your claim that the moment that Dr. Spiehs said "I don't give a fuck what you think of me," you're saying that's when -- according to Jay Armbrister, that's when the crime of disorderly conduct happened?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. That's a -- that's a statement that I heard. I never commentated about --
BY MR. BAKER:
Q. Right. You wrote the report that disorderly conduct happened, right?
A. That's what I wrote in the report.
Q. When was that offense completed, in your opinion?
A. I don't know.
Q. Was it completed when he said "I don't give a fuck what you think of me"?
A. I never determined -- I never made that determination.
Q. In your charging affidavit, that's what

Page 143

your testimony is here today?
MR. HOLDER: Object to form.
A. I wrote the affidavit based on facts and circumstances that I was told by other people, and I believe the specific comment that you're asking about was an observation that I heard that statement.
BY MR. BAKER:
Q. But you're the charging officer, right?
A. No.
Q. You're not?
A. No.
Q. Who is the charging officer?
A. I believe Jay is.
Q. Jay is?
A. He was establishing probable cause and I was assisting the Sheriff with an arrest.
Q. All right. So if Dr. Spiehs had already committed a crime by -- he'd already said this statement, "I don't give a fuck what you think of me," by page 4, right?
A. I don't know. Again, I don't remember the specific sequences of when things were said.
Q. Well, okay. So on Exhibit 7, page 1, you don't know whether he'd already said "I

Page 144

don't give a fuck what you think of me" by then?
A. That's correct.
Q. Okay. In fact, if you look through those pages, when do you think he said it?
MS. STEWART: Object to form.
MR. HOLDER: Join.
A. I don't know.
BY MR. BAKER:
Q. Well, you don't think he -- I mean, and that's when the crime got committed, that statement?
MR. HOLDER: Object to the form.
MS. STEWART: Object to the form.
A. I'm not able to determine that based on these photos.
BY MR. BAKER:
Q. Really. Okay. Well, let's go to -- you see at page 4, Jay Armbrister looks like he's doing something with Michael Almon?
A. I --
MS. STEWART: Object to form.
A. Sorry. And I wouldn't be able to answer that. I don't know what he's doing.
BY MR. BAKER:
Q. Well, he's not effectuating an arrest,

Page 145

in your opinion, is he?
A. Not at this time.
Q. Okay. Do you know why he would -- if he had seen a crime, why he's not effectuating an arrest by page 4?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
A. No, sir.
BY MR. BAKER:
Q. Okay. Let's look at page 5. Do you recall Jay Armbrister motioning again with his hand and the thumb up, see that?
A. I see it in the photo.
Q. Yeah. Do you know what he's doing?
A. No, sir.
Q. Do you see the other people there?
A. Yes, sir.
Q. Okay. And you have no opinion about their demeanor?
A. That's correct.
Q. Okay. And you're not claiming that at that point -- well, strike that.
And you don't know whether at that point, Dr. Spiehs had committed any crime, do you?

Page 146

A. I did not make any determinations of the crime being committed.
Q. Well, in terms of whatever crime was alleged, had he already committed it by 5 or do you know?
A. I wouldn't know.
MS. STEWART: Object to the form.
A. I'm sorry.
BY MR. BAKER:
Q. Then let's look at the bottom picture. We just see -- who is that head poking out?
A. On the bottom photo?
Q. Yeah.
A. That would be me.
Q. That's you. So that's -- so you had been at least in that area, at least according to this photo, correct?
A. Correct.
MR. HOLDER: Object to the form.
BY MR. BAKER:
Q. And you can't remember whether Jay Armbrister had told you prior to that, that he was going to arrest Dr. Spiehs?
A. That's correct.
Q. But he could have told you later that

Page 147

he was going to arrest him?
A. Again, I don't -- I don't recall when he told me he was making an arrest.
Q. All right. Let's look at 6. What are you doing?
A. Looks like I'm leaned over and I have my left hand on his sign, and I don't see where my right hand is.
Q. Why are you doing that?
A. To effect an arrest.
Q. All right. So had Jay Armbrister told you he was going to arrest him prior to that?
A. Yes.
Q. So you remember that part?
A. It would have had to have been before this because I would not have made the arrest without the Sheriff telling me he was arresting him.
Q. All right. Now, you wouldn't have made an arrest, but Jay Armbrister did?
MR. HOLDER: Object to form.
A. I did not make the arrest. Jay Armbrister did.
BY MR. BAKER:
Q. Right. And you wouldn't have made an

