**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JUSTIN SPIEHS,<br><br>Plaintiff,<br><br>v.<br><br>JAY ARMBRISTER, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 5:24-cv-4005-JAR-BGS |

**AFFIDAVIT OF CHASE COLEMAN**

I, Chase Coleman, of lawful age, do hereby declare:

1. At all times relevant to the above-captioned lawsuit, I was employed by the Douglas County Sheriff's Office and assigned to the patrol division.
2. On April 20th, 2022, I was assigned to Court Security at the Douglas County Sheriff's Office.
3. At or around approximately 6:25 p.m., I arrived at 1100 Massachusetts Street for a special assignment monitoring the Board of County Commissioner's ("BOCC") meeting.
4. As I walked up to the stairs, I observed Justin Spiehs being escorted down the stairs by Deputies Kruzel and Ward.
5. I approached Sheriff Armbrister, who told me that Spiehs had been arrested for disorderly conduct and assigned me to make contact with the victim, Michael Almon.
6. At approximately 5:41 hours, I made contact with Mr. Almon, who me he had been seated in the second row of benches for the meeting, and that Spiehs had entered the room and sat in the bench directly in front of him. Mr. Almon stated that Spiehs, while facing forward, asked out loud why someone would still wear a mask. I observed that Almon was the only person in the public seating area wearing a face mask. Mr. Almon told me he responded, "To protect people." Mr. Almon relayed to me that Spiehs turned towards him and began to raise his voice.

EXHIBIT G

Almon told me that he told Spiehs this would not help his chances for election to the county commission, at which point Spiehs told him, "I don't give a fuck!" Mr. Almon also told me that Spiehs may have called him a "mother fucker."

7. I asked Mr. Almon if he felt that Spiehs was trying to goad him into a fight, and Mr. Almon responded that he couldn't know Spiehs's intentions for sure, but that he was worried things would have escalated if law enforcement hadn't stepped in. Mr. Almon stated that he had knowledge of Spiehs's behavior from previous meetings and described his demeanor as "hostile," adding that this was a more severe situation than he had ever seen from Spiehs before.

8. I prepared the report attached hereto as **Attachment 1** in connection with the April 20, 2022 issue. I prepared the report at or near the time of the events described, based on my personal knowledge and observations. Preparing such reports is a regular practice of the Douglas County Sheriff's Office, and the report was made and kept in the course of the Douglas County Sheriff's Office's regularly conducted activity. The report has been maintained in the ordinary course of business, has not been altered or modified, and the attached report is a true and correct copy of the original.

9. Separately, at or around 6:15 p.m. on May 1, 2024, I responded to a request for assistance made by Deputy Melissa Favre, who reported to dispatch that there was a subject refusing to leave the BOCC meeting that was taking place.

10. Upon arrival at 3755 E. 25th Street, Lieutenant Channel and I spoke with Deputy Favre outside the building. Deputy Favre told us that the BOCC was conducting its meeting inside and that the commissioners and County Administrator Sarah Plinksky had asked Spiehs to leave the meeting because he was standing in the aisle near the staff area. Deputy Favre also shared that

the BOCC had called a recess and were waiting for Spiehs to be removed before they felt they could continue the meeting.

11. As of the time I arrived at 3755 E. 25th Street, I had not neither been present for, nor had any personal knowledge regarding what had taken place at the May 1, 2024 BOCC meeting.
12. As Lieutenant Channel and I entered the meeting room, I observed an empty area between where the members of the public were seated and where the BOCC tables were located, that appeared to be an area of separation to allow the meeting to be conducted.
13. I observed that Spiehs was standing in the empty area between the audience seats and the BOCC tables.
14. Lieutenant Channel and I made contact with Spiehs and asked him to move away from the tables towards the public side, but he refused. Spiehs was then informed to move or he would be arrested, and he continued to refuse.
15. At approximately 6:29 p.m., I placed Spiehs under arrest, handcuffed him, and transported him to the Douglas County Correctional Facility, where he was booked on one count of violating K.S.A. 21-5922, interference with conduct of public business in public buildings.
16. I prepared the report attached hereto as **Attachment 2** in connection with the events at issue. I prepared the report at or near the time of the events described, based on my personal knowledge and observations. Preparing such reports is a regular practice of the Douglas County Sheriff's Office, and the report was made and kept in the course of the Douglas County Sheriff's Office's regularly conducted activity. The report has been maintained in the ordinary course of business, has not been altered or modified, and the attached report is a true and correct copy of the original.

