# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JUSTIN SPIEHS, | |
| **Plaintiff,** | |
| v. | **Case No. 5:24-CV-04005-JAR** |
| JAY ARMBRISTER, et al., | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiff Justin Spiehs brings this action under 42 U.S.C. § 1983 against the Douglas County, Kansas Board of County Commissioners (the "Commission") and several individual Douglas County law-enforcement officers.  Specifically, Plaintiff names as defendants Sheriff Jay Armbrister, Lieutenant Kristen Channel, Deputy Tyler Kruzel, and Deputy Chase Coleman (collectively, the "Officer Defendants").[1]  This matter is now before the Court on the Commission's Motion for Summary Judgment (Doc. 145) and the Officer Defendants' Motion for Summary Judgment (Doc. 148).  The motions are fully briefed, and the Court is prepared to rule.  For the reasons explained below, the Court grants both motions.

## I.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2]  In applying this standard, the Court views the evidence and all reasonable inferences therefrom in

---

[1] Plaintiff also named several other individual defendants, including County Clerk Jameson Shew, Deputy Jimmy Wold, County Commissioners Shannon Portillo, Shannon Reid, Patrick Kelly, and Karen Willey, and County Administrator Sarah Plinsky.  However, these defendants have since been dismissed.  *See* Docs. 82, 116.

[2] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

the light most favorable to the non-moving party.[3]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[6]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[7]  Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[8]

The non-moving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the non-moving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]  A non-movant "cannot create

---

[3] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[5] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[11] *Adler*, 144 F.3d at 671.

a genuine issue of material fact with unsupported, conclusory allegations."[12]  In responding to a motion for summary judgment, a party cannot rest on "ignorance of the facts, on speculation, or on suspicion" to escape summary judgment.[13]

## II.   Preliminary Matters

Before setting out the facts material to the pending motions, the Court must first address Plaintiff's summary-judgment briefing.  Plaintiff's responses to Defendants' motions are riddled with deficiencies that not only made it unnecessarily arduous for the Court to determine the proper scope of the summary-judgment record, but also rendered nearly all of Plaintiff's asserted statements of fact and responses to Defendants' statements of fact without proper record support.

First, Plaintiff repeatedly cites allegations from his Amended Complaint to support many of his asserted statements of fact.[14]  A party may not simply rely on his complaint in opposing summary judgment, unless the complaint is verified—that is, unless it "alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury."[15]  The Tenth Circuit has held that "a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56 of the Federal Rules of Civil Procedure."[16]  Rule 56, in turn, requires that an "affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out

---

[12] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[13] *Genzer v. James River Ins.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).

[14] Docs. 17, 157-3.

[15] *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) ("Although a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e).").

[16] *Vette v. Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021) (citation modified).

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."[17]  A verified complaint must be "sworn, dated, and signed under penalty of perjury pursuant to 28 U.S.C. § 1746."[18]

Plaintiff's Amended Complaint appears to satisfy that minimum verification requirement. It was signed and dated under penalty of perjury and, had it remained the operative pleading, the Court could have considered its factual allegations as summary-judgment evidence to the extent they otherwise satisfied Rule 56.  But Plaintiff has since filed a Third Amended Complaint.[19] And "it is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."[20]  The Third Amended Complaint therefore superseded the Amended Complaint as the operative pleading.

That replacement matters here because the Third Amended Complaint is not properly verified.  Although the Third Amended Complaint includes a verification page, Plaintiff did not sign or date the verification under penalty of perjury.  Instead, the signature line states only "[signed in original]."[21]  That notation is insufficient.  Plaintiff's signatures on the original pleadings verify only those earlier pleadings; they do not show that Plaintiff verified the allegations in the Third Amended Complaint as true under penalty of perjury.  Thus, the Third Amended Complaint cannot be treated as a verified complaint or affidavit for purposes of Rule 56.

---

[17] Fed. R. Civ. P. 56(c)(4).

[18] *Pacheco v. Timme*, No. 11-CV-02530-RM-KLM, 2014 WL 2442111, at *4 n.2 (D. Colo. May 30, 2014).

[19] Doc. 81.

[20] *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991) (citation modified).

[21] Doc. 81 at 70.

Nor does the Amended Complaint retain evidentiary value simply because it was properly verified before it was superseded.  The Tenth Circuit has followed the rule that an unsworn amended complaint renders a sworn earlier complaint without evidentiary value for purposes of summary judgment unless the amended complaint specifically adopts or refers to the earlier verified pleading.[22]  The Third Amended Complaint does not do so.  Accordingly, Plaintiff may not rely on the superseded Amended Complaint to create a genuine dispute of material fact, and the Court disregards Plaintiff's citations to the allegations in that pleading.

Second, Plaintiff attempts to support many of his asserted facts by citing to his own one-page sworn statement.  But the sworn statement does not itself set out the facts Plaintiff asserts in his summary-judgment responses.  Instead, Plaintiff states generally that he has "personal knowledge of the Statement of Facts submitted in support of Plaintiff's opposition to both Defendants' motions for summary judgment which are true."[23]  He also states that he was present for certain depositions, was present for the events described in "ECF 1," and that Exhibits 1 through 21 are "true and correct copies of what they purport to be."[24]

This is insufficient.  A verification attached to a summary-judgment response stating that the contents of the response are within the affiant's knowledge and are true and correct is not enough to avoid summary judgment.[25]  To effectively oppose a motion for summary judgment, the affidavit must itself set forth facts and show that the affiant is competent to testify to those

---

[22] *Hatcher v. Fields*, 120 F.3d 270, 1997 WL 431784, at *2 n.2 (10th Cir. Aug. 1, 1997).

[23] Doc. 157-16 ¶ 2.

[24] *Id.* ¶¶ 3, 5.

[25] *See Ricks v. Xerox Corp.*, 877 F. Supp. 1468, 1470 n.1 (D. Kan. 1995) (disregarding affidavit stating that the plaintiff had read his summary judgment opposition and that his "responses and allegations are true and correct to the best of his knowledge and belief" because the affidavit did not satisfy Rule 56(e)); *Malek v. Martin Marietta Corp.*, 859 F. Supp. 458, 460–61 (D. Kan. 1994) (disregarding affidavit in which the plaintiff stated that he had read his responses to defendant's facts and his statement of additional facts and that the statements were "true and correct to the best of my knowledge and belief").

facts.[26]  A general verification that a party has personal knowledge of his statement of facts, or that the statement of facts is true, does not itself set out admissible facts.[27]  Nor does it permit the Court to treat every factual assertion in Plaintiff's briefing as competent evidence.  Thus, the Court disregards Plaintiff's asserted facts to the extent they rely solely on the sworn statement's general verification of Plaintiff's summary judgment briefing.

Third, Plaintiff attempts to support several asserted facts by citing to non-existent portions of deposition transcripts.  In other instances, Plaintiff cites existing deposition testimony, but the cited testimony does not support the factual proposition for which it is offered.  Some citations are unrelated to the asserted fact, while others contradict the assertion Plaintiff asks the Court to accept.  Accordingly, the Court disregards Plaintiff's asserted facts to the extent they rely on non-existent deposition citations or deposition testimony that does not support the asserted proposition.

Fourth, Plaintiff relies heavily on four videos that purportedly depict incidents occurring at the Commission meetings at issue in this case.  His citations to those videos suffer from two recurring problems.  First, Plaintiff often cites all four videos together to support a single asserted fact, without providing timestamps, identifying the specific portion of any video on which he relies, or even specifying which video supports the asserted proposition.  Second, even when Plaintiff does identify a specific video and timestamp, the cited footage often does not support the asserted fact.

---

[26] *See* Fed. R. Civ. P. 56(c)(4).

[27] *See Malek*, 859 F. Supp. at 460–61 (explaining that the plaintiff's attempt to "sweepingly adopt[] all facts found in his brief" by affidavit stating that his summary-judgment facts were "true and correct" contradicted "the plain requirements of Rule 56(e) and D. Kan. Rule 206(c)").

Rule 56 requires a party moving for or opposing summary judgment to support its factual assertions by citing to particular parts of materials in the record,[28] and D. Kan. Rule 56.1 likewise requires a party to refer with particularity to the record evidence on which he relies. Plaintiff's video citations do not satisfy those requirements to the extent they either lack the necessary particularity or point to footage that does not support the asserted proposition. And "[i]t is not the duty of the court to search the record to find support for plaintiff's arguments."[29] The Court therefore declines to sift through multiple video exhibits to determine which one, if any, supports Plaintiff's asserted facts. Accordingly, the Court disregards Plaintiff's asserted facts to the extent they rely on generalized citations to multiple videos without timestamps or other particularized references to the relevant portions of the record, or on specific video citations that do not support the asserted proposition.

Fifth, Plaintiff includes several facts about open-records requests he submitted to the Commission. Those requests sought agenda materials from any Commission meeting at which rules governing public speaking or public attendance were proposed, discussed, or voted on. According to Plaintiff, the Commission did not produce records showing that the Commission ever placed those rules on an agenda or adopted them by formal vote.

Plaintiff uses those facts to advance a threshold argument: that the Commission cannot obtain summary judgment because it has not shown that its public-comment policies were lawfully enacted and enforceable under Kansas law. Plaintiff states this proposition in bold terms, arguing that "[w]hen a government defendant seeks to justify restrictions on speech by invoking 'policies,' 'rules,' or asserted 'authority,' it bears the affirmative burden to identify the

---

[28] Fed. R. Civ. P. 56(c)(1)(A).

[29] *Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kan. v. Black*, No. 06-2248-CM, 2013 WL 3878007, at *1 (D. Kan. July 26, 2013) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998)).

specific legal source of that authority and to demonstrate that the rule was duly adopted and enforceable."[30]  But Plaintiff cites no authority to support that proposition.  Nor did Plaintiff include in the Pretrial Order any theory that the Commission's public-comment policies are invalid or unenforceable because they were not lawfully enacted.

"The Pretrial Order controls the course of litigation."[31]  "As such, claims, issues, defenses, or theories of damages not included in the pretrial order are waived."[32] And "[a] plaintiff cannot escape the binding effect of the pretrial order by raising new issues in a response to the defendant's motion for summary judgment."[33]  Accordingly, Plaintiff waived any theory that the Commission's public-comment policies are invalid or unenforceable because they were not lawfully enacted under Kansas law.  And because that theory is not before the Court, the facts Plaintiff offers solely to support it are immaterial to the issues presented on summary judgment and are disregarded.

Sixth, Plaintiff asserts several facts supported only by his own vague, conclusory, and self-serving deposition testimony.  "Evidence relied upon in opposition to summary judgment may be insufficient to create a triable fact if it is nonspecific or otherwise non-responsive, vague, conclusory, or self-serving."[34]  Plaintiff asserts, for example, that "the Commission changed its meeting rules without notice," that "the Commission permitted positive commentary but prohibited negative commentary," and that the "Commission's practices regarding permissible

---

[30] Doc. 158 at 35.

[31] *Iweha v. Kansas*, No. 21-1228-DDC, 2023 WL 2837824, at *26 (D. Kan. Apr. 7, 2023) (citing Fed. R. Civ. P. 16(d)).

[32] *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

[33] *Hullman v. Bd. of Trs. of Pratt Cmty. Coll.*, 732 F. Supp. 91, 93 (D. Kan. 1990).

[34] *Harvey v. Baker*, 242 F. App'x 547, 551 (10th Cir. 2007) (citation modified).

topics were inconsistent."[35]  But the deposition testimony cited to support those facts does not identify when the Commission purportedly changed its rules, how the rules changed, or what notice was required but not given.  Nor does the cited testimony identify any specific meeting at which the Commission allegedly permitted positive commentary while prohibiting negative commentary, or otherwise explain with any specificity how the Commission's practices regarding permissible topics were inconsistent.  At most, Plaintiff testified that at some unidentified prior Commission meeting, an unidentified speaker praised the character of a commissioner, while Plaintiff was later muted when he was critical of the Commission.  Because the cited testimony lacks the specificity necessary to create a genuine dispute of material fact, the Court disregards these asserted facts.