Page 148

arrest because you didn't see any crime committed that day, correct?
MR. HOLDER: Object to form.
MS. STEWART: Join.
A. Those were my observations. I did not make that determination.
BY MR. BAKER:
Q. Right. So this is based solely on what Jay Armbrister is doing, not your opinion, correct?
A. I was assisting the Sheriff in making the arrest.
Q. All right. And so why do you have your hand on his sign?
A. So that it wasn't used against me. It's just standard to take things that might hurt you when you're making an arrest.
Q. All right. Now, what's the protocol when you make a -- this would be what, a felony or a misdemeanor?
A. I don't know the statute level of that. Off the top of my head, I believe it's a misdemeanor, but I --
Q. I mean, you're the charging officer, right?

Page 149

MS. STEWART: Object to form.
BY MR. BAKER:
Q. I mean, you wrote the affidavit? I'm sorry.
A. Correct. I wrote the affidavit.
Q. And he was charged a certain statute, right?
A. Correct. I just don't recall whether it was a misdemeanor or felony.
Q. All right. Well, what's the protocol when you're making an arrest like that?
A. I don't understand your question.
Q. Well, let's talk about handcuffing.
A. Okay.
Q. What's the protocol on handcuffing?
MS. STEWART: Object to the form.
BY MR. BAKER:
Q. When you're effectuating a misdemeanor arrest, right?
A. Uh-huh.
Q. So tell me when you -- or do you handcuff?
A. We did in this instance, yes.
Q. So what's the protocol? What have you been trained to do in an arrest of a disorderly

Page 150

conduct like this?
A. Well, we simply took him out of the room and then placed him in handcuffs.
Q. Is that the protocol?
A. I wouldn't say there's a protocol. It's just what you could do in the moment.
Q. So, I mean, why wasn't he handcuffed right there?
A. I don't -- I don't know.
Q. I mean, why didn't you handcuff him?
A. Because we walked out of the room.
Q. Yeah, I know you did that, but why did you walk him out of the room first and then handcuff him rather than handcuff him there?
A. I was following the lead of the Sheriff, so I believe he was -- I had just walked with him.
Q. Okay. So we see -- look at page 7. I see you over there, right?
A. Yes, sir.
Q. What are you doing?
A. On which photo? I'm sorry.
Q. 7.
A. I know. But top or bottom?
Q. Top.

Page 151

A. I have my hand on my radio. It looks like I'm talking to somebody on the radio.
Q. Who would you be talking to?
A. It could be a number of people. Dispatch, maybe somebody else in the room, but most likely dispatch.
Q. What would you be telling them?
A. That we had somebody in custody.
Q. Okay. And why would that be necessary to say?
A. It's just common practice that we notify dispatch when we make an arrest.
Q. All right. Now, I see the other people. Do you see anybody standing up over there?
A. I see someone standing to the right.
Q. Yes, the people that are seated over here.
A. Oh. No, I don't see anybody standing.
Q. All right. Who is this officer coming towards you and Armbrister?
A. That would be Deputy Wold.
Q. Okay. Now, where was Wold before this?
A. I don't recall specifically.
Q. Now, you're saying that Jay Armbrister

Page 152

told you that he was arresting Dr. Spiehs. Did he also tell Deputy Wold that?
A. I don't know.
Q. Okay. We looked at the bottom of the picture. Can you describe what you're doing there?
A. Looks like I'm still on the radio.
Q. Okay. And this is all prior to the meeting starting?
A. I don't remember the specific time, so I don't -- I don't know.
Q. Well, your report says 5:25. Anything to say this is when he's being arrested?
A. It was an estimated time to the best of my knowledge. I estimated it to be about that time, yes.
Q. But in your opinion, he is being arrested at this point?
A. Correct.
Q. In fact, he's being arrested -- when is he being arrested? Show me in one of these pictures where you think the arrest is being effectuated.
MS. STEWART: Object to the form.
MR. HOLDER: Join.