FURTHER, AFFIANT SAITH NOUGHT.

CHASE COLEMAN

Date: 1/23/26

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my official seal this 23 day of January 2026.

Notary Public

My Commission Expires:

STATE OF NOTARY PUBLIC KANSAS
HEATHER N. SMITHART
My Appointment Expires 10/28/2028

## Supplement

On Wednesday, April 20th, 2022, I, Deputy C. Coleman, was assigned to Court Security at the Douglas County Sheriff's Office. I was identifiable by my department issued uniform with the Sheriff's Office badge and name tag.

At approximately 1725 hours, I arrived at 1100 Massachusetts Street in Lawrence, Douglas County Kansas for a special assignment. I was to monitor the County Commissioner's meeting, which takes place on the second floor in the County Commission Meeting Room. As I walked up the stairs to the second floor I witnessed Justin Spiehs (DOB: 08/18/1981) being escorted down the stairs in handcuffs by Deputy T. Kruzel and Deputy J. Wold. I approached Sheriff Jay Armbrister who advised that Justin had been arrested for disorderly conduct and assigned me to make contact with the victim. Sheriff Armbrister pointed out the victim who was sitting in the meeting room.

I entered the meeting room and noticed approximately 30 people assembled in the public seating area for the meeting. At approximately 1731 hours, I made contact with the victim, who I identified by Kansas Driver's License as Michael Almon (DOB: 02/04/1945) and asked what happened. (I noted the meeting was scheduled to start at 1730, and still had not started due to the disruption). The following is a summary of my interview with Michael.

Michael explained that he was seated in the south most row of benches, in the second bench from the front. Justin entered the meeting room and sat in the bench directly in front of Michael. After a short period, Justin continued to face forward but asked out loud why someone would still wear their mask. (I noted that Michael was the only person in the public seating area wearing a face mask). Michael replied "to protect people." Justin turned towards Michael and began to raise his voice. Michael told Justin that this wouldn't help his chances for election to the county commission, and Justin began yelling "I don't give a fuck!" Michael also believed Justin may have called him a "motherfucker." Michael stated that the yelling was loud enough for the crowd of people around to hear. I asked Michael if he felt that Justin was trying to goad him into a fight, and Michael stated that he couldn't know Justin's intentions for sure, but was worried things would have escalated if law enforcement hadn't stepped in. Michael had knowledge of Justin's behavior from previous meetings and described his demeanor as "hostile," and added that this was a more severe situation than he had ever seen from Justin before.

Michael was provided with a business card with this case number and was notified that an affidavit would be submitted to the Douglas County District Attorney's Office. Michael had no further questions and thanked the Sheriff's Office for our involvement.

Nothing further to report.

Respectfully submitted,

Deputy C. Coleman

# Douglas County Sheriff's Office

Officer Report for Case # D24-08706

**Nature:** SPECIAL ASSIGNM SPECIAL ASSIGNMENT

**Case Status:** CLEARED ADULT ARREST **Responsible Officer:** Coleman C - S635

**Location:** 3755 E 25TH ST; DGCO PUBLIC WORKS / ZONING & CODES, Lawrence, KS. 66046

**Occurred between:** 17:36:21 05/01/24 and 17:36:21 05/01/24 Reported: 17:36:21 05/01/2024

**Offense Codes:** (90Z)

Attachment 2

## Case # D24-08706 Continued
## MAIN NARRATIVE

**Officer: Coleman C - S635** **Page 1 of 1 - Main Narrative**

On Wednesday, May 1st, 2024, I, Deputy C. Coleman, was assigned to the Patrol Division of the Douglas County Sheriff's Office. At approximately 1815 hours, I responded to 3755 E 25th street, the Douglas County Public Works building, located in Lawrence, Douglas County, Kansas. I was responding due to Deputy M. Farve requesting additional officers due to a subject refusing to leave the County Commission meeting.