For these reasons, the Court does not rely on Plaintiff's asserted statements of fact in resolving the pending motions for summary judgment except for those facts that are supported by competent record evidence and properly cited.  Furthermore, the same deficiencies discussed above also affect Plaintiff's attempts to controvert Defendants' statements of fact.  In many instances, Plaintiff does not cite record evidence directly, but instead cites to his own asserted statements of fact.  However, as explained earlier, many of those asserted facts are unsupported by the record.  In other instances, Plaintiff cites to asserted facts that do not exist or that were omitted from his statement of facts.  And even where the cited facts exist and are supported, they often do not address the fact Plaintiff purports to controvert.  Accordingly, the Court deems nearly all of Defendants' properly supported statements of fact admitted.[36]

---

[35] Doc. 158 at 17, 22.

[36] D. Kan. Rule 56.1(a) ("All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.").

**III.    Uncontroverted Facts**

Having resolved the issues that frame the summary judgment record, the Court now recites the following material facts, which are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the non-moving party.[37]

The Commission sets county policies, manages budgets, oversees county property and services, and addresses matters related to the fiscal management, land use, infrastructure, and interests of Douglas County.  The Commission hosts public meetings to conduct business relevant to Douglas County and to ensure effective governance and administration.  At those meetings, the Commission deliberates and votes on agenda items.  All meetings of the Commission are open to the public.

The Commission typically meets in the Commission Chamber of the Douglas County Historic Courthouse.  When public meetings are not being conducted, the general public is not permitted to enter the Commission Chamber.  On occasion, and at the Commission's discretion,

---

[37] Plaintiff raises numerous objections to the facts recited below.  The objections generally fall into several categories: objections that ordinary words are vague; objections that straightforward factual assertions are legal conclusions; objections that asserted facts mischaracterize the record without identifying any material mischaracterization; objections that facts lack foundation despite record support; and objections that facts are irrelevant despite bearing directly on the events at issue.  The Court has reviewed Plaintiff's objections and finds the vast majority of them to be trivial at best and, in many instances, absurd.

For example, Plaintiff objects to the statement that he began "arguing" with a commissioner as a legal conclusion.  But the asserted fact does not apply any legal standard or resolve any legal issue.  It merely describes the verbal exchange between Plaintiff and the Commissioner in ordinary, non-technical terms.  Plaintiff also objects on lack-of-foundation and mischaracterization grounds to the statement that a Commissioner asked a deputy to have Plaintiff step back against the wall, arguing that the Commissioner made only a non-binding request and lacked authority to issue enforceable directives.  But the asserted fact says only that the Commissioner asked the deputy to have Plaintiff step back; it does not state that the Commissioner issued a legally enforceable command. Plaintiff further objects on lack-of-foundation, legal-conclusion, and relevance grounds to the statement that the Commission met in a room with a podium where citizens could stand to make public comment and rows of tables on either side of the podium.  But this fact simply describes the physical layout of the meeting room, is supported by Plaintiff's own deposition testimony, and provides context for where Plaintiff, county staff, and members of the public were located during one of the Commission meetings at issue.

The Court therefore declines to address each of Plaintiff's objections individually and overrules them except as otherwise indicated below.

members of the public may provide oral or written comments during Commission meetings on specific agenda items.  Members of the public may also, at the Commission's discretion, provide general comments on matters not scheduled for discussion on the agenda.  Comments on non-agenda items are limited to three minutes and must be germane to the business of the Commission.

The Commission allows general public comment on non-agenda items to provide constituents an opportunity to voice concerns and opinions on topics relevant to the Commission. The Commission uses those comments to gather concerns, opinions, and issues from constituents in connection with its governance of Douglas County.  The Commission also implemented policies and procedures for public comment to ensure that public meetings are run efficiently and effectively.  Those policies and procedures, including germaneness and decorum standards, are announced at the beginning of each public meeting.  Under those policies and procedures, the Commission reserves the right to mute or remove a speaker who violates the germaneness and decorum standards during public meetings.

At all relevant times, Sheriff Armbrister was the Sheriff of Douglas County, Kansas. Lieutenant Channel and Deputies Kruzel and Coleman were sworn law-enforcement officers employed by the Douglas County Sheriff's Office.

On April 20, 2022, the Commission convened a public meeting.  That afternoon, Plaintiff stood outside the Douglas County Courthouse with a cardboard sign stapled to a piece of wood. The sign read: "Dr. Spiehs for DGCO Commissioner. Fuck these liberal mother fuckers."[38] Plaintiff estimated that the wood was under three feet long.  Plaintiff entered the meeting room before the meeting began and brought his sign with him.  Around 15 to 20 people were already

---

[38] Doc. 149-1 at 6 (Spiehs Dep. 19:7–10).

11

in the room.  Upon entering, Plaintiff walked to the sign-up sheet to sign up to make public

comment.  At that time, Sheriff Armbrister was standing near the Commissioners' table, and

Deputy Kruzel was stationed in the corner to the right of the table.

As Plaintiff walked to the sign-up sheet, Sheriff Armbrister approached him and told him

that he could not be there with his sign.  Plaintiff responded, "Oh yeah, why's that?"[39] Sheriff

Armbrister responded, "It's got cuss words."[40]  Plaintiff replied, "Horse shit it does."[41]  Plaintiff

then told Sheriff Armbrister that he was wrong, that Plaintiff could be there with his sign, and

that Sheriff Armbrister was crossing the line.  Sheriff Armbrister responded, "Okay then."[42]

Sheriff Armbrister then began speaking with the Commissioners while Plaintiff finished

signing up to speak and sat down in the front row.  Sheriff Armbrister told Commissioner

Shannon Reid and possibly Commissioner Shannon Portillo that if there was a problem and the

Commission wanted someone removed, the Commission needed to let him know because he was

not going to do it on his own.  Neither Plaintiff nor Deputy Kruzel could hear that conversation.

After Sheriff Armbrister finished speaking with the Commissioners, he stood in the back of the

room.

While seated in the front row, Plaintiff asked Sheriff Armbrister why someone would still

be wearing a mask as a COVID-19 precaution.  Plaintiff then called Sheriff Armbrister a "pussy

for wearing a mask."[43]  Sheriff Armbrister responded with something along the lines of, "My

---

[39] *Id.* at 7 (Spiehs Dep. 22:20–23:1).

[40] *Id.* (Spiehs Dep. 23:2–4).

[41] *Id.* (Spiehs Dep. 23:5–14).

[42] *Id.* (Spiehs Dep. 23:15–16).

[43] *Id.* at 9 (Spiehs Dep. 31:3–7).

face, my choice."[44]  Although not directed at Sheriff Armbrister, Plaintiff then said something to the effect of, "You didn't give a fuck about my face when it was my choice."[45]

A man seated next to Sheriff Armbrister said, "Hey, watch your mouth.  There are ladies present."[46]  Sheriff Armbrister interpreted that comment to indicate that someone not involved in the conversation felt upset, alarmed, or angered by Plaintiff's actions.  A citizen named Michael Almon was seated in the row directly behind Plaintiff and was also wearing a mask.  Almon told Plaintiff that Plaintiff's conduct would not help his chances for election to the county commission.  Plaintiff turned to see who made the comment and said, "I don't give a fuck what you think about me."[47]  Plaintiff was speaking in his "normal conversational voice," which was loud enough that he believed others in the crowd could hear it.[48]  Members of the audience told Plaintiff to watch his language.  Plaintiff then replied to the crowd: "How would you guys like it if you-all came in here and said, 'Back The Blue no matter who,' and I'm up on the Commission and I tell you guys to get out of here? How would you like that?"[49]

When Plaintiff turned back around, Sheriff Armbrister approached him and said, "Get out."[50]  Plaintiff responded, "For what?"[51]  Sheriff Armbrister threw his hands up and said, "disorderly conduct."[52]  While still seated, Plaintiff questioned, "Disorderly conduct?" and

---

[44] *Id.* at 32 (Spiehs Dep. 123:13–15).

[45] *Id.* (Spiehs Dep. 124:10–14).

[46] Doc. 149-2 at 17 (Armbrister Dep. 64:23–24).

[47] Doc. 149-1 at 10 (Spiehs Dep. 36:19–22).

[48] *Id.* at 33 (Spiehs Dep. 126:13–23).

[49] *Id.* at 9 (Spiehs Dep. 32:1–10).

[50] *Id.* at 11 (Spiehs Dep. 37:17–19).

[51] *Id.* (Spiehs Dep. 37:20–21).

[52] *Id.* (Spiehs Dep. 37:22–23).

repeatedly asked, "For what?"[53]  Plaintiff told Sheriff Armbrister "No" three times and then asked, "For what?" seven times.[54]  Plaintiff did not stand up on his own and was forced up by Sheriff Armbrister and Deputy Kruzel.  Plaintiff denies that he was ever told he was under arrest while seated in the meeting room and testified that he thought he was merely being "thrown out" of the meeting room.[55]

Sheriff Armbrister and Deputy Kruzel grabbed Plaintiff by the wrists, took his sign, and led him into the hallway, where he was arrested.  Sheriff Armbrister was the officer who witnessed the conduct, initiated the contact, and initiated the arrest.  Sheriff Armbrister arrested Plaintiff for disorderly conduct based on the totality of the circumstances, which he considered to include: (1) the close proximity between Almon and Plaintiff; (2) the volume and tone of Plaintiff's voice; (3) Plaintiff's use of profane language directed at Almon; and (4) Plaintiff's possession of a sign attached to a large wooden stick.  Deputy Kruzel then placed Plaintiff in his patrol car and transported him from the courthouse to the Douglas County Judicial and Law Enforcement Center.[56]

Deputy Kruzel prepared and submitted a probable-cause affidavit relating to Plaintiff's April 20, 2022 arrest.  In the affidavit, Deputy Kruzel stated, in relevant part, that he "observed [Plaintiff] turn toward Michael Almon . . . who was seated directly behind [Plaintiff,] and started

---

[53] *Id.* (Spiehs Dep. 37:25–38:8).

[54] *Id.* (Spiehs Dep. 39:17–40:11).

[55] *Id.* (Spiehs Dep. 38:14–20).

[56] Defendants assert several additional facts concerning statements Almon made to Deputy Coleman after Plaintiff's arrest regarding Plaintiff's conduct and demeanor.  Plaintiff objects to these facts on several grounds, including relevance.  The Court sustains the relevance objection.  As discussed below, Plaintiff's claims against the Officer Defendants require the Court to determine whether they had probable cause to arrest him.  That inquiry turns on the facts known to the officers "at the time of the arrest." *United States v. Little*, 119 F.4th 750, 770–71 (10th Cir. 2024).  Because Almon made these statements only afterward, they could not have informed the officers' probable cause determination and are therefore immaterial. *See Shimomura v. Carlson*, 811 F.3d 349, 356 (10th Cir. 2015) (declining to consider a witness's post-arrest statements because they "could not have affected the decision to arrest").

14

yelling at Almon," and that he heard Plaintiff yell, "I don't give a fuck what you think of me!"[57] Deputy Kruzel also stated that he and Sheriff Armbrister approached Plaintiff and asked him to leave; that Plaintiff did not leave right away and asked Sheriff Armbrister why he needed to leave; and that Deputy Kruzel heard Sheriff Armbrister tell Plaintiff that he was under arrest for disorderly conduct. Deputy Kruzel further stated that the meeting, which was scheduled to start at 5:30 p.m., was delayed by Plaintiff's actions. Deputy Kruzel later testified that he stated the meeting had been delayed because he observed that the Commissioners were already out, which to him meant they had been ready to start the meeting. But Deputy Kruzel also agreed that the meeting minutes stated that the meeting started at 5:30 p.m., approximately five minutes after the time he noted in his report that Plaintiff was arrested. Criminal charges arising from Plaintiff's April 20, 2022 arrest were later dismissed by the Douglas County District Attorney's Office.