Page 153

BY MR. BAKER:
Q. First effectuated.
A. Well, based on these photos that you provided me, I'd say -- I'd say No. 6 is probably where the arrest started, the actual attempt to arrest him.
Q. All right. Now, you were close. Did Jay Armbrister say anything to Dr. Spiehs?
A. Not that I recall.
Q. Did he say anything in your presence to Dr. Spiehs?
A. It's possible.
Q. Well, do you remember anything?
A. No, I don't.
Q. Okay. If you look at 8. So what are you doing?
A. Looks like I'm assisting in escorting him out of the County Commission chambers.
Q. All right. Now, that is fairly called a use of force, isn't it?
A. We were effecting an arrest, so yes, I guess it could be categorized as that.
Q. No, don't guess. It is. You know what a use of force is, don't you?
A. I would -- yes, this is a use of force.

Page 154

Q. Thank you. And do you know what kind of -- was Jay Armbrister using any kind of compliance technique?
A. I don't know.
Q. Look at page 9. So I notice your wrist -- or your hand is on Dr. Spiehs' left wrist there, see that?
A. My left hand, yes, sir.
Q. And then your other arm, hand is on his elbow?
A. Yes, just above it.
Q. And look at what Jay Armbrister is doing.
A. Okay.
Q. Looks like that's a wrist compliance move?
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
A. I can't tell by this photo.
BY MR. BAKER:
Q. You know what I'm talking about, a wrist compliance?
A. No.
Q. Where you bend the wrist like this (indicating)?

Page 155

A. Okay.
Q. You've seen that move?
A. I've seen it, yes.
Q. Yeah. And that's called wrist compliance, right?
A. (Nods head up and down.)
Q. You don't know if he's doing that?
A. I don't know.
Q. You can't tell from this?
A. Not from the photo.
Q. Does it look like Dr. Spiehs is enjoying this?
MS. STEWART: Object to the form.
MR. HOLDER: Join.
A. I can't -- I can't answer how he feels or what he was feeling in the moment.
BY MR. BAKER:
Q. Yeah. I thought you said you looked at his demeanor, you could tell what his demeanor was?
MR. HOLDER: Object to form.
A. I don't know how to answer that question, sir.
BY MR. BAKER:
Q. Well, you said in this deposition that

Page 156

you had experience with Dr. Spiehs' demeanor in the past. And that's facial expressions, isn't it?
A. Correct.
Q. Well, use that same skill set in this picture that you've used past and tell me what you think his demeanor depicts on page 9.
MS. STEWART: Object to form.
MR. HOLDER: Object to form.
A. Well, I'd say based on my experiences, I have never met anybody happy to be arrested, so I would say he was not happy to be arrested.
MR. BAKER: All right. Let's take a break. I may be done.
(A recess was taken.)
MR. BAKER: That's all the questions I have.
MS. STEWART: I don't have any questions.
MR. HOLDER: I have no questions for the witness. He'll read and sign.
THE REPORTER: Do all counsel want an electronic copy?
MR. HOLDER: Yes, please.
MS. STEWART: Yes, please.

Page 157

(Deposition concluded at 11:48 a.m.)

C E R T I F I C A T E

I, Sharon R. Larrick, a Certified Court Reporter, do hereby certify:

That prior to being examined the witness was by me duly sworn;

That said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

The original transcript is in the custody of:
MR. LINUS L. BAKER
Attorney at Law
6732 West 185th Terrace
Stilwell, KS 66085

WITNESS my hand and seal this 25th day of July, 2025.

______________________________
Sharon R. Larrick
CCR NO. 765, CSR NO. 767

JUSTIN SPIEHS vs. JAY ARMBRISTER, et al.



Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

August 8th, 2025

To: MR. ANDREW HOLDER

Case Name: Spiehs, Justin v. Armbrister, Jay Et Al

Veritext Reference Number: 7444890

Witness: Tyler Kruzel Deposition Date: 7/25/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7444890
CASE NAME: Spiehs, Justin v. Armbrister, Jay Et Al
DATE OF DEPOSITION: 7/25/2025
WITNESS' NAME: Tyler Kruzel

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

______________ ______________________
Date Tyler Kruzel

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of___________________, 20____.

_________________________________
Notary Public

_________________________________
Commission Expiration Date



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7444890
CASE NAME: Spiehs, Justin v. Armbrister, Jay Et Al
DATE OF DEPOSITION: 7/25/2025
WITNESS' NAME: Tyler Kruzel

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

______________ ______________________
Date Tyler Kruzel

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of___________________, 20____.

_________________________________
Notary Public

_________________________________
Commission Expiration Date

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7444890

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

_______________ ________________________
Date Tyler Kruzel

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________
DAY OF ________________________, 20______ .

___________________________________
Notary Public

___________________________________
Commission Expiration Date