The following is an investigative summary. For full context and quotes, please refer to my body worn camera uploaded under this case number.

Deputy Farve briefed Lieutenant K. Channel and I on the following while outside the building. The Douglas County Board of County Commissioners (BOCC), consisting of Karen Willey, Shannon Reid, and Patrick Kelly, were conducting their weekly public meeting inside the Public Works building. The BOCC and Douglas County Administrator, Sarah Plinsky, had asked Justin Spiehs (DOB: 08/18/1981) to leave the meeting due to standing in the aisle near the staff area. The BOCC had called a recess to the meeting and were waiting for Spiehs to be removed before they felt they could continue.

Administrator Plinsky walked out of the building to meet with us. Administrator Plinsky stated Spiehs was disrupting the meeting by standing near the staff table and making staff uncomfortable. Administrator Plinsky did not think the meeting would be able to continue with Spiehs standing that close and blocking the aisle. Administrator Plinsky considered cancelling the meeting due to the extended recess. Administrator Plinsky also mentioned that Spiehs was yelling. I asked Administrator Plinsky if Spiehs was still yelling when she exited the building. Administrator Plinsky stated yes.

Lieutenant Channel and I walked into the meeting room being used by the BOCC. I observed it was a large room, with multiple rows of chairs on east side of the room. The chairs appeared to be filled by members of the public facing west. On the west side of the room, multiple tables had been pushed together to make a seating area for the BOCC. I observed Spiehs, who I was familiar with due to my previous law enforcement contacts, near the BOCC tables. I recognized his voice, speaking above the crowd booing, but was unable to make out specific words. The crowd continued to boo and jeer as we walked down the aisle. I believed the level of noise would prevent the meeting from taking place in an orderly fashion.

As I approached Spiehs, I saw there was an empty area between the public and the BOCC tables. It was apparent to me this was an area of separation between the BOCC and public to allow the meeting to be conducted. Spiehs was standing in the area, so close he would almost be positioned behind one of the BOCC seats.

I knew the Board of County Commissioners applies rules to the conduct of people attending the meeting to allow for the meeting to continue unobstructed. I believed that Spiehs standing so close to the BOCC was making county staff uncomfortable and unable to efficiently and orderly carry out the meeting.

Lieutenant Channel and I made contact with Spiehs and requested that he moved away from the tables towards the public side. Spiehs refused to move. Spiehs faced toward the crowd and said "This is a public building, I can stand right here if I want to." Spiehs was informed to move, or he would be placed under arrest. Spiehs continued to refuse. Spiehs faced away from Lieutenant Channel and said "Here we go". This caused more jeers and clapping from the crowd. At approximately 1829 hours, I placed Spiehs under arrest. I applied handcuffs, checked them for tightness, and double locked them. I asked Spiehs if the handcuffs were too tight. Spiehs stated yes. I checked the tightness of the handcuffs and was able to fit two fingers between Spieh's wrists and the metal of the handcuffs. I walked Spiehs outside and placed him in the rear compartment of my patrol vehicle after a search.

I began transporting Spiehs to the Douglas County Correctional Facility at approximately 1834 hours. We arrived at approximately 1835 hours.

Spiehs was left in the care of correctional staff and booked on one count of K.S.A 21-5922, interference with the conduct of public business in public buildings.

Nothing further to report.

Respectfully submitted,

Deputy C. Coleman