On May 11, 2022, the Commission convened another public meeting. At the beginning of the meeting, the Commission read aloud the following public-comment policy: "General public comment is related to County business and directed to the County Commission. Public comment is limited to 3 minutes and the County reserves the right to mute and remove any speaker who is vulgar, rude or inappropriate."[58] On May 11, 2022, the Commission also restricted campaigning for public office during the public-comment period and required public comment to relate to the general business of the Commission.

Plaintiff was present during the May 11, 2022 meeting. During the public-comment period of the meeting, Plaintiff approached the podium and stated: "Evening, they's, evening beta male. I'd like to start off with a quote by Einstein: the thing about smart motherfuckers is

---

[57] Doc. 149-8 at 2 ¶ 2.

[58] Doc. 146-2 ¶ 11.

that they look like crazy motherfuckers to stupid motherfuckers."[59]  Commissioner Reid instructed that Plaintiff's microphone be turned off and explained that Plaintiff's comments violated Douglas County's decorum requirement in its public-comment policy.

On April 3, 2024, the Commission held a public meeting at the Douglas County Public Works Building Training Room rather than the Commission Chamber.  Commissioner Karen Willey read the public-comment policy at the beginning of the meeting.  Commissioner Willey stated:

> Each speaker is limited to a total of 3 minutes, but always accept any length of communication in writing.  All comments must address topics within the jurisdiction of the County Commission and we reserve the right to mute and remove any speaker whose comments are threatening, aggressively hostile or belligerent.[60]

Plaintiff was present during the meeting and held a sign that stated, "Patrick Kelly is a giant pussy."[61]  Plaintiff spoke for his allotted three minutes during the public-comment period and was not muted or removed from the meeting.

On April 17, 2024, the Commission convened another public meeting.  Commissioner Reid read the public-comment policy at the beginning of the meeting.  Commissioner Reid stated:

> General public comment is to address items not on the agenda, but that otherwise relate to County business.  Given the limited time and need to have an orderly and efficient meeting, we apply certain rules regarding public comment.  We will do our best to enforce these rules consistently and without regard to the viewpoint expressed by the speaker.  Each speaker is limited to 3 minutes. All comments must address topics within the jurisdiction of the County Commission and we reserve the right to mute and remove any speaker whose comments are threatening, aggressively hostile or belligerent.  Campaigning for public office during public

---

[59] *Id.* ¶ 12.

[60] Doc. 146-3 ¶ 11.

[61] *Id.* ¶ 12.

comment period is not allowed.  And address comments to the Commission directly.[62]

During the public-comment period, Plaintiff began by stating:

> A few weeks ago, I came here to say that Patrick Kelly is a giant pussy because he refused to meet with a constituent because Commissioner Kelly said he did not feel safe with the tone and the words used by the constituent.  Sarah Plinsky has meet [sic] individually with that same colleague and there was a video made of the meeting and Patrick says like a giant beta that his feelings were being invalidated by the constituent.  So last time I was here I read some of the comments from the YouTube Video and there have been some additional comments. So I wanted to read those new comments as well.
>
> To be clear, this is not the only instance of Patrick Kelly outing himself as a giant pussy, he did this when he forced 2-year[-old] children to wear masks during COVID and he also shows it in his job as Director for Curriculum for USD 497 where he developed policies for gender . . . .[63]

Commissioner Reid asked Plaintiff to speak about items specific to the Commission. Plaintiff continued to speak about Commissioner Kelly and began reading comments from YouTube.  Plaintiff stated: "He also shows it in his Director of Curriculum for USD 497 where he developed and implemented the gender identity and sexual development curriculum.  Where adults talk to kids beginning at age 5 about sexual development, gender identity, and the role society has on genders."[64]  Commissioner Reid told Plaintiff that his comments were not germane to the business of the Commission.  Plaintiff began to argue with Commissioner Reid that his comments were germane because they concerned Commissioner Kelly's character. Commissioner Reid refused to argue with Plaintiff and asked County Administrator Sarah Plinsky to mute Plaintiff's microphone because Plaintiff had violated the germaneness and

---

[62] Doc. 146-2 ¶ 16.

[63] Id. ¶ 17.

[64] Id. ¶ 20.

decorum standards.  Plaintiff continued to argue with Commissioner Reid while his microphone was muted.  Commissioner Reid told Plaintiff that his public-comment time was over and that he was welcome to stay at the meeting. Plaintiff was not removed from the April 17, 2024 meeting.

On May 1, 2024, the Commission held another public meeting, this time in the Training Room at the Douglas County Public Works Building rather than in the Commission Chamber. Commissioners Reid and Willey were present, as was Administrator Plinsky.  The meeting room had a podium where citizens could stand to make public comment and rows of tables on either side of the podium.  The Commissioners were seated in the row of tables to the left of the podium, and county staff were seated in the front row to the right of the podium.

At the beginning of the meeting, Commissioner Willey read the Commission's public-comment policy:

> General public comment is to address items not on the agenda, but that otherwise relate to County business.  Given the limited time and need to have an orderly and efficient meeting, we apply certain rules regarding public comment.  A recent Federal Court decision has given additional clarity on the standards for public comment and we've updated our policy accordingly.  We will do our best to enforce these rules consistently and without regard to the point of view expressed by the speaker.  Each speaker is limited to 3 minutes.  Speakers cannot donate unused time to other speakers. All comments must address topics within the jurisdiction of the County Commission.  We also get to maintain the decorum of our meeting, therefore we prohibit public comments that are threatening, aggressively hostile or belligerent.  Fighting words, slander or speech that invades the privacy of individuals, unreasonably loud, disruptive or repetitive, or that interrupt or substantially interfere with the Board's ability to conduct County business.  The Commission reserve[s] the right to mute or remove any speaker who violates these public comment rules.[65]

---

[65] Doc. 146-3 ¶ 18.

The May 1, 2024 meeting was at capacity, and an overflow room was set up to accommodate members of the public in attendance. Plaintiff entered the meeting room shortly after the meeting was called to order and stood at the front of the room in a walkway to the right of the podium, between the audience and the table where county staff were seated. He was not standing in the area designated for the public to sit or stand. Plaintiff held a sign that read, on one side, "Women have more balls than Patrick too," in reference to Commissioner Kelly, and, on the other side, something to the effect of "Keep fighting the liberal agenda."[66] Before the meeting began, Commissioner Willey spoke with a resident who expressed concerns about Plaintiff's signs, which Plaintiff had held during meetings in close proximity to the resident and the resident's mother.[67] The resident felt the signs were intimidating. That resident was seated in the front row of the May 1, 2024 meeting near where Plaintiff stood with his sign.

During the public-comment period, Plaintiff held his sign at the podium while he began speaking about comments directed to Commissioner Willey at the previous meeting.

---

[66] Doc. 149-1 at 38 (Spiehs Dep. 147:2–16).

[67] Plaintiff objects to the resident's statements to Commissioner Willey on Rule 26, hearsay, and lack of foundation grounds. Rule 26(a)(1)(A)(i) requires a party to disclose individuals "likely to have discoverable information" that the party "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). But the Rule does not require disclosure of every person mentioned in the evidence. As the advisory committee's note explains, "[a] party is no[t] . . . obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use." Fed. R. Civ. P. 26(a)(1) advisory committee's note to 2000 amendment; *see also Middlebrooks v. Equifax, Inc.*, No. 23-11086, 2024 WL 631000, at *5 (11th Cir. Feb. 15, 2024) ("Manalo was not a witness, and so Equifax was not required to disclose her under Rule 26."). In response to Plaintiff's objection, the Commission states that it does not intend to use the resident as a witness. Accordingly, there is no Rule 26 violation.

Nor are the resident's statements hearsay. The Commission states that it does not offer the resident's concerns to prove that Plaintiff was, in fact, intimidating the resident or the resident's mother. Rather, the Commission offers the statements to show what information was conveyed to Commissioner Willey before the meeting and why Commissioner Willey acted as she did during the events leading to Plaintiff's removal from the May 1, 2024 meeting. And statements offered for their effect on the listener, rather than for the truth of the matter asserted, are not hearsay. *United States v. Twitty*, 689 F. App'x 890, 894–95 (10th Cir. 2017).

Finally, Commissioner Willey's affidavit provides adequate foundation for what was communicated to her before the meeting. The Court therefore overrules Plaintiff's objections and considers the resident's statements to Commissioner Willey only for the limited purpose of explaining the information conveyed to Commissioner Willey and its effect on her.

Commissioner Willey asked Plaintiff to put down his sign during his allotted time for public comment because, according to the Commission, Plaintiff's behavior and comments violated the germaneness and decorum standards.  Plaintiff began asking Commissioner Willey what was wrong with the sign, and Commissioner Willey asked Plaintiff if he had any other public comment.  Plaintiff then stated:

> I sure do, Karen I want to begin by saying I appreciate your stoic demeanor and that you give the impression that you're really listening to us and I appreciate that to no end.  [An unidentified individual] was allowed by this Commission to say that without interruption or muting her microphone.  After her I spoke the words that are on my sign and I was . . . .[68]

Plaintiff's microphone was then cut off at Commissioner Reid's direction.  Commissioner Willey asked Plaintiff to put his sign down and told him that his time for public comment was over because his behavior and comments violated the Commission's germaneness and decorum policy.  Commissioner Willey also told Plaintiff that he was allowed to stay at the meeting. Plaintiff continued speaking after his microphone was cut off, and Commissioner Kelly told him that he was welcome to stay, but he needed to take a seat.  After leaving the podium, Plaintiff returned to standing at the front of the room, close to the table where county staff were seated, in a walkway, with his sign.  He stood "extremely close" to a female county staff member who was seated at the table.[69]  The staff member told Administrator Plinsky that she was uncomfortable with Plaintiff's proximity and expressed that she was distracted from her job duties and feared for her safety because Plaintiff was standing so close to her.[70]  In response to those concerns,

---

[68] Doc. 146-3 ¶ 23.

[69] Doc. 146-1 ¶ 31.

[70] Plaintiff raises the same hearsay, foundation, and Rule 26 objections to the county staff member's statements to Administrator Plinsky as he does to the resident's statements to Commissioner Willey.  For the reasons explained above, the objections are overruled.  The Commission states that it does not intend to use the staff member as a witness.  And the statements are not offered to prove that Plaintiff was, in fact, intimidating staff or interfering with their duties, but to show what information was conveyed to Administrator Plinsky and why Administrator

Administrator Plinsky asked a Douglas County Sheriff's deputy to stand between Plaintiff and the staff members. Administrator Plinsky also informed the Commission that Plaintiff's proximity to county staff was intimidating staff members and distracting them from their job duties.

Approximately 30 minutes after Plaintiff's public comment, Commissioner Reid stated:

> I do want to make a point of public order before we start public comment. And, um, ask, Deputy, can you please have Justin just step back and stand near the wall? Um, we've been very patient. You've made your point. You can still stand there. You've been very close to staff and I would just like you to step back because that's a traffic way for folks that may be leaving the room after their public comment. So you can just stand right next to Michael.[71]

Plaintiff refused to move and began arguing with Commissioner Reid. Commissioner Reid told Plaintiff that he could stay, but added: "Justin, the alternative is to leave the meeting. So either please take a step back and allow traffic flow and follow the deputy's orders, or please leave the meeting."[72] Because Plaintiff refused to move away from county staff, Administrator Plinsky exchanged seats with a staff member so that she was seated closest to Plaintiff. Administrator Plinsky also asked a deputy to stand between her and Plaintiff. The county staff member who had been seated closest to Plaintiff stood up and switched seats with Administrator Plinsky, who had previously occupied a seat farther away from Plaintiff.

Plaintiff continued standing in the same general location until Commissioner Willey said, "Thank you deputies. I think it's time, I'm sorry. Deputies, please."[73] After another minute

---

Plinsky acted as she did in the events leading to Plaintiff's removal. And Administrator Plinsky's affidavit provides adequate foundation for what was communicated to her and how she responded.

[71] Doc. 149-9 at 40:42–41:10.

[72] *Id.* at 41:25–42:01.

[73] *Id.* at 42:00–42:06.

passed with Plaintiff continuing to stand in the same general area, Commissioner Willey said, "[Plaintiff], we've asked very nicely.  If we could have you either step back or leave the room.  And deputies, I think we'll have to make that happen."[74]  Plaintiff continued to stand in the same area.  The Commission then tried to move on with the meeting but ultimately took a five-minute recess at Administrator Plinsky's request.

When the Commission returned from recess, Plaintiff was again asked to move back toward the wall.  Plaintiff refused again.  Commissioner Reid told Plaintiff to comply with the request to move back to the wall because he was standing close to county staff and in a walkway, or to leave the meeting.  Plaintiff remained in the same general area where he had previously been standing.  Commissioner Reid then announced that the meeting was resuming and stated: "On the advice of counsel, we would like to ask deputies to remove our two sign holders from the room.  I'm very sorry, we'd like to have you back next time but we have an orderly meeting to conduct here, so deputies if you don't mind, thank you."[75]  The Commission then announced a second recess to "handle this issue."[76]

Around 6:15 p.m., Deputy Coleman and Lieutenant Channel responded to a request for assistance from Deputy Melissa Favre, who reported to dispatch that there was a subject refusing to leave the Commission meeting.  When Lieutenant Channel and Deputy Coleman arrived, neither had been present for, nor had personal knowledge of, what had already occurred at the meeting.  Lieutenant Channel and Deputy Coleman spoke with Deputy Favre outside the building.  Deputy Favre told them that the Commission was conducting its meeting inside; that the Commissioners and Administrator Plinsky had asked Plaintiff to leave because he was

---

[74] *Id.* at 43:00–43:18.

[75] *Id.* at 44:10–44:32.

[76] *Id.* at 45:10–45:17.

standing in the aisle near the staff area; and that the Commission had called a recess and was waiting for Plaintiff to be removed before the Commissioners felt they could continue the meeting.

While the meeting was still in recess, Administrator Plinsky and County Counselor John Bullock met with Lieutenant Channel, Deputy Coleman, and Deputy Favre outside. Administrator Plinsky told the deputies that Plaintiff was causing a disturbance and needed to be removed. Administrator Plinsky explained that Plaintiff was blocking the access path and standing next to the staff table, which made staff feel threatened, and that she had already moved one staff member who felt uncomfortable with Plaintiff standing so close to the table. Administrator Plinsky also told the deputies that Plaintiff had been asked multiple times to move away from the table and have a seat with the rest of the audience, but he would not.

While the meeting was still in recess, Lieutenant Channel and Deputy Coleman entered the building. They observed that the room appeared to be set up to intentionally create separation between the audience seating and the tables where the Commissioners and county staff were seated, so people could approach the podium when needed and so the Commission could conduct the meeting. Lieutenant Channel and Deputy Coleman observed Plaintiff standing beyond the front row of audience chairs, close to the end of one of the tables.

Lieutenant Channel told Plaintiff that she was not asking him to remove his sign but was asking him to move away from staff. Plaintiff asked the grounds for Lieutenant Channel's request and what he was doing wrong, then stated that it was a public building and a public meeting and that he could stand where he was if he wanted. Lieutenant Channel again asked Plaintiff to move down, and Plaintiff responded that he would not. Lieutenant Channel told Plaintiff that she was telling him to leave on behalf of the Commission, and Plaintiff again

23

responded that he was declining.  Plaintiff told Lieutenant Channel that he was not leaving, and

Lieutenant Channel responded that, per the Sheriff, she was going to have to arrest him for

disrupting the meeting.  Plaintiff refused to move out of the traffic way and away from county

staff after multiple requests.  Deputies told Plaintiff that he was being arrested for interference

with public duties and removed him from the meeting.  Commissioner Willey apologized to the

public in attendance for the disruption and stated that she was trying to run an orderly

Commission meeting.

Plaintiff returned to the May 1, 2024 meeting after being removed and requested to make

public comment regarding the wind energy conversation in which the Commission was engaged.

The Commission allowed Plaintiff to do so.  During that public comment, Plaintiff stated:

> I heard someone say they trusted you did your research on this and
> I gotta tell ya, I don't trust that, I don't trust that you did your
> research on this because—aside from the fact that you're
> incompetent there's no trust because earlier tonight I was standing
> here with my sign and I got unlawfully arrested and taken to jail
> for doing nothing wrong and now I've come back to the meeting to
> speak about how you're [sic] incompetence leads you to make bad
> decisions and it leads me to make signs that say . . . .[77]

Commissioner Willey asked Plaintiff to pull his comments back to the wind energy

conversation because, according to the Commission, Plaintiff's behavior and comments violated

the germaneness and decorum standards.  Plaintiff stated that his lack of trust in the

Commission's judgment led him to hold a sign that says "Patrick Kelly is a pussy."[78]  He then

stated, "So I want to know Patrick, as a giant pussy, how much research have you done."[79]

Commissioner Willey again asked Plaintiff to redirect his comments to the wind energy topic

---

[77] Doc. 146-3 ¶ 29.

[78] *Id.* ¶ 31.

[79] *Id.*

because, according to the Commission, Plaintiff's behavior and comments violated the germaneness and decorum standards.  Plaintiff ignored the request and stated, "Patrick, as a giant pussy, how much research have you done on the wind turbine issue."[80]  Commissioner Willey informed Plaintiff that he was using fighting words, and Plaintiff began arguing with her.  Commissioner Willey asked Plaintiff to sit down and muted his microphone because, according to the Commission, Plaintiff's behavior and comments violated the germaneness and decorum requirements.  Plaintiff continued speaking at the podium with his microphone muted, and Commissioner Willey again asked him to sit down because his public comment was over.

Following Plaintiff's May 1, 2024 arrest, the Douglas County District Attorney's Office declined to initiate criminal prosecution against him.

Each time the Commission muted Plaintiff's microphone, ended his public comment, or requested that he be removed from public meetings, it did so based on Plaintiff's statements and conduct that the Commission viewed as violating the germaneness and decorum standards of Douglas County's public-comment policy.  After the May 1, 2024 meeting, Plaintiff returned to and spoke during the public-comment portion of later Commission meetings.

## IV.    Discussion

Against the Commission, Plaintiff asserts the following remaining official-capacity claims: Right to Petition (Count I), Freedom of Speech (Count II), First Amendment Retaliation (Count III), First Amendment As-Applied Challenge (Count V), First Amendment Facial Challenge (Count VI), and Unconstitutional Conditions (Count VII).  Against the Officer Defendants, Plaintiff asserts the following remaining individual-capacity claims: Fourth

---

[80] *Id.* ¶ 33.

Amendment Unlawful Arrest (Count IX) and Fourth Amendment Malicious Prosecution (Count X). Defendants move for summary judgment on all remaining claims.

Before turning to those claims, however, the Court notes that Plaintiff's response to the Commission's motion for summary judgment does not address his unconstitutional conditions claim in Count VII. Because Plaintiff fails to respond to the Commission's arguments on that claim, he has abandoned it.[81] The Commission is therefore entitled to summary judgment on Count VII.

### A. Official-Capacity Claims

The Court begins with Plaintiff's remaining official-capacity claims, which arise from the Commission's public-comment policies and its enforcement of those policies during Commission meetings.

Under *Monell v. Department of Social Services of the City of New York*,[82] an injured plaintiff may hold a municipal entity liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."[83] "The claim has three general requirements: (1) an underlying injury to a constitutional right of the plaintiff; (2) a municipal policy or custom, and (3) a direct causal link between the policy or custom and the injury."[84] A plaintiff may demonstrate a municipal policy through a formal regulation of the municipality's governing

---

[81] *Hinsdale v. City of Liberal*, 19 F. App'x 749, 768 (10th Cir. 2001) (affirming the district court's determination that the plaintiff abandoned a claim by failing to address it in his memorandum opposing summary judgment).

[82] 436 U.S. 658 (1978).

[83] *Id.* at 694.

[84] *Calvo-Pino v. Weidl*, 514 F. Supp. 3d 1321, 1326 (D. Kan. 2021) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)).

body.[85]  And where "a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."[86]

Because Plaintiff challenges the Commission's public-comment policies and argues that the policies themselves violate the First Amendment, the municipal-policy and causation requirements are satisfied for purposes of the Commission's motion.  The dispositive question is therefore whether Plaintiff has raised a genuine dispute of material fact that the Commission's public-comment policies, or their application to him, violated his constitutional rights.

### 1.  Count I—Right to Petition; Count II—Free Speech: Viewpoint Discrimination; Count V—As-Applied Challenge

Counts I, II, and V challenge the Commission's public-comment policy under the First Amendment.  Count I alleges that the policy interfered with Plaintiff's right to petition the government at Commission meetings.  Count II alleges that the policy permits content and viewpoint-based discrimination.  Count V alleges that the policy violated Plaintiff's right to free speech as applied to him.

A challenge to a government policy may be facial, as applied, or both.[87]  A facial challenge contests the validity of the policy itself,[88] while an as-applied challenge contests the policy's application to the plaintiff under the particular facts of the case.[89]  The nature of the

---

[85] *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) ("A municipal policy or custom may take the form of . . . 'a formal regulation or policy statement . . . .'" (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010))).

[86] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

[87] *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011).

[88] *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012).

[89] *Carel*, 668 F.3d at 1217.

challenge turns on the substance of the claim and the scope of the relief sought, not the label Plaintiff assigns to it.[90]

Although Plaintiff does not expressly identify Counts I and II as facial challenges, both attack the validity of the policy itself.  Count V, by contrast, challenges the Commission's application of the policy to Plaintiff's own speech.  The Court therefore construes Counts I and II as facial challenges and Count V as an as-applied challenge.  The Court begins with the First Amendment forum framework that governs all three claims.  The Court then applies that framework separately to Plaintiff's facial and as-applied challenges.

To analyze a First Amendment challenge, courts follow three steps: (1) determining whether the speech in question is protected; (2) identifying the status of the forum "because that determination dictates the extent to which the government can restrict First Amendment activities"; and (3) determining "whether the proffered justifications for prohibiting speech in the forum satisfy the requisite standard of review."[91]  Here, the parties do not meaningfully contend that Plaintiff's speech fell into a category of unprotected speech.  Instead, they dispute the second and third steps of the analysis: the status of the forum and the appropriate standard of review.  The Court addresses each in turn.

### a.  Forum Status

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property

---

[90] *See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 914 (10th Cir. 2016) (explaining that, in determining whether a constitutional challenge is facial or as applied, "the labels the parties attach to claims are not determinative"; instead, courts consider whether "the claim and the relief therein extend beyond the plaintiffs' particular circumstances").

[91] *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

at issue."[92]  The Supreme Court has identified three categories of forums: (1) traditional public forums; (2) designated public forums; and (3) non-public forums.[93]

Traditional public forums are places such as parks, streets, and sidewalks that "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."[94]  In traditional public forums, the government's ability to restrict expressive activity is "sharply circumscribed" and must satisfy strict scrutiny.[95]

Designated public forums are "spaces that have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose.'"[96] Infringement on speech at a designated public forum is subject to the same strict scrutiny as traditional public forums.[97]

In contrast, a non-public forum is "[p]ublic property which is not by tradition or designation a forum for public communication."[98]  "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."[99]

Relevant here, there is a sub-category of the non-public forum called a "limited public forum," which "arises where the government allows selective access to some speakers or some

---

[92] *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

[93] *Id.* at 45–46.

[94] *Id.* at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

[95] *Id.*

[96] *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469–70 (2009)).

[97] *Id.*

[98] *Perry*, 460 U.S. at 46.

[99] *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (citing *Perry*, 460 U.S. at 49).

types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum."[100]  If the government restricts speech in a limited public forum, the restriction "must only be reasonable in light of the purpose served by the forum and be viewpoint neutral."[101]

Here, the Commission argues that the public-comment portion of its meetings is a limited public forum and that its public-comment policy therefore need only be reasonable in light of the forum's purpose and viewpoint neutral.  Plaintiff, by contrast, argues that the Commission created a designated public forum and that its restrictions on speech must satisfy strict scrutiny.

The Tenth Circuit has declined to decide whether county commission meetings constitute designated public forums or limited public forums.[102]  The Tenth Circuit, however, "has offered 'three non-exhaustive factors to consider in determining whether the government has created a designated public forum' instead of a limited public forum: (1) the forum's purpose; (2) the extent of the forum's use; and (3) the government's intent in opening the forum to the public."[103]  Courts "will not find that a public forum has been created in the face of clear evidence of a contrary intent," or when "the nature of the property is inconsistent with expressive activity."[104]

---

[100] *See Shero v. City of Grove*, 510 F.3d 1196, 1202 (10th Cir. 2007) (quoting *Summum v. City of Ogden*, 297 F.3d 995, 1002 n.4 (10th Cir. 2002)).

[101] *Id.* at 1202–03 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

[102] *See id.* at 1203 ("We need not decide whether a city council meeting is a designated public forum or a limited public forum, however, as the time limitation on [the plaintiff's] speech satisfies the more stringent strict scrutiny standard."); *see also Griffin v. Bryant*, 677 F. App'x 458, 462 n.7 (10th Cir. 2017) ("Because we conclude that [the plaintiff] was not restrained from speaking during the Council meeting and that the time limit on his speech during the Public Input portion of the meeting satisfies the strict scrutiny standard . . . we need not decide whether the Council meeting is a designated public forum or a limited public forum.").

[103] *Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 660 F. App'x 600, 605 (10th Cir. 2016) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012)).

[104] *Cornelius*, 473 U.S. at 803.

Based on the undisputed facts, the Court finds that the public-comment period of the Commission meetings is a limited public forum. Applying the Tenth Circuit's test, the Court concludes that the Commission did not create a designated public forum when it opened the public-comment period. Rather, the Commission opened that portion of its meetings for a limited purpose: to solicit public comment on matters relevant to the Commission's conduct of county business.

First, the public-comment period's purpose is limited. It exists to allow "constituents an opportunity to comment and voice their opinions on topics *relevant* to the Douglas County Commission."[105] Second, the extent of the forum's use is limited in the same way: public comments must be germane to the business of the Commission, limited to three minutes, and addressed to the Commission. The Commission also maintains decorum standards and reserves the right to mute or remove speakers who violate those standards, including speakers whose comments are threatening, aggressively hostile, belligerent, disruptive, repetitive, or otherwise interfere with the Commission's ability to conduct county business. Moreover, the public-comment period is not guaranteed; the Commission retains discretion to hold one or not. Those limits are inconsistent with the "general access" or "indiscriminate use" required to create a designated public forum.[106] Rather, they permit only "selective access to some speakers or some types of speech" [107]—in other words, limits indicative of a limited public forum.[108] Third and

---

[105] Doc. 146-1 ¶ 9 (emphasis added).

[106] *See Summum v. Callaghan*, 130 F.3d 906, 915 n.13 (10th Cir. 1997) (citation modified).

[107] *Celebrity Attractions*, 660 F. App'x at 604 (quoting *Verlo v. Martinez*, 820 F.3d 1113, 1129 n.6 (10th Cir. 2016)).

[108] *See Hirt v. Unified Sch. Dist. No. 287*, No. 2:17-CV-02279-HLT, 2018 WL 6326412, at *5 (D. Kan. Dec. 4, 2018) (finding that school board did not create general or indiscriminate access because comments were limited to three minutes and to comments about school board's business); *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1180 (D.N.M. 2014) (finding city-council meeting is limited public forum because "[t]he Governing Body has placed numerous reasonable restrictions on speakers").

finally, the Commission's intent in opening the forum confirms that conclusion.  The

Commission opened the public-comment period to "gather concerns, opinions, and issues from"

constituents so that it could "continue to effectively govern Douglas County," not to create a

forum for unrestricted public discourse.[109]  Accordingly, all three factors support finding that the

public-comment period is a limited public forum, not a designated public forum.[110]

### b.  Facial Challenge—Counts I and II

Having found that the public-comment period of the Commission meetings is a limited

public forum, the Court turns to whether the Commission's public-comment policy is facially

valid under the applicable standard of review.  Recall that in a limited public forum, restrictions

on speech must be (1) "reasonable in light of the purpose served by the forum" and (2)

"viewpoint neutral."[111]  The Commission's public-comment policy satisfies both of these

conditions.

First, the policy's germaneness and decorum requirements are reasonable in light of the

purpose served by the forum.  The Commission opens the floor for public comment during its

meetings to hear citizens' comments on county business.  The germaneness requirement furthers

that purpose by limiting public comment to topics within the Commission's authority and related

to the Commission's business.  The decorum requirement likewise furthers that purpose by

allowing the Commission to conduct orderly and efficient meetings.

---

[109] Doc. 146-1 ¶ 10.

[110] This conclusion is consistent with decisions from other courts treating public-comment periods at local-government meetings as limited public forums.  *See Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010) ("The Board meeting here—and the comment session in particular—is a limited public forum for the limited time and topic of the meeting." (citation modified)); *Steinberg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 385 (4th Cir. 2008) ("In this case the parties agree that the Commission's public meeting was a 'limited public forum,' and we concur in that assessment."); *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) ("[S]uch meetings, once opened, have been regarded as public forums, albeit limited ones.").

[111] *Shero v. City of Grove*, 510 F.3d 1196, 1202 (10th Cir. 2007).

Second, the policy's germaneness and decorum requirements are viewpoint neutral. Viewpoint discrimination occurs "[w]hen government officials target speech *because of* 'particular views taken by speakers on a subject.'"[112] This "egregious form of content discrimination" arises when the government squelches "the specific motivating ideology or the opinion or perspective of the speaker."[113]

The policy's germaneness requirement limits the subject matter of public comment to topics within the Commission's authority and related to county business. It does not permit favorable comments on county business while prohibiting unfavorable ones. Nor does it distinguish between speakers based on the position they take on an otherwise permissible topic. The decorum requirement is likewise viewpoint neutral. The prohibition on comments or conduct that are threatening, aggressively hostile, belligerent, disruptive, repetitive, or that otherwise interfere with the Commission's ability to conduct county business does not favor or disfavor any viewpoint. Rather, it regulates *how* messages—regardless of viewpoint—may be expressed during the public-comment period.

Accordingly, the Commission's public-comment policy is reasonable in light of the purpose served by the forum and viewpoint neutral. Plaintiff has therefore failed to raise a genuine dispute of material fact that the policy is facially unconstitutional. The Commission's motion for summary judgment is granted as to Counts I and II.

### c.  As-Applied Challenge—Count V

Plaintiff's as-applied challenge requires a slightly different inquiry. "To succeed on First Amendment as-applied challenges premised on viewpoint discrimination, plaintiffs 'must show

---

[112] *Pahls v. Thomas*, 718 F.3d 1210, 1230 (10th Cir. 2013) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

[113] *Rosenberger*, 515 U.S. at 829.

that [they were] prevented from speaking while someone espousing another viewpoint was permitted to do so.'"[114]  Plaintiff has not made that showing.

Plaintiff points to his own statement during the May 1, 2024 public-comment period where he told the Commission that they allowed an unidentified speaker to compliment Commissioner Willey without interruption or muting.  But Plaintiff's statement is too nonspecific, vague, and self-serving to create a triable issue.  "Evidence relied upon in opposition to summary judgment may be insufficient to create a triable fact if it is nonspecific or otherwise non-responsive, vague, conclusory, or self-serving."[115]  Plaintiff does not identify the speaker, the meeting at which the statement occurred, the circumstances surrounding the statement, or the full context in which it was made.  His vague reference to an unidentified speaker's prior comment therefore does not create a genuine dispute that he was prevented from speaking while someone espousing another viewpoint was permitted to do so.

However, even assuming Plaintiff's statement is sufficient to constitute competent summary-judgment evidence identifying a comparator, it still does not create a genuine dispute of viewpoint discrimination.  As far as the Court can gather from Plaintiff's vague description, the unidentified speaker stated that she appreciated Commissioner Willey's "stoic demeanor" and the impression that Commissioner Willey was listening to the community.[116]  Plaintiff argues that this demonstrates that the Commission permitted that favorable comment but muted him when he criticized Commissioner Kelly.  But that argument assumes the unidentified speaker and Plaintiff engaged in materially similar speech or conduct.  They did not.  Nothing in

---

[114] *Harmon v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023) (alteration in original) (quoting *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014)).

[115] *Harvey v. Baker*, 242 F. App'x 547, 551 (10th Cir. 2007) (citation modified).

[116] Doc. 146-3 ¶ 23.

the record suggests that the unidentified speaker used vulgar or derogatory language when she purportedly praised the Commission, held a sign containing derogatory language, stood in a walkway near county staff, refused repeated requests to move, or otherwise interfered with the orderly conduct of the meeting.

The undisputed facts instead show that the Commission muted or removed Plaintiff only when his comments or conduct violated the Commission's germaneness and decorum standards—not because of his criticism of Commissioner Kelly. For instance, on May 11, 2022, Plaintiff was muted after he approached the podium and began his public comment with vulgar and derogatory language in violation of the Commission's decorum requirement.

On April 17, 2024, Plaintiff was muted after referring to Commissioner Kelly in vulgar terms. At the meeting, Plaintiff stated that he had previously come to the Commission meeting "to say that Patrick Kelly is a giant pussy" and that this was "not the only instance of Patrick Kelly outing himself as a giant pussy."[117] Despite being asked to speak about matters germane to the Commission, Plaintiff instead continued to speak about Commissioner Kelly, specifically stating that Commissioner Kelly "also shows it" in his role as Director of Curriculum for USD 497, where Commissioner Kelly developed and implemented gender identity and sexual development curriculum.[118] Commissioner Reid told Plaintiff that his comments were not germane to county business. Plaintiff then began arguing with Commissioner Reid. At that point, Plaintiff was muted.

The May 1, 2024 meeting follows the same pattern. Plaintiff entered the meeting room shortly after the meeting was called to order and stood at the front of the room in a walkway to

---

[117] Doc. 146-2 ¶ 17.

[118] *Id.*

the right of the podium, between the audience and the table where county staff were seated.  He held a sign stating, on one side, "Women have more balls than Patrick too," and, on the other side, something to the effect of "Keep fighting the liberal agenda."[119]  During public comment, Plaintiff held the sign at the podium and began speaking about comments directed to Commissioner Willey.  Commissioner Willey asked Plaintiff to put down the sign during his allotted public-comment time because it violated the germaneness and decorum standards.  Plaintiff questioned why he had to put the sign down and asserted that he was being treated differently from the unidentified speaker discussed earlier.  At that point, Plaintiff was muted.

Commissioner Willey told Plaintiff that he was allowed to stay at the meeting but that his public comment was over.  After leaving the podium, Plaintiff returned to standing at the front of the room, close to the table where county staff were seated, in a walkway, with his sign.  A county staff member expressed discomfort with Plaintiff's proximity and stated that she was distracted from her job duties and feared for her safety because Plaintiff was standing so close to her.  Plaintiff then refused repeated requests to move out of the walkway and away from county staff by stepping back toward the wall.  The Commission ultimately requested Plaintiff's removal only after he continued standing in the same general location despite those requests and after the Commission recessed to address the issue—not because of Plaintiff's viewpoint.

And when Plaintiff later returned to the May 1 meeting, the Commission permitted him to speak on the wind-energy issue then under discussion.  Plaintiff stated that he did not trust the Commission's research on the wind-energy issue because, "aside from the fact that you're incompetent," he had been "unlawfully arrested and taken to jail for doing nothing wrong," and had returned "to speak about how your incompetence leads you to make bad decisions and it

---

[119] Doc. 149-1 at 38 (Spiehs Dep. 147:2–16).

leads me to make signs that say."[120]   Commissioner Willey then asked Plaintiff to bring his comments back to the wind-energy issue being discussed.  Plaintiff did not do so.  Instead, he stated that his lack of trust in the Commission's judgment led him to hold a sign saying "Patrick Kelly is a pussy" and then asked Commissioner Kelly, "as a giant pussy," how much research he had done.[121]   At that point, Plaintiff was muted.

Thus, the uncontroverted facts demonstrate that each time Plaintiff was muted or removed, the Commission acted because Plaintiff's comments or conduct were non-germane, violated decorum standards, or otherwise interfered with the orderly conduct of Commission business—not because of Plaintiff's critical viewpoint toward Commissioner Kelly.  Plaintiff has therefore failed to raise a genuine dispute that he was prevented from speaking while someone espousing another viewpoint was permitted to do so.  The Commission's motion for summary judgment is granted as to Count V.

### 2.   Count III—First Amendment Retaliation

In Count III, Plaintiff alleges that the Commission retaliated against him for engaging in protected First Amendment activity by muting or removing him during Commission meetings. To establish a First Amendment retaliation claim, Plaintiff must show that (1) "he . . . was engaged in constitutionally protected activity," (2) "the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) "the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."[122]

---

[120] Doc. 146-3 ¶ 29.

[121] *Id.* ¶ 31.

[122] *Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007).

Plaintiff's claim fails at the first step.  As explained above, Plaintiff's speech and conduct during the public-comment portions of the meetings were not constitutionally protected because they violated the limited public forum's constitutionally permissible speech restrictions.[123] Because the undisputed facts show that Plaintiff was not engaged in constitutionally protected activity when the Commission muted or removed him, he cannot establish a First Amendment retaliation claim.  Accordingly, the Commission's motion for summary judgment is granted as to Count III.

### 3.  Count VI—Unbridled Discretion

In Count VI, Plaintiff asserts a facial challenge separate from the facial challenges discussed above.  In response to the Commission's motion for summary judgment, Plaintiff advances several theories in support of Count VI: (1) that the Commission's public-comment policy was never lawfully enacted; (2) that the policy permits viewpoint-based enforcement; (3) that the policy is vague; (4) that the policy vests the Commission with unbridled discretion; and (5) that the Commission edited or muted portions of the official meeting record.

Most of these theories are not properly before the Court.  Plaintiff's viewpoint-based theory is redundant of the facial challenges already resolved under Counts I and II.  For the reasons explained above, the Commission's public-comment policy is facially reasonable and viewpoint neutral in a limited public forum.  The Commission is therefore entitled to summary judgment on Count VI to the extent Plaintiff relies on the same viewpoint-discrimination theory.

---

[123] *Spiehs v. Larsen*, No. 23-4107-JAR-BGS, 2025 WL 721946, at *6 (D. Kan. Mar. 6, 2025) (granting summary judgment on a First Amendment retaliation claim because speech delivered in violation of a limited public forum's constitutionally permissible restrictions was not constitutionally protected activity).

Plaintiff's lawful-enactment and record-editing theories also fail because neither theory appears in the Pretrial Order as a basis for Count VI and both are therefore waived.[124]  Plaintiff's vagueness theory also fails because the Court previously dismissed Plaintiff's facial challenge to the extent it was premised on vagueness.[125]

That leaves only Plaintiff's unbridled-discretion theory.  The Pretrial Order preserves Count VI as a facial challenge based on the Commission's alleged unbridled discretion to mute or remove speakers during public comment.  The Court therefore turns to the merits of Count VI only to the extent it is based on unbridled discretion.

Neither party meaningfully identifies the appropriate standard for analyzing Plaintiff's unbridled-discretion theory.  The Tenth Circuit has, however, provided guidance for evaluating the level of discretion afforded to government officials in a limited public forum.  In *Summum v. Callaghan*, the Tenth Circuit considered a county's refusal to allow the plaintiff to place a monument on the county courthouse lawn, even though the county had permitted another private organization to place a Ten Commandments monument there.[126]  The court concluded that the plaintiff sufficiently alleged the county had created a limited public forum by allowing some private expression on county property.[127]  The court explained that once the county opened the forum to private speech, its access decisions had to be reasonable in light of the forum's purpose and viewpoint neutral.[128]

---

[124] *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived.").

[125] Doc. 116 at 34 ("To the extent that Plaintiff's facial and as-applied challenges assert vagueness, they are dismissed for failure to state a claim.").

[126] 130 F.3d 906, 909–10 (10th Cir. 1997).

[127] *Id.* at 919.

[128] *Id.*

As to the issue of unbridled discretion, the plaintiff alleged that the county commissioners had "sole authority" to decide who could place a permanent monument on county property and what the monument could say.[129]  The Tenth Circuit held that those allegations were sufficient to state a claim because "unbridled discretion" in government officials "raises the specter of . . . viewpoint censorship."[130]  The court explained that "[a]llowing government officials to make decisions as to who may speak on county property, without any criteria or guidelines to circumscribe their power, strongly suggests the potential for unconstitutional conduct, namely favoring one viewpoint over another."[131]  The court further explained that this danger is "at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official" because, "without standards governing the exercise of discretion," the official "may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker."[132]  The court therefore remanded for the district court to consider whether the county lacked rules, criteria, or guidelines governing the placement of permanent displays on county property, and whether the county's stated reasons were post hoc rationalizations or a pretext for viewpoint discrimination.[133]

Here, the Commission's public-comment policy does not give officials the kind of standardless discretion at issue in *Summum*.  The policy does not merely authorize the Commission to mute or remove speakers whenever it chooses.  Rather, it identifies the circumstances in which the Commission may act.  For instance, public comments must be

---

[129] *Id.*

[130] *Id.* (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988)).

[131] *Id.* at 920.

[132] *Id.* (quoting *City of Lakewood*, 486 U.S. at 763–64).

[133] *Id.*

directed to the Commission, limited to matters within the Commission's jurisdiction, and germane to county business. The policy also requires speakers to maintain decorum and prohibits comments or conduct that are threatening, aggressively hostile, belligerent, disruptive, repetitive, or that otherwise interfere with the Commission's ability to conduct county business.

Those standards sufficiently circumscribe the Commission's discretion in the limited public forum at issue. *Summum* recognized that the constitutional concern arises when, "without standards governing the exercise of discretion," an official "may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker."[134] That is not the case here. The Commission's policy contains standards governing when a speaker may be muted or removed, and those standards are tied to the purpose of the forum: allowing members of the public to address the Commission about county business in an orderly and efficient manner. The policy does not permit the Commission to decide who may speak based on the viewpoint of the speaker. It permits the Commission to act only when a speaker's comments or conduct violate the policy's germaneness and decorum requirements, regardless of the speaker's viewpoint.

Nor does the record suggest that the Commission used post hoc rationalizations or shifting criteria to justify its enforcement of the policy. The Commission's stated reasons for muting or removing Plaintiff were consistent with the policy itself. When Plaintiff was muted or removed, the Commission identified concerns with germaneness, decorum, disruption, or interference with the orderly conduct of Commission business. Those are the same standards contained in the public-comment policy. Plaintiff therefore has not shown that the Commission

---

[134] *Id.* (quoting *City of Lakewood*, 486 U.S. at 763–64).

relied on standardless discretion or invoked facially neutral criteria as a pretext for viewpoint discrimination.

Accordingly, the Commission's public-comment policy does not vest officials with unbridled discretion on its face.  The Commission's motion for summary judgment is therefore granted as to Count VI.

### B.  Individual-Capacity Claims

Having resolved the claims asserted against the Commission, the Court turns to the individual-capacity claims asserted against the Officer Defendants.  Count IX asserts Fourth Amendment unlawful-arrest claims, and Count X asserts a Fourth Amendment malicious-prosecution claim.  The Officer Defendants move for summary judgment on these claims on the basis of qualified immunity.

It is well established that "[i]ndividual defendants named in a § 1983 action may raise a defense of qualified immunity."[135]  "The doctrine of qualified immunity shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law."[136]  When the defense of qualified immunity is asserted, the burden shifts to the plaintiff to show: "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."[137]  "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity."[138]  The Court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances

---

[135] *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013).

[136] *Elder v. Holloway*, 510 U.S. 510, 512 (1994).

[137] *Cillo*, 739 F.3d at 460.

[138] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citing *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

in the particular case at hand."[139]  At the summary-judgment stage, "[i]n determining whether the plaintiff has shouldered this heavy burden, '[the Court] construe[s] the facts in the light most favorable to the plaintiff as the non-movant.'"[140]

The Officer Defendants argue that Plaintiff cannot satisfy the first prong of the qualified-immunity analysis because the undisputed evidence shows that they did not violate any of Plaintiff's constitutional rights.  Accordingly, the Court begins, and ultimately ends, its qualified-immunity inquiry at step one by considering whether the summary-judgment record would permit a reasonable jury to find that any Officer Defendant violated Plaintiff's Fourth Amendment rights through either an unlawful arrest or malicious prosecution.  For the reasons explained below, the Court concludes that the Officer Defendants are entitled to qualified immunity at step one.

### 1.  Count IX—Fourth Amendment Unlawful Arrest

In Count IX, Plaintiff alleges that Sheriff Armbrister and Deputy Kruzel arrested him without probable cause on April 20, 2022; and that Lieutenant Channel and Deputy Coleman arrested him without probable cause on May 1, 2024.

"A warrantless arrest violates the Fourth Amendment unless probable cause exists to believe a crime has been or is being committed."[141]  "When assessing whether an officer had probable cause to arrest an individual, courts examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."[142]  "Probable cause exists if facts and

---

[139] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[140] *Corona v. Aguilar*, 959 F.3d 1278, 1282 (10th Cir. 2020) (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)).

[141] *Id.*

[142] *A.M. v. Holmes*, 830 F.3d 1123, 1138 (10th Cir. 2016) (citation modified).

circumstances within the arresting officer's knowledge and of which he or she has reasonably

trustworthy information are sufficient to lead a prudent person to believe that the arrestee has

committed or is committing an offense."[143]  Probable cause does not demand that there be

knowledge or facts sufficient for a finding of guilt, but it requires "more than mere suspicion."[144]

The Court applies this standard to each arrest separately below.

### a.  Sheriff Armbrister and Deputy Kruzel—April 20, 2022 Arrest

The Court turns first to Plaintiff's April 20, 2022 arrest.  Sheriff Armbrister and Deputy

Kruzel arrested Plaintiff for disorderly conduct under K.S.A. § 21-6203(a)(3), which defines

disorderly conduct to include "engaging in noisy conduct tending reasonably to arouse alarm,

anger or resentment in others."

Nearly two years after Plaintiff's arrest, the Kansas Supreme Court considered an

overbreadth challenge to a materially identical city ordinance in *City of Wichita v. Griffie*.[145]

The ordinance at issue defined disorderly conduct to include "noisy conduct tending to

reasonably arouse alarm, anger or resentment in others."[146]  The court began by interpreting the

plain language of the ordinance to determine its scope.[147]  Applying dictionary definitions of

"noisy" and "conduct," the court concluded that the ordinance "criminally punishes a person who

makes disagreeable, unpleasant, or loud sounds that the person knows or should know would

tend to reasonably arouse alarm, anger, or resentment in others."[148]  The court further explained

---

[143] *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting *Jones v. City & Cnty. of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988)).

[144] *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998).

[145] 544 P.3d 776, 783–91 (Kan. 2024).

[146] *Id.* at 786.

[147] *Id.*

[148] *Id.*

that the provision would criminalize, "in a considerable number of cases," conduct such as "[u]sing profane language in front of, or directed to, another person," if the language were "expressed in a disagreeable, unpleasant, or loud way that would tend to reasonably arouse alarm, anger, or resentment in others."[149]  Because the ordinance swept within its scope a substantial amount of protected First Amendment activity, the court held the "noisy conduct" provision unconstitutionally overbroad and severed the phrase "or engaging in noisy conduct tending to reasonably arouse alarm, anger or resentment in others" from the ordinance.[150]

Although *Griffie* suggests that the "noisy conduct" portion of K.S.A. § 21-6203(a)(3) may likewise be overbroad, that does not resolve the Fourth Amendment question presented here.  Plaintiff's arrest occurred nearly two years before *Griffie* was decided, and "[p]olice are charged to enforce laws until and unless they are declared unconstitutional."[151]  Thus, "[a] prudent officer, in the course of determining whether [a suspect] had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional."[152]  Sheriff Armbrister and Deputy Kruzel were therefore entitled to rely on the plain language of K.S.A. § 21-6203(a)(3) unless the statute was "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws."[153]

That standard is not met here.  Before *Griffie*, the Kansas Court of Appeals had repeatedly upheld disorderly conduct convictions under K.S.A. § 21-6203(a)(3), or its materially

---

[149] *Id.* at 787.

[150] *Id.* at 791.

[151] *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979).

[152] *Id.* at 37–38.

[153] *Id.* at 38.

identical predecessor statute,[154] in circumstances consistent with the Kansas Supreme Court's later interpretation of the provision's plain meaning.[155]

The Court therefore asks whether the facts known to Sheriff Armbrister and Deputy Kruzel supplied probable cause under the statute as it then existed. The uncontroverted facts show that Plaintiff entered the meeting room before the meeting began carrying a sign affixed to a piece of wood that Plaintiff estimated was under three feet long. The sign contained profane language. After Sheriff Armbrister told Plaintiff that he could not be there with the sign because it had "cuss words," Plaintiff responded, "Horse shit it does."[156] Plaintiff later called Sheriff Armbrister a "pussy for wearing a mask."[157] After Sheriff Armbrister responded with something along the lines of, "My face, my choice," Plaintiff said something to the effect of, "You didn't give a fuck about my face when it was my choice."[158] A member of the audience responded by telling Plaintiff to watch his mouth. Plaintiff then turned toward Almon, who was seated directly behind him, and said, "I don't give a fuck what you think about me."[159] Plaintiff spoke loudly

---

[154] K.S.A. § 21-4101.

[155] *See, e.g.*, *State v. Heyder*, No. 82,810, 2000 WL 36745844, at *1–2 (Kan. Ct. App. Feb. 11, 2000) (affirming disorderly conduct conviction under predecessor statute defining disorderly conduct to include "engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others," where defendant angrily exited his vehicle at a toll booth, used profanity in a raised voice, blocked traffic, shouted, and motioned with his arms); *City of Paola v. Ammel*, 167 P.3d 387, 2007 WL 2767953, at *3 (Kan. Ct. App. Sept. 21, 2007) (affirming disorderly conduct conviction where jury was instructed that disorderly conduct included "noisy conduct of such a nature that it would tend to reasonably arouse alarm, anger or resentment in others," and witnesses testified that defendant was "very noisy," "shouting," loud enough to be heard throughout the library, and caused them to feel disturbed and alarmed); *State v. Mead*, 401 P.3d 687, 2017 WL 4082240, at *5 (Kan. Ct. App. Sept. 15, 2017) (affirming disorderly conduct conviction where the State proceeded under the "noisy conduct" portion of K.S.A. § 21-6203(a)(3), and witnesses testified that defendant was "shouting and screaming" as he came toward them, acted in a "belligerent and threatening" manner, and engaged in conduct reasonably causing alarm and anger); *State v. Hughs*, 419 P.3d 102, 2018 WL 2374766, at *4 (Kan. Ct. App. May 25, 2018) (affirming disorderly conduct conviction where defendant and others engaged in a verbal confrontation by "screaming and cursing at each other," which was sufficient to show "noisy conduct tending reasonably to arouse alarm, anger, or resentment in others").

[156] Doc. 149-1 at 31 (Spiehs Dep. 119:10–15).

[157] *Id.* at 9 (Spiehs Dep. 31:3–7).

[158] *Id.* at 32 (Spiehs Dep. 123:13–124:14).

[159] *Id.* at 10 (Spiehs Dep. 36:19–22).

46

enough that he believed others in the room could hear him, and members of the audience told him to watch his language.

Viewed from the standpoint of an objectively reasonable officer, those facts supplied "more than mere suspicion" that Plaintiff had committed disorderly conduct under the statute as it existed at the time of the arrest.[160] Plaintiff repeatedly used profanity in a public meeting room, directed profanity toward or in response to nearby attendees, and did so loudly enough that others in the room could hear and react to it. Plaintiff was also seated in close proximity to Almon while holding a sign affixed to a piece of wood. Under the plain language later described in *Griffie*, those facts were sufficient to lead an objectively reasonable officer to believe that Plaintiff had engaged in "disagreeable, unpleasant, or loud sounds that the person knows or should know would tend to reasonably arouse alarm, anger, or resentment in others."[161]

Plaintiff's arguments in response wholly miss the mark. First, Plaintiff argues that Sheriff Armbrister's reasons for being at the April 20, 2022 Commission meeting were "pretextual" and "illogical," and that the sequence of events creates a question of whether Sheriff Armbrister was there to coordinate Plaintiff's removal from the meeting. This argument fails. As already explained, the probable-cause inquiry is objective, and an "officer's own subjective reason for the arrest is irrelevant."[162]

Second, Plaintiff argues that the later dismissal of the charges against him shows that the arrest lacked probable cause. Again, this argument is unavailing. Probable cause is determined "at the moment the arrest was made," based on the facts and circumstances known to the officers

---

[160] *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998).

[161] *See City of Wichita v. Griffie*, 544 P.3d 776, 786 (Kan. 2024).

[162] *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008).

at that time.[163]  And because the inquiry is tied to the arrest itself, "it does not matter whether the arrestee was later charged with a crime."[164]

Third, Plaintiff appears to argue that he was arrested at the Commission's direction and because of his sign.  Again, any purported improper motive is irrelevant because the Fourth Amendment inquiry is objective.[165]  And as discussed above, the facts known to Sheriff Armbrister and Deputy Kruzel were sufficient to lead an objectively reasonable officer to believe that Plaintiff had committed disorderly conduct under K.S.A. § 21-6203(a)(3).  Accordingly, Plaintiff has failed to raise a genuine dispute of material fact that Sheriff Armbrister and Deputy Kruzel lacked probable cause to arrest him on April 20, 2022.  Sheriff Armbrister and Deputy Kruzel are therefore entitled to qualified immunity.  The Officer Defendants' motion for summary judgment is granted as to Count IX to the extent it is asserted against Sheriff Armbrister and Deputy Kruzel based on the April 20, 2022 arrest.

### b.  Lieutenant Channel and Deputy Coleman—May 1, 2024 Arrest

The Court turns next to Plaintiff's May 1, 2024 arrest.  Lieutenant Channel and Deputy Coleman arrested Plaintiff for interference with the conduct of public business in a public building under K.S.A. § 21-5922(a)(3), which prohibits, as relevant here,

> knowingly refusing or failing to leave any such public building upon being requested to do so by the chief administrative officer, or such officer's designee, charged with maintaining order in such public building, if such person is committing, threatens to commit or incites others to commit, any act that did or would if completed, disrupt, impair, interfere with or obstruct the lawful missions, processes, procedures or functions being carried on in such public building.[166]

---

[163] *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

[164] *Fogarty*, 523 F.3d at 1156.

[165] *See id.*

[166] K.S.A. § 21-5922(a)(3).

Here, the uncontroverted facts show that Lieutenant Channel and Deputy Coleman had probable cause to arrest Plaintiff under K.S.A. § 21-5922. The May 1, 2024 meeting was held in the Training Room at the Douglas County Public Works Building. Plaintiff entered that public building, stood at the front of the meeting room in a walkway between the audience and the table where county staff were seated, and remained there after being asked multiple times to move away from county staff or leave the meeting.

By the time Lieutenant Channel and Deputy Coleman arrived, Deputy Favre had told them that the Commission was conducting its meeting inside, that the Commissioners and Administrator Plinsky had asked Plaintiff to leave because he was standing in the aisle near the staff area, and that the Commission had called a recess and was waiting for Plaintiff to be removed before the Commissioners felt they could continue the meeting. Administrator Plinsky then separately told the deputies that Plaintiff was causing a disturbance, blocking the access path, standing next to the staff table in a manner that made staff feel threatened, and had refused multiple requests to move away from the table and have a seat with the rest of the audience.

After entering the building, Lieutenant Channel and Deputy Coleman personally observed Plaintiff standing beyond the front row of audience chairs, close to the end of one of the tables. Lieutenant Channel told Plaintiff that she was not asking him to remove his sign, but was asking him to move away from staff. Plaintiff refused. Lieutenant Channel again asked Plaintiff to move, and Plaintiff again refused. Lieutenant Channel then told Plaintiff that she was telling him to leave on behalf of the Commission. Plaintiff stated that he was not leaving.

Viewed from the standpoint of an objectively reasonable officer, those facts supplied more than mere suspicion that Plaintiff had violated K.S.A. § 21-5922. Plaintiff was in a public building, was asked to leave on behalf of the Commission, and knowingly refused to do so. And

49

the facts known to Lieutenant Channel and Deputy Coleman supported a reasonable belief that Plaintiff was committing acts that disrupted, impaired, interfered with, or obstructed the Commission's lawful functions in that building: he refused to move out of the walkway and away from county staff after multiple requests, staff reported that his proximity interfered with their ability to perform their duties, and the Commission had recessed and was waiting for his removal before continuing the meeting.  Those facts were sufficient to establish probable cause.

In response, Plaintiff makes several arguments.  First, Plaintiff argues that the arrest was unlawful because Lieutenant Channel told him he was being arrested for "disrupting the meeting," and "disrupting a meeting" is not a crime under Kansas law.  Plaintiff also argues that the arrest was unlawful because Lieutenant Channel and Deputy Coleman did not identify which subsection of K.S.A. § 21-5922 he allegedly violated.  Both arguments fail.  "Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for *any offense*, not just the offense cited at the time of arrest or booking."[167]  Thus, the question is not whether Lieutenant Channel used the phrase "disrupting the meeting" or whether the officers identified the precise subsection of K.S.A. § 21-5922 at the time of arrest.  The question is whether the facts known to Lieutenant Channel and Deputy Coleman supplied probable cause to believe Plaintiff had committed any offense.  As explained above, they did.

Second, Plaintiff argues that Lieutenant Channel and Deputy Coleman had no personal knowledge of any purported criminal activity when they arrived.  While that is true, it does not defeat the existence of probable cause.  "Police officers are entitled to rely upon information relayed to them by other officers in determining whether there is . . . probable cause to arrest."[168]

---

[167] *District of Columbia v. Wesby*, 583 U.S. 48, 54 n.2 (2018) (emphasis added).

[168] *Oliver v. Woods*, 209 F.3d 1179, 1190 (10th Cir. 2000).

Here, Deputy Favre told Lieutenant Channel and Deputy Coleman when they arrived on the scene that Plaintiff had been asked to leave because he was standing in the aisle near the staff area, and that the Commission had recessed and was waiting for Plaintiff to be removed before it could continue the meeting.  Administrator Plinsky then told Lieutenant Channel and Deputy Coleman that Plaintiff was blocking the access path, standing next to the staff table in a manner that made staff feel threatened, and had refused multiple requests to move away from the table and have a seat with the rest of the audience.  And after entering the building, Lieutenant Channel and Deputy Coleman personally observed Plaintiff standing beyond the front row of audience chairs, close to the end of one of the tables, and refusing Lieutenant Channel's requests to move away from staff or leave on behalf of the Commission.  Thus, although Lieutenant Channel and Deputy Coleman were not present for the earlier events inside the meeting room, they were entitled to rely on the information relayed to them and their own observations in determining whether probable cause existed.

Third, Plaintiff argues that Lieutenant Channel and Deputy Coleman acted at the direction of the Commission and selectively enforced the law against him based on the content and viewpoint of his speech.  Again, the officers' subjective reasons for the arrest are irrelevant because the probable cause inquiry is objective.[169]  The question is whether the facts known to Lieutenant Channel and Deputy Coleman would lead a reasonable officer to believe that the arrest was supported by probable cause.  As discussed above, they would.  Thus, even assuming the Commission wanted Plaintiff removed because of his sign or viewpoint, and even assuming Lieutenant Channel and Deputy Coleman acted at the Commission's direction, those arguments do not create a genuine dispute that the arrest lacked probable cause.

---

[169] *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008).

51

Lastly, Plaintiff argues that he could not have violated K.S.A. § 21-5922 because the Commission had no rule prohibiting him from standing where he stood. But the statute does not require a preexisting rule about where a person may stand in a public building. It requires only that the person knowingly refuse or fail to leave after being asked to do so by the proper official while committing conduct that disrupts, impairs, interferes with, or obstructs the lawful functions being carried on in the building. As discussed above, the facts known to Lieutenant Channel and Deputy Coleman supplied probable cause to believe those requirements were met.

Accordingly, Plaintiff has failed to meet his burden of raising a genuine issue of material fact as to whether probable cause existed for his arrest. Lieutenant Channel and Deputy Coleman are therefore entitled to qualified immunity. The Officer Defendants' motion for summary judgment is granted as to Count IX to the extent it is asserted against Lieutenant Channel and Deputy Coleman based on the May 1, 2024 arrest.

### 2. Count X—Malicious Prosecution

In Count X, Plaintiff asserts a malicious prosecution claim against Deputy Kruzel arising out of the April 20, 2022 arrest. Plaintiff contends that Deputy Kruzel prepared an affidavit in connection with the arrest, and that the affidavit contained false statements and omitted exculpatory facts material to the magistrate's probable-cause determination and the prosecutor's decision to file charges.

To establish a malicious-prosecution claim, a plaintiff must show: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4)

the defendant acted maliciously; and (5) the plaintiff sustained damages."[170]  Plaintiff's claim

fails at the first element because he has not shown that Deputy Kruzel caused his continued

confinement or prosecution.

"Pursuing a malicious prosecution claim against a police officer is anomalous because the

principal player in carrying out a prosecution is not [a] police officer but [a] prosecutor."[171]  And

ordinarily, "a judge determines at a preliminary hearing whether there is probable cause."[172]

"Thus, even when police officers 'set in motion a malicious prosecution,' the chain of causation

is ordinarily broken by an indictment or preliminary hearing."[173]

An officer may nonetheless be said to have caused a prosecution when the officer

prepares an affidavit and "(1) 'knowingly or with reckless disregard for the truth' include[s] false

statements or omit[s] facts in the affidavit, (2) the inaccuracies are material because they are

'significant enough to vitiate probable cause,' and (3) the statements or omissions 'induce the

criminal justice system to confine and then to prosecute an innocent defendant.'"[174]

"To establish recklessness, there must exist evidence that the officer in fact entertained

serious doubts as to the truth of his allegations, not just evidence of negligence or

inadvertence."[175]  "To determine materiality, we consider whether the affidavit would still

support probable cause after 'setting aside the false information' and 'examining the affidavit as

if the omitted information had been included.'"[176]

---

[170] *Horocofsky v. City of Lawrence*, -- F.4th --, 2026 WL 2130707, at *4 (10th Cir. July 24, 2026) (quoting *Coones v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty./Kan. City*, 166 F.4th 1, 25 (10th Cir. 2026)).

[171] *Id.* (citation modified).

[172] *Id.*

[173] *Id.* (quoting *Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996)).

[174] *Id.* (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1287, 1293 (10th Cir. 2004)).

[175] *Id.* (citation modified).

[176] *Id.* (quoting *Taylor*, 82 F.3d at 1562).

Here, Plaintiff argues that Deputy Kruzel's affidavit contained both false statements and material omissions. The Court first addresses Plaintiff's asserted false statements and then turns to Plaintiff's asserted omissions.

Plaintiff identifies four statements in the affidavit that he contends are false: (1) that Plaintiff engaged in "noisy conduct" or "began yelling";[177] (2) that Plaintiff caused a disturbance; (3) that Plaintiff was asked to leave or refused to leave; and (4) that the meeting was delayed by Plaintiff's actions. Plaintiff has not shown that Deputy Kruzel knowingly or recklessly included any materially false statement in the affidavit.

First, Plaintiff challenges the statement that he engaged in "noisy conduct" or "began yelling." But Plaintiff does not dispute that he turned toward Almon and said, "I don't give a fuck what you think about me."[178] Nor does he dispute that he spoke loudly enough that others in the room could hear him. Plaintiff characterizes his voice as a normal conversational voice, but that does not make Deputy Kruzel's description knowingly or recklessly false. At most, Plaintiff identifies a dispute over characterization. That is insufficient to show that Deputy Kruzel "in fact entertained serious doubts" about the truth of the statement.[179]

Second, Plaintiff challenges the statement that he caused a disturbance. But the uncontroverted facts show that Plaintiff repeatedly used profanity in the meeting room, directed profanity toward or in response to nearby attendees, and drew responses from audience members who told him to watch his language. Those facts support Deputy Kruzel's characterization that Plaintiff caused a disturbance.

---

[177] Doc. 157 at 32.

[178] Doc. 149-1 at 10 (Spiehs Dep. 36:19–22).

[179] *See Horocofsky*, 2026 WL 2130707, at *4.

Third, Plaintiff challenges the statement that he was asked to leave or refused to leave. The undisputed facts show that Sheriff Armbrister approached Plaintiff, told him to "Get out," and stated that Plaintiff was being arrested for disorderly conduct.[180]  Plaintiff did not stand up on his own.  Instead, he questioned the basis for Sheriff Armbrister's instruction, said "No" three times, and repeatedly asked "For what?"[181] before Sheriff Armbrister and Deputy Kruzel forced him up from his seat.  Thus, the affidavit's statement that Plaintiff was asked to leave or did not leave right away was not knowingly or recklessly false.

Fourth, Plaintiff challenges the statement that the meeting was delayed by his actions. Plaintiff points to the meeting minutes, which state that the meeting began at 5:30 p.m., approximately five minutes after the time Deputy Kruzel noted Plaintiff was arrested.  Thus, the statement appears to be false.  However, Deputy Kruzel testified that he believed the meeting had been delayed because the Commissioners were already present in the meeting room before Plaintiff was removed, which he understood to mean that the meeting was ready to proceed but could not do so until Plaintiff was removed.  That testimony does not show that Deputy Kruzel "in fact entertained serious doubts" about the truth of his statement.[182]  At most, it suggests negligence or inadvertence, which is insufficient to establish recklessness.[183]

Accordingly, Plaintiff's challenge to the alleged false statements fails.  The record does not show that Deputy Kruzel knowingly or recklessly included any materially false statement in the affidavit.

---

[180] Doc. 149-1 at 11 (Spiehs Dep. 37:17–24).

[181] *Id.* (Spiehs Dep. 39:17–40:4).

[182] *See Horocofsky*, 2026 WL 2130707, at *4.

[183] *See id.*

The Court next turns to Plaintiff's asserted omissions. Plaintiff contends that Deputy Kruzel omitted: (1) that the meeting had not yet begun; (2) that Plaintiff was seated and silent at the time of arrest; (3) that no Commission rule applied to pre-meeting conduct; (4) that Plaintiff made no threats; (5) that Plaintiff did not obstruct any official; (6) that Deputy Kruzel did not observe any audience reaction or know how Plaintiff's statement affected any listener; and (7) that Deputy Kruzel did not personally determine that Plaintiff committed a crime.

The record does not indicate that Deputy Kruzel omitted these facts knowingly or with reckless disregard for the truth. But even assuming he did, the omissions are immaterial because, after setting aside the allegedly false statement that the meeting was delayed by Plaintiff's actions and examining the affidavit as if the omitted information had been included, the affidavit still supports probable cause.

The affidavit states that Deputy Kruzel believed Plaintiff violated K.S.A. § 21-6203(a)(3) by engaging in "noisy conduct tending reasonably to arouse alarm, anger or resentment in others."[184] In support, the affidavit states that on April 20, 2022, Plaintiff entered the Commission meeting room holding a sign that said, "DR. SPIEHS FOR DGCO COMMISSIONER FUCK THESE LIBERAL MOTHER FUCKERS."[185] It further states that Plaintiff sat on the south end of the first row of the gallery, that Deputy Kruzel observed Plaintiff turn toward Almon, who was seated directly behind Plaintiff, and that Deputy Kruzel heard Plaintiff yell, "I don't give a fuck what you think of me!"[186]

---

[184] Doc. 149-8 at 3.

[185] *Id.* at 2 ¶ 1.

[186] *Id.*

Those facts establish probable cause to believe that Plaintiff engaged in noisy conduct tending reasonably to arouse alarm, anger, or resentment in others. Even considering the omitted facts, the affidavit still supports probable cause.

First, it is immaterial that the meeting had not yet begun, that Plaintiff was seated and silent at the time of arrest, that no Commission rule applied to pre-meeting conduct, that Plaintiff made no threats, or that Plaintiff did not obstruct any official. K.S.A. § 21-6203(a)(3) did not require an ongoing Commission meeting, a violation of a Commission rule, disruptive conduct at the precise moment of arrest, a threat, or obstruction. It required probable cause to believe that Plaintiff engaged in noisy conduct tending reasonably to arouse alarm, anger, or resentment in others.[187] As explained above, the facts stated in the affidavit supplied that probable cause.

Second, the fact that Deputy Kruzel did not observe any audience reaction to Plaintiff's conduct and did not know how Plaintiff's statement affected any particular listener is likewise immaterial. K.S.A. § 21-6203(a)(3) did not require Deputy Kruzel to know each listener's subjective reaction. Rather, the statute required noisy conduct "tending reasonably to arouse alarm, anger or resentment in others."[188] That is an objective inquiry.[189] The affidavit stated that Plaintiff turned toward Almon, who was seated directly behind him, and yelled, "I don't give a fuck what you think of me!"[190] Deputy Kruzel's alleged lack of knowledge about Almon's subjective reaction therefore does not vitiate probable cause.

---

[187] *See* K.S.A. § 21-6203(a)(3).

[188] *Id.*

[189] *City of Wichita v. Griffie*, 544 P.3d 776, 789 (Kan. 2024) (characterizing the requirement that conduct "tend[] to reasonably arouse alarm, anger, or resentment in others" as the "objective component" of a city disorderly-conduct ordinance containing language identical to K.S.A. § 21-6203(a)(3)).

[190] Doc. 149-8 at 2 ¶ 2.

Third, the fact that Deputy Kruzel omitted that he did not personally determine that Plaintiff committed a crime is immaterial. "Officers may rely on information furnished by other law enforcement officials . . . to develop probable cause for an arrest."[191] The facts also show that Deputy Kruzel was present in the room, observed Plaintiff's profanity directed at Almon, and assisted in the arrest initiated by Sheriff Armbrister. Plaintiff's assertion that Deputy Kruzel did not independently make the arrest decision therefore does not vitiate probable cause.

Thus, even without the statement about the delay and with the omitted facts included, the affidavit still would have shown that Plaintiff entered a public meeting room with a profane sign, sat directly in front of Almon, turned toward him, and loudly directed profanity at him. Under K.S.A. § 21-6203(a)(3), as the statute existed at the time, those facts were sufficient to support probable cause. Accordingly, the alleged omissions were not "significant enough to vitiate probable cause."[192]

Because Plaintiff has not shown that Deputy Kruzel knowingly or recklessly included material false statements or omitted material facts, his malicious-prosecution claim fails as a matter of law. Deputy Kruzel is therefore entitled to qualified immunity. The Officer Defendants' motion for summary judgment is granted as to Count X.

**IT IS THEREFORE ORDERED BY THE COURT** that the Commission's Motion for Summary Judgment (Doc. 145) and the Officer Defendants' Motion for Summary Judgment (Doc. 148) are **granted**. The Clerk is directed to enter judgment in favor of Defendants and terminate this action.

**IT IS SO ORDERED.**

---

[191] *Albright v. Rodriguez*, 51 F.3d 1531, 1536 (10th Cir. 1995).

[192] *Horocofsky v. City of Lawrence*, -- F.4th --, 2026 WL 2130707, at *4 (10th Cir. July 24, 2026) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1287, 1293 (10th Cir. 2004)).

Dated: August 13, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE